Appeal No. 25-1347

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

GLENWOOD SPRINGS CITIZENS' ALLIANCE,
*Plaintiff-Appellant,*

V.

U.S. DEPARTMENT OF THE INTERIOR,
U.S. BUREAU OF LAND MANAGEMENT,
*Defendant-Appellees.*

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLORADO
Case No.: 1: 24-CV-00445-GPG-RTG
District Court Judge Gordon P. Gallagher

**APPELLANT'S OPENING BRIEF**

Travis Stills
Energy & Conservation Law
227 E. 14th St., Ste 201
Durango, Colorado 81301
(970) 375-9231
stills@eclawoffice.org

Roger Flynn
Jeffrey C. Parsons
Western Mining Action Project
P.O. Box 349; 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org
jeff@wmaplaw.org

Attorneys for Appellant

March 10, 2026

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................................v

CORPORATE DISCLOSURE STATEMENT..............................................viii

GLOSSARY OF ABBREVIATIONS................................................................viii

PRIOR OR RELATED APPEALS................................................................1

STATEMENT OF JURISDICTION..............................................................1

STATEMENT OF ISSUES............................................................................2

*District Court's Duty to Consider GSCA's Cross-Motion
for Summary Judgment*...........................................................................2

*Burden on the Agency to Justify Withholding Records Under Exemption 4*..........2

*Agency Duty to Search Headquarters Offices in Washington, D.C.*....................3

STATEMENT OF THE CASE......................................................................3

A.      NATURE OF THE CASE.................................................................3

B.      STATEMENT OF FACTS .............................................................6

The Glenwood Springs Mine and the Importance of the Withheld Documents ....6

In Response to the 2018 and 2019 FOIA Requests, BLM Freely Produced the
Sales Reports, with No Assertion of "Confidentiality"
by Either the Agencies or RMI. ...........................................................11

After GSCA Sued BLM Over Its Failure to Properly Regulate the Mine
in March 2020, the Agency, and RMI, Reversed Their Positions and
Started Withholding the Same Sales Reports as "Confidential" Under
FOIA Exemption 4. ...........................................................................18

The Colorado BLM Failed to Search the Records of the Relevant
Federal Officials ...............................................................................24

C.       **COURSE OF PROCEEDINGS AND DISPOSTION BELOW**.............34

**SUMMARY OF ARGUMENT** ........................................................36

**STANDARD OF REVIEW** ...........................................................38

**ARGUMENT** ...............................................................................40

I.       **THE DISTRICT COURT ABUSED ITS DISCRETION IN REFUSING TO CONSIDER THE EVIDENCE AND LEGAL ARGUMENTS IN GSCA'S CROSS-MOTION FOR SUMMARY JUDGMENT** ...........................................................40

II.      **BLM HAS NOT MET ITS BURDEN TO JUSTIFY ITS REFUSAL TO PRODUCE THE REQUESTED RECORDS UNDER EXEMPTION 4**. ................................................................41

1.      FOIA Statutory and Caselaw Background. .................................41

2.      The Government Has Not Meet Its Burden to Justify Withholding the Same Documents It, and RMI, Customarily, Freely, and Previously Produced ...................................................................45

     a. *The withheld documents do not meet the Argus Leader test for confidentiality* ......................................................45

     b. *BLM's refusal to produce the documents is contrary to its regulations.*. ......................................................49

     c. *The Government has not shown that release of the customarily produced documents would harm a FOIA-protected interest.* ...............52

     d. *The District Court ignored the years of RMI's customary practice of freely releasing the sales reports, and failed to properly apply Argus Leader.* .........................................54

iii

**III.   BLM FAILED TO CONDUCT A REASONABLE SEARCH.** .............56

**CONCLUSION** ................................................................................................61

REQUEST FOR ORAL ARGUMENT ...............................................62
CERTIFICATE OF SERVICE ...........................................................63
CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT................63
CERTIFICATE OF DIGITAL SUBMISSION ....................................63

**GSCA ADDENDUM of STATUTES and REGULATIONS**

District Court Order on Summary Judgment, Final Judgment...GSCA_Add_001
5 U.S.C. § 552, *et seq* (FOIA) ...................................................GSCA_Add_034
28 U.S.C. §1291 ..........................................................................GSCA_Add_043
28 U.S.C. §1331 ..........................................................................GSCA_Add_043
30 U.S.C. §§21, *et seq* (Mining Law of 1872) ..........................GSCA_Add_044
30 U.S.C. §§601-604, (Materials Act of 1947) ..........................GSCA_Add_046
30 U.S.C. §611 (Common Variety Act) ......................................GSCA_Add_048

43 C.F.R. Part 2 ..........................................................................GSCA_Add_049
43 C.F.R. Part 3600 ....................................................................GSCA_Add_085
43 C.F.R. Part 3809 ....................................................................GSCA_Add_109

# TABLE OF AUTHORITIES

***Federal Caselaw***

*Anderson v. Health & Human Servs.*,
907 F.2d 936 (10th Cir. 1990) ......................................... 6, 36, 39, 42, 43, 44, 61

*Buell Cabinet Co. v. Sudduth*,
608 F.3d 406 (10th Cir. 1979) ........................................................................ 41

*Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*,
483 F.3d 1025 (10th Cir. 2007). ........................................................... 5, 38, 41

*Clean Air Council v. United States DOI*,
No. 22-2741, 2024 WL 4111047 (E.D. Pa. Sept. 6, 2024) .............................. 47

*Coastal States Gas Corp. v. Dep't of Energy*,
617 F.2d 854 (D.C. Cir. 1980) ........................................................................ 42

*Copar Pumice Co. v. Tidwell*,
603 F.3d 780 (10th Cir. 2010) .........................................................................7

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
244 F.3d 144 (D.C. Cir. 2001). ....................................................................... 45

*DeSalvo v. IRS,*
861 F.2d 1217 (10th Cir. 1988) ...................................................................... 42

*Dep't of the Air Force v. Rose*,
425 U.S. 352 (1976) ................................................................................. 38, 42

*Fogg v. IRS,*
106 F.4th 779 (8th Cir. 2024) ......................................................................... 53

*Food Mktg. Inst. v. Argus Leader Media*,
588 U.S. 427 (2019) ................................................ 2, 36, 43, 44, 46, 47, 52, 53, 54

*Friends of Animals v. Bernhardt*,
15 F.4th 1254 (10th Cir. 2021) .............................................. 41, 42, 43, 44, 45

*Friends of Blackwater v. U.S. Dept. of Interior*,
391 F.Supp.2d 115 (D.D.C. 2005) ........................................................ 56

*Glenwood Springs Citizens' Alliance v. Dept. of the Interior*,
Civ. No. 1:20-cv-00658-CNS (D. Colo.) ...................................... 11, 18

*Herrick v. Garvey*,
298 F.3d 1184 (10th Cir. 2002). ........................................................ 42

*Humane Society Intl v. U.S. Fish and Wildlife Service*,
Civ. No. 16-720 (TJK), 2021 WL 1197726 (D.D.C. March 29, 2021) ............ 45

*Info. Network for Responsible Mining v. BLM*,
611 F.Supp.2d 1178 (D. Colo. 2009) ................................................. 56

*Johnson v. United States Dep't of Justice*,
739 F.2d 1514 (10th Cir. 1984) ......................................................... 39

*Morley v. CIA,*
508 F.3d 1108 (D.C. Cir. 2007) ......................................................... 60

*Prison Legal News v. Exec. Office for United States Attys.,*
628 F.3d 1243 (10th Cir. 2011) ......................................................... 38

*Renegotiation Bd. v. Bannercraft Clothing Co.*,
415 U.S. 1 (1974) .............................................................................4

*Renewable Fuels Ass'n & Growth Energy v. EPA,*
Civ. No. 18-2031 (JEB), 2021 WL 602913 (D.D.C. Feb. 16, 2021) .......... 45, 49

*Rocky Mt. Wild, Inc. v. United States Forest Serv.*,
56 F.4th 913 (10th Cir. 2022). ......................................................... 53

*Rocky Mountain Wild v. BLM,*
455 F.Supp.3d 1005 (D. Colo. 2020) ............................... 3, 37, 56, 59

*Rocky Mt. Wild, Inc. v. United States Forest Serv.*,
138 F. Supp. 3d 1216 (D. Colo. 2015) ............................................ 58

*Sheet Metal Workers Int'l Ass'n, Local No. 9 v. United States Air Force,*
63 F.3d 994 (10th Cir. 1995) ................................................................. 39

*Trentadue v. FBI,*
572 F.3d 794 (10th Cir. 2009) ............................................................... 39

*United States Dep't of Justice v. Reporters Comm. for Freedom of Press*,
489 U.S. 749 (1989) ............................................................................... 56

*Weisberg v. U.S. Dep't of Just.*,
627 F.2d 365 (D.C. Cir. 1980) ............................................................... 60

### *Federal Statutes*

Freedom of Information Act (FOIA)
5 U.S.C. §552 ...........................................................................................1

Freedom of Information Act (FOIA)
5 U.S.C. §552(a) ............................................... 1, 3, 4, 37, 43, 53, 56

Freedom of Information Act (FOIA)
5 U.S.C. §552(b) ................................................................ 2, 42, 43

Materials Act of 1947,
30 U.S.C. §§601-604 ...............................................................................7

Mining Law of 1872
30 U.S.C. §§22, *et seq* ...........................................................................7

Surface Resources and Multiple Use Act of 1955 (Common Variety Act),
30 U.S.C. §611 .........................................................................................7

28 U.S.C. §1291 .......................................................................................1

28 U.S.C. §1331 .......................................................................................1

### *Federal Regulations*

43 C.F.R. §§2.26-2.36................................................................. 49
43 C.F.R. §2.13 ......................................................................... 52

43 C.F.R. §2.22 ................................................................ 48, 56

43 C.F.R. §2.26 ..................................................................... 49

43 C.F.R. §2.27-28 ................................................................ 49

43 C.F.R. §2.35 ..................................................................... 50

43 C.F.R. §2.68 .................................................................... 34

43 C.F.R. Part 3600 ............................................................ 8, 50

43 C.F.R. §3601.8 ............................................................ 50, 51

43 C.F.R. Part §3809 ...................................................... 7, 50, 51

43 C.F.R. §3809.101 ............................................................. 50

## *Additional Authority*

*United States v. Armstrong,*
184 IBLA 180; 2013 WL 6631451 ....................................................7

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. Rule of App. Proc. 26.1, Glenwood Springs Citizens' Alliance ("GSCA"), a non-profit organization, does not have a parent corporation nor is a publicly held corporation that owns 10% or more of their stock.

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| FOIA | Freedom of Information Act, 5 U.S.C. §552 |
| BLM | Bureau of Land Management |
| DOI | Department of the Interior |
| Agency | Refers Collectively to Appellees BLM and DOI |
| GSCA | Glenwood Springs Citizens' Alliance |
| RMI | Rocky Mountain Industrials ("RMI")(also known as RMI Aggregates, and previously known as Rocky Mountain Resources, "RMR") |
| PoO | Plan of Operations |
| CVD | Common Variety Determination |
| DCV | Determination of Common Varietiess |

## PRIOR OR RELATED APPEALS

There are no prior or related appeals.

## STATEMENT OF JURISDICTION

This case challenges the federal government's failure to produce requested agency records under the Freedom of Information Act, 5 U.S.C. §552 ("FOIA"). The District Court had jurisdiction over GSCA's complaint and FOIA requests under 5 U.S.C. §552(a)(4)(B) and 28 U.S.C. §1331.

GSCA filed its complaint on February 15, 2024, Aplt.App._V1_0006, which was amended on April 12, 2024. Aplt.App._V1_0038. Defendants' Answer was filed on April 26, 2024. Aplt.App._V1_0071. The parties briefed cross-motions for summary judgment. Aplt.App._V1_0106 (BLM Motion), Aplt.App._V2_0448 (GSCA Response), Aplt.App._V3_0728 (GSCA Cross Motion), Aplt.App._V3_0795 (Agency Combined Response/Reply), Aplt.App._V4_0849 (GSCA Reply). No oral argument or hearing was held.

The District Court issued its Order on July 28, 2025. Aplt.App._V4_1090. Final Judgment issued the same day. Aplt.App._V4_1121. Appellant GSCA timely filed its Notice of Appeal on September 5, 2025. Aplt.App._V4_1123. This Court has jurisdiction pursuant to 28 U.S.C. §1291.

>>>

<u>**STATEMENT OF ISSUES**</u>

*<u>District Court's Duty to Consider GSCA's Cross-Motion for Summary Judgment</u>*

Under F.R.C.P. 56, the District Court is required to consider and rule upon the parties' evidence and legal arguments presented in each of the cross-motions for summary judgment.

Did the District's Court's failure to address evidence or legal arguments presented with GSCA's Cross Motion (Aplt.App._V3_0728), Reply (Aplt.App._V4_0849), and Statements of Fact (Aplt.App._V2_0464-474, Aplt.App._V3_0734-748) in addressing either Rule 56 motion, thus holding that GSCA's claims were moot (Aplt.App._V4_1119), constitute an abuse of discretion and clear error?

*<u>Burden on the Agency to Justify Withholding Records Under Exemption 4</u>*

FOIA Exemption 4 allows the Agency to withhold requested records ***only*** if it has met its burden to prove that the records are "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential" and to show that disclosure would harm the interests protected by Exemption 4. 5 U.S.C. §552(b)(4).

Did the District Court err in finding (Aplt.App._V4_1117) that the government met its burden, under the Supreme Court's leading case regarding Exemption 4, *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427 (2019), when

it withheld agency records as "confidential" in response to GSCA's 2022 FOIA request, when the same company-submitted agency records were previously and freely produced by the agencies (and the company) in response to GSCA's 2018 and 2019 FOIA requests, without any redactions, and without any claim of confidentiality?

*Agency Duty to Search Headquarters Offices in Washington, D.C.*

FOIA requires federal agencies to conduct a search reasonably calculated to uncover all relevant agency records. 5 U.S.C. §§552(a)(3)(C-D). This includes the duty to "forward a FOIA request to another office if the agency knows that office has or is likely to have responsive documents." *Rocky Mountain Wild v. BLM*, 455 F.Supp.3d 1005, 1024 (D. Colo. 2020).

Did the District Court err in finding (Aplt.App._V4_1114) that the agencies' failure to conduct any search to determine whether the BLM and DOI national offices had any responsive records did not violate FOIA's reasonable search requirements?

## STATEMENT OF THE CASE

**A. NATURE OF THE CASE.**

This a case challenging the federal government's failure to produce requested agency records under FOIA. Plaintiff/Appellant GSCA submitted three FOIA requests in 2018, 2019, and 2022. Each FOIA request described and sought

prompt access to agency records from the BLM/DOI regarding the ongoing mining operations, and proposed major expansion of, a large limestone mine on federal public lands directly above Glenwood Springs, CO, known as the Mid-Continent Mine ("Mine").

In particular, in response to GSCA's 2022 FOIA request, BLM refused to provide critical agency records regarding the Mine – despite the fact that BLM had produced essentially the exact same company-submitted information in response to GSCA's 2018 and 2019 FOIA requests after the company stated there was nothing to "classify as a trade secret or as confidential." Aplt.App._V2_0410, Aplt.App._V2_0428.  BLM never offered a reason or support for this abrupt change.  Instead, BLM simply redacted (blacked-out) entire sets of documents.

FOIA provides explicit "jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. §552(a)(4)(B).  When an agency withholds records without meeting its burden to show it complied with FOIA, the Court has power to remedy the FOIA violations. *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 19-20 (1974)("FOIA imposes no limits on courts' equitable powers in enforcing its terms.").

In addition, staff personnel at the Colorado BLM unilaterally determined not to search BLM/DOI headquarters offices in Washington, D.C., despite the direct

4

involvement of various headquarters officials in BLM/DOI's review of the Mine, violating FOIA's mandate on agencies to conduct a thorough search of all applicable offices.

In ruling on the parties' cross-motions for summary judgment, the District Court did not address countervailing documentary evidence presented with GSCA's Response and Cross Motion (Aplt.App._V2_0486-727) or GSCA's Reply (Aplt.App._V4_0875-1089) in addressing either Rule 56 motion. In addition, "the Court d[id] not specifically address Plaintiff's Statement of Undisputed Material Facts [Aplt.App._V3_0734-748) because its motion [was] denied as moot in light of granting Defendants' motion." Aplt.App._V4_1094 FN5.

Instead of addressing the evidence or argument in GSCA's Cross Motion, the District Court denied the Cross Motion as moot. Order at 30 ("Because Defendants have shown that they have complied with FOIA, the Court grants Defendants' motion and denies Plaintiff's motion as moot."). Aplt.App._V4_1119. This is clear error, as "[c]ross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007).

Taken together, the practical effect of the District Court's legal error turned FOIA's de novo review standard on its head, and prevented GSCA from having its

evidence and arguments adjudicated de novo based on standards imposed by Rule 56 and FOIA. *See Anderson v. Health & Human Servs.*, 907 F.2d 936, 941-42 (10th Cir. 1990)(district court, and appellate court, conduct de novo review of whether agency has met its burden to withhold documents).

Regardless, however, of the District Court's clear error and abuse of discretion in failing to consider and rule upon GSCA's cross-motion for summary judgment, due to the significant public interest in the Mine and the withheld documents, **GSCA requests that this Court exercise its *de novo* authority to rule upon GSCA's FOIA claims and require the government to provide the requested records and conduct the proper search**. *Id.*

## B. STATEMENT OF FACTS.

The Glenwood Springs Mine and the Importance of the Withheld Documents

The Mine operates on BLM-managed federal public land immediately above the City of Glenwood Springs. Aplt.App._V4_0915.[1] It covers a large blasted and excavated area, as well as a processing plant, and various access and internal roads. BLM initially authorized mining operations based on a mining Plan of Operations ("PoO") submitted by a previous owner and approved by BLM in 1982 (slightly

---

[1] The background facts regarding the mine are drawn from the Common Variety Determination (Aplt.App._V4_0886-1084) prepared by BLM Headquarters and other non-Colorado personnel. Aplt.App._V4_0886.

amended in 1989).  The current owner and operator of the Mine, RMI, purchased the Mine in October 2016 and has been conducting operations since then based on that 1982/89 authorization.

The 1982/89 authorization to mine the federal public lands was for only "locatable" ("hardrock") minerals governed under the 1872 Mining Law, 30 U.S.C. §§22 *et seq*.  The 1982/89 PoO approval never authorized the mining of "common variety" minerals, which are governed by completely different regulatory regimes under the 1947 Materials Act, 30 U.S.C. §§601-604, and the 1955 Common Varieties Act, 30 U.S.C. §611.  BLM's review and approval was done pursuant to BLM's locatable/hardrock minerals regulations at 43 C.F.R. Part 3809, which do not allow the removal/sale of minerals from federal public lands when such minerals are to be used for common variety purposes.

Minerals sold for common construction and similar uses, such as for road base, rip-rap, and general fill, as is the case here, are considered "common variety" minerals, not authorized by the 1872 Law or the 1982/89 approval. *See Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 785-86 (10th Cir. 2010).  "[I]t is the end use of the [mineral] that is determinative of whether the mineral is uncommon and thus locatable." *United States v. Armstrong*, 184 IBLA [Interior Board of Land Appeals] 180, 196 (2013), 2013 WL 6631451, **13.  Under federal mining and public land laws, RMI may not mine, remove, or sell "common variety" minerals

on federal public lands, without specific approval for such mining/removal/sale under BLM's common variety regulations. *See* 43 C.F.R. Part 3600.

Despite the years of growing evidence before BLM, showing that RMI mined/sold common variety rock since 2016, BLM continued to allow RMI to conduct mining operations unabated and without subjecting such operations to the proper regulatory controls. GSCA first became aware of the serious problems at the Mine when RMI announced its proposal in 2018 to expand the Mine from its current roughly 15 permitted acres to over 400 permitted acres.

In order to inform its members and the Glenwood Springs community of the Mine's operations, and BLM's oversight of the Mine, including the critical issues surrounding RMI's mining of common variety minerals in violation of federal mining laws, GSCA filed the three FOIA requests which are the subject of this lawsuit. Aplt.App._V1_0191 (2018 Request), Aplt.App._V1_0280 (2019 Request), Aplt.App._V2_0308 (2022 Request). Based on GSCA's investigations, and due in part to documents obtained from BLM in response to GSCA's FOIA requests in 2018 and 2019, it became clear that RMI was mining and selling large tonnages of limestone for common variety uses in violation of the 1982/89 PoO approval and federal law.

As BLM became aware, from at least 2012, of the mounting evidence that the Mine was producing and selling minerals for road base, rip-rap, fill, and other

common variety end uses, BLM questioned whether the original 1982/89 PoO approval was still valid.  For example, in an October 19, 2012 letter to CalX Minerals (the previous owner), BLM required that "CalX will supply the BLM with monthly sales information" to show whether the removed/sold minerals were not being used for common variety purposes. Aplt.App._V2_0486.  CalX continued to provide those sales reports to BLM, with no statement that these documents were confidential or subject to any exemption under FOIA. *See, e.g.,* Aplt.App._V2_0488 (CalX sales report, April 2016).

RMI purchased the Mine from CalX in October 2016.  BLM re-iterated to RMI that it was required to provide monthly sales reports.  "CalX was required to provide monthly scale tickets to this office.  As the new operator of the Mid-Continent Quarry, and having assumed all liabilities and responsibilities under the existing Plan of Operations, please provide the scale tickets from Oct. 12, 2016 (the date of the sale) to Oct 31, 2016 at your earliest convenience.  RMR Aggregates will be required to provide the scale tickets for each coming month as well." Aplt.App._V2_0493 (BLM November 1, 2016 email to RMR).

These scale tickets, or sales reports, consist mainly of daily listings of the rock type, tonnage, price, buyer/user and other information detailing the mineral sales from the Mine.  Since November, 2016, RMI supplied this information to BLM without **any** indication that it should be considered confidential.

Aplt.App._V2_0410, Aplt.App._V2_0428 (emails to BLM stating requests did not involve information the company would "classify as a trade secret or as confidential."). It is these sales reports that GSCA requested in the 2018, 2019, and 2022 FOIA requests, which BLM provided unredacted until March 2020. *Id*.

Under public scrutiny, BLM recognized that its records contained mounting and undisputable evidence that RMI was selling the minerals for common variety end uses. Confronted with this information, BLM required that RMI could no longer mine and sell these materials unless it established an "escrow agreement" with BLM where the fair market value of the proceeds of these common variety sales were placed in an escrow account. "[O]n March 21, 2019, BLM sent a letter to RMR stating it will allow operations that are currently authorized to continue, provided that you first establish an escrow account in a form acceptable to BLM and make payments for the in-place value of the materials removed." Aplt.App._V1_0078 (Answer)(admitting Aplt.App._V1_0044, Am.Compl. ¶33). The BLM/RMI Escrow Agreement was finalized and "entered into" on September 25, 2019. Aplt.App._V2_0495 (Escrow Agreement).

In March of 2020, due to BLM's continued failure to properly regulate the Mine under federal public land and mining laws, GSCA filed suit in the District of Colorado. After almost 4 years of litigation, the Interior Department issued a decision in January of 2025 prohibiting mining of common variety limestone at the

site.  As the District Court here noted: "Plaintiff also filed a case directly challenging various actions related to the Mine that has been dismissed as effectively moot in view of final agency action barring further mining of certain materials without legal compliance." Aplt.App._V4_1091 (Order at FN1), citing *Glenwood Springs Citizens' Alliance v. U.S. Dep't of the Interior*, 1:20-cv-00658-CNS, ECF No. 70 (D. Colo. Jan.14, 2025).

Despite this agency decision in January of 2025 and dismissal of GSCA's direct challenge to the mining activities, *id*., RMI still holds its federal mining claims at the site, and may revise/resubmit its expansion plans at any time, which has garnered significant public, media, and local government interest.  GSCA continues to rely on FOIA and government records to carry out its non-profit conservation and public information mission. https://loveglenwood.org/news/ (visited March 5, 2026).

<u>In Response to the 2018 and 2019 FOIA Requests, BLM Freely Produced the Sales Reports, with No Assertion of "Confidentiality" by Either the Agencies or RMI.</u>

From October, 2016 onward, RMI submitted to BLM, each month, the reports, or scale tickets ("sales reports"), of its sales of minerals from the Mine. These sales reports contain information detailing the tonnage/quantity, purchaser/user, date, and price, of each sale from the Mine during that month.

Aplt.App._V1_0077-78 (BLM Answer ¶31) admitting Aplt.App._V1_0044

(Am.Compl. ¶31).[2]

In response to GSCA's 2018 and 2019 FOIA requests (and up to March

2020 in response to GSCA's 2022 FOIA request), BLM produced to GSCA,

**without any redactions**, these sales reports/invoices.

> Defendants admit that Plaintiff's 2018 FOIA request sought all documents
> related to the Mine. **Defendants further admit that in response to the
> 2018 FOIA request Defendants provided spreadsheets from October
> 2016 until June 2018 that included information regarding RMI's sales
> and tonnages of minerals removed and sold from the site.** Defendants
> further admit that the three spreadsheets produced from October 2018 [sic,
> 2017] include over 350 entries with the phrases 'Roadbase' and 'Backfill.'

*Id*. (emphasis added) *accord* Aplt.App._V2_0506-514 (example sales sheets

obtained via FOIA).

The BLM/RMI Escrow Agreement requires that "on a monthly basis,

Operator shall prepare and deliver to the BLM Colorado River Valley Field Office

a report describing the quantity of Minerals excavated and removed from the

Subject Lands during the preceding month. … Operator shall pay into the Escrow a

sum of money equal to the appraised values listed in Exhibit B (subject to

paragraph # below) multiplied by the number of tons Operator removed from the

---

[2] Related admissions at Answer ¶36 (Aplt.App._V1_0079), Answer ¶121
(Aplt.App._V1_0094).

Subject Lands in the preceding calendar month." Aplt.App._V2_0496 (Escrow Agreement ¶4).

The Escrow Agreement contains no mention that the submitted monthly reports are to be considered confidential by any person. *Id.* Despite BLM's and RMI's new post-2022 assertion that sales price information is now confidential, the Escrow Agreement itself specifies the price/ton of the "Mid-Continent Quarry Fair Market Values" for "Crushed Limestone," "Rip Rap," "Limestone Boulders," and "Crusher Fines." Aplt.App._V2_0500.

In response to the 2019 FOIA request, BLM also produced agency records, like it had in response to GSCA's 2018 FOIA, that included additional monthly reports of RMI's sales and end uses, as required by the Escrow Agreement. Aplt.App._V1_0079 (Answer ¶36), admittingAplt.App._V1_0045 (Am.Compl. ¶36)("Defendants admit that, in response to Plaintiff's 2019 FOIA Request, BLM produced responsive agency records, and that like the response to the 2018 FOIA Request, BLM provided monthly reports of RMI's sales and end uses.").

"Defendants admit the 2022 FOIA Request sought 'the same records … as described [in the 2018 FOIA Request]. . . from the November 8, 2019, FOIA request date until the present day.' **Defendants further admit BLM previously provided Plaintiff RMI's sales invoices in an unredacted form.**"

Aplt.App._V1_0055 (Answer ¶90)(emphasis added), Aplt.App._V1_0055 (Am.Compl. ¶90).

In response to GSCA's 2019 FOIA request, BLM produced the Escrow Agreement. Aplt.App._V2_0495-500 (September 2019 Escrow Agreement). BLM also produced responsive agency records, like it had in response to GSCA's 2018 FOIA, that included additional monthly reports of RMI's sales and end uses, as required by the Escrow Agreement. These reports and other agency records show that RMI continued to mine and sell rock for common variety construction and similar uses.

Notably, the Escrow Agreement did not contain any statement that RMI's submittals were "confidential" or protected from disclosure under FOIA. For example, as shown in the unredacted Escrow Account spreadsheets/report provided by BLM, in November 2018 alone, RMI made over 90 deliveries of common rock to local construction firms for common variety uses such as "rip-rap." Aplt.App._V2_0501-503 (November 2018 Escrow Account spreadsheet)(note: different colors/shading signify BLM's determination as to whether the materials were used for common variety purposes such as rip-rap).

The same occurred the following month, where RMI made over 80 deliveries of rock for construction purposes: "Defendants admit that BLM provided Plaintiff sales spreadsheets in response to its FOIA requests, including a

November 2019 and a December 2019 spreadsheet. Defendants further admit that the November 2019 spreadsheet includes entries for 'rip rap,' and the December 2019 spreadsheet includes entries for 'roadbase.'". Aplt.App._V1_0079 (Answer ¶37). BLM's Escrow Account financial summary spreadsheet also shows amounts and sales prices for various limestone products from October 2016 through December 2019. Aplt.App._V2_0504 (BLM Calculations Summary Table, Oct. 2016 – Dec. 2019).

In response to GSCA's 2022 FOIA request, BLM provided the same RMI monthly sales reports, as well as BLM's corresponding calculations for the required Escrow Account payments up to February, 2020. Aplt.App._V2_0505 ("RMR Mid-Continent Quarry Monthly Tons and Escrow Value" for February 2020).

"BLM also previously provided to GSCA under FOIA detailed lists and information regarding each RMI Mine sale, including the date, purchaser, products sold, quantity, cost and overall value. *See* 'RMR Mid-Continent Quarry Monthly Tons and Escrow Value,' for various months between September 2019 and February 2020 (attached to GSCA appeal)." Aplt.App._V1_0060 (Am.Compl. ¶122), Aplt.App._V1_0094 (admitted by Answer ¶122).

Thus, the unredacted monthly sales reports/spreadsheets provided to GSCA in response to the 2018 and 2019 FOIA requests list the tonnages, sale price,

buyer/end user, and sale date, among other information – the same information requested in the 2022 FOIA but abruptly withheld after March 2020. *Id.*[3]

At no time did RMI inform or instruct BLM that its submittals of the monthly sales reports from October 2016 until February 2020 were confidential or in any way protected from disclosure.  In fact, GSCA provided uncontroverted evidence with its cross-motion briefing showing RMI informed BLM that there was nothing to "classify as a trade secret or as confidential" and that the information and could be released without restriction. Aplt.App._V2_0410, 428 (emails between RMI and BLM).  As just one example that is repeated each month, in its submittal of the October, 2017 sales tickets/report discussed above, the company merely said: "Attached is October's report." Aplt.App._V2_0506 (November 20, 2017 email from RMI to BLM), Aplt.App._V2_0508-513 (October 2017 sales report).

BLM's declarant and Colorado FOIA Officer, Laura Garcia-Hinojosa, testified that, despite her inquiries regarding the 2018 FOIA request, RMI did not considered the relevant sales reports to be "confidential" or exempted from FOIA disclosure.

---

[3] BLM did withhold some "confidential commercial and financial information from a small number of documents in response to the 2019 Request, including RMI bank account numbers and URLs for RMI's private document sharing platforms." Aplt.App._V1_0177 (Garcia-Hinojosa Decl., ¶93 et seq.).  GSCA does not argue that this information must be disclosed.

> On August 13, 2019, I sent a letter to Bobby Wagner, the Vice President of Operations at RMI, attaching documents that the BLM identified as responsive to the 2018 Request, but that RMI may consider confidential and covered by exemption 4. See Att. N, Aug. 13, 2019, Letter from BLM to RMI. **I requested that if RMI "wish[es] to object to the release of this information, the regulations require [RMI] to provide a written statement setting forth the specific and detailed justification for withholding any portion."** *Id*.
>
> "On August 29, 2019, Mr. Wagner responded via email stating **"[w]e did not see anything contained [in the provided documents] that we would classify as trade secret or as confidential."** Att. O, Aug. 29, 2019, Email from RMI to BLM.

Aplt.App._V1_0174 (Garcia-Hinojosa Decl. ¶¶83-84)(emphasis added). BLM then provided all of the sales reports to GSCA without any redactions.

The same was true for the sales reports provided to GSCA in response to the 2019 FOIA request, as BLM on multiple occasions asked RMI if the sales reports were confidential or subject to any FOIA exemption. As BLM's FOIA Officer testified:

> "On September 15, 2020, I emailed Mr. Wagner regarding the March 2020 letter. See Att. S, Sept. 15, 2020, Email from BLM to RMI. I wrote "I believe you left me a voicemail in March stating that you did not see anything contained within the documents that would classify as a trade secret or as confidential. I am just verifying that this is correct." Id. **Mr. Wagner responded that he "did not see anything contained within the documents that would classify as a trade secret or as confidential in that request."** Id.

Aplt.App._V1_0175 (Garcia-Hinojosa Decl. ¶89)(emphasis added). Mr. Wagner, RMI's Vice-President, confirmed these communications, and that the company did not believe that the sales reports provided to GSCA in response to the 2018 and

2019 FOIAs were confidential or subject to any FOIA exemption.

Aplt.App._V2_0393-397 (Wagner Decl., ¶¶13-32).

Faced with BLM's continued approval of the mining and sale of common variety minerals from public lands without proper authorization, GSCA filed litigation in this District challenging BLM's actions and inactions. *Glenwood Springs Citizens' Alliance v. Dept. of the Interior*, Civ. No. 1:20-cv-00658-CNS (D. Colo.)(March 10, 2020). The Board of County Commissioners for Garfield County successfully intervened as plaintiff in the case, raising issues similar to GSCA.

After GSCA Sued BLM Over Its Failure to Properly Regulate the Mine in March 2020, the Agency, and RMI, Reversed Their Positions and Started Withholding the Same Sales Reports as "Confidential" Under FOIA Exemption 4.

After GSCA sued BLM over its failure to properly regulate the Mine in March of 2022, BLM changed its FOIA position and thereafter completely redacted all of the sales reports. It was not until February 15, 2023, when RMI first informed BLM that the sales reports responsive to GSCA's 2022 FOIA request were "confidential and should not be released to the public." Aplt.App._V2_0397-398 (Wagner Decl. ¶34). RMI took this new position only after BLM asked the company in 2023 to assert privilege, for as shown above, RMI had not previously requested, or designated, these same reports as confidential. Aplt.App._V1_0177-178 (Garcia-Hinojosa Decl. ¶¶96-97);

Aplt.App._V2_0397-401 (Wagner Decl. ¶¶33-34, ¶¶41-47), Aplt.App._V2_0410, 428 (RMI emails stating "I did not see anything contained within the documents that would classify as a trade secret or as confidential in the [2018 or 2019 FOIA] request.").

In response to GSCA's 2022 FOIA request, BLM refused to provide critical agency records regarding the Mine starting in March of 2020 – despite the fact that BLM had produced essentially the exact same company-submitted information in response to GSCA's 2018 and 2019 FOIA requests.[4] This undisputed material fact was established in the pleadings.

> Defendants admit that in response to the 2022 FOIA Request BLM withheld information regarding RMI's sales invoices under Exemption Four. Defendants further admit BLM had previously produced RMI's sales invoices in response to the 2018 and 2019 FOIA requests.

Aplt.App._V1_0094 (Answer ¶¶117) *Id*. ¶121 ("in response to the 2018 and 2019 FOIA Requests, BLM provided RMR/RMI's sales report/receipts and spreadsheets"), *see also,* Aplt.App._V1_0059-61 (Am. Compl. ¶¶113-127); Aplt.App._V1_0094 (Answer ¶¶113-127).

---

[4] In an attempt to obtain the latest agency records, GSCA filed another FOIA request to BLM/DOI in September, 2025, asking for the same sales reports/invoices (among other documents). Like it did in response to the 2022 FOIA, the government again refused to produce the documents, blacking-out all information with no explanation. On November 21, 2025, GSCA filed an appeal with the Interior Department in Washington, D.C., regarding these FOIA violations, but has to date received no response.

BLM never offered a reason or support for this abrupt change. BLM simply redacted (blacked-out) entire sets of documents responsive to the 2022 FOIA Request according to RMI's request in 2023. *See* Aplt.App._V1_0232-258 (*Vaughn* Index, Entries 301-598). GSCA was thus obligated to file formal appeal in 2023, as it had done in 2020 and 2021, to DOI's FOIA Office in Washington, detailing how BLM/DOI's withholdings and blanket redactions violated FOIA. Aplt.App._V1_0072 (Answer ¶9-11)("Defendants admit Plaintiff filed formal appeals in 2020, 2021, and 2023 to the DOI's FOIA Office in Washington, D.C."). GSCA never received a response to these administrative appeals. *Id*.

In response to GSCA's 2022 FOIA, BLM first began asserting RMI's newly minted confidentiality assertion as the basis to redact all of the monthly sales reports from March of 2020, and continued to redact all information in the subsequent sales reports. *See* Aplt.App._V1_0232-258 (*Vaughn* Index, entries 301-598 cover the 2022 Request). "[I]n response to the 2022 Request, a number of documents were withheld in full or in part as protected from disclosure by exemption 4. The information redacted from these documents pursuant to this exemption consists overwhelmingly of: (1) RMI's scale tickets and escrow account information that contains customer level data, pricing, and order quantity information." Aplt.App._V1_0179 (Garcia-Hinojosa Decl. ¶100). BLM listed

20

these redacted sales reports as BLM docs: USA_BLM_00027654, 27655, 27902, 27903, 28133, 28339, 28340, 34594-34656, 34862, 36304-37165. *Id*.

As part of GSCA's (unanswered) FOIA appeals to the Interior Department, and as set out above in more detail, GSCA provided the district court with specific evidence of RMI's custom and practice of providing the public with detailed evidence showing the type of materials sold from the Mine, the customers and end users of the mined products, and the price of the minerals. Aplt.App._V2_0514 (RMI Document: "2018 Rocky Mountain Resources – Mid Continent Quarry Price Sheet," showing that RMI was selling: "Road Base," "Structural Fill," "Rip Rap," "Screened Rock," and various types of "Boulders."). This evidence was also provided in support of GSCA's summary judgment response and cross motion. *See* Aplt.App._V2_0453, 731 (Table of Exhibits), Aplt.App._V3_0758-761 (Cross Motion)(requesting summary judgment relief on withholdings, by cross motion filed separately from response to BLM's summary judgment motion, as required by GPG Civ. Practice Standards 7.1A (5-6), 7.1D).

Long-after BLM's arbitrary and new-found "confidentiality" cut-off of March 2020, RMI customarily advertised details regarding its products. For example, in August 2022, RMI distributed to local construction firms and the public a Sales Flyer, entitled "Mid-Continent Quary, August [2022] Focus: Rip Rap Product Offering," identifying the types of rocks/materials offered for sale.

Aplt.App._V2_0514 (RMI flyer listing "Road Base," "Crushed Rock," "Rip Rap," "Structural Fill," and "Boulders").

Thus, the company routinely, customarily and publicly identified the types of rocks/materials produced and sold at the Mine and subject to the Escrow Agreement – information BLM now asserts is "confidential" and cannot be disclosed under Exemption 4.

As further proof that its sales information was not treated as confidential, RMI stated in its court filing in its lawsuit against Garfield County challenging the County's regulation of the Mine, that it was selling rock from the Mine for local construction projects. RMI admitted that "rocks purchased from RMR" have been "used in the reconstruction of the City's Grand Avenue Bridge." Aplt.App._V2_0517 (RMI Response in Opposition to City's Motion to Intervene, Case Number: 2019CV30087). RMI boasted that the Bridge "may not have been possible but for the availability of material purchased from RMR by City contractors within 2 miles of the project site." *Id*. at n. 1.

Thus, regarding the purchasers of these sales, withheld by BLM since March of 2020, RMI previously and voluntarily released their names to the public. As another example, RMI stated in its 10-K Report to the federal Securities and Exchange Commission, at 1 (For the fiscal year ended March 31, 2019): "The operation currently serves Arch Coal, Hickman Farms, local construction firms,

22

and various city and county government construction projects."

Aplt.App._V2_0534.[5] RMI's recent 10-K report for 2023 similarly states that:

"The operation currently serves Arch Resources, local construction firms, and

various city and county government construction projects." Aplt.App._V2_0536.[6]

BLM now relies on a declaration stating that "This information was withheld

because RMI provided this commercial and financial information to the BLM with

an implied assurance that it would be kept confidential and the BLM understood

this to be information RMI kept private." Aplt.App._V1_0177 (Garcia-Hinojosa

Decl. ¶93).

Yet the record contains no "implied assurance" from BLM to RMI to

support BLM's new-found "implied assurance of confidentiality" theory first

found in its staff declarations in response to this litigation. Aplt.App._V1_0173-4,

199 (Garcia-Hinojosa Decl. ¶80, ¶93). The contradiction between Garcia-

Hinojosa's hearsay testimony regarding "implied assurance" and the BLM

admissions and GSCA's documentary evidence is made crystal clear in BLM's

response to GSCA's 2018 FOIA request, where BLM provided all of RMI's sales

---

[5]Excerpt from:
https://www.sec.gov/Archives/edgar/data/1556179/000110465920000861/tm1920
806-1_10k.htm#b_003 .
[6]Excerpt from:
https://www.sec.gov/ix?doc=/Archives/edgar/data/1556179/000155837023010951/
rmri-20230331x10k.htm .

reports from October 2016 to mid-2018, showing the number/date of sales, type of material (e.g. "roadbase"), sales price, purchaser, and quantity of the minerals removed and sold from the site. *See, e.g.*, Aplt.App._V2_0488-494 (RMI November 2016 sales report).

<u>The Colorado BLM Failed to Search the Records of the Relevant Federal Officials</u>

Defendants admit that a search of BLM headquarters would identify responsive agency records. Aplt.App._V1_0165 (Garcia-Hinojosa Decl. ¶47) (assuming communications with BLM Headquarters and other offices "would have been captured by the searches conducted by the Colorado State Office custodians"). The declaration speculates, with no admissible evidence, that all responsive agency records created or obtained by BLM Headquarters and unspecified "other offices" would be found in Colorado's files. *Id*. The declaration identifies no person from BLM headquarters that was involved in designing any of the searches for responsive records. The declaration is based entirely on information gained from persons in BLM's Colorado Offices. Aplt.App._V1_0164-165 (Garcia-Hinojosa Decl. ¶¶47, 50).

GSCA's cross motion relies on extensive documentary evidence establishing that Headquarters was involved. Aplt.App._V3_0734, 726-746 (Cross Motion ¶3, 19-61). Relying entirely on the Garcia-Hinojosa declaration, Defendants did not dispute that BLM's search for responsive records was limited to its Colorado

24

offices. Aplt.App._V3_0805 (BLM Response/Reply ¶9).  **"All BLM headquarters personnel were excluded from the search for responsive agency records."** Aplt.App._V3_0737 (Cross Motion ¶20)(Aplt.App._V3_0807, undisputed)(emphasis added).  Yet, Defendants admitted that a search of BLM headquarters would identify responsive agency records. *Id*. ¶21 (Aplt.App._V3_0807, undisputed).

Without conducting any searches and without any evidence from Headquarters officials, the Agency relied entirely on the Garcia-Hinojosa declaration to argue that a headquarters search is unlikely to identify "unique documents" not found in the Colorado offices. Aplt.App._V3_0807 (Response/Reply ¶21).  Headquarters personnel are not necessarily located in Washington D.C. Aplt.App._V3_0736-737 (Cross Motion ¶19), (Aplt.App._V3_0806 undisputed).

Persons assigned to Agency headquarters are identified as being involved in communications regarding the Mine so substantial that BLM foresaw potential harm if released and therefore BLM withheld information pursuant to FOIA Exemptions, including: a) BLM Acting Director William "Perry" Pendley, Aplt.App._V1_0233 (Vaughn Entry 312); b) BLM Director Tracy Stone Manning and BLM Deputy Director Nada Culver, Aplt.App._V1_0233, 242 (Vaughn Entries 311,416), c) Kirk Rentmeister, Aplt.App._V1_0212-214, 298, 230, 232,

236, 246-250 (Vaughn Entries 71, 74, 82, 102, 252, 255, 279, 296, 340, 345, 346, 408, 466, 470, 477, 484, 496, 497, 507, 524).

Additional BLM headquarters personnel, beyond those listed in the previous sentence, are listed in the *Vaughn* index as authors, senders, or recipients of withheld records. BLM Directors, their staffs, and other headquarters personnel whose files and file systems were not searched were substantially involved in substantive analysis, reviews, field visits, communications, and briefings regarding BLM oversight of the public lands and Mid-Continent Mine that were requested in the FOIA Requests. *Id*.

For example, on July 25, 2018, Greg Shoop, Acting Colorado State BLM Director, sought a meeting with BLM's headquarters in Washington D.C. to inform the BLM Director of non-compliance dating back to the 1990s regarding the controversial proposed Mine expansion. Aplt.App._V3_0577-579 (Shoop email). The referenced "Director" is the BLM Acting Director in BLM's Washington D.C. Office. *Id*. Anticipated participants in the meeting also included headquarters personnel Brian Steed, Mike Nedd, Kathleen Benedetto. Aplt.App._V3_0579. None of these four high-level BLM Washington Office headquarters officials, or their staffs, conducted a search. Aplt.App._V1_0164-165 (Garcia-Hinojosa Decl. ¶47).

A May, 2019 Briefing Memorandum confirms the likely ongoing involvement of high-level BLM/DOI officials in Washington. "This site is under an immense amount of scrutiny by the community (citizens groups, business interests and an official Resolutions by the City of Glenwood Springs opposing the proposed expansion) and several entities have already hired politically connected attorneys and consultants." Aplt.App._V3_0582 (Briefing Memo).

On June 6, 2019, Jamie Connell, BLM Colorado State Director, sent a memorandum to the Assistant Secretary of Lands and Minerals in Washington D.C. with the subject: "Answers to specific questions related to the mid-Continent Quarry." Aplt.App._V2_0548 (Connell Memorandum). The contents were redacted with a reference to the deliberative process privilege. *Id*.

On June 7, 2019, Colorado Associate State Director Greg Shoop sent agency records to eleven BLM personnel supplementing the briefing materials he thought "may be useful or of interest to folks back there." Aplt.App._V2_0544 (Shoop email to headquarters). The phrase "folks back there" refers to BLM headquarters in Washington D.C. Mr. Shoop left it to the recipients to decide whether to "forward up the lines, or hold in reserve." *Id*. The Shoop email was also sent to numerous agency headquarters personnel. *Id*.

During 2020, BLM headquarters remained involved at the highest levels. On February 20, 2020, Acting BLM Director Pendley was directly notified about

concerns raised by Congressman Tipton's Office regarding the Mid-Continent Quarry. Aplt.App._V3_0627 (email string).

Significant information was redacted from an April 20, 2020 email involving headquarters personnel. Aplt.App._V1_0233 (Vaughn Entry 312). An April 29, 2020 email string following up on the April 20, 2020 email included headquarters personnel, including Acting Director Pendley, Nicholas Douglas, Amand Kaster, Michael Nedd, Jamie Connell, Mitchell Leverette, Travis Annatoyn, all of whom are headquarters personnel with extensive staff support. The email was partially redacted. Aplt.App._V3_0573-5 (email string). The final version of the communication decision attached to the email was redacted in full. *Id.* Aplt.App._V1_0233 (Vaughn Entry 313) citing Aplt.App._V3_0631-635. The files of Acting Director Pendley and other headquarters personnel were never searched.

In 2021-2022, the BLM Washington Office remained directly involved with non-compliance issues and expansion proposals at the Mine. In late 2021, Deputy Director Nada Culver was making Colorado-specific public remarks and exchanging emails regarding the proposal with local businesses with serious concerns about the non-compliance and expansion proposal on Glenwood Springs' notable hot springs, the local environment, and the local economy. Aplt.App._V3_0701-702 (September 2021 Email String). BLM Headquarters "put

together bureau wide talking points" that coordinated with Colorado talking points for the Mid-continent Quarry. Aplt.App._V3_0701.

BLM Director Stone-Manning sent an email with "Mid-continent Quarry" in the subject line. Aplt.App._V3_0708 (6/4/2022 BLM Director). The BLM Director's email was, addressed to Headquarters personnel. *Id*. ("To: Connolly, Stephanie A sconnolly@blm.gov Cc: Culver, Nada L <nculver@blm.gov>; Annatoyn, Travis J <travis.annatoyn@sol.doi.gov>").

BLM Acting Director Pendley and later BLM Director Stone-Manning were directly involved with BLM's attorneys in reviewing and drafting letters sent to RMI. Aplt.App._V3_0708 (Entries 311-312). BLM redacted the letters, which contained "proposals for review," asserting attorney/client and deliberative process privilege. *Id*. The unspecified headquarters personnel involved with drafting these letters did not conduct a search for agency records responsive to any of the three FOIA Requests.

BLM Director Stone Manning and Deputy Director Culver were involved in an email string on June 4, 2022 involving the subject matter of the FOIA Requests. Aplt.App._V3_0708 (Director email). A June 4, 2022 email from Stone-Manning confirms that the BLM Director and other headquarters personnel were directly involved in the subject matter of the FOIA Requests. Aplt.App._V3_233, 242 (Vaughn Entries 311, 416). The BLM Director wrote, "It's my understanding from

29

the city of Glenwood Springs that the Mid-continent Quary has noncompliance issues and has for a while, so I asked SOL to look at what we had done previously." Aplt.App._V3_0708 (6/4/2022 Director email). No search of the SOL (shorthand for DOI Solicitors Office) was conducted for any of the FOIA Requests.

BLM headquarters communicated directly with RMI regarding the subject matter of the FOIA request. Aplt.App._V3_0712 (8/23/2022 BLM HQ letter at USA_BLM_00033246-48)("Subject: Re: RMI/DCV Letter from HQ to RMI"). "DCV" is an acronym sometimes used by BLM for Determination of Common Varieties. DCV and CVD are search terms that, if used in a systematic search of BLM personnel, including headquarters' personnel and recordkeeping systems, would likely identify responsive agency records created or obtained by BLM that have not been produced.

Regarding the Mine, BLM headquarters established in 2018 a Common Variety Determination Team ("CVD Team") to address noncompliance at mines such as the Mid-Contentment Mine. Aplt.App._V3_0723 (email string). Kirk N. Rentmeister is the National Mining Law Program Lead, Mid-Continent Quarry CVD Team. Aplt.App._V3_0721. Mr. Rentmeister was not listed as a person involved in the search for responsive records. The CVD Team carried out its duties at the direction of and with significant participation of BLM Headquarters

staff, including Mr. Rentmeister. The existence and composition of the CVD Team is not disclosed by BLM's proffers, but is revealed by via obvious leads in the responsive agency records, including those provided below. These leads were not followed out by the unnamed BLM personnel who designed and carried out the search.

Like many BLM headquarters staff that are not located in Washington, Mr. Rentmeister worked out of BLM offices in western states. Aplt.App._V3_0715-716 (2019 Cost Determinations). Mr. Rentmeister's "regular working location" was Ogden Utah. Aplt.App._V3_0718. At all times relevant to the FOIA Requests, Mr. Rentmeister carried out his work with the CVD Team as a headquarters employee. *See e.g.* Aplt.App._V3_0721 (November 2019 emails email from Kirk N. Rentmeister, National Mining Law Program Lead, Geologist, CME HQ 320).

Agency records confirm that BLM headquarters, led by Mr. Rentmeister, played a significant and substantive role in the CVD Team as technical advisor to Colorado and headquarters personnel. Aplt.App._V3_0722 (5/15/2029 email approving CVD Team request for Colorado BLM signature).

Beginning in at least 2018, the CVD Team used a Sharepoint Library to store and exchange agency records responsive to the FOIA Requests. Aplt.App._V3_0723 (October 2018 email string). Yet. BLM has not identified any

searches of the Sharepoint Library or any other file system that BLM used to maintain and share agency records involving the Mine.

"The mineral examination team led by Kirk Rentmeister and Rebecca Fincham, concluded their first visit to the property on May 3 2019." Aplt.App._V3_0726 (5/15/2029 Sandoval Letter). Specific activities of Kirk Rentmeister, and other mineral specialists from outside Colorado BLM are identified in BLM letters and emails released in response to the FOIA Requests. Kirk Rentmeister and Rebecca Fincham and other persons who conducted CVD investigation and analysis are not listed in BLM's proffers as persons who conducted a search.

The Common Variety Determination (Aplt.App._V4_0886-1085) was prepared and issued by Headquarters personnel in various locations based on investigations that began in 2018. Aplt.App._V4_0889-891. The final CVD determination was merely acknowledged by Colorado personnel on January 12, 2024. Aplt.App._V4_0886.

The Garcia-Hinojosa declaration fails to acknowledge that BLM headquarters staff, headquarters mineral specialists, the CVD Team, and at least two BLM Directors, were directly and substantially involved with the subject matter of the FOIA Requests during the period covered by each of the three FOIA Requests. BLM never provided evidence to establish that BLM's headquarters did

not create or obtain agency records when directly involved and carrying out their oversight of Colorado BLM's handling of the Mine's controversial non-compliance and expansion proposals addressed by the FOIA Requests.

Garcia-Hinojosa's declaration conflates BLM's response to three FOIA requests and provides BLM's only account in the judicial record of BLM's FOIA search and BLM's withholding decisions. No contemporaneous evidence was offered for any BLM decisions regarding three FOIA Requests filed in 2018, 2019, and 2022. The Garcia-Hinojosa declaration is based, in part, on her "review of the official BLM FOIA files and records of the BLM FOIA Program" that were prepared by other BLM employees. Aplt.App._V1_0146 (Garcia- Hinojosa Decl. ¶4).

BLM did not proffer or disclose the official files that contain the contemporaneous written accounts prepared by BLM personnel for the purpose of designing and documenting the FOIA searches. Files created or obtained by the agency in response to FOIA requests must be maintained by the Action Office or the Bureau FOIA Officer under the appropriate records schedule. 43 C.F.R. §2.68(a). For the Action Office or Bureau FOIA Officer in charge of the FOIA Requests to meet Defendants FOIA duties, an official file was created and maintained on each of GSCA's requests received that includes, among other things, 1) a copy of the incoming request and the bureau's response; 2) a clean

copy of all the responsive record; 3) a detailed account of every record or part of it disclosed to a requester (or a copy of the records disclosed), with any redactions marked, records concerning the status of the request; 4) follow-up correspondence with the requester; 5) any time extensions taken; and 6) communications inside the Department or with other federal agencies concerning the FOIA request. Aplt.App._V3_0665 (FOIA Handbook at 28).

The official BLM file for each of the three FOIA Requests and files of persons who designed and conducted the search and withholding decisions, not the Garcia-Hinojosa declaration, contains the official documentation and contemporaneous documentary evidence of the steps BLM took to respond to the FOIA request, search for records, make and justify use of FOIA Exemptions, and the effort to ensure potentially responsive documents are not destroyed. 43 C.F.R. §2.68. Aplt.App._V3_0665 (FOIA Handbook at 28).

## C.   COURSE OF PROCEEDINGS AND DISPOSITION BELOW.

This case challenges the federal government's failure to produce requested agency records under FOIA. GSCA submitted FOIA requests in 2018, 2019, and 2022. Each request described and sought prompt access to agency records from BLM/DOI regarding the ongoing operations, and proposed major expansion of, the Mine.

In particular, in response to GSCA's 2022 FOIA request, BLM refused to provide critical agency records regarding the Mine – despite the fact that BLM had produced essentially the exact same company-submitted information in response to GSCA's 2018 and 2019 FOIA requests.  BLM never offered a reason or support for this abrupt change, as BLM simply redacted (blacked-out) entire sets of documents.  GSCA was thus obligated to file administrative appeals to DOI's FOIA Office in Washington, detailing how BLM/DOI's refusals and blanket redactions violated FOIA.  DOI never responded to these appeals.

As a result, GSCA filed its complaint on February 15, 2024. Aplt.App._V1_0006.  The Complaint was amended on April 12, 2024. Aplt.App._V1_0038.  After briefing on cross-motions for summary judgment, without oral argument or evidentiary hearing, and without considering or ruling upon GSCA's cross-motion, the District Court entered its Order on July 28, 2025, granting summary judgment to the government Defendants. Aplt.App._V4_1090. The Final Judgment was entered the same day. Aplt.App._V4_1121.  Appellant GSCA timely filed its Notice of Appeal on September 5, 2025. Aplt.App._V4_1123.

>>>

>>>

>>>

<u>**SUMMARY OF ARGUMENT**</u>

GSCA's requests are based on FOIA's basic purpose, which "is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Anderson v. Health & Human Servs.*, 907 F.2d 936, 941 (10th Cir. 1990).

The federal government violated the FOIA when it refused to produce agency documents, under a new-found assertion of "confidentiality," for the same documents that it had previously and freely provided to GSCA with no such restrictions. BLM/DOI failed to prove that the withheld sales reports and related information satisfied the heavy burden of confidentiality under the Supreme Court's leading case regarding Exemption 4. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 440 (2019)("*Argus Leader*"). BLM failed to prove that RMI "customarily kept private, or at least closely held," the sales information contained in the reports withheld by BLM. 588 U.S. at 428.[7]

For years, RMI provided this information to BLM and the public, which BLM provided to GSCA, with no assertion of confidentiality or harm to its interests. This information included daily listings of the price, tonnage/amount,

---

[7] GSCA raised additional issues below, such as the failure of BLM to produce "reasonably segregable" portions of the withheld documents. In the interests of focusing this Court's review on the fundamental issues surrounding the agency's about-face on the "confidentiality" of documents that had previously been freely provided, those other issues are not carried-forward in this appeal.

type of material, purchaser/end use, and other information.  Indeed, RMI even bragged about the customers it was selling its rocks to, and the common variety end uses (such as for local and County construction projects).  RMI freely and customarily submitted this information without any assertion of confidentiality, following its practice for its submittal of the sales reports from 2016 into 2020.

But after GSCA sued BLM over its lax oversight of the Mine in March 2020, all of these previously-produced non-confidential documents suddenly became "confidential" exempted from FOIA disclosure.  Yet BLM provides no rebuttal to uncontested facts that the same sales information/documents were customarily and repeatedly provided —for years—to the agency, and the public, by the company, without any assertion of confidentiality and without any redactions.

Regarding its search of its offices for the requested records, the government improperly failed to search the Washington, DC offices of the BLM and Interior Department, despite GSCA's specific request that it do so in the 2018, 2019, and 2022 FOIA requests.  FOIA requires federal agencies to conduct a search reasonably calculated to uncover all relevant agency records. 5 U.S.C. §§552(a)(3)(C-D).  BLM "must forward a FOIA request to another office if the agency knows that office has or is likely to have responsive documents." *Rocky Mountain Wild v. BLM*, 455 F.Supp.3d 1005, 1024 (D. Colo. 2020).

Regarding the District Court's summary judgment ruling, it improperly denied GSCA's cross motion as moot, based only on the government's evidence, without considering GSCA's arguments or evidence. The District Court abused its discretion by ignoring all of GSCA's summary judgment evidence. "Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007).

Despite the prejudicial harm caused by the District Court's clear error, due to the public's continued significant interest in receiving the withheld documents, GSCA requests that this Court exercise its de novo authority to rule on GSCA's claims on the merits.

## STANDARD OF REVIEW

"Congress enacted FOIA to 'open agency action to the light of public scrutiny.'" *Prison Legal News v. Exec. Office for United States Attys.*, 628 F.3d 1243, 1247 (10th Cir. 2011) quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)(quotation omitted). "To promote government accountability, 'disclosure, not secrecy, is the dominant objective of the Act.'" *Id*.

Appellate review of summary judgment and other legal determinations in FOIA cases is *de novo*. The court "review[s] the government's refusal to release

requested information de novo, reading the act broadly in favor of disclosure and construing its exemptions narrowly." *Anderson,* 907 F.2d at 941-942.

"Where the district court has granted summary judgment in favor of the government agency, we must review de novo the district court's legal conclusions that the requested materials are covered by the relevant FOIA exemptions." *Anderson,* at 942 (citing *Johnson v. United States Dep't of Justice*, 739 F.2d 1514, 1517 (10th Cir. 1984)). This Court "reviews de novo any legal determinations made by the district court, once we have assured ourselves that the district court 'had an adequate factual basis upon which to base its decision.'" *Sheet Metal Workers Int'l Ass'n, Local No. 9 v. United States Air Force*, 63 F.3d 994, 997 (10th Cir. 1995) quoting *Anderson*, at 942. "A district court abuses its discretion where it commits a legal error or relies on clearly erroneous factual findings, or where there is no rational basis in the evidence for its ruling." *Trentadue v. FBI*, 572 F.3d 794, 806 (10th Cir. 2009)(internal quotation marks omitted).

>>>

>>>

>>>

>>>

<u>**ARGUMENT**</u>

**I.   THE DISTRICT COURT ABUSED ITS DISCRETION IN REFUSING TO CONSIDER THE EVIDENCE AND LEGAL ARGUMENTS IN GSCA'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Without considering GSCA's arguments or evidence, the District Court denied GSCA's cross motion as moot after granting the government's summary judgment motion. Aplt.App._V4_1094 (Order, FN2)(GSCA's cross "motion will be denied as moot in light of granting Defendants' motion").

Instead of addressing GSCA's Rule 56 evidence or argument in the GSCA Response (Aplt_App._V2_0448-485), in granting BLM's Rule 56 motion, the District Court drew "the operative facts as set forth from Defendants' Movant's Statement of Undisputed Facts [Aplt.App._V1_0107-126]." Aplt.App._V4_1094. Similarly, in resolving GSCA's cross motion, the District Court did not address the evidence or legal arguments presented with GSCA's Cross Motion (Aplt.App._V2_0448-485) or Cross Motion Reply (Aplt.App._V4_0849-874). Aplt.App._V4_1094 (Order, FN2)("The [District] Court d[id] not specifically address Plaintiff's Statement of Undisputed Material Facts [Aplt.App._V3_0734-0748 because its motion [was] denied as moot in light of granting Defendants' motion.").

The Court held that the Cross Motion was moot based on a granting the BLM Motion based entirely on facts asserted in the government's Rule 56 motion.

ECF 33 at 30 ("Because Defendants have shown that they have complied with FOIA, the Court grants Defendants' motion and denies Plaintiff's motion as moot."). This holding is clear legal error.

It is well established that, "[c]ross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007)(quoting *Buell Cabinet Co. v. Sudduth,* 608 F.3d 406, 433 (10th Cir. 1979)). Summarily disposing of GSCA's cross motion as moot is thus contrary to controlling authority.

However, due to the significant community and public interest in the withheld documents, related to mining operations just above Glenwood Springs, in addition to acknowledging the District Court's errors, GSCA requests that this Court utilize its *de novo* authority to rule on the merits of GSCA's claims, and order the agencies to produce the illegally-withheld documents and conduct a proper search of their offices.

## II. BLM HAS NOT MET ITS BURDEN TO JUSTIFY ITS REFUSAL TO PRODUCE THE REQUESTED RECORDS UNDER EXEMPTION 4.

1. FOIA Statutory and Caselaw Background.

"Congress enacted FOIA to promote public access to federal agency records and information upon request." *Friends of Animals v. Bernhardt*, 15 F.4th 1254,

41

1260 (10th Cir. 2021). "It is [the agency's] burden to justify the nondisclosure" of agency records responsive to a written FOIA request. *Id. citing Herrick v. Garvey*, 298 F.3d 1184, 1190 (10th Cir. 2002). When there is a dispute over whether the agency met its FOIA burdens, FOIA requires that the district court review the decisions de novo. *DeSalvo v. IRS*, 861 F.2d 1217, 1221-22 (10th Cir. 1988); 5 U.S.C. §552(a)(4)(B). The agency may avoid disclosure only if it proves that the requested documents fall within one of the nine enumerated exemptions to the overarching disclosure requirement. 5 U.S.C. §552(b)(1)-(9).

"These exemptions are exclusive and we construe them narrowly." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976). "As such, they do not displace FOIA's dominant objective of disclosure." *Friends of Animals*, 15 F.4th at 1260. BLM cannot meet its burden of proving the requested documents fall within FOIA's exemptions by making conclusory and generalized allegations of confidentiality. *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 861 (D.C. Cir. 1980)("conclusory assertions of privilege will not suffice to carry the Government's burden of proof in defending FOIA cases.").

Agency affidavits that "merely parrot" the FOIA's language or provide conclusions without explanation do not meet the agency burden. *Anderson*, 907 F.2d at 942. "The district court must determine whether all of the requested materials fall within an exemption to the FOIA and may not simply conclude that

an entire file or body of information is protected without consideration of the component parts." *Id*. at 941.

FOIA provides the court with explicit "jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. §552(a)(4)(B).  When an agency withholds agency records without meeting its burden to show it met its FOIA duties, the Court has power to remedy the FOIA violations. *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 19-20 (1974)("The FOIA imposes no limits on courts' equitable powers in enforcing its terms.").

Exemption 4 permits, if justified, federal agencies to withhold "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. §552(b)(4).  "To receive protection under Exemption 4, information, if not a trade secret, must be: '(a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential.' *Anderson*, 907 F.2d at 944 (quotation omitted)." *Friends of Animals*, 15 F.4th at 1270-71.  "If the agency … does not have evidence to satisfy the first factor for confidentiality, we need not address the second." *Id*. at 1271 (finding agency failed to justify withholding information under Exemption 4).

The standard for withholding pursuant to Exemption 4 was recently realigned by the U.S. Supreme Court to conform with the statutory text. *Argus*

*Leader*, 588 U.S. at 440.  Where, as here, there are no "trade secrets," there is a three-element test that must be met for Exemption 4 to apply.  The "information, […] must be: '(a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential.'" *Friends of Animals v. Bernhardt*, 15 F.4th 1254, 1271 (10th Cir. 2021) quoting *Anderson*, 907 F.2d at 944 (quotation omitted).  This case does not involve the first two elements.

The "confidentiality" exemption is strictly construed, and is only satisfied when the government's evidence proves that the "information is both customarily **and** actually treated as private by its owner **and** provided to the government under an assurance of privacy." *Argus Leader*, 588 U.S. at 440 (emphasis added).  The Court must also assess the harm to the purposes of Exemption 4 to determine whether to uphold agency decision to withhold the information.

Here, the agencies do not claim that the information in the withheld/redacted sales reports and Escrow documents beginning in March of 2020 is a "trade secret," but rather that withheld information obtained from RMI is "confidential" under Exemption 4.  "The Supreme Court has identified two factors for testing whether information is 'confidential': (1) whether it 'is customarily kept private, or at least closely held, by the person imparting it'; and (2) whether 'the party receiving it provides some assurance that it will remain secret.'" *Friends of Animals*, at 1271 quoting *Argus Leader*, 588 U.S. at 428.  The government must

meet **both** tests to justify non-disclosure: "Because we conclude that FWS does not have evidence to satisfy the first factor for confidentiality, we need not address the second." *Friends of Animals,* at 1271.

The "heart of the [confidentiality] test" asks whether the Defendants can prove the third-party objectors customarily and actually treat the information at issue as private and never disclosed. *Renewable Fuels Ass'n & Growth Energy v. EPA*, Civ. No. 18-2031 (JEB), 2021 WL 602913, *6 (D.D.C. Feb. 16, 2021). When assessing a third-party's claim of confidentiality under Exemption 4, "the court will consider how the particular party customarily treats the information, not how the industry as a whole treats the information." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 148 (D.C. Cir. 2001). *See also Humane Society Intl v. U.S. Fish and Wildlife Service*, Civ. No. 16-720 (TJK), 2021 WL 1197726, * 3 (D.D.C. March 29, 2021)(same).

2.    <u>The Government Has Not Meet Its Burden to Justify Withholding the Same Documents It, and RMI, Customarily, Freely, and Previously Produced.</u>

    a.  *The withheld documents do not meet the <u>Argus Leader</u> test for confidentiality.*

The government failed to prove that the withheld sales reports/invoices and escrow information satisfied the strict conditions for confidentiality under *Argus Leader*. At the outset, as detailed above, RMI freely, for years, customarily submitted this information for public review, without any assertion of

confidentiality, following its practice of providing sales reports/invoices from 2016 into 2020.  This was true even when BLM specifically inquired whether any of the reports/invoices were in any way private, giving the company the opportunity to mark the documents as confidential.

Under *Argus Leader*, BLM failed to prove that RMI "customarily kept private, or at least closely held," the sales information contained in the reports withheld by BLM. 588 U.S. at 428.  **"[I]t is hard to see how information could be deemed confidential if its owner shares it freely."** *Id*. at 434 (emphasis added).

As detailed above, it is undisputed that RMI regularly provided this information to BLM for years, with no assertion of confidentiality or harm to its interests.  This included daily listings of the price, tonnage/amount, type of material, purchaser/end use, and other information.  Indeed, as noted, RMI even bragged to the public about the customers it was selling its rocks to, and the common variety end uses (such as for local and County construction projects).

There is no evidence proving the "practices of the information owner" to establish and maintain confidentiality.  As one recent decision held:

> [I]n determining whether the information is "customarily" or "actually" treated as private, this Court will review the practices of the information owner by considering the following factors, as relevant: (1) whether the information owner restricts access to the records to certain personnel; (2) whether any restrictive markings are applied to the documents; (3) whether

the information is protected using secure technology systems or password protection; and (4) whether the information owner requires confidentiality agreements to access the information.

*Clean Air Council v. United States DOI*, No. 22-2741, 2024 WL 4111047, *9 (E.D. Pa. Sept. 6, 2024)(citations omitted).

GSCA does not seek information that may truly be confidential in this case, such as RMI's bank account numbers, associated with the sales reports. Instead, GSCA simply asks that the information regarding what was being mined from the federal public lands and freely submitted to BLM and the public up to February 2020 (with no assertion of confidentiality) be provided to GSCA.

BLM also failed to prove that the requested information in the sales/invoices/escrow reports was submitted by RMI under "some assurance [by BLM] that it will remain secret." *Argus Leader*, 588 U.S. at 428. As shown above, from October 2016 through February 2020, BLM never even implied, let alone stated to RMI, that the monthly sales reports would be kept confidential. Indeed, the company expressly told BLM, when BLM informed it in response to the 2018 and 2019 FOIAs, that the information was not confidential. The same was true for the 2022 FOIA, as BLM never provided such assurances.

BLM relies on RMI's late-arriving conclusory statement, with no practices identified. Aplt.App._V1_0135-136 (BLM Motion). Despite the countervailing-evidence, the declaration asserts that "RMI takes every reasonable precaution to

protect its customer list, customer-specific pricing, and purchase information from the public and its competitors." Aplt.App._V2_0400 (Wagner Decl. ¶45). That bare assertion does not square with the uncontested evidence and BLM admission that that RMI customarily provided this information to the public and BLM, for years. Aplt.App._V1_0094 (Answer ¶¶117, 121, 123)(Defendants "admit BLM had previously produced RMI's sales invoices in response to the 2018 and 2019 FOIA requests."). *Id*. ¶117.

As shown above, until 2023, RMI never asserted that the information contained in the nearly identical 2016-2020 sales reports and Escrow reports were confidential, and freely provided that information to BLM for public review—and even then it only asserted that the same information after March 2020 was, in its view, now confidential in light of the 2022 FOIA request.

It was only after GSCA sued BLM in March of 2020 did RMI begin to claim confidentiality, and even then only after being prompted by BLM in 2023 while preparing its overdue determination on the 2022 FOIA request. BLM never explains its about-face to hold that the same information that was not confidential from 2016 to February 2020 somehow became confidential. BLM, "not the submitter, is responsible for deciding whether the information will be released or withheld." 43 C.F.R. §2.22(b)(agency FOIA regulations).

Thus, regardless of RMI's new-found assertions of confidentiality in 2023, BLM failed to meet its heavy burden of proving that RMI "customarily and actually treat the information at issue as private and never disclosed." *Renewable Fuels Ass'n & Growth Energy*, 2021 WL 602913, \*6. BLM provides no rebuttal to uncontested fact that the sales information was customarily and repeatedly submitted—for years—to the agency, and the public, by RMI, without any assertion of confidentiality or harm, and without any redactions.

### b. *BLM's refusal to produce the documents is contrary to its regulations.*

In addition, BLM/DOI's refusal to provide the documents is not supported by its own regulations regarding documents submitted by permit applicants. DOI/BLM FOIA regulations contain specific duties that apply when potentially confidential information is submitted by a third party. 43 C.F.R. §2.26-2.36 ("Subpart F"). The rules allow "submitters to designate confidential information" that may be protected by Exemption 4 "at the time of submission or reasonably soon thereafter." 43 C.F.R. §2.26(a). BLM then confers with the submitter, as to whether the information may be confidential. 43 C.F.R. §§2.27-2.28.

Here, BLM is withholding agency records that RMI did not designate as confidential "at the time of submission or reasonably soon thereafter." 43 C.F.R. §2.26(a). RMI's and BLM's new-found expressions of confidentiality cannot create facts and statements that did not exist when the sales reports were submitted.

Subpart F also requires BLM to notify GSCA (the FOIA requester) of any notice and opportunity that BLM provides to the submitter. 43 C.F.R. §2.35. BLM did not provide GSCA with the emails/letters exchanged between RMI and BLM in response to the 2018, 2019, and 2022 FOIA requests until only after litigation began, after being requested by GSCA's litigation counsel, and prompted by Magistrate Judge Neureiter. "Defendants admit that for the three FOIA requests Defendants never sent Plaintiff any notice or information pursuant to Subpart F." Aplt.App._V1_0097 (Answer ¶136).

BLM also argues, and only after litigation began, that under its "common variety" mining regulations, "Part 3600 provides that if the company asserts the information is confidential, as RMI did here, then the BLM will maintain the information as confidential. See 43 C.F.R. § 3601.8." Aplt.App._V1_0135 (BLM Motion). This is both factually and legally wrong.

First, Part 3600 governs the mining of common variety "mineral materials," not the "hardrock" mineral regulations at 43 C.F.R. Part 3809, under which BLM regulated the mine. Section 3809.101 is the regulatory provision which governs the Escrow Agreement, and BLM refused to apply the common variety rules to the Mine, as it allowed RMI to operate as a "locatable/hardrock" mineral under the 3809 regulations since 1982.

The District Court erroneously applied the confidentiality of the Part 3600 rules, believing that they "applied to the mining," and thus "this regulation provided a basis for RMI to believe the submissions would be treated as confidential." Aplt.App._V4_1117 (Order FN13).  But, BLM never applied the Part 3600 regulations to the mine until January 2025, and consistently regulated the mine under its "hardrock" rules at 43 C.F.R. Part 3809.  Thus, the government cannot manufacture a reason for withholding documents under a regulatory regime it never applied to the Mine until years later.

Second, even if Part 3600 applied to the operations and the September 2019 Escrow Agreement, BLM released the sales reports and Escrow calculations from before September 2019 through February 2020, with no assertion by BLM or RMI that the information in these documents were confidential. *See, e.g.*, Aplt.App._V2_0505 ("RMR Mid-Continent Quarry Monthly Tons and Escrow Value" for February 2020).

Even then, BLM's quoted provision, 43 C.F.R §3601.8, states that any confidentiality protections only apply if RMI met its obligation to "clearly mark each page that you believe includes confidential information." §3601.8(b).  As

GSCA's evidence shows, RMI never did that when it submitted its sales reports/escrow information.[8]

Here, "confidentiality" cannot be established where RMI customarily and actually **never** treated the withheld information (other than banking account information which GSCA does not request) as confidential.  These materials were freely provided by RMI to BLM (and then provided by BLM to GSCA).

    c. *The Government has not shown that release of the customarily produced documents would harm a FOIA-protected interest.*

Regarding the purported "harm" from release of the sales/escrow reports, BLM asserts competitive harm: "If the scale tickets and escrow account data were disclosed, RMI would be harmed because competitors would know its customer-specific pricing and could negotiate lower prices to take business from RMI." BLM brief/motion, Aplt.App._V1_0122 (BLM Motion ¶71) citing Aplt.App._V2_0401 (Wagner Decl. ¶47).  But reliance on the "competitive harm" to the submitter as a reason to withhold agency documents was rejected by the Supreme Court in *Argus Leader*.  "Finding at least this 'competitive harm'

---

[8] BLM also misleading states that it "will maintain the information as confidential." Aplt.App._V1_0135-136 citing 43 C.F.R. § 3601.8.  But that regulation only says that "BLM will keep all data and information confidential to the extent allowed by § 2.13(c) of this title." *Id*.  In other words, BLM is under no obligation to withhold the documents unless it justifies the withholding under FOIA, which it has not shown here.

requirement inconsistent with the terms of the statute, we reverse." 588 U.S. at 430.

Instead, in addition to failing to substantiate its refusal to release the sales/escrow reports, the Agency failed to show that release would harm the Agency's ability to regulate the Mine and fulfill its duties under federal public land law. "Congress amended FOIA in 2016 to allow an agency to withhold information only if the agency 'reasonably foresees that disclosure would harm an interest protected by an exemption.' 5 U.S.C §552(a)(8)(A)(i)." *Rocky Mt. Wild, Inc. v. United States Forest Serv.*, 56 F.4th 913, 929 (10th Cir. 2022). "This showing requires more than just an expectation of a risk, but an actual expectation of harm. As the D.C. Circuit explained, 'the foreseeability requirement means that agencies must concretely explain how disclosure 'would'—not 'could'—adversely impair [an exemption's protected interest]." *Fogg v. IRS*, 106 F.4th 779, 788-89 (8th Cir. 2024)(citations omitted).

BLM has not met this duty, as it failed to prove how release of the same sales/escrow documents that RMI freely provided, and which BLM provided to GSCA for years, without any adverse impact on its operations, suddenly became "harmful" in March 2020.

>>>

>>>

*d. The District Court ignored the years of RMI's customary practice of freely releasing the sales reports, and failed to properly apply <u>Argus Leader</u>.*

The District Court, relying on BLM and RMI's new-found and changed assertions of confidentiality, held that "RMI customarily and actually treated the information contained in the sales reports and related escrow information as private. It also shows that it had an assurance of privacy in the materials." Aplt.App._V4_1117 (Order) see also *Id*. FN13 citing 42 C.F.R. § 3600. But that explanation contradicts the record evidence, which shows that RMI (and BLM), for years, never "customarily and actually" treated the sales information as confidential. Indeed it "customarily and actuality," and repeatedly, provided the information to the public, to the BLM, and in court filings, with no claim of confidentiality.

The District Court improperly relied on pre-*Argus Leader* cases from other Circuits as grounds to support RMI and BLM's about face. Aplt.App._V4_1117. Although it is true that "past disclosures" do not automatically render future documents non-confidential, under *Argus Leader*, the question is whether RMI "customarily and actually" treated the information as private – which necessarily looks to the past as evidence of such "custom" and practice. Here, the evidence is undisputed, that the sales reports, invoices, customers, and other sales information were freely provided for years, with no assertions of confidentiality or harm by RMI or BLM.

There is nothing in the record to legitimize the sudden change in treatment from readily freely-disclosed to confidential, especially in light of the District Court's disregard of GSCA's countervailing evidence. This dramatic change can only be explained by the increased public scrutiny of RMI's operations, and litigation against BLM/DOI officials for continuing to allow RMI to conduct mining operations of common variety limestones based on the 1872 Mining Act, contrary to the interests of the public, local governments, and GSCA in the lawsuits involving this Mine. *See* Aplt.App._V2_0516 (1/27/2020 RMI Opposition to City of Glenwood Springs Intervention Motion, *RMR v. Garfield County Commissioners*, 2019CV30087 (Garfield County District Court), Aplt.App._V4_0875 (9/16/2024 BLM Motion to Dismiss Reply Brief, *GSCA v. Dept of the Interior*, 20-cv-00658-CNS (D.Colo)).

Public access to this information is exactly the purpose of FOIA, as BLM/DOI's production of RMI's sales reports/invoices involving the sale and end use of the limestone mined from federal lands was critical to GSCA's effort to convince DOI in 2025 to correct longstanding BLM and RMI noncompliance with federal mining laws, based on the final DCV that issued in 2024. Aplt.App._V4_0886-1084. The sale and use information that was withheld beginning in 2022 remains critical to GSCA's efforts to ensure federal public lands are afforded the protections required by federal laws.

## III. BLM FAILED TO CONDUCT A REASONABLE SEARCH.

FOIA requires federal agencies to conduct a search reasonably calculated to uncover all relevant agency records. 5 U.S.C. §§552(a)(3)(C-D). Courts conduct de novo review to determine whether the agency's search was reasonable. *United States Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989). Agency affidavits may be used to meet the agency burden to demonstrate a reasonable search, but affidavits may be overcome by the FOIA requester's proffer of "countervailing evidence or apparent inconsistency of proof." *Trentadue*, 572 F.3d at 807.

Courts must assess information known to the agency or learned during the search, to determine whether the agency "must forward a FOIA request to another office if the agency knows that office has or is likely to have responsive documents." *Rocky Mountain Wild v. BLM*, 455 F.Supp.3d 1005, 1024 (D. Colo. 2020), quoting *Friends of Blackwater v. U.S. Dept. of Interior*, 391 F.Supp.2d 115, 121 (D.D.C. 2005)(quoting 43 C.F.R. § 2.22(a)(1)).

BLM's search is unreasonable where BLM made no "effort to determine whether BLM personnel in any other office, such as […] BLM's national office, participated in the agency's decision-making […] thus may have responsive records in their control or possession." *Information Network for Responsible Mining v. BLM*, 611 F. Supp. 2d 1178, 1185 (D. Colo. 2009)(declaration with

"conclusory terms and without any accompanying detail or explanation" failed to "meet the agency's burden of demonstrating a search reasonably calculated to locate all responsive documents.").

BLM admits that it did not search the Washington, DC offices of the BLM and Interior Department based on the Declaration of Garcia-Hinojosa, stating that the internal searches in Colorado "did not contain records or communications which would tend to indicate that a non-Colorado BLM official was substantially involved in matter." Aplt.App._V1_0157, 164-5 (Garcia-Hinojosa Decl. ¶39, 47) (requests to seek "all BLM records related to the mine."). BLM offered no other evidence that these Washington officials were not "substantially involved in [the] matter." *Id*. Nor did BLM provide support for its conclusory decision to limit its search to only Colorado BLM officials who were "substantially involved in the matter." *Id*.

Instead of conducting de novo review, the District Court erred by basing its findings exclusively on BLM's declarations. Aplt.App._V4_1095-96, 1098-1102 (Order). Yet, BLM offered no support from headquarters personnel for its position that its FOIA staff in Colorado could have unilaterally determined the extent of Washington officials' involvement in legal determinations about the mining and sale of common minerals, as well as public discussions about the proposed

expansions, all of which garnered significant public interest and media coverage, as well as direct involvement by high-ranking BLM/DOI officials.

The bare notion that "that all relevant communications would have gone through" a bottleneck ensuring identification via a narrowed search has been squarely rejected by Judge Wiley Y. Daniel. *Rocky Mt. Wild, Inc. v. United States Forest Serv.*, 138 F. Supp. 3d 1216, 1218 (D. Colo. 2015). Judge Daniel's opinion reflects a careful analysis of a de novo record, and a fact-specific assessment supporting the holding that the agency did not "make the proper effort to determine whether personnel in its various offices participated in the agency's decision making regarding the Wolf Creek Project, or whether they may have had responsive records in their control or possession." *Id*. at 1223. Here, the District Court made no such findings, and instead of considering GSCA's countervailing documentary evidence (Aplt.App._V2_0538-726), erroneously relied entirely on the agency declaration to uphold the search. *Trentadue*, 572 F.3d 794, 807.

Although not considered by the District Court, and as detailed above, GSCA's proffers detail how the BLM/DOI headquarters offices were directly involved in critical decision-making on the Mine, refuting BLM's statement that these officials were not "substantially involved in [the] matter." *See e.g.*, Aplt.App._0734, 736-47 (Cross-Motion Statement of Facts ¶¶ 2-3,19-65), Aplt.App._V4_0868-72 (Reply). As such, because these offices "has [have] or is

likely to have responsive documents," the Colorado BLM was required to ensure thorough search of the headquarters offices was conducted for any responsive records. *Rocky Mountain Wild*, 455 F.Supp.3d at 1024.  This aspect of GSCA's case was not reached, as the District Court held the cross motion was moot. Aplt.App._V4_1119.

Countervailing evidence confirms headquarters personnel, including at least two BLM Directors, a Deputy Director, and numerous headquarters-assigned mineral management personnel were substantially involved beginning in 2018 when significant noncompliance was brought to the BLM Director's attention. Aplt.App._V3_0734,744  (GSCA Cross-Motion) ¶2, 51.  Numerous headquarters personnel were involved under the leadership of Director Tracy Stone-Manning, including the Director herself. Aplt.App._V3_0742-743 (GSCA Cross Motion at ¶¶ 39-41, 47).

The District Court also erred by upholding ad hoc searches that were not based on a method articulated by the agency. Aplt.App._V4_1114 (Order).  The District Court relied entirely on a post hoc description that conflated several ad hoc searches that were carried out for the 2018, 2019, and 2022 FOIA requests. Aplt.App._V4_1098-1102 (Order).  Instead of requiring evidence of a search methodology that corresponded to each FOIA Request, the District Court deferred to an agency approach that "provided the custodians a copy of the Requests and

instructed them to search all of their electronic and paper files

[Aplt.App._V1_0110 ¶ 16).” *Id*. at 9.  The District Court accepted the assertion

that “custodians themselves were best-positioned to know” where to search and

what search parameters to use. Aplt.App._V4_1099.

But the agency declarations fail to describe a systematic approach to the

search, fail to identify the specific files searched, and are insufficiently detailed to

permit summary judgment for the agency. *Weisberg v. U.S. Dep't of Just.*, 627 F.2d

365, 371 (D.C. Cir. 1980)(a declaration that fails to “denote which files were

searched or by whom, . . . reflect any systematic approach to document location, . .

. [or] provide information specific enough to enable [a plaintiff] to challenge the

procedures utilized” is insufficient).  The District Court erred by finding the

general descriptions of multiple individual searches was reasonable, based on the

meager search terms and date parameters, and without identifying specific

information establishing a systematic approach and without identifying which

specific files were searched. Aplt.App._V4_1099-1102.

“[E]ven if the protected records could be withheld under one of the FOIA

exemptions, that does not absolve the [agency] of its duty to identify responsive

documents, claim the relevant exemptions in the *Vaughn* index, and explain its

reasoning for withholding the documents in its affidavit.” *Morley v. CIA*, 508 F.3d

1108, 1120 (D.C. Cir. 2007)(invalidating search).

Courts must conduct de novo review to "determine whether all of the requested materials fall within an exemption to the FOIA and may not simply conclude that an entire file or body of information is protected without consideration of the component parts." *Anderson*, 907 F.2d, 941. In short, a search of headquarters was avoided by impermissibly assuming a FOIA exemption would allow complete withholding of all headquarters records identified by a reasonable search. Aplt.App._V4_1114 (Order).

Thus, the Agency improperly failed to search its Washington, DC offices, despite the overwhelming evidence showing the direct involvement of these officials in the review and regulation of the Mine – the subject of GSCA's specific FOIA requests in 2018, 2019, and 2022.

## CONCLUSION

Based on this Court's de novo review authority under FOIA, GSCA respectfully requests the Court to reverse the District Court's decision, and enter an order directing that BLM release all responsive records being withheld pursuant to Exemption 4, except RMI's bank account and drill hole data as discussed above, and direct BLM and DOI to conduct a proper search of its offices for additional records.

**RESPECTFULLY SUBMITTED THIS 10th Day of March, 2026**

/s/Travis E. Stills
Travis E. Stills
Energy & Conservation Law
227 E. 14th St., Ste 201
Durango, Colorado 81301
(970) 375-9231
stills@eclawoffice.org

Roger Flynn
Jeffery C. Parsons
Western Mining Action Project
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5728
roger@wmaplaw.org
jeff@wmaplaw.org

## <u>REQUEST FOR ORAL ARGUMENT</u>

Oral argument is warranted because this case concerns important issues regarding public disclosure of Federal agency records used to manage federal public lands. This appeal raises important statutory interpretation issues concerning the Freedom of Information Act under the controlling Supreme Court decision in *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427 (2019), as well as additional issues that have not been addressed by reported Tenth Circuit opinions.

**CERTIFICATE OF SERVICE**

I hereby certify that on March 10, 2026, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

I hereby certify that with respect to the foregoing:

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(g) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,932 words, as determined using the word count feature of Microsoft Word.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Bitdefender Internet Security, and according to the program are free of viruses.

**Certified on March 10, 2026**

*s/Travis E. Stills*
Travis E. Stills
Energy & Conservation Law
227 E. 14th St., Ste 201
Durango, Colorado 81301
(970) 375-9231
stills@eclawoffice.org

## GSCA ADDENDUM of STATUTES and REGULATIONS

District Court Order on Summary Judgment, Final Judgment ....GSCA_Add_001
5 U.S.C. § 552, *et seq* (FOIA) ....................................................GSCA_Add_034
28 U.S.C. §1291 ..........................................................................GSCA_Add_043
28 U.S.C. §1331 ..........................................................................GSCA_Add_043
30 U.S.C. §§21, *et seq* (Mining Law of 1872) .........................GSCA_Add_044
30 U.S.C. §§601-604, (Materials Act of 1947) ........................GSCA_Add_046
30 U.S.C. §611 (Common Variety Act) ....................................GSCA_Add_048

43 C.F.R. Part 2 ..........................................................................GSCA_Add_049
43 C.F.R. Part 3600 ....................................................................GSCA_Add_085
43 C.F.R. Part 3809 ....................................................................GSCA_Add_109

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Civil Action No. 24-cv-00445-GPG-RTG

GLENWOOD SPRINGS CITIZENS' ALLIANCE,

    Plaintiff,

v.

U.S. DEPARTMENT OF THE INTERIOR and
U.S. BUREAU OF LAND MANAGEMENT,

    Defendants.

---

## ORDER

---

Before the Court are Defendants' Motion for Summary Judgment (D. 25), filed by Defendants United States Department of the Interior (DOI) and Bureau of Land Management (BLM), and Plaintiff's Cross Motion for Summary Judgment (D. 27), filed by Plaintiff Glenwood Springs Citizens' Alliance (GSCA).  The Court GRANTS Defendants' motion and DENIES Plaintiff's motion for the following reasons.

### I.  BACKGROUND

Plaintiff, a wildlife and land conservation group, alleges that Defendants violated the Freedom of Information Act (FOIA), 5 U.S.C. § 552, et seq., by improperly responding to

1

Plaintiff's FOIA requests for documents related to the mid-Continent Quarry (Mine) near Glenwood Springs, Colorado.[1]

### A. The Court's Practice Standards for Summary Judgment Motions

To assist with the resolution of motions for summary judgment under Federal Rule of Civil Procedure 56, this District's Local Rules require that a "motion under Fed. R. Civ. P. 56 for summary judgment or partial summary judgment shall include a statement of undisputed facts." D.C.COLO.LCivR 56.1(a).

The Court, along with five other District Judges, have adopted a set of Uniform Practice Standards that include procedures specific to how the parties must create the statement of undisputed facts and respond. *See* GPG Civ. Practice Standard 7.1D—Motions for Summary Judgment Pursuant to Fed. R. Civ. P. 56. Although others have elected to depart from the uniform rules, this Court uses the default procedures for summary judgment, including those that apply to resolution of factual disputes. The relevant subsection provides:

> (b) Due to the voluminous factual materials often submitted with Rule 56 motions, all such motions must comply with the following:
>
> (1) In a section of the brief required by D.C.COLO.LCivR 56.1(a) styled "Statement of Undisputed Material Facts," the movant shall set forth in simple, declarative sentences, separately numbered and paragraphed, each material fact that the movant believes is not in dispute and that supports the movant's claim that movant is entitled to judgment as a matter of law.
>
> (2) Each material fact must be accompanied by a specific reference to material in the record that establishes that fact. General references

---

[1] Plaintiff also filed a case directly challenging various actions related to the Mine that has been dismissed as effectively moot in view of final agency action barring further mining of certain materials without legal compliance. *See Glenwood Springs Citizens' Alliance v. U.S. Dep't of the Interior*, 1:20-cv-00658-CNS, ECF No. 70 (D. Colo. Jan 14, 2025).

GSCA_Add_002

to pleadings, depositions, or documents are insufficient if the document is more than one page in length.

(3) A general reference is sufficient only if the nature of the material fact does not permit a specific reference (e.g., "The contract contains no provision for termination.").

(4) Any party opposing the motion for summary judgment shall, in a section of the brief styled "Response to Statement of Undisputed Material Facts," admit or deny the movant's asserted material facts. The admission or denial shall be made in separate correspondingly numbered paragraphs. Any denial shall be accompanied by a brief factual explanation of the reason(s) for the denial and a specific reference to material in the record supporting the denial.

(5) If the party opposing the motion believes that there are additional disputed questions of fact that have not been adequately addressed in the submissions made pursuant to subsection (4) above (e.g., disputed facts concerning an affirmative defense), the party shall, in a separate section of the brief styled "Statement of Additional Disputed Facts," set forth in simple, declarative sentences, separately numbered and paragraphed, each additional, material disputed fact that undercuts the movant's claim that it is entitled to judgment as a matter of law. Each such fact shall be accompanied by a specific reference to material in the record establishing the fact or demonstrating that it is disputed.

GPG Civ. Practice Standard 7.1D(b).

This procedure helps to clarify and increase the accuracy of the determinations of what facts are undisputed under Rule 56. The utility of such procedures is apparent from their ubiquity. Similar, if not identical, procedures are used by other judges in this District who have not adopted the Uniform Practice Standards. *See* Philip A. Brimmer Civil Practice Standard III.F.3.b (imposing similar requirements); Daniel D. Domenico Civil Practice Standard III.E.1 (same); William J. Martínez Practice Standard III.F.3 (same). Many other districts and sister courts throughout the country have adopted similar procedures, either through the local rules or the practice standards. *E.g.*, Central Dist. Cali. L.R. 56-1 (requiring a "Statement of Uncontroverted

3

Facts" wherein "Each such fact must be numbered and must be supported by pinpoint citations (including page and line numbers, if available) to evidence in the record").

Although such procedures are quite common, particularly within this District, they are still often overlooked or not complied with by litigants. *See* William J. Martínez Practice Standard at cover page (nothing the summary judgment procedures among those "Commonly Overlooked"). This is unfortunate, because such procedures are grounded in and consistent with the requirements of Rule 56 regarding how factual positions are supported and addressed. The relevant subsection of Rule 56 provides:

> (c) Procedures.
>
> (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> (2) Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> (3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.
>
> (4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

4

Fed. R. Civ. P. 56(c). Rule 56 also provides the relevant sanctions for failure to properly support or address factual assertions in the context of a motion for summary judgment.

> (e) Failing to Properly Support or Address a Fact. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

Because the Court's practice standards "give an opportunity to properly support or address" any fact, the Court will generally ignore assertions of fact that that are improperly supported and, when a fact is not properly addressed, "consider the fact undisputed for purposes of the motion." *Id*.; *see also United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Here, the Court draws the operative facts as set forth from Defendants' Movant's Statement of Undisputed Facts (D. 25 at 2–21).[2] The facts are identified by paragraph number. Between them, the Parties assert 167 facts as undisputed. Sorting them out, even using the Court's procedures, is a monumental task not made simpler by how the Parties have presented their facts and disputes.

---

[2] The Court does not specifically address Plaintiff's Movant's Statement of Undisputed Material Facts (D. 27 at 7–21) because its motion will be denied as moot in light of granting Defendants' motion.

5

Plaintiff's briefing is particularly problematic. In its own assertion of undisputed facts, whole pages can pass without any citation to a supporting fact. For example, for its asserted facts 57 through 63, Plaintiff cites no evidence whatsoever (D. 27 at 18–19). This violates Rule 56(c)(1) and the Court's practice standards. Such asserted "facts" will not be considered.

Similarly, Plaintiff fails to address many facts asserted by Defendants or does so in a way that is incoherent. This failure extends to critical issues. For example, Defendants' asserted facts 21 through 23 state:

> 21. Upon initial review of the documents received from the custodians, it was determined that no other custodians should be searched, as their records were not reasonably likely to contain unique documents not already captured by the searches the already-identified custodians had performed. Id. at 23 (Garcia-Hinojosa Decl. ¶ 50).
>
> 22. In consultation with the Mine subject matter experts, the FOIA Officer, Laura Garcia-Hinojosa, determined that the Colorado River Valley Field Office—which covers the location of the Mine—and the Colorado State Office would possess documents or communications responsive to the Requests. Id. at 22-23 (Garcia-Hinojosa Decl. ¶ 47).
>
> 23. Any communications with other offices, including Washington D.C., would have been between that office and the Colorado State Office, and would have been captured by the searches conducted by the Colorado-based custodians. Id. at 23.

(D. 25 at 9–10).

Plaintiff responds:

> 21. GSCA admits, and further notes that BLM acknowledges that the Washington Offices of the BLM and Interior Department were not searched. See ¶18 above.
>
> 22. GSCA admits.

6

23. GSCA admits that the Colorado BLM did not search any of the BLM or Interior Department offices in Washington. BLM relies on the Declaration of Garcia-Hinojosa, which states that the internal searches in Colorado "would tend to indicate that a non-Colorado BLM official was substantially involved in matter." BLM Appx. 022-23 (¶47). BLM offers no evidence that these Washington officials were not "substantially involved in [the] matter." Nor does BLM provide support for its decision to limit its search to only officials who were "substantially involved in the matter." GSCA's Cross-Motion filed today further details BLM's failure to conduct a reasonable search by failing to conduct any search of the BLM/DOI headquarters offices.

(D. 26 at 17–18).

This response fails to comply with Court's practice standards and is somewhat incoherent. For fact 21, Plaintiff refers back to a prior response ("See ¶18 above."), but the cited paragraph merely says "GSCA admits paragraphs 1-18." Then, for fact 23, Plaintiff does not address the asserted fact. It admits something not stated in the asserted fact ("GSCA admits that the Colorado BLM did not search any of the BLM or Interior Department offices in Washington") and does not dispute anything stated in the asserted fact. Instead, Plaintiff makes some arguments about who was substantially involved that are irrelevant to the stated fact, namely, that "communications with other offices . . . would have been captured by the searches conducted by the Colorado-based custodians." Accordingly, Plaintiff's asserted fact 23 is deemed admitted in accordance with the Court's practice standards and Rule 56(c). In accordance with Rule 56(c), Local Rules, and the Uniform Practice Standards, the Court finds the following facts undisputed for the purposes of deciding the motions.

7

**B. Undisputed Material Facts**

*1. The Mine*

The Mine began operating in 1982, providing crushed limestone to a nearby mining complex (D. 25 at ¶ 1).  In 2016, Rocky Mountain Industrials, Inc. (RMI, formerly Rocky Mountain Resources or RMR)—a for-profit corporation—purchased the Mine and began to operate it pursuant to BLM permits (D. 25 at ¶ 2).  Beginning in November 2018, RMI began submitting proposals to modify operations at the Mine to expand the current site footprint, which have been, or currently are, under review by the BLM (D. 25 at ¶ 3).  The BLM's evaluation of RMI's proposed expansion included, among other things, a Determination of Common Variety (DCV) and various studies, including hydrologic, cave/karst, and ethnographic (D. 25 at ¶ 4).  In addition, RMI has established an escrow account into which it pays amounts based on its revenues that will cover the potential royalties owed to the BLM depending on the DCV (D. 25 at ¶ 5).  As the escrow payments correspond to RMI's revenues, RMI submits to the BLM sales data to substantiate those payments (D. 25 at ¶ 6).

*2. Plaintiff's FOIA Requests and Defendants' Initial Productions*

On June 12, 2018, Plaintiff submitted a FOIA request (the 2018 Request) to the BLM's Colorado State Office seeking "[a]ll records involve the [Mine] . . . (starting in 1982) to the present day" (D. 25 at ¶ 7).  In six installments, the BLM produced 7,500 pages of responsive records, 149 pages with redactions, and withheld 263 pages subject to exemptions set forth in the *Vaughn* Index (D. 25 at ¶ 8).[3]

---

[3] *See Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

GSCA_Add_008

On November 8, 2019, GSCA submitted a second FOIA request (the 2019 Request) to the BLM's Colorado State Office seeking "the same records as described" in the 2018 Request "from the initial June 12, 2018 FOIA request date until the present day" (D. 25 at ¶ 9). Over four installments, the BLM produced over 9,000 pages in full, 1,080 pages with redactions, and withheld 232 pages subject to exemptions set forth in the *Vaughn* Index (D. 25 at ¶ 10).

On November 2, 2022, GSCA submitted a third FOIA request (the 2022 Request) to the BLM's Colorado State Office seeking the same information as the 2018 and 2019 FOIA Requests from "November 8, 2019, . . . until the present day" (D. 25 at ¶ 11).  Over three installments, the BLM produced over 3,300 pages in full, 718 pages with redactions, and withheld 357 pages subject to exemptions set forth in the *Vaughn* Index (D. 25 at ¶ 12).

Plaintiff filed formal appeals to DOI's FOIA office for all three Requests (D. 25 at ¶ 13).

### 3. *Defendants' Searches*

In consultation with the Mine subject matter experts, the FOIA Officer, Laura Garcia-Hinojosa, determined that the Colorado River Valley Field Office—which covers the location of the Mine—and the Colorado State Office would possess documents or communications responsive to the Requests (D. 25 at ¶ 22).  Any communications with other offices, including Washington D.C., would have been between that office and the Colorado State Office, and would have been captured by the searches conducted by the Colorado-based custodians (D. 25 at ¶ 23).  In total, across all three Requests, the BLM identified thirty-three individuals as likely to have responsive records (the custodians), and the records of those custodians were searched (D. 25 at ¶ 15).

The BLM provided the custodians a copy of the Requests and instructed them to search all of their electronic and paper files (D. 25 at ¶ 16).  Most of the custodians searched their own

9

documents, using the search parameters they identified as most likely to identify potentially

responsive documents, as the custodians themselves were best-positioned to know (i) where they

would have saved potentially responsive documents in their files, and (ii) what search parameters

would be best aimed to locate those documents (D. 25 at ¶ 17). The BLM used the date ranges

Plaintiff provided in its Requests to search for responsive documents (D. 25 at ¶ 14).

The custodians' searches encompassed the following search terms and date parameters:

a. Chad Mickschl: Search terms: RMR, Bobby Wagner, Mid Continent, Rocky Mountain Resources; Dates: 1982 to November 12, 2019.

b. Lisa Dawson: Search terms: RMR, Mid-Continent, Quarry, Rocky Mountain Resources, Mid Continent, Bernhardt. Quarry, RMI, DCV; Dates: 1982 to November 3, 2022.

c. Kim Leitzinger: Search term: RMR; Dates: 1982 to November 12, 2019. Id.

d. Jessica Lopez: Search terms: RMR, Cal-X, Mid-Continent Resources, Pitkin, Iron, Mid-Continent Quarry, Mid-Continent Resources, Mid-Continent Quarry; Dates: 1982 to November 12, 2019.

e. Hilary Boyd: Search terms: Amy Way, Bobby Wagner, Aleta Powers, Dan Neubaum, Mexican Spotted Owls, RMR, quarry, limestone, mine expansion, Mid-Continent, MSO, spotted owl, Oreohelix, RMI, Quarry, Limestone, Witch, Snail; Dates: 1982 to November 3, 2022.

f. Suzanne Mehlhoff: Search terms: RMR, Mid-Continent, Quarry; Dates: 1982 to June 18, 2018.

g. Carla DeYoung: Search terms: RMR, CalX, Bobby Wagner, Jessica Lopez Pearce, Mid-Continent; Dates: 1982 to November 12, 2019.

h. Erin Leifeld: Search terms: RMR, ERO, Kathy Croll, Sean Larmore, Mid-Continent, Bobby, Bobby Wagner, S#795, 5GF876,

10

RMI, Mid-Continent, Mid-Continent Quarry, Limestone; Dates: 1982 to November 3, 2022.

i. Miles Gurtler: Search terms: RMR, Mid-Continent; Dates: 1982 to November 12, 2019.

j. Nicolas Sandoval: Search terms: Limestone, RMR, Mid-Continent, Rocky Mountain Resources, Bernhardt, Brownstein, RMI, Glenwood Springs, Mid-Continent Quarry, Common Variety; Dates: 1982 to November 3, 2022.

k. Steve Ficklin: Search terms: RMR, Mid-Continent; Dates: 1982 to November 12, 2019.

l. Helen Mary Johnson: Search terms: RMR, Rocky Mountain Resources, Mid-Continent Quarry; Dates: June 12, 2018 to November 12, 2019.

m. Andrew Archuleta: Search terms: RMR, Rocky Mountain Resources, Bernhardt, Brownstein, Mid-Continent Quarry; Dates: June 12, 2018 to November 12, 2019.

n. Larry Sandoval: Search terms: RMR, Cal-X, Mid-Continent Resources, Pitkin, Iron, Mid-Continent Quarry, RMI, Limestone; Dates: June 12, 2018 to November 3, 2022.

o. Kristy Wallner: Search terms: RMR, CalX, Mid-Continent Quarry; Dates: June 12, 2018 to November 12, 2019.

p. Jill Bogdanovich: Search term: RMR; Dates: June 12, 2018 to a November 12, 2019.

q. Doug Siple: Search terms: RMR, Rocky Mountain Resources, Mid-Continent Quarry; Dates: June 12, 2018 to November 12, 2019.

r. Erin Jones: Search terms: RMR, MOU, RMR NEPA, EIS; Dates: June 12, 2018 to November 12, 2019.

s. David Boyd: Search terms: Secretary, Bernhardt, RMR, Rocky Mountain Resources, Mid-Continent Quarry; Dates: June 12, 2018 to November 12, 2019.

t. Brian Hopkins: Search term: Rocky Mountain Resources; Dates: June 12, 2018 up to and including November 12, 2019.

11

u. Brian Achziger: Search terms: RMR, Rocky Mountain Resources, Mid-Continent Quarry; Dates: November 8, 2019 to November 3, 2022.

v. Stephanie Connolly: Search terms: RMR, RMI, Mid-Cont Quarry, Cal X, MCR; Dates: November 8, 2019 to November 3, 2022.

w. Greg Larson: Search terms: RMI, RMR, Quarry, Limestone, compliance; Dates: November 8, 2019 to November 3, 2022.

x. David Lazorchak: Search terms: RMI, Mid-Continent, Quarry, Limestone; Dates: November 8, 2019 to November 3, 2022.

y. Brittany Cocina: Search terms: RMI, MidContinent, Mid-Continent Quarry, MCQ, RMR; Dates: November 8, 2019 to November 3, 2022.

z. Sharon Sales: Search terms: RMI, Mid Continent Quarry, RMR; Dates: November 8, 2019 to November 3, 2022.

aa. Monte Senor: Search terms: RMI, Mid-Continent, Quarry, Limestone; Dates: November 8, 2019 to November 3, 2022.

bb. Steve Hall: Search term: RMI; Dates: November 8, 2019 to November 3, 2022.

cc. Kirby Shedlowski: Search terms: quarry, glenwood, mid-continent, RMR, Rocky Mountain Resources; Dates: November 8, 2019 to November 3, 2022.

dd. The BLM does not have a contemporaneous record of the dates and search terms AJ Johnson used, but agency records indicate her search identified 90 pages responsive to the 2019 Request.

ee. The BLM does not have a contemporaneous record of the dates and search terms Tom Fresques used, but agency records indicate his search identified 120 pages responsive to the 2019 Request.

ff. The BLM does not have a contemporaneous record of the dates and search terms Gloria Tibbetts used, but agency records indicate her search identified 1572 pages responsive to the 2019 Request.

12

> gg. The BLM does not have a contemporaneous record of the dates
> and search terms Ben Smith used, but agency records indicate his
> search identified 10 pages responsive to the 2019 Request.

(D. 25 at ¶ 18).

Locations searched in connection with the Requests included physical hard copy files, external and internal computer hard drives, custodians' email communications and attachments, BLM's local servers at the Colorado River Valley Field Office, and BLM Colorado State Office shared drive (D. 25 at ¶ 19).[4]  For most custodians, two or three separate rounds of searches were conducted (D. 25 at ¶ 20).

### 4. *Defendants' Review of Records and Additional Productions*

Once custodians had identified potentially responsive records, Ms. Garcia-Hinojosa reviewed the documents (D. 25 at ¶ 24). First, Ms. Garcia-Hinojosa reviewed the potentially responsive documents to eliminate those not responsive to the Requests (D. 25 at ¶ 25).  Next, Ms. Garcia-Hinojosa determined which documents were not subject to any applicable exemption and should be released in full (D. 25 at ¶ 26).  Finally, Ms. Garcia-Hinojosa reviewed the documents for the applicability of any FOIA exemptions and applied redactions to all or parts of the pages of each document as appropriate (D. 25 at ¶ 27).  In general, the applied redactions included text indicating the exemption being asserted (D. 25 at ¶ 28).

Upon initial review of the documents received from the custodians, it was determined that no other custodians should be searched, as their records were not reasonably likely to contain

---

[4] Plaintiff makes a variety of statements about this fact but does not deny it (D. 26 at 17).  Therefore, it is deemed admitted.

GSCA_Add_013

unique documents not already captured by the searches the already-identified custodians had performed (D. 25 at ¶ 21).

Between November 2018 and September 2023, the BLM made thirteen productions to Plaintiff in response to the Requests (D. 25 at ¶ 29). During the pendency of this case, Defendants provided two additional discretionary releases of documents to Plaintiff (D. 25 at ¶ 30).

During this case, attorneys in the DOI and the DOJ reviewed each exemption assertion (D. 25 at ¶ 31). In several instances the BLM agreed to limit or fully remove previous exemption applications to limit the issues and documents at issue in this motion (*id.*). These releases included letters between the BLM and RMI related to the Requests and a re-production of the documents attached to those letters (D. 27 at ¶ 32).

On September 27, 2024, the BLM re-produced to Plaintiff all the documents that it had previously produced in response to the Requests (D. 25 at ¶ 33). The re-production included Bates stamps because the prior responses did not include them (*id.*). And that production included documents for which it had been determined that the redactions applied when the documents were initially produced should be reduced or removed (*id.*). In that production, the BLM released in whole or in part over 750 additional pages that had been previously withheld (*id.*).

In total, the BLM has produced 2,800 documents and 20,764 pages in full to Plaintiff in response to the Requests (D. 25 at ¶ 34).

### 5. The Vaughn *Index and Defendants' Asserted Exemptions*

In the course of its review of documents potentially responsive to the Requests, the BLM determined that certain information should be withheld under FOIA exemptions 3, 4, 5, and 6 (D.

GSCA_Add_014

25 at ¶ 35).[5]  The documents responsive to the Requests were reviewed both in the BLM's initial evaluation of the Requests and again during the pendency of this case to ensure that all reasonably segregable information not subject to a FOIA exemption has been released (D. 25 at ¶ 36).[6]

A description of all of the material withheld in whole or in part pursuant to FOIA exemptions, and the bases for asserting those exemptions, are set forth in the *Vaughn* Index filed as Attachment C to Garcia-Hinojosa's Declaration (D. 25 at ¶ 37).

During its evaluations of the Requests, the BLM sought to consult with RMI when it appeared that the BLM was preparing to release information that RMI may consider confidential (D. 25 at ¶ 44).  In its responses to the Requests, the BLM withheld some[7] of RMI's and Pitkin Iron's confidential commercial information (D. 25 at ¶ 43).  On August 13, 2019, the BLM sent RMI a letter attaching documents that the BLM identified as responsive to the 2018 Request, but that RMI may consider confidential, and requested that if RMI "wish[es] to object to the release of this information," it should "provide a written statement setting forth the specific and detailed justification for withholding any portion" (D. 25 at ¶ 45).  On August 29, 2019, RMI responded via email stating "[w]e did not see anything contained [in the provided documents] that we would classify as trade secret or as confidential" (D. 25 at ¶ 46).

---

[5] As discussed below, Plaintiff has withdrawn its objection to the withholdings under FOIA exemptions 3 and 6. Accordingly, related facts are omitted.

[6] Plaintiff purports to dispute this fact but provides no specific reference to material in the record supporting the denial (D. 26 at 18).  Even when the Court goes beyond what is required by the Rules and looks to the "discussion below on BLM's failure to release all reasonably segregable information" (*id.*), that section contains only a general citation to 24 undifferentiated pages of records discussed below.   Accordingly, this fact is deemed admitted.

[7] Plaintiff purports to dispute that such information was withheld with an improperly placed extended argument, but its 'denial' boils down to asserting that Defendants previously produced information similar to the information that they have withheld as classified in response to a later Request (D. 26 at 18–20).  While arguing that some information was improperly withheld, it does not dispute the proposition some confidential commercial information was withheld (*id.*)  Thus, the asserted fact is modified, and it is deemed undisputed that "some" such information was withheld.

15

On January 31, 2020, the BLM sent a second letter to RMI related to the 2018 Request, providing additional documents for review and requesting that if RMI "wish[es] to object to the release of this information," it should provide a statement justifying withholding any portion (D. 25 at ¶ 47). RMI never responded to the BLM's second letter (D. 25 at ¶ 48).

In response to the 2018 Request, the BLM withheld information under exemption 4 from a small number of documents that contained Pitkin Iron Corporation's (RMI's predecessor) bank account information (D. 25 at ¶ 49). The BLM withheld this financial information because it understood Pitkin kept its bank account number confidential, provided it to the BLM with an implied assurance of confidentiality, and Pitkin could be harmed if the public had access to its banking account and could interfere with its finances (D. 25 at ¶ 50).

On February 13, 2020, the BLM sent RMI a letter attaching documents that the BLM identified as responsive to the 2019 Request, but that RMI may consider confidential, and requested that if RMI "wish[es] to object to the release of this information," it should "provide a written statement setting forth the specific and detailed justification for withholding any portion" (D. 25 at ¶ 51). On March 13, 2020, the BLM sent a second letter to RMI providing additional documents the BLM had identified as responsive to the 2019 Request, but that RMI may consider confidential, and requested again that if RMI "wish[es] to object to the release of this information," it should provide "a written statement explaining the justification for withholding any portion" (D. 25 at ¶ 52). On September 15, 2020, Ms. Garcia-Hinojosa emailed Robert Wagner from RMI regarding the BLM's March 2020 letter, writing "I believe you left me a voicemail in March stating that you did not see anything contained within the documents that would classify as a trade secret or as confidential. I am just verifying that this is correct" (D. 25 at ¶ 53). Mr. Wagner responded

16

that he "did not see anything contained within the documents that would classify as a trade secret or as confidential in that request" (D. 25 at ¶ 54).

On December 30, 2020, the BLM sent RMI a third letter attaching documents the BLM identified as responsive to the 2019 Request, but that RMI may consider confidential, and requested that if RMI objects to the release, it should provide a statement justifying the withholding (D. 25 at ¶ 55). 56. On January 21, 2021, Ms. Garcia-Hinojosa emailed Mr. Wagner seeking a response to the December 30, 2020 letter (D. 25 at ¶ 56).  RMI did not respond to the December 30, 2020, letter (D. 25 at ¶ 57).

As reflected in the *Vaughn* Index, in response to the 2019 Request, the BLM redacted confidential commercial and financial information from a small number of documents that included RMI's bank account numbers and URLs for its document sharing platform (D. 25 at ¶ 58).

RMI's private document sharing platform URLs are commercial in nature because RMI contracts for access to these sites and the documents it shares on these platforms relate to RMI's commercial functions (D. 25 at ¶ 59).  The BLM withheld the URLs and banking information because RMI provided this information to the BLM with an implied assurance that it would be kept confidential, and the BLM understood this to be information RMI kept private (D. 25 at ¶ 60). The BLM understood that providing public access to RMI's bank account or its document sharing platforms could harm RMI because the public could interfere with RMI's banking or access confidential transaction-level data (D. 25 at ¶ 61).

On January 24, 2023, the BLM sent RMI a letter attaching documents that the BLM identified as responsive to the 2022 Request, but that RMI may consider confidential, and

17

requested that if RMI "wish[es] to object to the release of this information," it should provide a written statement justifying the withholding (D. 25 at ¶ 62).  On February 15, 2023, RMI responded to the BLM's letter asserting that the documents provided were confidential (D. 25 at ¶ 63).  Specifically, RMI asserted that the "Drill Hole Data, Map and Sampling Protocol," the scale tickets (sales reports) and escrow account calculations, and emails containing RMI's bank statements held commercial value, were not publicly available, and were provided to the BLM with an assurance that they would be kept confidential (D. 25 at ¶¶ 64, 65).  RMI provided its drill hole data, map, and sampling protocol to the BLM as a part of its expansion proposal and did so with the implied and explicit assurance from the BLM that this information would remain confidential (D. 25 at ¶ 66).  If RMI's drill hole data, map, and sampling protocol were released, it would harm RMI because its competitors would gain unfair insight into the geological formations within its mining claims and the quantity and type of reserves it possesses (D. 25 at ¶ 67).

### i.    FOIA Exemption 4

If the sales reports and escrow account data were disclosed, RMI would be harmed because competitors would know its customer-specific pricing and could negotiate lower prices to take business from RMI (D. 25 at ¶ 71).[8]  RMI also asserted that its banking information, such as its bank account numbers and transaction-level data, was confidential commercial information that it does not share publicly (D. 25 at ¶ 72).[9]  Disclosure of RMI's banking information would cause it

---

[8] Plaintiff does not explicitly dispute this fact or offer contrary evidence.  It is deemed admitted.

[9] Plaintiff does not explicitly dispute this fact or offer contrary evidence.  It is deemed admitted.

GSCA_Add_018

harm because the public could access its bank account and individual transaction data and, possibly, compromise its finances (D. 25 at ¶ 74).

Finally, RMI's dial-in line and the URLs for its file sharing platforms are confidential commercial information (D. 25 at ¶ 75). This information relates to RMI's running of its business and was shared with the BLM under the implied assurance of confidentiality (D. 25 at ¶ 76). Disclosure of RMI's telephonic or file sharing systems could compromise the security of such systems and provide the public access to confidential information that RMI shares through those channels (D. 25 at ¶ 77). Based on RMI's assertions of confidentiality, the nature of the information, and the BLM's assessment, the BLM withheld numerous documents in full or in part in response to the 2022 Request under exemption 4 (D. 25 at ¶ 78).

## ii. FOIA Exemption 5

The BLM withheld documents pursuant to exemption 5 that are pre-decisional and part of the BLM's deliberative process, reflect confidential attorney-client communications, are attorney work-product, or contain the government's confidential commercial information (D. 25 at ¶ 79).[10] A large number of documents were withheld in full or in part pursuant to the attorney-client privilege because the documents contained: (i) communications among BLM personnel, attorneys from the Solicitor's Office, and/or DOJ attorneys in the course of seeking or providing legal advice, or seeking or providing information necessary to provide legal advice; and (ii) documents reflecting Solicitor's Office and/or DOJ attorneys' legal advice in the form of comments or drafts

---

[10] In its Response, Plaintiff states that it "admits that paragraphs 79-92 state BLM's reasons for withholding the requested documents under Exemption 5." This argument is improperly placed and does not respond to the stated facts or provide contrary evidence. Notably, Plaintiff does not assert that any of the asserted facts are actually legal conclusions or deny them. Accordingly, these facts are deemed admitted.

19

(D. 25 at ¶ 80).  If disclosed, the redacted information would reveal confidential, attorney-client privileged material (D. 25 at ¶ 81).

Additionally, as indicated in the attached *Vaughn* Index, a small number of documents were withheld in full or in part pursuant to work product protection because they were draft legal documents, or communications relating to draft briefs, declarations and other filings that were prepared by attorneys in the context of ongoing or foreseeable litigation under the APA and/or FOIA (D. 25 at ¶ 82).  If disclosed, the redacted material would reveal attorney mental impressions and work product (D. 25 at ¶ 83).  The BLM also redacted agency conference line numbers, passcodes and URLs for document sharing platforms that were shared internally for the purpose of conducting official government business (D. 25 at ¶ 84).  These numbers relate solely to internal agency practices and are of little to no public interest (D. 25 at ¶ 85).  Disclosure of this information could allow individuals outside the agency to dial into the agency's telephone conference system or obtain unauthorized access to agency information and disrupt agency operations (D. 25 at ¶ 86).

Pursuant to the deliberative process privilege, the BLM withheld drafts or internal documents and communications among BLM officials discussing and providing opinions related to (1) the escrow account agreement with RMI, (2) the BLM's response to RMI's proposed expansion of the Mine, which the BLM is still evaluating, (3) non-compliance issues at the Mine, and (4) agency actions under consideration by federal officials that are unrelated to the Mine (D. 25 at ¶ 87). The draft documents and email discussions were circulated confidentially among relevant federal officials, and the draft versions and email discussions would not be made public in the normal course of business (D. 25 at ¶ 88).  Draft documents generally incorporate BLM officials' proposed changes, questions, comments, and/or areas of concern or interest regarding

20

the pre-decisional documents—as these draft documents did (D. 25 at ¶ 89).  The factual information withheld in the documents consists of facts selectively chosen by federal officials for inclusion in the pre-decisional draft documents or discussions (D. 25 at ¶ 90). Disclosure of these documents would reveal part of the BLM's deliberative process; in particular, which facts the officials believed important to include (D. 25 at ¶ 91).  Furthermore, disclosure of these documents would discourage candid discussions within the BLM (D. 25 at ¶ 92).

## II.  LEGAL STANDARD

### A.  Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must consider the factual record and reasonable inferences based on said record "in the light most favorable to the non-moving party."  *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008).  The moving party bears the burden of demonstrating that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.*  If the moving party meets this burden, the opposing party must go beyond the pleadings and designate evidence showing there is a genuine triable issue.  *Celotex*, 477 U.S. at 323–24.  Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

21

prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.  "[Q]uestions of intent, which involve intangible factors including witness creditability, are matters for consideration of the fact finder after a full trial."  *Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir. 1980).  Cross-motions for summary judgment must be viewed separately, and the denial of one does not necessitate the granting of the other. *United States v. Supreme Court of N.M.*, 839 F.3d 888, 906-07 (10th Cir. 2016) (citations omitted).

### B. The FOIA

The FOIA provides in general that the public has a right of access to federal agency records, and the right is enforceable in court.  *Anderson v. Dep't of Health and Human Servs.*, 907 F.2d 936, 941 (10th Cir. 1990); *Stewart v. United States Dep't of Interior*, 554 F.3d 1236, 1239 (10th Cir. 2009); 5 U.S.C. § 552(b).  The FOIA governs requests made for the records of a federal agency.  *See Trentadue v. F.B.I.*, 572 F.3d 794, 796 (10th Cir. 2009).  The right to federal agency records is "subject to nine specific exemptions."  *Anderson*, 907 F.2d at 941; *see also Milner v. Dep't of Navy*, 562 U.S. 562, 564 (2011) (FOIA "requires federal agencies to make Government records available to the public, subject to nine exemptions for specific categories of material.").  It provides that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."  5 U.S.C. § 552(b).  A district court in any FOIA action challenging an agency decision to withhold records reviews the agency's decision not to disclose de novo, *Herrick v. Garvey*, 298 F.3d 1184, 1189 (10th Cir. 2002), reading the act broadly in favor of disclosure and construing its exemptions narrowly.  *Hull v. I.R.S.* 656 F.3d 1174, 1177 (10th Cir. 2011); *Anderson*, 907 F.2d at 941.

GSCA_Add_022

"In general, FOIA request cases are resolved on summary judgment." *See World Publishing Co. v. U.S. Dep't of Justice*, 672 F.3d 825, 832 (10th Cir. 2012). Courts may award summary judgment in FOIA cases based solely upon the information provided in affidavits or declarations. *Id*. (observing that a court may grant summary judgment based on declarations); *Hull*, 656 F.3d at 1178 ("To satisfy its burden of proof under FOIA, an agency typically submits affidavits."). "Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (cited by the Tenth Circuit with approval in *Trentadue*, 572 F.3d at 808). When considering motions for summary judgment in the FOIA context, "if a review of the record raises substantial doubt, particularly in view of well defined requests and positive indications of overlooked materials, summary judgment is inappropriate." *Valencia-Lucena v. United States Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999). If the affidavits "provide specific information sufficient to place the documents within the exemption 5 category, if the information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate." *Hull*, 656 F.3d at 1177–78.

### III. ANALYSIS

#### A. Admissibility of Defendant's Evidence

Plaintiff challenges one portion of the Garcia-Hinojosa declaration as hearsay (D. 26 at 37). It argues that "BLM provides no admissible evidence for BLM's conclusory explanation that hearsay conveyed by the Garcia-Hinojosa declaration 'would tend to indicate' that headquarters personnel were not 'substantially involved in the matter'" (*id*.). This argument is unavailing.

GSCA_Add_023

As Defendants argue in reply, an "affidavit from an agency employee responsible for supervising a FOIA search is all that is needed . . .; there is no need for the agency to supply affidavits from each individual who participated in the actual search." *Akel v. Dep't of Just.*, 578 F. Supp. 3d 88, 100 (D.D.C. 2021) (cleaned up).  "[S]o long as the declarant attests to his personal knowledge of the procedures used in handling the request and his familiarity with the documents in question, he satisfies Rule 56's personal knowledge requirement." *Id*. (cleaned up).  "Because courts routinely allow declarations from agency employees not directly involved in a search for records, hearsay is generally permitted." *Rocky Mountain Wild, Inc. v. U.S. Bureau of Land Mgmt.*, 455 F. Supp. 3d 1005, 1020 n.3 (D. Colo. 2020) (citation omitted); *see also Ecological Rts. Found. v. U.S. Env't Prot. Agency*, 541 F. Supp. 3d 34, 50 (D.D.C. 2021) ("statements by agency declarants who are knowledgeable insiders as to the agency practices and procedures on which they testify and who acquire knowledge from examination of agency records constituting public records and reports are admissible") (citation omitted).

### B. Reasonableness of Search

Plaintiff argues that Defendants failed to conduct a reasonable search of their records (D. 26 at 35–36).  Plaintiff asserts that it was unreasonable for Defendants not to search the "Washington, DC offices of the BLM and Interior Department" because the "BLM/DOI headquarters offices were directly involved in critical decision-making on the Mine" (*id*. at 36).

Defendants assert that, notwithstanding their decision not to search their Washington, D.C. offices, the search that they conducted was nonetheless reasonable (D. 30 at 26).  The Court agrees.

"Reasonableness does not require defendant to search every record system or to demonstrate that no other potentially responsive documents might exist, but it must show 'that it

GSCA_Add_024

made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.'" *Rocky Mountain Wild, Inc. v. United States Forest Serv.*, 138 F. Supp. 3d 1216, 1221 (D. Colo. 2015) (quoting *Oglesby v. United States Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).  "Courts 'evaluate the reasonableness of an agency's search based on what the agency knew at its conclusion rather than what the agency speculated at its inception.'"  *Id*. at 1222 (quoting *Friends of Blackwater v. U.S. Dep't of Interior*, 391 F. Supp. 2d 115, 121 (D.D.C. 2005)).

Based on her review, Ms. Garcia-Hinojosa determined, after "consultation with the Mine subject matter experts" and "other employees within the BLM," not to search other offices.  This determination is reasonable "because, with few exceptions, mining decisions are made at the state level" and that "communications with other offices, including Washington D.C., would have been between that office and the Colorado State Office" such that they "would have been captured by the searches conducted by the Colorado State Office custodians" (D. 25-1 at 23).  The decision not to search further offices was made at the conclusion of the review of documents and, accordingly, took into consideration what those documents contained (D. 25 at ¶ 21).  The records already located "did not contain records or communications which would tend to indicate that a non-Colorado BLM official was substantially involved in matter" (D. 25-1 at 22–23).  Plaintiff's speculation that other documents may exist, even if true, does not render the search unreasonable or call into question the determination that searches of headquarters records "were not reasonably likely to contain unique documents not already captured by the searches the already-identified custodians had performed" (D. 25 at ¶ 21).  Even if the headquarters did have other responsive records, there is no reason to believe that such documents would be subject to production because,

25

as discussed below, pre-decisional records are not available under FOIA and decisions, in this circumstance, are generally made at the state level.

## C. Applicability of Exemptions

Plaintiff has withdrawn its objections regarding the documents withheld under exemptions 3 and 6 (D. 26 at 34).  Thus, only withholdings under exemptions 4 and 5 are at issue.  These exemptions apply to matters that are:

> (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

> (5) inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested;

5 U.S.C. § 552(b).

### 1.  Exemption 4

Plaintiff argues that Defendants "failed to prove that the withheld sales reports and Escrow information satisfied the heavy burden of confidentiality" (D. 26 at 28).[11]  It asserts that, because Defendants previously produced sales reports without asserting confidentiality, the later reports and related Escrow information are not confidential (*id*. at 30–31).

---

[11] Plaintiff also argues that the procedures used are at odds with BLM regulations because RMI did not designate the documents as confidential quickly enough and did not mark every page (D. 26 at 28–29).  But it does not argue, and cites no authority for the proposition, that these provisions prevent BLM from withholding under FOIA exemptions notwithstanding third-party delays in the designation of records as confidential (*id*.). Rather the BLM "encourages, but does not require, submitters to designate confidential information . . . at the time of submission or reasonably soon thereafter."  Accordingly, the Court focuses on whether the documents are confidential within the meaning of FOIA. Plaintiff further argues that showing harm to RMI's competitive position from disclosure is insufficient, and BLM must instead show that disclosure would harm BLM's ability to regulate the Mine (*id*. at 32).  The Court does not reach this issue because the records are confidential under the general test.

26

"To receive protection under Exemption 4, information, if not a trade secret, must be: (a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential." *Friends of Animals v. Bernhardt*, 15 F.4th 1254, 1270–71 (10th Cir. 2021) (internal quotations omitted). Only the third element, confidentiality, is at issue.  Information is "confidential" at least[12] when the "information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 440 (2019).

Defendants rely on the Declaration of Robert Wagner, a Vice President of Engineering at RMI (D. 25-4 at 3).  He avers that:

> 42. The [sales reports] and escrow account calculation files contain specific information about the types of products RMI sells, the exact prices RMI sells them for, and the specific customers RMI is selling them to.
>
> 43. The pricing we provide to different customers in the market varies based on the job and our relationship with them.
>
> 44. While we do publish a general pricing list for the public, we do not let the public know what we are charging each specific customer for each product.
>
> 45. RMI takes every reasonable precaution to protect its customer list, customer-specific pricing, and purchase information from the public and its competitors.  In most cases, this information remains within RMI's secure computer systems and is not publicly available, other than via the submission of this information to BLM or other governmental agencies. RMI employees and authorized agents are directed to keep its customer list, customer-specific pricing, and purchase information, confidential.
>
> 46. We provided the [sales reports] and escrow account calculations to the BLM because it was required under the Escrow Agreement.

---

[12] The Supreme Court declined to determine whether the second prong, i.e., that a record was provided under an assurance of privacy, was mandatory.  *Argus Leader Media*, 588 U.S. at 435.

27

> We provided this information under both an implied and express assurance that the information would remain confidential. Specifically, RMI submitted this information to the BLM under its regulations at 42 C.F.R. § 3600.  Those regulations provided RMI an express assurance that if RMI asserted the information is confidential, the "BLM will keep all data and information confidential to the extent allowed by [the Department's FOIA regulations]." 43 C.F.R. § 3601.8.

(D. 24-5 at 13–14) (footnote omitted).

The Court finds this evidence sufficient to meet both prongs of the confidentiality test. It shows that RMI customarily and actually treated the information contained in the sales reports and related escrow information as private.  It also shows that it had an assurance of privacy in the materials.[13]  As various Courts have concluded, that BLM previously produced such reports when RMI did not indicate that they were confidential does not prevent later documents of the same type from being confidential when they meet the applicable standard.  *Friends of Animals*, 15 F.4th at 1264 ("Past disclosures are not determinative.") (citing *Mobil Oil Corp. v. E.P.A.*, 879 F.2d 698, 701 (9th Cir. 1989)); *Wolf v. C.I.A.*, 473 F.3d 370, 378 (D.C. Cir. 2007) ("Prior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure.").

  2.  *Exemption 5*

Plaintiff argues that the limited information in the *Vaughn* Index "provides insufficient basis to analyze the assertion of privilege and the propriety of the withholding" under exemption 5 (D. 26 at 33).  It notes that "index entries, claiming exemption 5 attorney-client or attorney work

---

[13] Plaintiff argues that the cited regulation cannot apply because, despite common variety mineral material mining being at issue and what is described in the sales reports, the Mine had been incorrectly regulated under a different regime (D. 26 at 29).  However, the cited regulation, 42 C.F.R. § 3600, applied to the mining occurring and the related reports and, this regulation provided a basis for RMI to believe the submissions would be treated as confidential if RMI asserted confidentiality, which is what ultimately matters.  *See Argus Leader Media*, 588 U.S. at 435.

GSCA_Add_028

product privileges, do not list the both the author and recipient, making it impossible to gauge the veracity of the claimed privilege" (*id*.).  It requests *in camera* review (*id*. at 34).

The Court denies the request to review the documents.  Exemption 5 "protects documents that would be covered by any privilege that an agency could assert in a civil proceeding," including protections of confidential attorney-client communications and attorney work-product.  *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007).  The undisputed facts show that "BLM withheld documents pursuant to exemption 5 that are pre-decisional and part of the BLM's deliberative process, reflect confidential attorney-client communications, are attorney work-product, or contain the government's confidential commercial information" (D. 25 at ¶ 79).  Where documents have been redacted, the undisputed facts show that, "[i]f disclosed, the redacted information would reveal confidential, attorney-client privileged material" (D. 25 at ¶ 81).  Thus, *in camera* review is unnecessary.

### D. Reasonably Segregable Portions of Records

Specific to the sales reports, Plaintiff argues that Defendants failed to comply with their obligations "under FOIA to redact only those specific portions of the document(s) that are legally exempt" (D. 26 at 35).  *See* 5 U.S.C. § 552 ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.").  It asserts that, even if the customer-specific pricing information is confidential, the "the type of material actually sold, such as rip-rap, roadbase, and other forms of rock, as well as its purchasers (such as County/City road projects and local construction firms acknowledged by RMI and BLM) have not been claimed as confidential" (D. 26 at 35).  Plaintiff

29

asserts that "RMI publicly stated and advertised it was selling these products, and to whom" (*id*.) (citing D. 26-1 at 29–53).

Defendants counter that "the information in the escrow account documents is not publicly available and is not reasonably segregable from the confidential information" and that "RMI's customers and the exact products they purchase *is* confidential" (D. 30 at 38).

Rather than stating RMI's specific customers and what they purchased, the 24 undifferentiated pages cited by Plaintiff generally indicate its class of customers and total sales. For example, RMI's March 31, 2023 Form 10-K indicates that it "serves Arch Resources, local construction firms, and various city and county government construction" and that the Mine "produced and sold 21,578 and 26,356 tons of high-calcium limestone" in the fiscal year (D. 26-1 at 52). The Declaration of Robert Wagner indicates that the specifics of who customers are what customers buy is maintained as confidential, i.e., RMI's "customer list, customer-specific pricing, and purchase information" (D. 24-5 at 13). Thus, the Court finds this information was properly withheld under exemption 4 for the reasons stated above and need not have been segregated. Because Defendants have shown that they have complied with FOIA, the Court grants Defendants' motion and denies Plaintiff's motion as moot.

### IV. CONCLUSION

Accordingly, Defendants' Motion for Summary Judgment (D. 25) is GRANTED and Plaintiff's Cross Motion for Summary Judgment (D. 27) is DENIED AS MOOT. It is FURTHER ORDERED that JUDGMENT shall enter in favor of Defendants and against Plaintiff.

GSCA_Add_030

DATED July 28, 2025.

BY THE COURT:

_____

Gordon P. Gallagher
United States District Judge

31

GSCA_Add_031

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher**

Civil Action No. 24-cv-00445-GPG-RTG

GLENWOOD SPRINGS CITIZENS' ALLIANCE,

      Plaintiff,

v.

U.S. DEPARTMENT OF THE INTERIOR and
U.S. BUREAU OF LAND MANAGEMENT,

      Defendants.

      Defendants.

---

**FINAL JUDGMENT**

---

In accordance with the orders filed during the pendency of this case, and pursuant to Fed. R. Civ. P. 58(a), the following Final Judgment is hereby entered.

Pursuant to the Orders entered by Judge Gordon P. Gallagher on July 28, 2025 [D. 33], it is

ORDERED that the Defendants Motion for Summary Judgment [D. 25] is GRANTED. It is

FURTHER ORDERED that Plaintiffs Motion for Summary Judgment [D. 27] is DENIED AS MOOT. It is

FURTHER ORDERED that judgment is entered in favor of Defendants and against Plaintiff.

This case is closed.

Dated at Grand Junction, Colorado this 28th day of July 2025.

FOR THE COURT:
JEFFREY P. COLWELL, CLERK

By:    s/D. Clement
         D. Clement
         Deputy Clerk

GSCA_Add_033



cies, as appropriate and consistent with applicable law. In addition, any personnel positions, committees, task forces, or other entities established pursuant to the Executive Orders identified in section 2 of this order, including the regulatory reform officer positions and regulatory reform task forces established by sections 2 and 3 of Executive Order 13777 [former 5 U.S.C. 601 note], shall be abolished, as appropriate and consistent with applicable law.

SEC. 4. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

J.R. BIDEN, JR.

### § 552. Public information; agency rules, opinions, orders, records, and proceedings

(a) Each agency shall make available to the public information as follows:

(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

(A) descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

(B) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

(C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

(E) each amendment, revision, or repeal of the foregoing.

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

(2) Each agency, in accordance with published rules, shall make available for public inspection in an electronic format—

(A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

(B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;

(C) administrative staff manuals and instructions to staff that affect a member of the public;

(D) copies of all records, regardless of form or format—

(i) that have been released to any person under paragraph (3); and

(ii)(I) that because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records; or

(II) that have been requested 3 or more times; and

(E) a general index of the records referred to under subparagraph (D);

unless the materials are promptly published and copies offered for sale. For records created on or after November 1, 1996, within one year after such date, each agency shall make such records available, including by computer telecommunications or, if computer telecommunications means have not been established by the agency, by other electronic means. To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, staff manual, instruction, or copies of records referred to in subparagraph (D). However, in each case the justification for the deletion shall be explained fully in writing, and the extent of such deletion shall be indicated on the portion of the record which is made available or published, unless including that indication would harm an interest protected by the exemption in subsection (b) under which the deletion is made. If technically feasible, the extent of the deletion shall be indicated at the place in the record where the deletion was made. Each agency shall also maintain and make available for public inspection in an electronic format current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph to be made available or published. Each agency shall promptly publish, quarterly or more frequently, and distribute (by sale or otherwise) copies of each index or supplements thereto unless it determines by order published in the Federal Register that the publication would be unnecessary and impracticable, in which case the agency shall nonetheless provide copies of such index on request at a cost not to exceed the direct cost of duplication. Each agency shall make the index referred to in subparagraph (E) available by computer telecommunications by December 31, 1999. A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if—

(i) it has been indexed and either made available or published as provided by this paragraph; or

(ii) the party has actual and timely notice of the terms thereof.

(3)(A) Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

(B) In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format. Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section.

(C) In responding under this paragraph to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format, except when such efforts would significantly interfere with the operation of the agency's automated information system.

(D) For purposes of this paragraph, the term ''search'' means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request.

(E) An agency, or part of an agency, that is an element of the intelligence community (as that term is defined in section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4)))[1] shall not make any record available under this paragraph to—

(i) any government entity, other than a State, territory, commonwealth, or district of the United States, or any subdivision thereof; or

(ii) a representative of a government entity described in clause (i).

(4)(A)(i) In order to carry out the provisions of this section, each agency shall promulgate regulations, pursuant to notice and receipt of public comment, specifying the schedule of fees applicable to the processing of requests under this section and establishing procedures and guidelines for determining when such fees should be waived or reduced. Such schedule shall conform to the guidelines which shall be promulgated, pursuant to notice and receipt of public comment, by the Director of the Office of Management and Budget and which shall provide for a uniform schedule of fees for all agencies.

(ii) Such agency regulations shall provide that—

(I) fees shall be limited to reasonable standard charges for document search, duplication, and review, when records are requested for commercial use;

(II) fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by an educational or noncommercial scientific institution, whose purpose is scholarly or scientific research; or a representative of the news media; and

(III) for any request not described in (I) or (II), fees shall be limited to reasonable standard charges for document search and duplication.

In this clause, the term ''a representative of the news media'' means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. In this clause, the term ''news'' means information that is about current events or that would be of current interest to the public. Examples of news-media entities are television or radio stations broadcasting to the public at large and publishers of periodicals (but only if such entities qualify as disseminators of ''news'') who make their products available for purchase by or subscription by or free distribution to the general public. These examples are not all-inclusive. Moreover, as methods of news delivery evolve (for example, the adoption of the electronic dissemination of newspapers through telecommunications services), such alternative media shall be considered to be news-media entities. A free-lance journalist shall be regarded as working for a news-media entity if the journalist can demonstrate a solid basis for expecting publication through that entity, whether or not the journalist is actually employed by the entity. A publication contract would present a solid basis for such an expectation; the Government may also consider the past publication record of the requester in making such a determination.

(iii) Documents shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.

(iv) Fee schedules shall provide for the recovery of only the direct costs of search, duplication, or review. Review costs shall include only the direct costs incurred during the initial examination of a document for the purposes of determining whether the documents must be disclosed under this section and for the purposes of withholding any portions exempt from disclosure under this section. Review costs may not include any costs incurred in resolving issues of law or policy that may be raised in the course of processing a request under this section. No fee may be charged by any agency under this section—

(I) if the costs of routine collection and processing of the fee are likely to equal or exceed the amount of the fee; or

(II) for any request described in clause (ii)(II) or (III) of this subparagraph for the first two hours of search time or for the first one hundred pages of duplication.

(v) No agency may require advance payment of any fee unless the requester has previously failed to pay fees in a timely fashion, or the agency has determined that the fee will exceed $250.

(vi) Nothing in this subparagraph shall supersede fees chargeable under a statute specifically

---

[1] See References in Text note below.

providing for setting the level of fees for particular types of records.

(vii) In any action by a requester regarding the waiver of fees under this section, the court shall determine the matter de novo: *Provided*, That the court's review of the matter shall be limited to the record before the agency.

(viii)(I) Except as provided in subclause (II), an agency shall not assess any search fees (or in the case of a requester described under clause (ii)(II) of this subparagraph, duplication fees) under this subparagraph if the agency has failed to comply with any time limit under paragraph (6).

(II)(aa) If an agency has determined that unusual circumstances apply (as the term is defined in paragraph (6)(B)) and the agency provided a timely written notice to the requester in accordance with paragraph (6)(B), a failure described in subclause (I) is excused for an additional 10 days. If the agency fails to comply with the extended time limit, the agency may not assess any search fees (or in the case of a requester described under clause (ii)(II) of this subparagraph, duplication fees).

(bb) If an agency has determined that unusual circumstances apply and more than 5,000 pages are necessary to respond to the request, an agency may charge search fees (or in the case of a requester described under clause (ii)(II) of this subparagraph, duplication fees) if the agency has provided a timely written notice to the requester in accordance with paragraph (6)(B) and the agency has discussed with the requester via written mail, electronic mail, or telephone (or made not less than 3 good-faith attempts to do so) how the requester could effectively limit the scope of the request in accordance with paragraph (6)(B)(ii).

(cc) If a court has determined that exceptional circumstances exist (as that term is defined in paragraph (6)(C)), a failure described in subclause (I) shall be excused for the length of time provided by the court order.

(B) On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).

(C) Notwithstanding any other provision of law, the defendant shall serve an answer or otherwise plead to any complaint made under this subsection within thirty days after service upon the defendant of the pleading in which such complaint is made, unless the court otherwise directs for good cause shown.

[(D) Repealed. Pub. L. 98–620, title IV, § 402(2), Nov. 8, 1984, 98 Stat. 3357.]

(E)(i) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed.

(ii) For purposes of this subparagraph, a complainant has substantially prevailed if the complainant has obtained relief through either—

(I) a judicial order, or an enforceable written agreement or consent decree; or

(II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial.

(F)(i) Whenever the court orders the production of any agency records improperly withheld from the complainant and assesses against the United States reasonable attorney fees and other litigation costs, and the court additionally issues a written finding that the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding, the Special Counsel shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible for the withholding. The Special Counsel, after investigation and consideration of the evidence submitted, shall submit his findings and recommendations to the administrative authority of the agency concerned and shall send copies of the findings and recommendations to the officer or employee or his representative. The administrative authority shall take the corrective action that the Special Counsel recommends.

(ii) The Attorney General shall—

(I) notify the Special Counsel of each civil action described under the first sentence of clause (i); and

(II) annually submit a report to Congress on the number of such civil actions in the preceding year.

(iii) The Special Counsel shall annually submit a report to Congress on the actions taken by the Special Counsel under clause (i).

(G) In the event of noncompliance with the order of the court, the district court may punish for contempt the responsible employee, and in the case of a uniformed service, the responsible member.

(5) Each agency having more than one member shall maintain and make available for public inspection a record of the final votes of each member in every agency proceeding.

(6)(A) Each agency, upon any request for records made under paragraph (1), (2), or (3) of this subsection, shall—

(i) determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of—

(I) such determination and the reasons therefor;

(II) the right of such person to seek assistance from the FOIA Public Liaison of the agency; and

(III) in the case of an adverse determination—

(aa) the right of such person to appeal to the head of the agency, within a period determined by the head of the agency that is not less than 90 days after the date of such adverse determination; and

(bb) the right of such person to seek dispute resolution services from the FOIA Public Liaison of the agency or the Office of Government Information Services; and

(ii) make a determination with respect to any appeal within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of such appeal. If on appeal the denial of the request for records is in whole or in part upheld, the agency shall notify the person making such request of the provisions for judicial review of that determination under paragraph (4) of this subsection.

The 20-day period under clause (i) shall commence on the date on which the request is first received by the appropriate component of the agency, but in any event not later than ten days after the request is first received by any component of the agency that is designated in the agency's regulations under this section to receive requests under this section. The 20-day period shall not be tolled by the agency except—

(I) that the agency may make one request to the requester for information and toll the 20-day period while it is awaiting such information that it has reasonably requested from the requester under this section; or

(II) if necessary to clarify with the requester issues regarding fee assessment. In either case, the agency's receipt of the requester's response to the agency's request for information or clarification ends the tolling period.

(B)(i) In unusual circumstances as specified in this subparagraph, the time limits prescribed in either clause (i) or clause (ii) of subparagraph (A) may be extended by written notice to the person making such request setting forth the unusual circumstances for such extension and the date on which a determination is expected to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days, except as provided in clause (ii) of this subparagraph.

(ii) With respect to a request for which a written notice under clause (i) extends the time limits prescribed under clause (i) of subparagraph (A), the agency shall notify the person making the request if the request cannot be processed within the time limit specified in that clause and shall provide the person an opportunity to limit the scope of the request so that it may be processed within that time limit or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request. To aid the requester, each agency shall make available its FOIA Public Liaison, who shall assist in the resolution of any disputes between the requester and the agency, and notify the requester of the right of the requester to seek dispute resolution services from the Office of Government Information Services. Refusal by the person to reasonably modify the request or arrange such an alternative time frame shall be considered as a factor in determining whether exceptional circumstances exist for purposes of subparagraph (C).

(iii) As used in this subparagraph, ''unusual circumstances'' means, but only to the extent reasonably necessary to the proper processing of the particular requests—

(I) the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request;

(II) the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or

(III) the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject-matter interest therein.

(iv) Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for the aggregation of certain requests by the same requestor, or by a group of requestors acting in concert, if the agency reasonably believes that such requests actually constitute a single request, which would otherwise satisfy the unusual circumstances specified in this subparagraph, and the requests involve clearly related matters. Multiple requests involving unrelated matters shall not be aggregated.

(C)(i) Any person making a request to any agency for records under paragraph (1), (2), or (3) of this subsection shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph. If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records. Upon any determination by an agency to comply with a request for records, the records shall be made promptly available to such person making such request. Any notification of denial of any request for records under this subsection shall set forth the names and titles or positions of each person responsible for the denial of such request.

(ii) For purposes of this subparagraph, the term ''exceptional circumstances'' does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.

(iii) Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

(D)(i) Each agency may promulgate regulations, pursuant to notice and receipt of public

comment, providing for multitrack processing of requests for records based on the amount of work or time (or both) involved in processing requests.

(ii) Regulations under this subparagraph may provide a person making a request that does not qualify for the fastest multitrack processing an opportunity to limit the scope of the request in order to qualify for faster processing.

(iii) This subparagraph shall not be considered to affect the requirement under subparagraph (C) to exercise due diligence.

(E)(i) Each agency shall promulgate regulations, pursuant to notice and receipt of public comment, providing for expedited processing of requests for records—

(I) in cases in which the person requesting the records demonstrates a compelling need; and

(II) in other cases determined by the agency.

(ii) Notwithstanding clause (i), regulations under this subparagraph must ensure—

(I) that a determination of whether to provide expedited processing shall be made, and notice of the determination shall be provided to the person making the request, within 10 days after the date of the request; and

(II) expeditious consideration of administrative appeals of such determinations of whether to provide expedited processing.

(iii) An agency shall process as soon as practicable any request for records to which the agency has granted expedited processing under this subparagraph. Agency action to deny or affirm denial of a request for expedited processing pursuant to this subparagraph, and failure by an agency to respond in a timely manner to such a request shall be subject to judicial review under paragraph (4), except that the judicial review shall be based on the record before the agency at the time of the determination.

(iv) A district court of the United States shall not have jurisdiction to review an agency denial of expedited processing of a request for records after the agency has provided a complete response to the request.

(v) For purposes of this subparagraph, the term "compelling need" means—

(I) that a failure to obtain requested records on an expedited basis under this paragraph could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

(II) with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity.

(vi) A demonstration of a compelling need by a person making a request for expedited processing shall be made by a statement certified by such person to be true and correct to the best of such person's knowledge and belief.

(F) In denying a request for records, in whole or in part, an agency shall make a reasonable effort to estimate the volume of any requested matter the provision of which is denied, and shall provide any such estimate to the person making the request, unless providing such estimate would harm an interest protected by the exemption in subsection (b) pursuant to which the denial is made.

(7) Each agency shall—

(A) establish a system to assign an individualized tracking number for each request received that will take longer than ten days to process and provide to each person making a request the tracking number assigned to the request; and

(B) establish a telephone line or Internet service that provides information about the status of a request to the person making the request using the assigned tracking number, including—

(i) the date on which the agency originally received the request; and

(ii) an estimated date on which the agency will complete action on the request.

(8)(A) An agency shall—

(i) withhold information under this section only if—

(I) the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b); or

(II) disclosure is prohibited by law; and

(ii)(I) consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible; and

(II) take reasonable steps necessary to segregate and release nonexempt information; and

(B) Nothing in this paragraph requires disclosure of information that is otherwise prohibited from disclosure by law, or otherwise exempted from disclosure under subsection (b)(3).

(b) This section does not apply to matters that are—

(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;

(2) related solely to the internal personnel rules and practices of an agency;

(3) specifically exempted from disclosure by statute (other than section 552b of this title), if that statute—

(A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

(B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(5) inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested;

(6) personnel and medical files and similar files the disclosure of which would constitute

a clearly unwarranted invasion of personal privacy;

(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;

(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(9) geological and geophysical information and data, including maps, concerning wells.

Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection. The amount of information deleted, and the exemption under which the deletion is made, shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption in this subsection under which the deletion is made. If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made.

(c)(1) Whenever a request is made which involves access to records described in subsection (b)(7)(A) and—

(A) the investigation or proceeding involves a possible violation of criminal law; and

(B) there is reason to believe that (i) the subject of the investigation or proceeding is not aware of its pendency, and (ii) disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings,

the agency may, during only such time as that circumstance continues, treat the records as not subject to the requirements of this section.

(2) Whenever informant records maintained by a criminal law enforcement agency under an informant's name or personal identifier are requested by a third party according to the informant's name or personal identifier, the agency may treat the records as not subject to the requirements of this section unless the informant's status as an informant has been officially confirmed.

(3) Whenever a request is made which involves access to records maintained by the Federal Bureau of Investigation pertaining to foreign intelligence or counterintelligence, or international terrorism, and the existence of the records is classified information as provided in subsection (b)(1), the Bureau may, as long as the existence of the records remains classified information, treat the records as not subject to the requirements of this section.

(d) This section does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in this section. This section is not authority to withhold information from Congress.

(e)(1) On or before February 1 of each year, each agency shall submit to the Attorney General of the United States and to the Director of the Office of Government Information Services a report which shall cover the preceding fiscal year and which shall include—

(A) the number of determinations made by the agency not to comply with requests for records made to such agency under subsection (a) and the reasons for each such determination;

(B)(i) the number of appeals made by persons under subsection (a)(6), the result of such appeals, and the reason for the action upon each appeal that results in a denial of information; and

(ii) a complete list of all statutes that the agency relies upon to authorize the agency to withhold information under subsection (b)(3), the number of occasions on which each statute was relied upon, a description of whether a court has upheld the decision of the agency to withhold information under each such statute, and a concise description of the scope of any information withheld;

(C) the number of requests for records pending before the agency as of September 30 of the preceding year, and the median and average number of days that such requests had been pending before the agency as of that date;

(D) the number of requests for records received by the agency and the number of requests which the agency processed;

(E) the median number of days taken by the agency to process different types of requests, based on the date on which the requests were received by the agency;

(F) the average number of days for the agency to respond to a request beginning on the date on which the request was received by the agency, the median number of days for the agency to respond to such requests, and the range in number of days for the agency to respond to such requests;

(G) based on the number of business days that have elapsed since each request was originally received by the agency—

(i) the number of requests for records to which the agency has responded with a determination within a period up to and including 20 days, and in 20-day increments up to and including 200 days;

(ii) the number of requests for records to which the agency has responded with a determination within a period greater than 200 days and less than 301 days;

(iii) the number of requests for records to which the agency has responded with a determination within a period greater than 300 days and less than 401 days; and

(iv) the number of requests for records to which the agency has responded with a determination within a period greater than 400 days;

(H) the average number of days for the agency to provide the granted information beginning on the date on which the request was originally filed, the median number of days for the agency to provide the granted information, and the range in number of days for the agency to provide the granted information;

(I) the median and average number of days for the agency to respond to administrative appeals based on the date on which the appeals originally were received by the agency, the highest number of business days taken by the agency to respond to an administrative appeal, and the lowest number of business days taken by the agency to respond to an administrative appeal;

(J) data on the 10 active requests with the earliest filing dates pending at each agency, including the amount of time that has elapsed since each request was originally received by the agency;

(K) data on the 10 active administrative appeals with the earliest filing dates pending before the agency as of September 30 of the preceding year, including the number of business days that have elapsed since the requests were originally received by the agency;

(L) the number of expedited review requests that are granted and denied, the average and median number of days for adjudicating expedited review requests, and the number adjudicated within the required 10 days;

(M) the number of fee waiver requests that are granted and denied, and the average and median number of days for adjudicating fee waiver determinations;

(N) the total amount of fees collected by the agency for processing requests;

(O) the number of full-time staff of the agency devoted to processing requests for records under this section, and the total amount expended by the agency for processing such requests;

(P) the number of times the agency denied a request for records under subsection (c); and

(Q) the number of records that were made available for public inspection in an electronic format under subsection (a)(2).

(2) Information in each report submitted under paragraph (1) shall be expressed in terms of each principal component of the agency and for the agency overall.

(3) Each agency shall make each such report available for public inspection in an electronic format. In addition, each agency shall make the raw statistical data used in each report available in a timely manner for public inspection in an electronic format, which shall be made available—

(A) without charge, license, or registration requirement;

(B) in an aggregated, searchable format; and

(C) in a format that may be downloaded in bulk.

(4) The Attorney General of the United States shall make each report which has been made available by electronic means available at a single electronic access point. The Attorney General of the United States shall notify the Chairman and ranking minority member of the Committee on Oversight and Government Reform of the House of Representatives and the Chairman and ranking minority member of the Committees on Homeland Security and Governmental Affairs and the Judiciary of the Senate, no later than March 1 of the year in which each such report is issued, that such reports are available by electronic means.

(5) The Attorney General of the United States, in consultation with the Director of the Office of Management and Budget, shall develop reporting and performance guidelines in connection with reports required by this subsection by October 1, 1997, and may establish additional requirements for such reports as the Attorney General determines may be useful.

(6)(A) The Attorney General of the United States shall submit to the Committee on Oversight and Government Reform of the House of Representatives, the Committee on the Judiciary of the Senate, and the President a report on or before March 1 of each calendar year, which shall include for the prior calendar year—

(i) a listing of the number of cases arising under this section;

(ii) a listing of—

(I) each subsection, and any exemption, if applicable, involved in each case arising under this section;

(II) the disposition of each case arising under this section; and

(III) the cost, fees, and penalties assessed under subparagraphs (E), (F), and (G) of subsection (a)(4); and

(iii) a description of the efforts undertaken by the Department of Justice to encourage agency compliance with this section.

(B) The Attorney General of the United States shall make—

(i) each report submitted under subparagraph (A) available for public inspection in an electronic format; and

(ii) the raw statistical data used in each report submitted under subparagraph (A) available for public inspection in an electronic format, which shall be made available—

(I) without charge, license, or registration requirement;

(II) in an aggregated, searchable format; and

(III) in a format that may be downloaded in bulk.

(f) For purposes of this section, the term—

(1) ''agency'' as defined in section 551(1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of

the Government (including the Executive Office of the President), or any independent regulatory agency; and

(2) ''record'' and any other term used in this section in reference to information includes—

(A) any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format; and

(B) any information described under subparagraph (A) that is maintained for an agency by an entity under Government contract, for the purposes of records management.

(g) The head of each agency shall prepare and make available for public inspection in an electronic format, reference material or a guide for requesting records or information from the agency, subject to the exemptions in subsection (b), including—

(1) an index of all major information systems of the agency;

(2) a description of major information and record locator systems maintained by the agency; and

(3) a handbook for obtaining various types and categories of public information from the agency pursuant to chapter 35 of title 44, and under this section.

(h)(1) There is established the Office of Government Information Services within the National Archives and Records Administration. The head of the Office shall be the Director of the Office of Government Information Services.

(2) The Office of Government Information Services shall—

(A) review policies and procedures of administrative agencies under this section;

(B) review compliance with this section by administrative agencies; and

(C) identify procedures and methods for improving compliance under this section.

(3) The Office of Government Information Services shall offer mediation services to resolve disputes between persons making requests under this section and administrative agencies as a nonexclusive alternative to litigation and may issue advisory opinions at the discretion of the Office or upon request of any party to a dispute.

(4)(A) Not less frequently than annually, the Director of the Office of Government Information Services shall submit to the Committee on Oversight and Government Reform of the House of Representatives, the Committee on the Judiciary of the Senate, and the President—

(i) a report on the findings of the information reviewed and identified under paragraph (2);

(ii) a summary of the activities of the Office of Government Information Services under paragraph (3), including—

(I) any advisory opinions issued; and

(II) the number of times each agency engaged in dispute resolution with the assistance of the Office of Government Information Services or the FOIA Public Liaison; and

(iii) legislative and regulatory recommendations, if any, to improve the administration of this section.

(B) The Director of the Office of Government Information Services shall make each report submitted under subparagraph (A) available for public inspection in an electronic format.

(C) The Director of the Office of Government Information Services shall not be required to obtain the prior approval, comment, or review of any officer or agency of the United States, including the Department of Justice, the Archivist of the United States, or the Office of Management and Budget before submitting to Congress, or any committee or subcommittee thereof, any reports, recommendations, testimony, or comments, if such submissions include a statement indicating that the views expressed therein are those of the Director and do not necessarily represent the views of the President.

(5) The Director of the Office of Government Information Services may directly submit additional information to Congress and the President as the Director determines to be appropriate.

(6) Not less frequently than annually, the Office of Government Information Services shall conduct a meeting that is open to the public on the review and reports by the Office and shall allow interested persons to appear and present oral or written statements at the meeting.

(i) The Government Accountability Office shall conduct audits of administrative agencies on the implementation of this section and issue reports detailing the results of such audits.

(j)(1) Each agency shall designate a Chief FOIA Officer who shall be a senior official of such agency (at the Assistant Secretary or equivalent level).

(2) The Chief FOIA Officer of each agency shall, subject to the authority of the head of the agency—

(A) have agency-wide responsibility for efficient and appropriate compliance with this section;

(B) monitor implementation of this section throughout the agency and keep the head of the agency, the chief legal officer of the agency, and the Attorney General appropriately informed of the agency's performance in implementing this section;

(C) recommend to the head of the agency such adjustments to agency practices, policies, personnel, and funding as may be necessary to improve its implementation of this section;

(D) review and report to the Attorney General, through the head of the agency, at such times and in such formats as the Attorney General may direct, on the agency's performance in implementing this section;

(E) facilitate public understanding of the purposes of the statutory exemptions of this section by including concise descriptions of the exemptions in both the agency's handbook issued under subsection (g), and the agency's annual report on this section, and by providing an overview, where appropriate, of certain general categories of agency records to which those exemptions apply;

(F) offer training to agency staff regarding their responsibilities under this section;

(G) serve as the primary agency liaison with the Office of Government Information Services and the Office of Information Policy; and

(H) designate 1 or more FOIA Public Liaisons.

(3) The Chief FOIA Officer of each agency shall review, not less frequently than annually, all aspects of the administration of this section by the agency to ensure compliance with the requirements of this section, including—

(A) agency regulations;

(B) disclosure of records required under paragraphs (2) and (8) of subsection (a);

(C) assessment of fees and determination of eligibility for fee waivers;

(D) the timely processing of requests for information under this section;

(E) the use of exemptions under subsection (b); and

(F) dispute resolution services with the assistance of the Office of Government Information Services or the FOIA Public Liaison.

(k)(1) There is established in the executive branch the Chief FOIA Officers Council (referred to in this subsection as the ''Council'').

(2) The Council shall be comprised of the following members:

(A) The Deputy Director for Management of the Office of Management and Budget.

(B) The Director of the Office of Information Policy at the Department of Justice.

(C) The Director of the Office of Government Information Services.

(D) The Chief FOIA Officer of each agency.

(E) Any other officer or employee of the United States as designated by the Co-Chairs.

(3) The Director of the Office of Information Policy at the Department of Justice and the Director of the Office of Government Information Services shall be the Co-Chairs of the Council.

(4) The Administrator of General Services shall provide administrative and other support for the Council.

(5)(A) The duties of the Council shall include the following:

(i) Develop recommendations for increasing compliance and efficiency under this section.

(ii) Disseminate information about agency experiences, ideas, best practices, and innovative approaches related to this section.

(iii) Identify, develop, and coordinate initiatives to increase transparency and compliance with this section.

(iv) Promote the development and use of common performance measures for agency compliance with this section.

(B) In performing the duties described in subparagraph (A), the Council shall consult on a regular basis with members of the public who make requests under this section.

(6)(A) The Council shall meet regularly and such meetings shall be open to the public unless the Council determines to close the meeting for reasons of national security or to discuss information exempt under subsection (b).

(B) Not less frequently than annually, the Council shall hold a meeting that shall be open to the public and permit interested persons to appear and present oral and written statements to the Council.

(C) Not later than 10 business days before a meeting of the Council, notice of such meeting shall be published in the Federal Register.

(D) Except as provided in subsection (b), the records, reports, transcripts, minutes, appendices, working papers, drafts, studies, agenda, or other documents that were made available to or prepared for or by the Council shall be made publicly available.

(E) Detailed minutes of each meeting of the Council shall be kept and shall contain a record of the persons present, a complete and accurate description of matters discussed and conclusions reached, and copies of all reports received, issued, or approved by the Council. The minutes shall be redacted as necessary and made publicly available.

(*l*) FOIA Public Liaisons shall report to the agency Chief FOIA Officer and shall serve as supervisory officials to whom a requester under this section can raise concerns about the service the requester has received from the FOIA Requester Center, following an initial response from the FOIA Requester Center Staff. FOIA Public Liaisons shall be responsible for assisting in reducing delays, increasing transparency and understanding of the status of requests, and assisting in the resolution of disputes.

(m)(1) The Director of the Office of Management and Budget, in consultation with the Attorney General, shall ensure the operation of a consolidated online request portal that allows a member of the public to submit a request for records under subsection (a) to any agency from a single website. The portal may include any additional tools the Director of the Office of Management and Budget finds will improve the implementation of this section.

(2) This subsection shall not be construed to alter the power of any other agency to create or maintain an independent online portal for the submission of a request for records under this section. The Director of the Office of Management and Budget shall establish standards for interoperability between the portal required under paragraph (1) and other request processing software used by agencies subject to this section.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 383; Pub. L. 90–23, § 1, June 5, 1967, 81 Stat. 54; Pub. L. 93–502, §§ 1–3, Nov. 21, 1974, 88 Stat. 1561–1564; Pub. L. 94–409, § 5(b), Sept. 13, 1976, 90 Stat. 1247; Pub. L. 95–454, title IX, § 906(a)(10), Oct. 13, 1978, 92 Stat. 1225; Pub. L. 98–620, title IV, § 402(2), Nov. 8, 1984, 98 Stat. 3357; Pub. L. 99–570, title I, §§ 1802, 1803, Oct. 27, 1986, 100 Stat. 3207–48, 3207–49; Pub. L. 104–231, §§ 3–11, Oct. 2, 1996, 110 Stat. 3049–3054; Pub. L. 107–306, title III, § 312, Nov. 27, 2002, 116 Stat. 2390; Pub. L. 110–175, §§ 3, 4(a), 5, 6(a)(1), (b)(1), 7(a), 8–10(a), 12, Dec. 31, 2007, 121 Stat. 2525–2530; Pub. L. 111–83, title V, § 564(b), Oct. 28, 2009, 123 Stat. 2184; Pub. L. 114–185, § 2, June 30, 2016, 130 Stat. 538.)

HISTORICAL AND REVISION NOTES
1966 ACT

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1002. | June 11, 1946, ch. 324, § 3, 60 Stat. 238. |

28 U.S. Code § 1291 - Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.


28 U.S. Code § 1331 - Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

in utilization and depletion of these resources, together with such recommendations for legislative programs as may be necessary to implement the policy of this section.''

SHORT TITLE

Pub. L. 91–631, § 1, Dec. 31, 1970, 84 Stat. 1876, provided: "That this Act [enacting this section] may be cited as the 'Mining and Minerals Policy Act of 1970'.''

### § 22. Lands open to purchase by citizens

Except as otherwise provided, all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States and those who have declared their intention to become such, under regulations prescribed by law, and according to the local customs or rules of miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States.

(R.S. § 2319.)

CODIFICATION

R.S. § 2319 derived from act May 10, 1872, ch. 152, § 1, 17 Stat. 91.

Words "Except as otherwise provided," were editorially supplied on authority of act Feb. 25, 1920, ch. 85, 41 Stat. 437, popularly known as the Mineral Lands Leasing Act, which is classified to chapter 3A (§ 181 et seq.) of this title.

SHORT TITLE

Sections 22 to 24, 26 to 28, 29, 30, 33 to 35, 37, 39 to 43, and 47 of this title are based on sections of the Revised Statutes which are derived from act May 10, 1872, ch. 152, 17 Stat. 91, popularly known as the "General Mining Act of 1872" and as the "Mining Law of 1872".

### § 23. Length of claims on veins or lodes

Mining claims upon veins or lodes of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, copper, or other valuable deposits, located prior to May 10, 1872, shall be governed as to length along the vein or lode by the customs, regulations, and laws in force at the date of their location. A mining claim located after the 10th day of May 1872, whether located by one or more persons, may equal, but shall not exceed, one thousand five hundred feet in length along the vein or lode; but no location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located. No claim shall extend more than three hundred feet on each side of the middle of the vein at the surface, nor shall any claim be limited by any mining regulation to less than twenty-five feet on each side of the middle of the vein at the surface, except where adverse rights existing on the 10th day of May 1872 render such limitation necessary. The end lines of each claim shall be parallel to each other.

(R.S. § 2320.)

CODIFICATION

R.S. § 2320 derived from act May 10, 1872, ch. 152, § 2, 17 Stat. 91.

### § 24. Proof of citizenship

Proof of citizenship, under sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, may consist, in the case of an individual, of his own affidavit thereof; in the case of an association of persons unincorporated, of the affidavit of their authorized agent, made on his own knowledge, or upon information and belief; and in the case of a corporation organized under the laws of the United States, or of any State or Territory thereof, by the filing of a certified copy of their charter or certificate of incorporation.

(R.S. § 2321.)

REFERENCES IN TEXT

Sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, referred to in text, were in the original "this chapter", meaning chapter 6 of title 32 of the Revised Statutes, consisting of R.S. §§ 2318 to 2352.

CODIFICATION

R.S. § 2321 derived from act May 10, 1872, ch. 152, § 7, 17 Stat. 94.

### § 25. Affidavit of citizenship

Applicants for mineral patents, if residing beyond the limits of the district wherein the claim is situated, may make any oath or affidavit required for proof of citizenship before the clerk of any court of record or before any notary public of any State or Territory.

(Apr. 26, 1882, ch. 106, § 2, 22 Stat. 49.)

### § 26. Locators' rights of possession and enjoyment

The locators of all mining locations made on any mineral vein, lode, or ledge, situated on the public domain, their heirs and assigns, where no adverse claim existed on the 10th day of May 1872 so long as they comply with the laws of the United States, and with State, territorial, and local regulations not in conflict with the laws of the United States governing their possessory title, shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations. But their right of possession to such outside parts of such veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as above described, through the end lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of such veins or ledges. Nothing in this section shall authorize the locator or possessor of a vein or lode which extends in its downward course beyond the vertical lines of his claim to enter upon the surface of a claim owned or possessed by another.

(R.S. § 2322.)

CODIFICATION

R.S. § 2322 derived from act May 10, 1872, ch. 152, § 3, 17 Stat. 91.

### § 27. Mining tunnels; right to possession of veins on line with; abandonment of right

Where a tunnel is run for the development of a vein or lode, or for the discovery of mines, the

of Land Management. In the general reorganization and realignment of functions of the Bureau, the office of the Chief Cadastral Engineer was abolished, and the functions of that office have been delegated to the Director of the Bureau of Land Management. See 43 C.F.R. § 9180.0–3(a)(1).

In sentence beginning "The Director of the Bureau of Land Management shall also have power", "Director of the Bureau of Land Management" substituted for "Commissioner of the General Land Office" in two instances and "Director" for "Commissioner" on authority of Reorg. Plan No. 3 of 1946, § 403, set out in the Appendix to Title 5. Section 403 of Reorg. Plan No. 3 of 1946, abolished the office of the Commissioner of the General Land Office and consolidated the functions of the General Land Office with the Grazing Service to form the Bureau of Land Management.

Office of register of district land office abolished and all functions of register transferred to Secretary of the Interior, or to officers and agencies of Department of the Interior as Secretary may designate, by Reorg. Plan No. 3 of 1946, § 403, set out in the Appendix to Title 5.

See also note set out under section 1 of this title.

## § 40. Verification of affidavits

All affidavits required to be made under sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title, and section 661 of title 43 may be verified before any officer authorized to administer oaths within the land district where the claims may be situated, and all testimony and proofs may be taken before any such officer, and, when duly certified by the officer taking the same, shall have the same force and effect as if taken before the register of the land office. In cases of contest as to the mineral or agricultural character of land, the testimony and proofs may be taken as herein provided on personal notice of at least ten days to the opposing party; or if such party cannot be found, then by publication of at least once a week for thirty days in a newspaper, to be designated by the register of the land office as published nearest to the location of such land; and the register shall require proof that such notice has been given.

(R.S. § 2335; Mar. 3, 1925, ch. 462, 43 Stat. 1145; 1946 Reorg. Plan No. 3, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100.)

### REFERENCES IN TEXT

Sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, referred to in text, were in the original "this chapter", meaning chapter 6 of title 32 of the Revised Statutes, consisting of R.S. §§ 2318 to 2352.

### CODIFICATION

R.S. § 2335 derived from act May 10, 1872, ch. 152, § 13, 17 Stat. 95.

### AMENDMENTS

1925—Act Mar. 3, 1925, affected words in first sentence of text, now reading "before the register of the land office." Such words formerly read "before the register and receiver of the land-office." Such act is treated more fully in note under section 29 of this title.

### TRANSFER OF FUNCTIONS

Office of register of district land office abolished and all functions of register transferred to Secretary of the Interior, or to officers and agencies of Department of the Interior as Secretary may designate, by Reorg. Plan No. 3 of 1946, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100, set out in the Appendix to Title 5, Government Organization and Employees.

See also note set out under section 1 of this title.

## § 41. Intersecting or crossing veins

Where two or more veins intersect or cross each other, priority of title shall govern, and such prior location shall be entitled to all ore or mineral contained within the space of intersection; but the subsequent location shall have the right-of-way through the space of intersection for the purposes of the convenient working of the mine. And where two or more veins unite, the oldest or prior location shall take the vein below the point of union, including all the space of intersection.

(R.S. § 2336.)

### CODIFICATION

R.S. § 2336 derived from act May 10, 1872, ch. 152, § 14, 17 Stat. 96.

## § 42. Patents for nonmineral lands: application, survey, notice, acreage limitation, payment

### (a) Vein or lode and mill site owners eligible

Where nonmineral land not contiguous to the vein or lode is used or occupied by the proprietor of such vein or lode for mining or milling purposes, such nonadjacent surface ground may be embraced and included in an application for a patent for such vein or lode, and the same may be patented therewith, subject to the same preliminary requirements as to survey and notice as are applicable to veins or lodes; but no location made on and after May 10, 1872, of such nonadjacent land shall exceed five acres, and payment for the same must be made at the same rate as fixed by sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43 for the superficies of the lode. The owner of a quartz mill or reduction works, not owning a mine in connection therewith, may also receive a patent for his mill site, as provided in this section.

### (b) Placer claim owners eligible

Where nonmineral land is needed by the proprietor of a placer claim for mining, milling, processing, beneficiation, or other operations in connection with such claim, and is used or occupied by the proprietor for such purposes, such land may be included in an application for a patent for such claim, and may be patented therewith subject to the same requirements as to survey and notice as are applicable to placers. No location made of such nonmineral land shall exceed five acres and payment for the same shall be made at the rate applicable to placer claims which do not include a vein or lode.

(R.S. § 2337; Pub. L. 86–390, Mar. 18, 1960, 74 Stat. 7.)

### REFERENCES IN TEXT

Sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of title 43, referred to in subsec. (a), were in the original "this chapter", meaning chapter 6 of title 32 of the Revised Statutes, consisting of R.S. §§ 2318 to 2352.

### CODIFICATION

R.S. § 2337 derived from act May 10, 1872, ch. 152, § 15, 17 Stat. 96.

### AMENDMENTS

1960—Pub. L. 86–390 designated existing provisions as subsec. (a) and added subsec. (b).

Sec.

SUBCHAPTER II—MINING LOCATIONS

611. Common varieties of sand, stone, gravel, pumice, pumicite, or cinders, and petrified wood.
612. Unpatented mining claims.
613. Procedure for determining title uncertainties.
614. Waiver of rights.
615. Limitation of existing rights.

## SUBCHAPTER I—DISPOSAL OF MATERIALS ON PUBLIC LANDS

### § 601. Rules and regulations governing disposal of materials; payment; removal without charge; lands excluded

The Secretary, under such rules and regulations as he may prescribe, may dispose of mineral materials (including but not limited to common varieties of the following: sand, stone, gravel, pumice, pumicite, cinders, and clay) and vegetative materials (including but not limited to yucca, manzanita, mesquite, cactus, and timber or other forest products) on public lands of the United States, including, for the purposes of this subchapter, land described in subchapter V of chapter 28 of title 43, if the disposal of such mineral or vegetative materials (1) is not otherwise expressly authorized by law, including, but not limited to, subchapter I of chapter 8A of title 43, and the United States mining laws, and (2) is not expressly prohibited by laws of the United States, and (3) would not be detrimental to the public interest. Such materials may be disposed of only in accordance with the provisions of this subchapter and upon the payment of adequate compensation therefor, to be determined by the Secretary: *Provided, however,* That, to the extent not otherwise authorized by law, the Secretary is authorized in his discretion to permit any Federal, State, or Territorial agency, unit or subdivision, including municipalities, or any association or corporation not organized for profit, to take and remove, without charge, materials and resources subject to this subchapter, for use other than for commercial or industrial purposes or resale. Where the lands have been withdrawn in aid of a function of a Federal department or agency other than the department headed by the Secretary or of a State, Territory, county, municipality, water district or other local governmental subdivision or agency, the Secretary may make disposals under this subchapter only with the consent of such other Federal department or agency or of such State, Territory, or local governmental unit. Nothing in this subchapter shall be construed to apply to lands in any national park, or national monument or to any Indian lands, or lands set aside or held for the use or benefit of Indians, including lands over which jurisdiction has been transferred to the Department of the Interior by Executive order for the use of Indians. As used in this subchapter, the word "Secretary" means the Secretary of the Interior except that it means the Secretary of Agriculture where the lands involved are administered by him for national forest purposes or for the purposes of title III of the Bankhead-Jones Farm Tenant Act [7 U.S.C. 1010 et seq.] or where withdrawn for the purpose of any other function of the Department of Agriculture.

(July 31, 1947, ch. 406, § 1, 61 Stat. 681; July 23, 1955, ch. 375, § 1, 69 Stat. 367.)

#### Editorial Notes

##### REFERENCES IN TEXT

Subchapter V (§ 1181a et seq.) of chapter 28 of title 43, referred to in text, was in the original a reference to the Acts of Aug. 28, 1937 (50 Stat. 874), and June 24, 1954 (68 Stat. 270). For complete classification of these Acts to the Code, see Tables.

Subchapter I (§ 315 et seq.) of chapter 8A of title 43, referred to in text, was in the original a reference to the Act of June 28, 1934 (48 Stat. 1269), known as the Taylor Grazing Act. For complete classification of this Act to the Code, see Short Title note set out under section 315 of Title 43 and Tables.

The Bankhead-Jones Farm Tenant Act, referred to in text, is act July 22, 1937, ch. 517, 50 Stat. 522. Title III of such Act is classified generally to subchapter III (§ 1010 et seq.) of chapter 33 of Title 7, Agriculture. For complete classification of this Act to the Code, see section 1000 of Title 7 and Tables.

##### AMENDMENTS

1955—Act July 23, 1955, required disposal under this subchapter of common varieties of sand, stone, gravel, pumice, pumicite, and cinders, and gave the Secretary of Agriculture the same authority as to lands under his jurisdiction as the Secretary of Interior possesses as to lands under his jurisdiction in the disposal of mining and vegetative materials.

#### Statutory Notes and Related Subsidiaries

##### SHORT TITLE

Act July 31, 1947, ch. 406, 61 Stat. 681, as amended, which is classified to this subchapter, is popularly known as the "Materials Act of 1947".

#### Executive Documents

##### TRANSFER OF FUNCTIONS

Enforcement functions of Secretary or other official in Department of the Interior related to compliance with materials sales contracts under this subchapter and removal permits issued under this subchapter and enforcement functions of Secretary or other official in Department of Agriculture insofar as they involve lands and programs under jurisdiction of that Department related to compliance with removal of materials under this subchapter with respect to pre-construction, construction, and initial operation of transportation system for Canadian and Alaskan natural gas transferred to Federal Inspector, Office of Federal Inspector for Alaska Natural Gas Transportation System, until first anniversary of date of initial operation of Alaska Natural Gas Transportation System, see Reorg. Plan No. 1 of 1979, §§ 102(e), (f), 203(a), eff. July 1, 1979, 44 F.R. 33663, 33666, 93 Stat. 1373, 1376, set out in the Appendix to Title 5, Government Organization and Employees. Office of Federal Inspector for the Alaska Natural Gas Transportation System abolished and functions and authority vested in Inspector transferred to Secretary of Energy by section 3012(b) of Pub. L. 102–486, set out as an Abolition of Office of Federal Inspector note under section 719e of Title 15, Commerce and Trade. Functions and authority vested in Secretary of Energy subsequently transferred to Federal Coordinator for Alaska Natural Gas Transportation Projects by section 720d(f) of Title 15.

### § 602. Bidding; advertising and other notice; conditions for negotiation of contract

(a) The Secretary shall dispose of materials under this subchapter to the highest responsible qualified bidder after formal advertising and

such other public notice as he deems appropriate: *Provided, however,* That the Secretary may authorize negotiation of a contract for the disposal of materials if—

　　(1) the contract is for the sale of less than two hundred fifty thousand board-feet of timber; or, if

　　(2) the contract is for the disposal of materials to be used in connection with a public works improvement program on behalf of a Federal, State or local governmental agency and the public exigency will not permit the delay incident to advertising; or, if

　　(3) the contract is for the disposal of property for which it is impracticable to obtain competition.

(b) Repealed. Pub. L. 96–470, title I, § 102(a), Oct. 19, 1980, 94 Stat. 2237.

(July 31, 1947, ch. 406, § 2, 61 Stat. 681; Pub. L. 87–689, § 1, Sept. 25, 1962, 76 Stat. 587; Pub. L. 94–273, § 20, Apr. 21, 1976, 90 Stat. 379; Pub. L. 96–470, title I, § 102(a), Oct. 19, 1980, 94 Stat. 2237.)

#### Editorial Notes

##### AMENDMENTS

1980—Subsec. (b). Pub. L. 96–470 struck out subsec. (b) which required a report to be made to Congress on Apr. 1 and Oct. 1 of each year of the contracts made under subsec. (a)(2) and (3) during the period since the date of the last report, which report was to name each purchaser, furnish the appraised value of the material involved, state the amount of each contract, and describe the circumstances leading to the determination that the contract should be entered into by negotiation instead of competitive bidding after formal advertising.

1976—Subsec. (b). Pub. L. 94–273 substituted "April" for "January" and "October" for "July".

1962—Pub. L. 87–689 designated existing provisions as subsec. (a), substituted therein provisions requiring the Secretary to dispose of materials after formal advertising and such other public notice as he deems appropriate, and authorizing negotiation of a contract for the sale of less than 250,000 board-feet of timber, or for materials to be used in connection with public works improvement program for a Federal, State, or local governmental agency where the public exigency will not permit the delay of advertising, or for property for which it is impracticable to obtain competition, for provisions requiring publication of notice once a week for 4 consecutive weeks in a newspaper of general circulation, and competitive bidding, in cases where the value was in excess of $1,000, and permitting disposal upon such notice and in such manner as he prescribed where the value was $1,000 or less, and added subsec. (b).

#### Executive Documents

##### TRANSFER OF FUNCTIONS

For transfer of certain enforcement functions of Secretary or other appropriate officer or entity in Departments of Agriculture and the Interior under this subchapter to Federal Inspector of Office of Federal Inspector for Alaska Natural Gas Transportation System, and subsequent transfer to Secretary of Energy, then to Federal Coordinator for Alaska Natural Gas Transportation Projects, see note set out under section 601 of this title.

### § 603. Disposition of moneys from disposal of materials

All moneys received from the disposal of materials under this subchapter shall be disposed of

in the same manner as moneys received from the sale of public lands, except that moneys received from the disposal of materials by the Secretary of Agriculture shall be disposed of in the same manner as other moneys received by the Department of Agriculture from the administration of the lands from which the disposal of materials is made, and except that revenues from the lands described in subchapter I of chapter 44 of title 43 and subchapter III of chapter 44 of title 43 shall be disposed of in accordance with said subchapters and except that moneys received from the disposal of materials from school section lands in Alaska, reserved under section 1 of the Act of March 4, 1915 (38 Stat. 1214), shall be set apart as separate and permanent funds in the Territorial Treasury, as provided for income derived from said school section lands pursuant to said Act.

(July 31, 1947, ch. 406, § 3, 61 Stat. 681; Aug. 31, 1950, ch. 830, 64 Stat. 571; July 23, 1955, ch. 375, § 2, 69 Stat. 368.)

#### Editorial Notes

##### REFERENCES IN TEXT

Subchapter I of chapter 44 of title 43, referred to in text, was in the original a reference to act Aug. 28, 1937, ch. 876, 50 Stat. 874, which is classified principally to subchapter I (§ 2601 et seq.) of chapter 44 of Title 43, Public Lands. For complete classification of this Act to the Code, see Tables.

Subchapter III of chapter 44 of title 43, referred to in text, was in the original a reference to act June 24, 1954, ch. 357, 68 Stat. 270, which is classified principally to subchapter III (§ 2631 et seq.) of chapter 44 of Title 43. For complete classification of this Act to the Code, see Tables.

Act of March 4, 1915 (38 Stat. 1214), referred to in text, is act Mar. 4, 1915, ch. 181, 38 Stat. 1214. Section 1 of that Act, which made reservation of certain Alaska lands for educational purposes, covered disposition of proceeds or income derived from reserved lands, and set out the exclusion of certain lands, was classified to section 353 of Title 48, Territories and Insular Possessions, and was repealed by Pub. L. 85–508, § 6(k), July 7, 1958, 72 Stat. 343. For complete classification of this Act to the Code, see Tables.

##### AMENDMENTS

1955—Act July 23, 1955, provided for the disposal of moneys received by the Secretary of Agriculture, and for the disposal of revenues from lands described in subchapters I and III of chapter 44 of title 43.

1950—Act Aug. 31, 1950, provided for setting apart as separate and permanent funds in the Territorial Treasury moneys received from disposal of materials from school section lands in Alaska.

#### Executive Documents

##### TRANSFER OF FUNCTIONS

For transfer of certain enforcement functions of Secretary or other appropriate officer or entity in Departments of Agriculture and the Interior under this subchapter to Federal Inspector of Office of Federal Inspector for Alaska Natural Gas Transportation System, and subsequent transfer to Secretary of Energy, then to Federal Coordinator for Alaska Natural Gas Transportation Projects, see note set out under section 601 of this title.

##### ADMISSION OF ALASKA AS STATE

Admission of Alaska into the Union was accomplished Jan. 3, 1959, on issuance of Proc. No. 3269, Jan.

GSCA_Add_047



out as notes preceding section 21 of Title 48, Territories and Insular Possessions.

### § 604. Disposal of sand, peat moss, etc., in Alaska; contracts

Subject to the provisions of this subchapter, the Secretary may dispose of sand, stone, gravel, and vegetative materials located below high-water mark of navigable waters of the Territory of Alaska. Any contract, unexecuted in whole or in part, for the disposal under this subchapter of materials from land, title to which is transferred to a future State upon its admission to the Union, and which is situated within its boundaries, may be terminated or adopted by such State.

(July 31, 1947, ch. 406, § 4, as added Aug. 31, 1950, ch. 830, 64 Stat. 572.)

#### TRANSFER OF FUNCTIONS

For transfer of certain enforcement functions of Secretary or other appropriate officer or entity in Departments of Agriculture and the Interior under this subchapter to Federal Inspector of Office of Federal Inspector for Alaska Natural Gas Transportation System, and subsequent transfer to Secretary of Energy, then to Federal Coordinator for Alaska Natural Gas Transportation Projects, see note set out under section 601 of this title.

#### ADMISSION OF ALASKA AS STATE

Admission of Alaska into the Union was accomplished Jan. 3, 1959, on issuance of Proc. No. 3269, Jan. 3, 1959, 24 F.R. 81, 73 Stat. c16, as required by sections 1 and 8(c) of Pub. L. 85–508, July 7, 1958, 72 Stat. 339, set out as notes preceding section 21 of Title 48, Territories and Insular Possessions.

### SUBCHAPTER II—MINING LOCATIONS

### § 611. Common varieties of sand, stone, gravel, pumice, pumicite, or cinders, and petrified wood

No deposit of common varieties of sand, stone, gravel, pumice, pumicite, or cinders and no deposit of petrified wood shall be deemed a valuable mineral deposit within the meaning of the mining laws of the United States so as to give effective validity to any mining claim hereafter located under such mining laws: *Provided, however*, That nothing herein shall affect the validity of any mining location based upon discovery of some other mineral occurring in or in association with such a deposit. "Common varieties" as used in this subchapter and sections 601 and 603 of this title does not include deposits of such materials which are valuable because the deposit has some property giving it distinct and special value and does not include so-called "block pumice" which occurs in nature in pieces having one dimension of two inches or more. "Petrified wood" as used in this subchapter and sections 601 and 603 of this title means agatized, opalized, petrified, or silicified wood, or any material formed by the replacement of wood by silica or other matter.

(July 23, 1955, ch. 375, § 3, 69 Stat. 368; Pub. L. 87–713, § 1, Sept. 28, 1962, 76 Stat. 652.)

#### AMENDMENTS

1962—Pub. L. 87–713 defined "petrified wood", and provided that no deposit of petrified wood shall be deemed

a valuable mineral deposit within the mining laws of the United States.

#### REGULATIONS FOR REMOVAL OF LIMITED QUANTITIES OF PETRIFIED WOOD

Section 2 of Pub. L. 87–713 provided that: "The Secretary of the Interior shall provide by regulation that limited quantities of petrified wood may be removed without charge from those public lands which he shall specify."

### § 612. Unpatented mining claims

#### (a) Prospecting, mining or processing operations

Any mining claim hereafter located under the mining laws of the United States shall not be used, prior to issuance of patent therefor, for any purposes other than prospecting, mining or processing operations and uses reasonably incident thereto.

#### (b) Reservations in the United States to use of the surface and surface resources

Rights under any mining claim hereafter located under the mining laws of the United States shall be subject, prior to issuance of patent therefor, to the right of the United States to manage and dispose of the vegetative surface resources thereof and to manage other surface resources thereof (except mineral deposits subject to location under the mining laws of the United States). Any such mining claim shall also be subject, prior to issuance of patent therefor, to the right of the United States, its permittees, and licensees, to use so much of the surface thereof as may be necessary for such purposes or for access to adjacent land: *Provided, however*, That any use of the surface of any such mining claim by the United States, its permittees or licensees, shall be such as not to endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto: *Provided further*, That if at any time the locator requires more timber for his mining operations than is available to him from the claim after disposition of timber therefrom by the United States, subsequent to the location of the claim, he shall be entitled, free of charge, to be supplied with timber for such requirements from the nearest timber administered by the disposing agency which is ready for harvesting under the rules and regulations of that agency and which is substantially equivalent in kind and quantity to the timber estimated by the disposing agency to have been disposed of from the claim: *Provided further*, That nothing in this subchapter and sections 601 and 603 of this title shall be construed as affecting or intended to affect or in any way interfere with or modify the laws of the States which lie wholly or in part westward of the ninety-eighth meridian relating to the ownership, control, appropriation, use, and distribution of ground or surface waters within any unpatented mining claim.

#### (c) Severance or removal of timber

Except to the extent required for the mining claimant's prospecting, mining or processing operations and uses reasonably incident thereto, or for the construction of buildings or structures in connection therewith, or to provide clearance for such operations or uses, or to the extent authorized by the United States, no claimant of

This content is from the eCFR and is authoritative but unofficial.

## Title 43 —Public Lands: Interior
## Subtitle A —Office of the Secretary of the Interior

**Part 2**  Freedom of Information Act; Records and Testimony
  **Subpart A**  Introduction
    **§ 2.1**  What should you know up front?
    **§ 2.2**  What kinds of records are not covered by the regulations in subparts A through I of this part?
  **Subpart B**  How To Make a Request
    **§ 2.3**  Where should you send a FOIA request?
    **§ 2.4**  Does where you send your request affect its processing?
    **§ 2.5**  How should you describe the records you seek?
    **§ 2.6**  How will fee information affect the processing of your request?
    **§ 2.7**  What information should you include about your fee category?
    **§ 2.8**  Can you ask for records to be disclosed in a particular form or format?
    **§ 2.9**  What if your request seeks records about another person?
    **§ 2.10**  May you ask for the processing of your request to be expedited?
    **§ 2.11**  What contact information should your request include?
  **Subpart C**  Processing Requests
    **§ 2.12**  What should you know about how bureaus process requests?
    **§ 2.13**  How do consultations and referrals work?
  **Subpart D**  Timing of Responses to Requests
    **§ 2.14**  In what order are responses usually made?
    **§ 2.15**  What is multitrack processing and how does it affect your request?
    **§ 2.16**  What is the basic time limit for responding to a request?
    **§ 2.17**  When does the basic time limit begin for misdirected FOIA requests?
    **§ 2.18**  When can the bureau suspend the basic time limit?
    **§ 2.19**  When may the bureau extend the basic time limit?
    **§ 2.20**  When will expedited processing be provided and how will it affect your request?
  **Subpart E**  Responses to Requests
    **§ 2.21**  How will the bureau respond to requests?
    **§ 2.22**  How will the bureau grant requests?
    **§ 2.23**  When will the bureau deny a request or procedural benefits?
    **§ 2.24**  How will the bureau deny requests?
    **§ 2.25**  What if the requested records contain both exempt and nonexempt material?
  **Subpart F**  Handling Confidential Information
    **§ 2.26**  May submitters of possibly confidential information designate information as

GSCA_Add_049

confidential when making Departmental submissions?

**§ 2.27** When will the bureau notify a submitter of a request for their possibly confidential information?

**§ 2.28** What information will the bureau include when it notifies a submitter of a request for their possibly confidential information?

**§ 2.29** When will the bureau not notify a submitter of a request for their possibly confidential information?

**§ 2.30** How and when may a submitter object to the disclosure of confidential information?

**§ 2.31** What must a submitter include in a detailed Exemption 4 objection statement?

**§ 2.32** How will the bureau consider the submitter's objections?

**§ 2.33** What if the bureau determines it will disclose information over the submitter's objections?

**§ 2.34** Will a submitter be notified of a FOIA lawsuit?

**§ 2.35** Will you receive notification of activities involving the submitter?

**§ 2.36** Can a bureau release information protected by Exemption 4?

**Subpart G**  Fees

**§ 2.37** What general principles govern fees?

**§ 2.38** What are the requester fee categories?

**§ 2.39** How does your requester category affect the fees you are charged?

**§ 2.40** How will fee amounts be determined?

**§ 2.41** What search fees will you have to pay?

**§ 2.42** What duplication fees will you have to pay?

**§ 2.43** What review fees will you have to pay?

**§ 2.44** What fees for other services will you have to pay?

**§ 2.45** When will the bureau waive fees?

**§ 2.46** When may you ask the bureau for a fee waiver?

**§ 2.47** How will the bureau notify you if it denies your fee waiver request?

**§ 2.48** How will the bureau evaluate your fee waiver request?

**§ 2.49** When will you be notified of anticipated fees?

**§ 2.50** When will the bureau require advance payment?

**§ 2.51** What if the bureau needs clarification about fee issues?

**§ 2.52** How will you be billed?

**§ 2.53** How will the bureau collect fees owed?

**§ 2.54** When will the bureau combine or aggregate requests?

**§ 2.55** What if other statutes require the bureau to charge fees?

**§ 2.56** May the bureau waive or reduce your fees at its discretion?

**Subpart H**  Administrative Appeals

**§ 2.57** When may you file an appeal?

**§ 2.58** How long do you have to file an appeal?

GSCA_Add_050

**§ 2.59**   How do you file an appeal?

**§ 2.60**   Who makes decisions on appeals?

**§ 2.61**   How are decisions on appeals issued?

**§ 2.62**   When can you expect a decision on your appeal?

**§ 2.63**   Can you receive expedited processing of appeals?

**§ 2.64**   Must you submit an appeal before seeking judicial review?

**Subpart I**   General Information

**§ 2.65**   Where are records made available?

**§ 2.66**   What are FOIA Requester Centers and the FOIA Public Liaison?

**§ 2.67**   When will the Department make records available without a FOIA request?

**§ 2.68**   How will FOIA materials be preserved?

**§ 2.69**   How will a bureau handle a request for federally-funded research data?

**§ 2.70**   What definitions apply to subparts A through I of this part?

**Subpart J**   Declassification of Classified Documents

**§ 2.200**   Declassification of classified documents.

**Subpart K**   Privacy Act

**§ 2.220**   Purpose and scope.

**§ 2.221**   Definitions.

**§ 2.222**   Records subject to Privacy Act.

**§ 2.223**   Standards for maintenance of records subject to the Act.

*§ 2.224 [Reserved]*

**§ 2.225**   Federal Register notices describing systems of records.

**§ 2.226**   Assuring integrity of records.

**§ 2.227**   Conduct of employees.

**§ 2.228**   Government contracts.

*§§ 2.229-2.230 [Reserved]*

**§ 2.231**   Disclosure of records.

**§ 2.232**   Accounting for disclosures.

*§§ 2.233-2.234 [Reserved]*

**§ 2.235**   Request for notification of existence of records: Submission.

**§ 2.236**   Requests for notification of existence of records: Action on.

**§ 2.237**   Requests for access to records.

**§ 2.238**   Requests for access to records: Submission.

**§ 2.239**   Requests for access to records: Initial decision.

**§ 2.240**   Requests for notification of existence of records and for access to records: Appeals.

**§ 2.241**   Requests for access to records: Special situations.

*§§ 2.242-2.244 [Reserved]*

**§ 2.245**   Amendment of records.

**§ 2.246**   Petitions for amendment: Submission and form.

GSCA_Add_051

**§ 2.247**  Petitions for amendment: Processing and initial decision.

**§ 2.248**  Petitions for amendments: Time limits for processing.

**§ 2.249**  Petitions for amendment: Appeals.

**§ 2.250**  Petitions for amendment: Action on appeals.

*§ 2.251 [Reserved]*

**§ 2.252**  Statements of disagreement.

*§ 2.253 [Reserved]*

**§ 2.254**  Exemptions.

**Subpart L**  Legal Process: Testimony by Employees and Production of Records

General Information

**§ 2.280**  What does this subpart cover?

**§ 2.281**  What is the Department's policy on granting requests for employee testimony or Department records?

Responsibilities of Requesters

**§ 2.282**  How can I obtain employee testimony or Department records?

**§ 2.283**  If I serve a subpoena *duces tecum,* must I also submit a *Touhy* request?

**§ 2.284**  What information must I put in my *Touhy* Request?

**§ 2.285**  How much will I be charged?

**§ 2.286**  Can I get an authenticated copy of a Department record?

Responsibility of the Department

**§ 2.287**  How will the Department process my *Touhy* Request?

**§ 2.288**  What criteria will the Department consider in responding to my *Touhy* Request?

Responsibilities of Employees

**§ 2.289**  What must I, as an employee, do upon receiving a request?

**§ 2.290**  Must I get approval before testifying as an expert witness on a subject outside the scope of my official duties?

**Subpart M**  Social Security Number Fraud Prevention Act Requirements

**§ 2.300**  What is the purpose of this subpart?

**§ 2.301**  What does this subpart cover?

**§ 2.302**  What terms are used in this subpart?

**§ 2.303**  What are DOI's requirements for protecting SSNs in document sent by mail?

**Appendix A to Part 2**

Fee Schedule

**Appendix B to Part 2**

Mineral Leasing Act and Mineral Leasing Act for Acquired Lands—Special Rules

# PART 2—FREEDOM OF INFORMATION ACT; RECORDS AND TESTIMONY

**Authority:** 5 U.S.C. 301, 552, 552a, 553, 31 U.S.C. 3717, 43 U.S.C. 1460, 1461, the Social Security Number Fraud Prevention Act of 2017, Pub. L. 115-59, September 15, 2017.

**Source:** 40 FR 7305, Feb. 19, 1975, unless otherwise noted.

## Subpart A—Introduction

**Source:** 77 FR 76902, Dec. 31, 2012, unless otherwise noted.

## § 2.1 What should you know up front?

(a)  Subparts A through I of this part contain the rules that the Department follows in processing records under the Freedom of Information Act (FOIA), 5 U.S.C. 552.

(b)  Definitions of terms used in Subparts A through I of this part are found at § 2.70.

(c)  Subparts A through I of this part should be read in conjunction with the text of the FOIA and the OMB Fee Guidelines.

(d)  The Department's FOIA Handbook and its attachments contain detailed information about Department procedures for making FOIA requests and descriptions of the types of records maintained by different Department bureaus or offices. This resource is available at *https://www.doi.gov/foia/news/guidance*.

(e)  The Department's regulations for requests made under the Privacy Act of 1974, 5 U.S.C. 552a, are located at subpart K of this part.

(f)  Part 2 does not entitle any person to any service or to the disclosure of any record that is not required under the FOIA.

(g)  Before you file a FOIA request, you are encouraged to review the Department's electronic FOIA libraries at *http://www.doi.gov/foia/libraries*. The material you seek may be immediately available electronically at no cost.

*[77 FR 76902, Dec. 31, 2012, as amended at 81 FR 11127, Mar. 3, 2016]*

## § 2.2 What kinds of records are not covered by the regulations in subparts A through I of this part?

Subparts A through I of this part do not apply to records that fall under the law enforcement exclusions in 5 U.S.C. 552(c)(1)-(3). These exclusions may be used only in the limited circumstances delineated by the statute and require both prior approval from the Deputy Chief FOIA Officer and the recording of their use and approval process.

*[77 FR 76902, Dec. 31, 2012, as amended at 84 FR 61826, Nov. 14, 2019]*

## Subpart B—How To Make a Request

**Source:** 77 FR 76902, Dec. 31, 2012, unless otherwise noted.

## § 2.3 Where should you send a FOIA request?

(a) The Department does not have a central location for submitting FOIA requests and it does not maintain a central index or database of records in its possession. Instead, the Department's records are decentralized and maintained by various bureaus and offices throughout the country.

(b) To make a request for Department records, you must write directly to the bureau that you believe maintains those records by utilizing the written forms of submission listed on the Department's FOIA website, *https://www.doi.gov/foia*, or utilizing physical or facsimile addresses of an appropriate FOIA contact, located at *http://www.doi.gov/foia/contacts*.

(c) Questions about where to send a FOIA request should be directed to the bureau that manages the underlying program or to the appropriate FOIA Requester Center, as discussed in § 2.66 of this part.

*[77 FR 76902, Dec. 31, 2012, as amended at 81 FR 11127, Mar. 3, 2016; 84 FR 61826, Nov. 14, 2019]*

## § 2.4 Does where you send your request affect its processing?

(a) A request to a particular bureau or a bureau component (for example, a request addressed to a regional or field office) will be presumed to seek only records from that particular bureau or component. A request will not be forwarded to another bureau or component unless it is clear on the face of your request that it was misdirected. For example, if you address your request to an appropriate FOIA contact in the National Park Service and ask for records concerning a specific park, but your request is delivered to the Fish and Wildlife Service, your request was clearly misdirected. In such a case, a FOIA contact in the receiving bureau or component will route the request to a FOIA contact in the proper bureau or component. If you need assistance determining where to send a request, you may seek assistance from the bureau's designated FOIA contact or FOIA Requester Center (see § 2.66 of this part).

(b) If you seek records from an entire bureau, submit your request to the bureau FOIA Officer. The bureau FOIA Officer will forward it to the bureau component(s) that he or she believes has or are likely to have responsive records.

(c) If a request to a bureau states that it seeks records located at another specific component of the same bureau, the appropriate FOIA contact will forward the request to the other component.

(d) If a request to a bureau states that it seeks records from other unspecified components within the same bureau, the appropriate FOIA contact will send the request to the Bureau FOIA Officer. He or she will forward it to the components that the bureau FOIA Officer believes have or are likely to have responsive records.

*[77 FR 76902, Dec. 31, 2012, as amended at 81 FR 92694, Dec. 20, 2016; 84 FR 61826, Nov. 14, 2019]*

## § 2.5 How should you describe the records you seek?

(a) You must reasonably describe the records sought. A reasonable description contains sufficient detail to enable bureau personnel familiar with the subject matter of the request to locate the records with a reasonable amount of effort.

(b) You should include as much detail as possible about the specific records or types of records that you are seeking. This will assist the bureau in identifying the requested records (for example, time frames involved or specific personnel who may have the requested records). For example, whenever possible, identify:

(1) The date, title or name, author, recipient, and subject of any particular records you seek;

(2) The office that created the records you seek;

(3) The timeframe for which you are seeking records; and

(4) Any other information that will assist the bureau in locating the records.

(c) The bureau's FOIA Requester Center can assist you in formulating or reformulating a request in an effort to better identify the records you seek.

(d) If the bureau determines that your request does not reasonably describe the records sought, the bureau will inform you what additional information you need to provide in order to reasonably describe the records that you seek so the requested records can be located with a reasonable amount of effort. The bureau will also notify you that it will not be able to comply with your request unless the additional information it has requested is received from you in writing within 20 workdays after the bureau has requested it and that you may appeal its determination. If you receive this type of notification, you may wish to discuss it with the bureau's designated FOIA contact or its FOIA Public Liaison (see § 2.66 of this part). If the bureau does not receive your written response containing the additional information within 20 workdays after the bureau has requested it, the bureau will presume that you are no longer interested in the records and will close the file on the request.

*[77 FR 76902, Dec. 31, 2012; 78 FR 6216, Jan. 30, 2013, as amended at 81 FR 11127, Mar. 3, 2016; 84 FR 61826, Nov. 14, 2019]*

## § 2.6 How will fee information affect the processing of your request?

(a) Your request must explicitly state that you will pay all fees associated with processing the request, that you will pay fees up to a specified amount, and/or that you are seeking a fee waiver.

(b) If, after taking into consideration your fee category entitlements (see § 2.39 of this part), the bureau anticipates processing costs will exceed $50.00 (see § 2.37(g) of this part) and these processing costs exceed the amount you have agreed to pay or you did not agree in writing to pay processing fees or request a fee waiver, the bureau will notify you:

(1) Of the estimated processing fees;

(2) Of its need for either an advance payment (see § 2.50 of this part) or your written assurance that you will pay the anticipated fees (or fees up to a specified amount); and

(3) That it will not be able to fully comply with your request unless you provide a fee waiver request and/or the requested written assurance or advance payment.

GSCA_Add_055

(c) If the bureau does not receive a written response from you within 20 workdays after requesting the information in paragraph (b) of this section, it will presume that you are no longer interested in the records and will close the file on the request.

(d) If you are seeking a fee waiver, your request must include a justification that addresses and meets the criteria in §§ 2.45 and 2.48 of this part. Failure to provide sufficient justification will result in a denial of the fee waiver request. If you are seeking a fee waiver, you may also indicate the amount you are willing to pay if the fee waiver is denied. This allows the bureau to process the request for records while it considers your fee waiver request. You may also inform us of why you believe your request meets one or more of the criteria for a discretionary fee waiver under § 2.56 of this part.

(e) The bureau will begin processing your request only after all issues regarding fees are resolved.

(f) If you are required to pay a fee and it is later determined on appeal that you were entitled to a full or partial fee waiver or placement in a different fee category, you will receive an appropriate refund.

[77 FR 76902, Dec. 31, 2012, as amended at 81 FR 11128, Mar. 3, 2016; 84 FR 61826, Nov. 14, 2019]

## § 2.7 What information should you include about your fee category?

(a) A request should indicate your fee category (that is, whether you are a commercial-use requester, news media, educational or noncommercial scientific institution, or other requester as described in §§ 2.38 and 2.39 of this part).

(b) If you submit a FOIA request on behalf of another person or organization (for example, if you are an attorney submitting a request on behalf of a client), the bureau will determine the fee category by considering the underlying requester's identity and intended use of the information.

(c) If your fee category is unclear, the bureau may ask you for additional information (see § 2.51 of this part).

## § 2.8 Can you ask for records to be disclosed in a particular form or format?

(a) Generally, you may choose the form or format of disclosure for records requested. The bureau must provide the records in the requested form or format if the bureau can readily reproduce the record in that form or format. If the bureau cannot readily reproduce the record in that form or format, it must explain why it cannot.

(b) The bureau may charge you the direct costs involved in converting records to the requested format if the bureau does not normally maintain the records in that format (see § 2.44 of this part).

[77 FR 76902, Dec. 31, 2012, as amended at 81 FR 11128, Mar. 3, 2016]

## § 2.9 What if your request seeks records about another person?

(a) When a request seeks records about another person, you may receive greater access by submitting proof that the person either:

(1) Consents to the release of the records to you (for example, a notarized authorization signed by that person); or

(2) Is deceased (for example, a copy of a death certificate or an obituary).

GSCA_Add_056

(b)   The bureau can require you to supply additional information if necessary to verify that a particular person has consented to disclosure or is deceased.

*[77 FR 76902, Dec. 31, 2012, as amended at 81 FR 11128, Mar. 3, 2016]*

## § 2.10 May you ask for the processing of your request to be expedited?

You may ask for the processing of your request to be expedited. If you are seeking expedited processing, your request must include a justification that addresses and meets the criteria in § 2.20 of this part and includes the certification required at § 2.20(b)(2) of this part. Failure to provide sufficient justification or the required certification will result in a denial of the expedited processing request.

*[81 FR 11128, Mar. 3, 2016]*

## § 2.11 What contact information should your request include?

A request should include your name and a way (such as a mailing or email address) for the bureau to send responsive records to you and/or to request additional information or clarification of your request. You may also wish to include a daytime telephone number (or the name and telephone number of an appropriate contact).

*[81 FR 11128, Mar. 3, 2016]*

## Subpart C—Processing Requests

**Source:**   77 FR 76902, Dec. 31, 2012, unless otherwise noted.

## § 2.12 What should you know about how bureaus process requests?

(a)   Except as described in §§ 2.4 and 2.13 of this part, the bureau to which the request is addressed is responsible for responding to the request and for making a reasonable effort to search for responsive records.

(b)   In determining which records are responsive to a request, the bureau will include only records in its possession and control on the date that it begins its search.

(c)   The bureau will make reasonable efforts to search for the requested records. As part of its reasonable efforts, the bureau will search paper and/or electronic records (for example, emails), as appropriate. The bureau will not search for records in an electronic form or format if these efforts would significantly interfere with the operation of the bureau's automated information system.

(d)   If a bureau receives a request for records in its possession that primarily concern another bureau or Federal Government agency that is subject to FOIA, it may undertake consultations and/or referrals as described in § 2.13.

*[77 FR 76902, Dec. 31, 2012, as amended at 81 FR 11128, Mar. 3, 2016; 84 FR 61826, Nov. 14, 2019]*

GSCA_Add_057

## § 2.13 How do consultations and referrals work?

(a) When a bureau (other than the Office of Inspector General) locates responsive records that primarily concern another bureau or Federal Government agency that is subject to FOIA, the bureau will determine whether that bureau or agency would be better able to determine whether the record is exempt from disclosure.

(b) If the bureau processing the request believes that another bureau or agency would be better able to determine whether the record is exempt from disclosure, the bureau will contact that bureau or agency to determine whether it should refer the record to that bureau or agency or consult with that bureau or agency.

  (1) If the bureau processing the request refers a record to another bureau or agency, that other bureau or agency will respond to you directly about that record. If the bureau processing the request consults with another bureau or agency, the bureau processing the request will respond to you directly.

  (2) If the bureau receives a request for records that another agency has classified under any applicable executive order concerning record classification, or that the bureau believes may be appropriate for classification by another agency, it will refer the request for those records to that agency for response.

  (3) Whenever a bureau refers any part of the responsibility for responding to a request to another bureau or agency, it will:

    (i) Document the referral;

    (ii) Maintain a copy of the referred record; and

    (iii) Notify you in writing of the referral, including whether all or part of your request has been referred, the name of the bureau or agency to which the record was referred, and that bureau or agency's FOIA contact information.

  (4) If disclosure of the identity of the agency to which the referral would be made could harm an interest protected by an applicable exemption, such as the exemption that protects ongoing law enforcement investigations, a referral would be inappropriate and the bureau will coordinate with the agency instead.

(c) When a bureau receives a referral, the bureau will assign the referral to the appropriate processing track as described in § 2.15 of this part and process it according to the date that the consulting or referring bureau or agency received your request as described in § 2.14 of this part.

(d) Bureaus may establish written agreements with other bureaus or agencies to eliminate the need for consultations or referrals for particular types of records.

*[84 FR 61826, Nov. 14, 2019]*

## Subpart D—Timing of Responses to Requests

**Source:** 77 FR 76902, Dec. 31, 2012, unless otherwise noted.

## § 2.14 In what order are responses usually made?

The bureau ordinarily will respond to requests according to their order of receipt within their processing track.

## § 2.15 What is multitrack processing and how does it affect your request?

(a) Bureaus use processing tracks to distinguish simple requests from more complex ones on the basis of the estimated number of workdays needed to process the request.

(b) In determining the number of workdays needed to process the request, the bureau considers factors such as the number of pages involved in processing the request or the need for consultations.

(c) The basic processing tracks are assigned according to the expected complexity of the collection/review/production process of each request and designated as follows:

(1) Simple: requests in this track would generally take between one to five workdays to process;

(2) Normal: requests in this track would generally take between six to twenty workdays to process;

(3) Complex: requests in this track would generally take between twenty-one workdays and sixty workdays to process; or

(4) Extraordinary: requests in this track involve very complex processing challenges, which may include a large number of potentially responsive records, and would generally take over sixty workdays to process.

(d) Bureaus also have a specific processing track for requests that are granted expedited processing under the standards in § 2.20 of this part. These requests will be processed as soon as practicable.

(e) Bureaus must advise you of the track into which your request falls and, when appropriate, will offer you an opportunity to narrow your request so that it can be placed in a different processing track. If you request placement in a particular processing track but the bureau places you in a different processing track, the bureau will provide you with an explanation of why you were not placed in the processing track you requested.

(f) The use of multitrack processing does not alter the statutory deadline for a bureau to determine whether to comply with your FOIA request (see § 2.16 of this part).

(g) You may track the status of your request, including its estimated processing completion date, at *https://foia.doi.gov/requeststatus/*.

*[77 FR 76902, Dec. 31, 2012, as amended at 81 FR 11128, Mar. 3, 2016; 81 FR 92694, Dec. 20, 2016; 84 FR 61827, Nov. 14, 2019]*

## § 2.16 What is the basic time limit for responding to a request?

(a) Ordinarily, the bureau has 20 workdays (including the date of receipt) to determine whether to comply with a request, but unusual circumstances may allow the bureau to take longer than 20 workdays (see § 2.19 of this subpart).

(b) A consultation or referral under § 2.13 of this part does not restart the statutory time limit for responding to a request.

*[77 FR 76902, Dec. 31, 2012, as amended at 81 FR 11128, Mar. 3, 2016]*

GSCA_Add_059

## § 2.17 When does the basic time limit begin for misdirected FOIA requests?

The basic time limit for a misdirected FOIA request (see § 2.4(a) of this part) begins no later than ten workdays after the request is first received by any component of the Department that is designated to receive FOIA requests.

*[77 FR 76902, Dec. 31, 2012, as amended at 84 FR 61827, Nov. 14, 2019]*

## § 2.18 When can the bureau suspend the basic time limit?

   (a)   The basic time limit in § 2.16 of this part may be temporarily suspended for the time it takes you to respond to one written communication from the bureau reasonably asking for clarifying information.

   (b)   The basic time limit in § 2.16 may also repeatedly be temporarily suspended for the time it takes you to respond to written communications from the bureau that are necessary to clarify issues regarding fee assessment (see § 2.51 of this part).

## § 2.19 When may the bureau extend the basic time limit?

   (a)   The bureau may extend the basic time limit, if unusual circumstances exist, by notifying you in writing of:

      (1)   The unusual circumstances involved; and

      (2)   The date by which it expects to complete processing the request.

   (b)   If the processing time will extend beyond a total of 30 workdays, the bureau will:

      (1)   Give you an opportunity to limit the scope of the request or agree to an alternative time period for processing; and

      (2)   Make available the FOIA Public Liaison (see § 2.66 of this part) to assist in resolving any disputes between you and the bureau, and notify you of your right to seek dispute resolution from the Office of Government Information Services (OGIS).

   (c)   If the bureau extends the time limit under this section and you do not receive a response in accordance with § 2.16(a) in that time period, you may consider the request denied and file an appeal in accordance with the procedures in § 2.59.

   (d)   Your refusal to reasonably modify the scope of a request or arrange an alternative time frame for processing a request after being given the opportunity to do so may be considered for litigation purposes as a factor when determining whether exceptional circumstances exist.

*[77 FR 76902, Dec. 31, 2012, as amended at 81 FR 11128, Mar. 3, 2016; 81 FR 92694, Dec. 20, 2016; 84 FR 61827, Nov. 14, 2019]*

## § 2.20 When will expedited processing be provided and how will it affect your request?

   (a)   The bureau will provide expedited processing upon request if you demonstrate to the satisfaction of the bureau that there is a compelling need for the records. The following circumstances demonstrate a compelling need:

      (1)   Failure to expedite the request could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

      (2)   There is an urgency to inform the public about an actual or alleged Federal Government activity and the request is made by a person primarily engaged in disseminating information.

(i) In most situations, a person primarily engaged in disseminating information will be a representative of the news media.

(ii) If you are not a full time member of the news media, to qualify for expedited processing here, you must establish that your main professional activity or occupation is information dissemination, although it need not be your sole occupation.

(iii) The requested information must be the type of information that has particular value that will be lost if not disseminated quickly; this ordinarily refers to a breaking news story that concerns a matter of public exigency.

(iv) Information of historical interest only or information sought for litigation or commercial activities would not qualify, nor would a news media deadline unrelated to breaking news.

(b) If you seek expedited processing, you must submit a statement that:

(1) Explains in detail how all elements and subcomponents of your request meets each element of one or both of the criteria in paragraph (a) of this section; and

(2) Certifies that your explanation is true and correct to the best of your knowledge and belief.

(c) You may ask for expedited processing of your request by writing to the appropriate FOIA contact in the bureau that maintains the records requested any time before the bureau issues its final response to your request. Bureaus will consult with the Office of the Solicitor before granting expedited processing requests and responses to you will include the name and title of the Office of the Solicitor or Office of General Counsel attorney consulted. If only a portion of your request would qualify for expedited processing, we will:

(1) Assign the portion of the request that qualifies for expedited processing a new processing number and place it in the expedited processing track as described in § 2.15;

(2) Place the remainder of the request that does not qualify for expedited processing into the appropriate processing track as described in § 2.15; and

(3) Inform you of the basis for the partial denial of expedited processing and your right to file an appeal as set forth in § 2.20(g) of this subpart.

(d) When making a request for expedited processing of an administrative appeal, submit the request to the appropriate deciding official for FOIA appeals.

(e) The bureau must notify you of its decision to grant or deny expedited processing within 10 calendar days of receiving an expedited processing request.

(f) If expedited processing is granted, the request will be given priority, placed in the processing track for expedited requests, and be processed as soon as practicable.

(g) If expedited processing is denied, the bureau will:

(1) Inform you of the basis for the denial, including an explanation of why the expedited processing request does not meet the Department's expedited processing criteria under this section; and

(2) Notify you of the right to appeal the decision on expedited processing in accordance with the procedures in subpart H of this part.

(h)  If you appeal the bureau's expedited processing decision, that portion of your appeal (if it is properly formatted under § 2.59) will be processed before appeals that do not challenge expedited processing decisions.

(i)  If the bureau has not responded to the request for expedited processing within 10 calendar days, you may file an appeal (for nonresponse in accordance with § 2.57(a)(8)).

*[84 FR 61827, Nov. 14, 2019]*

## Subpart E—Responses to Requests

**Source:**  77 FR 76902, Dec. 31, 2012, unless otherwise noted.

## § 2.21 How will the bureau respond to requests?

(a)  When the bureau informs you of its decision to comply with a request by granting, partially granting, or denying the request, it will do so in writing and in accordance with the deadlines in subpart D of this part. The bureau's written response will include a statement about the services offered by the FOIA Public Liaison. The bureau's written response will also include a statement about the services offered by OGIS, using standard language that can be found at: *https://www.doi.gov/foia/news/guidance.*"

(b)  If the bureau determines that your request will take longer than 10 workdays to process, the bureau immediately will send you a written acknowledgment that includes the request's individualized tracking number and processing track (see § 2.15(e)). The acknowledgement may also include a brief description of the subject of your request.

*[77 FR 76902, Dec. 31, 2012, as amended at 81 FR 11129, Mar. 3, 2016; 81 FR 92694, Dec. 20, 2016; 84 FR 61828, Nov. 14, 2019]*

## § 2.22 How will the bureau grant requests?

(a)  Once the bureau makes a determination to grant a request in full or in part, it must notify you in writing.

(b)  The notification will inform you of any fees charged under subpart G of this part.

(c)  The bureau will release records (or portions of records) to you promptly upon payment of any applicable fees (or before then, at its discretion).

(d)  If the records (or portions of records) are not included with the bureau's notification, the bureau will advise you how, when, and where the records will be released or made available.

*[77 FR 76902, Dec. 31, 2012, as amended at 81 FR 11129, Mar. 3, 2016]*

## § 2.23 When will the bureau deny a request or procedural benefits?

(a)  A bureau denies a request when it makes a decision that:

(1)  A requested record is exempt, in full or in part;

(2)  The request does not reasonably describe the records sought;

GSCA_Add_062

(3) A requested record does not exist, cannot be located, or is not in the bureau's possession and/or control; or

(4) A requested record is not readily reproducible in the form or format you seek.

(b) A bureau denies a procedural benefit only, and not access to the underlying records, when it makes a decision that:

(1) A fee waiver, or another fee-related issue, will not be granted; or

(2) Expedited processing will not be provided.

(c) The bureau must consult with the Office of the Solicitor before it denies a fee waiver request or withholds all or part of a requested record (unless the Office of the Solicitor has expressly preapproved such a withholding).

*[77 FR 76902, Dec. 31, 2012, as amended at 81 FR 11129, Mar. 3, 2016; 84 FR 61828, Nov. 14, 2019]*

## § 2.24 How will the bureau deny requests?

(a) The bureau must notify you in writing of any denial of your request.

(b) The denial notification must include:

(1) The name and title or position of the person responsible for the denial, along with an office phone number or email address;

(2) A statement of the reasons for the denial;

(3) A reference to any FOIA exemption applied by the bureau to withhold records in full or in part, along with a statement that the bureau reasonably foresees that disclosure would harm an interest protected by the applied exemption(s) or disclosure is prohibited by law;

(4) An estimate of the volume of any records withheld in full or in part (for example, by providing the number of pages or some other reasonable form of estimation), unless the bureau notes that it does not have or could not locate responsive records or that including an estimate would harm an interest protected by an exemption used to withhold the records and the bureau explains this harm to you;

(5) The name and title of the Office of the Solicitor or Office of General Counsel attorney consulted (if the bureau is denying a fee waiver request or withholding all or part of a requested record); and

(6) A statement that the denial may be appealed under subpart H of this part and a description of the procedures in subpart H of this part.

*[77 FR 76902, Dec. 31, 2012, as amended at 81 FR 11129, Mar. 3, 2016; 81 FR 92694, Dec. 20, 2016; 84 FR 61828, Nov. 14, 2019]*

## § 2.25 What if the requested records contain both exempt and nonexempt material?

If responsive records contain both exempt and nonexempt material, the bureau will consult with the Office of the Solicitor, as discussed in § 2.23(c). After consultation, the bureau will partially grant and partially deny the request by:

(a) Segregating and releasing the nonexempt information, unless the nonexempt material is so intertwined with the exempt material that disclosure of it would leave only meaningless words and phrases;

(b) Indicating on the released portion of the record the amount of information deleted and the FOIA exemption under which the deletion was made, unless doing so would harm an interest protected by the FOIA exemption used to withhold the information; and

(c) If technically feasible, indicating the amount of information deleted and the FOIA exemption under which the deletion was made at the place in the record where the deletion was made.

*[77 FR 76902, Dec. 31, 2012, as amended at 81 FR 11129, Mar. 3, 2016]*

## Subpart F—Handling Confidential Information

**Source:** 77 FR 76906, Dec. 31, 2012, unless otherwise noted.

## § 2.26 May submitters of possibly confidential information designate information as confidential when making Departmental submissions?

(a) The Department encourages, but does not require, submitters to designate confidential information in good faith (in other words, to identify specific information as information the submitter considers protected from disclosure under Exemption 4 of the FOIA, found at 5 U.S.C. 552(b)(4)), at the time of submission or reasonably soon thereafter.

(b) The designations discussed in paragraph (a) of this section assist the bureau in identifying what information obtained from the submitter is possibly confidential and triggers the requirement for bureau-provided notifications under § 2.27(a)(1) of this subpart.

*[81 FR 11129, Mar. 3, 2016]*

## § 2.27 When will the bureau notify a submitter of a request for their possibly confidential information?

(a) Except as outlined in § 2.29 of this subpart, a bureau must exercise due diligence to promptly notify a submitter in writing when it receives a FOIA request if:

(1) The requested information has been designated by the submitter as confidential information under § 2.26(a) of this subpart; or

(2) The requested information has not been designated as confidential information by the submitter under § 2.26(a) of this subpart, but the bureau identifies it as possibly confidential information.

(b) If a voluminous number of submitters are involved, the bureau may publish a notice in a manner reasonably calculated to reach the attention of the submitters (for example, in newspapers or newsletters, the bureau's Web site, or the FEDERAL REGISTER) instead of providing a written notice to each submitter.

*[77 FR 76902, Dec. 31, 2012, as amended at 81 FR 11129, Mar. 3, 2016; 84 FR 61828, Nov. 14, 2019]*

## § 2.28 What information will the bureau include when it notifies a submitter of a request for their possibly confidential information?

A notice to a submitter must include:

GSCA_Add_064

(a) Either a copy of the request, the exact language of the request, or (for notices published under § 2.27(b) of this subpart) a general description of the request;

(b) Either a description of the possibly confidential information located in response to the request or a copy of the responsive records, or portions of records, containing the information;

(c) A description of the procedures for objecting to the release of the possibly confidential information under §§ 2.30 and 2.31 of this subpart;

(d) A time limit for responding to the bureau—no less than 10 workdays from receipt or publication of the notice (as set forth in § 2.27(b) of this subpart)—to object to the release and to explain the basis for the objection;

(e) Notice that information contained in the submitter's objections may itself be subject to disclosure under the FOIA;

(f) Notice that the bureau, not the submitter, is responsible for deciding whether the information will be released or withheld;

(g) A request for the submitter's views on whether they still consider the information to be confidential if the submitter designated the material as confidential commercial or financial information 10 or more years before the request; and

(h) Notice that failing to respond within the time frame specified under § 2.28(d) of this subpart will create a presumption that the submitter has no objection to the disclosure of the information in question.

*[77 FR 76902, Dec. 31, 2012, as amended at 81 FR 11129, Mar. 3, 2016]*

## § 2.29 When will the bureau not notify a submitter of a request for their possibly confidential information?

The notice requirements of § 2.28 of this subpart will not apply if:

(a) The information has been lawfully published or officially made available to the public;

(b) Disclosure of the information is required or prohibited by a statute other than the FOIA or by a regulation (other than this part) issued in accordance with the requirements of Executive Order 12600; or

(c) The bureau has exercised due diligence to notify the submitter, but its efforts were unsuccessful.

*[77 FR 76906, Dec. 31, 2012, as amended at 84 FR 61828, Nov. 14, 201]*

## § 2.30 How and when may a submitter object to the disclosure of confidential information?

(a) If a submitter has any objections to the disclosure of confidential information, the submitter should provide a detailed written statement to the bureau that specifies all grounds for withholding the particular information under any FOIA exemption (see § 2.31 of this subpart for further discussion of Exemption 4 objection statements).

(b) A submitter who does not respond within the time period specified under § 2.28(d) of this subpart will be considered to have no objection to disclosure of the information. Responses received by the bureau after this time period will not be considered by the bureau unless the appropriate bureau FOIA contact determines, in his or her sole discretion, that good cause exists to accept the late response.

GSCA_Add_065

## § 2.31 What must a submitter include in a detailed Exemption 4 objection statement?

(a) To rely on Exemption 4 as a basis for nondisclosure, the submitter must explain why the information is confidential information. To do this, the submitter must provide a detailed written statement that explains why the information is a trade secret or, if the information is not a trade secret, certification that the information is both customarily and actually treated as private by the owner of the information. The statement must also include any available background on whether the information was provided to the government under an assurance that the government would keep it private.

(b) If not already provided, the submitter must include a daytime telephone number, an email and mailing address, and a fax number (if available).

[77 FR 76902, Dec. 31, 2012, as amended at 81 FR 11129, Mar. 3, 2016; 84 FR 61828, Nov. 14, 2019]

## § 2.32 How will the bureau consider the submitter's objections?

(a) The bureau must carefully consider a submitter's objections and specific grounds for nondisclosure in deciding whether to disclose the requested information.

(b) The bureau, not the submitter, is responsible for deciding whether the information will be released or withheld.

## § 2.33 What if the bureau determines it will disclose information over the submitter's objections?

If the bureau decides to disclose information over the objection of a submitter, the bureau must notify the submitter by certified mail or other traceable mail, return receipt requested. The notification must be sent to the submitter's last known address and must include:

(a) The specific reasons why the bureau determined that the submitter's disclosure objections do not support withholding the information;

(b) Copies of the records or information the bureau intends to release; and

(c) Notice that the bureau intends to release the records or information no less than 10 workdays after receipt of the notice by the submitter.

## § 2.34 Will a submitter be notified of a FOIA lawsuit?

If you file a lawsuit seeking to compel the disclosure of confidential information, the bureau must promptly notify the submitter.

## § 2.35 Will you receive notification of activities involving the submitter?

If any of the following occur, the bureau will notify you:

(a) The bureau provides the submitter with notice and an opportunity to object to disclosure;

(b) The bureau notifies the submitter of its intent to disclose the requested information; or

(c) A submitter files a lawsuit to prevent the disclosure of the information.

GSCA_Add_066

## § 2.36 Can a bureau release information protected by Exemption 4?

If a bureau determines that the requested information is protected from release by Exemption 4 of the FOIA, the bureau has no discretion to release the information. Release of information protected from release by Exemption 4 is prohibited by the Trade Secrets Act, a criminal provision found at 18 U.S.C. 1905.

## Subpart G—Fees

**Source:** 77 FR 76906, Dec. 31, 2012, unless otherwise noted.

## § 2.37 What general principles govern fees?

(a) The bureau will charge for processing requests under the FOIA in accordance with this subpart and with the OMB Fee Guidelines.

(b) The bureau may contact you for additional information to resolve fee issues.

(c) The bureau ordinarily will collect all applicable fees before sending copies of records to you.

(d) You may usually pay fees by check, certified check, or money order made payable to the "Department of the Interior" or the bureau.

(1) Where appropriate, the bureau may require that your payment be made in the form of a certified check.

(2) You may also be able to pay your fees by credit card. You may contact the bureau to determine what forms of payment it accepts.

(e) The bureau should ensure that it conducts searches, review, and duplication in the most efficient and the least expensive manner so as to minimize costs for both you and the bureau.

(f) If the bureau does not comply with any time limit in the FOIA:

(1) Except as provided in paragraph (f)(2) of this section, the bureau cannot assess any search fees (or, if you are in the fee category of a representative of the news media or an educational and noncommercial scientific institution, duplication fees).

(2)

(i) If the bureau has determined that unusual circumstances apply (as the term is defined in § 2.70) and the bureau provided you a timely written notice to extend the basic time limit in accordance with § 2.19, the noncompliance is excused for an additional 10 workdays.

(ii) If the bureau has determined that unusual circumstances apply and more than 5,000 pages are necessary to respond to the request, the noncompliance is excused if the bureau has provided you a timely written notice in accordance with § 2.19 and has discussed with you via written mail, email, or telephone (or made not less than 3 good-faith attempts to do so) how you could effectively limit the scope of the request.

(iii) If a court has determined that exceptional circumstances exist (as that term is defined in § 2.70), the noncompliance is excused for the length of time provided by the court order.

(g) If the fee for processing your request is less than $50, you will not be charged unless multiple requests are aggregated under § 2.54 of this subpart to an amount that is $50 or more.

(h) If you fail to pay any FOIA-related fee within 30 calendar days of the date of billing, the processing of any new or ongoing requests and/or appeals from you shall ordinarily be suspended.

(i) If you would like to reformulate your request so it will meet your needs at a lower cost, you may wish to seek assistance from the bureau's designated FOIA contact or its FOIA Requester Center(see § 2.66 of this part).

*[77 FR 76906, Dec. 31, 2012, as amended at 81 FR 11129, Mar. 3, 2016; 81 FR 92694, Dec. 20, 2016; 84 FR 61828, Nov. 14, 2019]*

## § 2.38 What are the requester fee categories?

(a) There are four categories of requesters for the purposes of determining fees—commercial-use, educational and noncommercial scientific institutions, representatives of news media, and all others.

(b) The bureau's decision to place you in a particular fee category will be made on a case-by-case basis based on your intended use of the information and, in most cases, your identity. If you do not submit sufficient information in your FOIA request for the bureau to determine your proper fee category, the bureau may ask you to provide additional information (see § 2.51 of this subpart). If you request placement in a particular fee category but the bureau places you in a different fee category, the bureau will provide you with an explanation of why you were not placed in the fee category you requested (for example, if you were placed in the commercial use requester category rather than the category you requested, the bureau will describe how the records would further your commercial, trade, or profit interests).

(c) See § 2.70 of this part for the definitions of each of these fee categories.

*[77 FR 76906, Dec. 31, 2012, as amended at 81 FR 11129, Mar. 3, 2016]*

## § 2.39 How does your requester category affect the fees you are charged?

You will be charged as shown in the following table:

| Requester Category | Search fees | Review fees | Duplication fees |
|---|---|---|---|
| Commercial use requester | Yes | Yes | Yes. |
| Educational and noncommercial scientific institutions | No | No | Yes (first 100 pages, or equivalent volume, free). |
| Representative of news media requester | No | No | Yes (first 100 pages, or equivalent volume, free). |
| All other requesters | Yes (first 2 hours free) | No | Yes (first 100 pages, or equivalent volume, free). |

*[77 FR 76906, Dec. 31, 2012, as amended at 81 FR 11130, Mar. 3, 2016; 81 FR 92694, Dec. 20, 2016]*

## § 2.40 How will fee amounts be determined?

(a) The bureau will charge the types of fees discussed below unless a waiver of fees is required under § 2.39 of this subpart or has been granted under § 2.45 or § 2.56.

(b) Because the types of fees discussed below already account for the overhead costs associated with a given fee type, the bureau should not add any additional costs to those charges.

## § 2.41 What search fees will you have to pay?

(a) The bureau will charge search fees for all requests, subject to the restrictions of §§ 2.37(f), 2.39, and 2.40(a) of this subpart. The bureau may charge you for time spent searching even if it does not locate any responsive records or if it determines that the records are entirely exempt from disclosure.

(b) For each quarter hour spent by personnel searching for requested records, including electronic searches that do not require new programming, the fees will be the average hourly General Schedule (GS) base salary, plus the District of Columbia locality payment, plus 16 percent for benefits, of employees in the following three categories, as applicable:

    (1) Clerical—Based on GS-6, Step 5, pay (all employees at GS-7 and below are classified as clerical for this purpose);

    (2) Professional—Based on GS-11, Step 7, pay (all employees at GS-8 through GS-12 are classified as professional for this purpose); and

    (3) Managerial—Based on GS-14, Step 2, pay (all employees at GS-13 and above are classified as managerial for this purpose).

(c) You can review the current fee schedule for the categories discussed above in paragraph (b) of this section at *http://www.doi.gov/foia/fees-waivers*.

(d) Some requests may require retrieval of records stored at a Federal records center operated by the National Archives and Records Administration. For these requests, bureaus will charge additional costs in accordance with the Transactional Billing Rate Schedule established by the National Archives and Records Administration.

*[77 FR 76906, Dec. 31, 2012, as amended at 81 FR 11130, Mar. 3, 2016]*

## § 2.42 What duplication fees will you have to pay?

(a) The bureau will charge duplication fees, subject to the restrictions of §§ 2.37(f), 2.39, and 2.40(a) of this subpart.

(b) If photocopies or scans are supplied, the bureau will provide one copy per request at the cost determined by the table in appendix A to this part.

(c) For other forms of duplication, the bureau will charge the actual costs of producing the copy, including the time spent by personnel duplicating the requested records. For each quarter hour spent by personnel duplicating the requested records, the fees will be the same as those charged for a search under § 2.41(b) of this subpart.

(d) If the bureau must scan paper records to accommodate your preference to receive records in an electronic format or print electronic records to accommodate your preference to receive records in a paper format, you will pay both the per page amount noted in Appendix A to this part and the time spent

GSCA_Add_069

by personnel scanning or printing the requested records. For each quarter hour spent by personnel scanning or printing the requested records, the fees will be the same as those charged for a search under § 2.41(b) of this subpart.

*[77 FR 76906, Dec. 31, 2012, as amended at 81 FR 11130, Mar. 3, 2016]*

## § 2.43 What review fees will you have to pay?

(a) The bureau will charge review fees if you make a commercial-use request, subject to the restrictions of §§ 2.37(f), 2.39, and 2.40(a) of this subpart.

(b) The bureau will assess review fees in connection with the initial review of the record (the review conducted by the bureau to determine whether an exemption applies to a particular record or portion of a record).

(c) The Department will not charge for reviews at the administrative appeal stage of exemptions applied at the initial review stage. However, if the appellate authority determines that an exemption no longer applies, any costs associated with the bureau's re-review of the records to consider the use of other exemptions may be assessed as review fees.

(d) The bureau will charge review fees at the same rates as those charged for a search under § 2.41(b) of this subpart.

(e) The bureau can charge review fees even if the record(s) reviewed ultimately is not disclosed.

## § 2.44 What fees for other services will you have to pay?

(a) Although not required to provide special services, if the bureau chooses to do so as a matter of administrative discretion, it will charge you the direct costs of providing the service.

(b) Examples of these services include providing multiple copies of the same record, converting records that are not already maintained in a requested format to the requested format, obtaining research data under § 2.69 of this part, sending records by means other than first class mail, and conducting a search that requires the creation of a new computer search program to locate the requested records.

(c) The bureau will notify you of these fees before they accrue and will obtain your written assurance of payment or an advance payment before proceeding. See §§ 2.49 and 2.50 of this subpart.

*[77 FR 76906, Dec. 31, 2012, as amended at 81 FR 11130, Mar. 3, 2016]*

## § 2.45 When will the bureau waive fees?

(a) The bureau will release records responsive to a request without charge (in other words, it will give you a full fee waiver) or at a reduced charge (in other words, it will give you a partial fee waiver, as discussed further in paragraph (b) of this section) if the bureau determines, considering the information you have provided, that you have demonstrated (by addressing and meeting each of the criteria listed in § 2.48 of this subpart) that disclosing the information is:

(1) In the public interest because it is likely to contribute significantly to public understanding of government operations or activities, and

(2) Not primarily in your commercial interest.

GSCA_Add_070

(b)   A partial fee waiver may be appropriate if some but not all of the requested records are likely to contribute significantly to public understanding of the operations and activities of the government.

(c)   When deciding whether to waive or reduce fees, the bureau will rely on the fee waiver justification submitted in your request letter. If the letter does not include sufficient justification, the bureau will deny the fee waiver request. The bureau may, at its discretion, request additional information from you (see § 2.51 of this subpart).

(d)   The burden is on you to justify entitlement to a fee waiver. Requests for fee waivers are decided on a case-by-case basis under the criteria discussed above in paragraph (a) of this section and § 2.48 of this subpart. If you have received a fee waiver in the past, that does not mean you are automatically entitled to a fee waiver for every request submitted.

(e)   Discretionary fee waivers are addressed in § 2.56 of this subpart.

(f)   The bureau must not make value judgments about whether the information at issue is "important" enough to be made public; it is not the bureau's role to attempt to determine the level of public interest in requested information.

*[77 FR 76906, Dec. 31, 2012, as amended at 81 FR 11130, Mar. 3, 2016; 84 FR 61828, Nov. 14, 2019]*

## § 2.46 When may you ask the bureau for a fee waiver?

(a)   You should request a fee waiver when your request is first submitted to the bureau (see § 2.6 of this part).

(b)   You may submit a fee waiver request at a later time if the bureau has not yet completed processing your request.

*[77 FR 76906, Dec. 31, 2012, as amended at 81 FR 11130, Mar. 3, 2016]*

## § 2.47 How will the bureau notify you if it denies your fee waiver request?

If the bureau denies your request for a fee waiver, it will notify you, in writing, of the following:

(a)   The basis for the denial, including a full explanation of why the fee waiver request does not meet the Department's fee waiver criteria in § 2.48 of this subpart;

(b)   The name and title or position of each person responsible for the denial;

(c)   The name and title of the Office of the Solicitor attorney consulted;

(d)   Your right to appeal the denial under subpart H of this part and a description of the requirements set forth therein, within 90 workdays from the date of the fee waiver denial letter; and

(e)   Your anticipated fees, in accordance with § 2.49 of this subpart.

*[77 FR 76906, Dec. 31, 2012, as amended at 81 FR 11130, Mar. 3, 2016; 84 FR 61828, Nov. 14, 2019]*

## § 2.48 How will the bureau evaluate your fee waiver request?

(a)   In deciding whether your fee waiver request meets the requirements of § 2.45(a)(1) of this subpart, the bureau will consider the criteria listed in paragraphs (a)(1) through (a)(4) of this section. You must address and meet each of these criteria in order to demonstrate that you are entitled to a fee waiver.

(1) How the records concern the operations or activities of the Federal government. The subject of the request must concern discrete, identifiable agency activities, operations, or programs with a connection that is direct and clear, not remote or attenuated.

(2) How disclosure is likely to contribute significantly to public understanding of those operations or activities, including:

   (i) How the contents of the records are meaningfully informative. The disclosure of information that is already readily available to you from other sources or easily accessible to the public, in either the same or a substantially identical form, would not be meaningfully informative if nothing new would be added to the public's understanding and the bureau informs you of where the requested information is already available;

   (ii) What the logical connection is between the content of the records and the operations or activities of the Federal government;

   (iii) How disclosure will contribute to the understanding of a reasonably broad audience of persons interested in the subject, as opposed to your individual understanding;

   (iv) Your expertise in the subject area as well as your identity, vocation, qualifications, and your plan to disclose the information in a manner that will be informative to the understanding of a reasonably broad audience of persons interested in the subject, as opposed to furthering your individual understanding;

   (v) Your ability and intent to disseminate the information to a reasonably broad audience of persons interested in the subject (for example, how and to whom you intend to disseminate the information). If we have categorized you as a representative of the news media under § 2.38, we will presume you have this ability and intent;

   (vi) Whether the records would confirm or clarify data that has been released previously; and

   (vii) How the public's understanding of the subject in question will be enhanced to a significant extent by the disclosure.

(b) In deciding whether the fee waiver request meets the requirements in § 2.45(a)(2) of this subpart, the bureau will consider any commercial interest of yours that would be furthered by the requested disclosure. To determine whether disclosure of the requested records is primarily in your commercial interest (based on your intended use of the information), the bureau will consider:

(1) Whether the requested disclosure would further any commercial interest of yours.

(2) If you have a commercial interest, the bureau must determine whether that is the primary interest furthered by the request by balancing the commercial interest against the public interest in disclosure of the records. When the requirements of paragraph (a) are satisfied and any commercial interest is not the primary interest furthered by the request, this balancing test shows a waiver or reduction of fees is justified. Bureaus ordinarily will presume that, when a news media requester has satisfied paragraph (a) above, the request is not primarily in the commercial interest of the requester.

(3) You are encouraged to provide explanatory information regarding these considerations.

(4) The bureau will not find that disclosing the requested records will be primarily in your commercial interest where the public interest is greater than any identified commercial interest in disclosure.

(5) If you have a commercial interest that would be furthered by disclosure, explain how the public interest in disclosure would be greater than any commercial interest you may have in the documents.

    (i) Your identity, vocation, and intended use of the requested records are all factors to be considered in determining whether disclosure would be primarily in your commercial interest.

    (ii) If you are a representative of a news media organization seeking records as part of the news gathering process, we will ordinarily presume that the public interest outweighs your commercial interest. Disclosure to data brokers or others who merely compile and market government information for direct economic return will not be presumed to primarily serve the public interest.

    (iii) If you represent a business/corporation/association or you are an attorney representing such an organization, we will presume that your commercial interest outweighs the public interest unless you demonstrate otherwise.

*[84 FR 61828, Nov. 14, 2019]*

## § 2.49 When will you be notified of anticipated fees?

(a) The bureau will notify you under this section unless:

    (1) The anticipated fee is less than $50 (see § 2.37(g) of this subpart).

    (2) You have been granted a full fee waiver;

    (3) Your request does not reasonably describe the records sought and/or does not explicitly state that you will pay all fees associated with the processing of the request, that you will pay fees up to a specified amount, and/or that you are seeking a fee waiver; or

    (4) You have already agreed to pay all the fees associated with the request.

(b) If none of the above exceptions apply, the bureau will:

    (1) Promptly notify you of the estimated costs for search, review, and/or duplication;

    (2) Ask you to provide written assurance within 20 workdays that you will pay all fees or fees up to a designated amount;

    (3) Notify you that it will not be able to comply with your FOIA request unless you provide the written assurance requested; and

    (4) Give you an opportunity to reduce the fee by modifying the request.

(c) If the bureau does not receive your written response containing the additional information that resolves any fee issues, in accordance with paragraphs (b)(2) and/or (b)(4) of this section, within 20 workdays after the bureau has requested it, the bureau will presume that you are no longer interested in the records and will close the file on the request.

(d) After the bureau begins processing a request, if it finds that the actual cost will exceed the amount you previously agreed to pay, the bureau will:

    (1) Stop processing the request;

    (2) Promptly notify you of the higher amount and ask you to provide written assurance of payment; and

GSCA_Add_073

(3) Notify you that it will not be able to fully comply with your FOIA request unless you provide the written assurance requested; and

(4) Give you an opportunity to reduce the fee by modifying the request.

(e) If you wish to modify your request in an effort to reduce fees, the bureau's FOIA Requester Center can assist you.

[77 FR 76906, Dec. 31, 2012, as amended at 81 FR 11130, Mar. 3, 2016; 84 FR 61829, Nov. 14, 2019]

## § 2.50 When will the bureau require advance payment?

(a) The bureau will require advance payment before starting further work when it finds the estimated fee is over $250 and:

(1) You have never made a FOIA request to the Department requiring the payment of fees; or

(2) You did not pay a previous FOIA fee within 30 calendar days of the date of billing.

(b) If the bureau believes that you did not pay a previous FOIA fee within 30 calendar days of the date of billing, the bureau will require you to either:

(1) Demonstrate you paid prior fee within 30 calendar days of the date of billing; or

(2) Pay any unpaid amount of the previous fee, plus any applicable interest penalties (see § 2.53 of this subpart), and pay in advance the estimated fee for the new request.

(c) When the bureau notifies you that an advance payment is due under paragraph (a) of this section, it will give you an opportunity to reduce the fee by modifying the request.

(d) Your payment of the funds you owe the bureau for work it has already completed before records are sent to you is not an advance payment under paragraph (a) of this section.

(e) If the bureau requires advance payment, it will start further work only after receiving the advance payment. It will also notify you that it will not be able to comply with your FOIA request unless you provide the advance payment. Unless you pay the advance payment within 20 workdays after the date of the bureau's fee letter, the bureau will presume that you are no longer interested and will close the file on the request.

[77 FR 76906, Dec. 31, 2012, as amended at 81 FR 11130, Mar. 3, 2016]

## § 2.51 What if the bureau needs clarification about fee issues?

(a) If your FOIA request does not contain sufficient information for the bureau to determine your proper fee category or leaves another fee issue unclear, the bureau may ask you to provide additional clarification. If it does so, the bureau will notify you that it will not be able to comply with your FOIA request unless you provide the clarification requested.

(b) If the bureau asks you to provide clarification, the 20-workday statutory time limit for the bureau to respond to the request is temporarily suspended.

(1) If the bureau receives a written response within 20 workdays after the bureau has requested the additional clarification, the 20-workday statutory time limit for processing the request will resume (see § 2.16 of this part).

(2) If you still have not provided sufficient information to resolve the fee issue, the bureau may ask you again to provide additional clarification and notify you that it will not be able to comply with your FOIA request unless you provide the additional information requested within 20 workdays after the bureau has requested the additional clarification.

(3) If the bureau asks you again for additional clarification, the statutory time limit for response will be temporarily suspended again and will resume again if the bureau receives a written response from you within 20 workdays after the bureau has requested the additional clarification.

(c) If the bureau asks for clarification about a fee issue and does not receive a written response from you within 20 workdays after the bureau has requested the additional clarification, it will presume that you are no longer interested and will close the file on the request.

[77 FR 76906, Dec. 31, 2012; 78 FR 6216, Jan. 30, 2013; 81 FR 11130, Mar. 3, 2016]

## § 2.52 How will you be billed?

If you are required to pay a fee associated with a FOIA request, the bureau processing the request will send a bill for collection.

## § 2.53 How will the bureau collect fees owed?

(a) The bureau may charge interest on any unpaid bill starting on the 31st day following the billing date.

(b) The bureau will assess interest charges at the rate provided in 31 U.S.C. 3717 and implementing regulations and interest will accrue from the billing date until the bureau receives payment.

(c) The bureau will follow the provisions of the Debt Collection Act of 1982 (Public Law 97-365, 96 Stat. 1749), as amended, and its administrative procedures, including the use of consumer reporting agencies, collection agencies, and offset to collect overdue amounts and interest.

(d) This section does not apply if you are a state, local, or tribal government.

## § 2.54 When will the bureau combine or aggregate requests?

(a) The bureau may aggregate requests and charge accordingly when it reasonably believes that you, or a group of requesters acting in concert with you, are attempting to avoid fees by dividing a single request into a series of requests on a single subject or related subjects.

(1) The bureau may presume that multiple requests of this type made within a 30-day period have been made to avoid fees.

(2) The bureau may aggregate requests separated by a longer period only where there is a reasonable basis for determining that aggregation is warranted in view of all the circumstances involved.

(b) The bureau will not aggregate multiple requests involving unrelated matters.

(c) The bureau may administratively aggregate requests without charging fees accordingly when it reasonably believes you, or a group of requesters acting in concert with you, are dividing a single request into a series of requests on a single subject or related subjects.

(1) The bureau may presume that multiple requests on a single subject or related subjects made within a 30-day period are dividing a single request into a series of requests.

(2) The bureau may administratively aggregate requests separated by a longer period only where there is a reasonable basis for determining that aggregation is warranted in view of all the circumstances involved.

*[77 FR 76906, Dec. 31, 2019, as amended at 84 FR 61829, Nov. 14, 2019]*

## § 2.55 What if other statutes require the bureau to charge fees?

(a) The fee schedule in appendix A to this part does not apply to fees charged under any statute that specifically requires the bureau to set and collect fees for particular types of records.

(b) If records otherwise responsive to a request are subject to a statutorily-based fee schedule, the bureau will inform you whom to contact to obtain the records.

## § 2.56 May the bureau waive or reduce your fees at its discretion?

(a) The bureau may waive or reduce fees at its discretion if a request involves furnishing:

(1) A copy of a record that the bureau has reproduced for free distribution;

(2) One copy of a personal document (for example, a birth certificate) to a person who has been required to furnish it for retention by the Department;

(3) One copy of the transcript of a hearing before a hearing officer in a grievance or similar proceeding to the employee for whom the hearing was held;

(4) Records to donors with respect to their gifts;

(5) Records to individuals or private nonprofit organizations having an official, voluntary, or cooperative relationship with the Department if it will assist their work with the Department;

(6) A reasonable number of records to members of the U.S. Congress; state, local, and foreign governments; public international organizations; or Indian tribes, when to do so is an appropriate courtesy, or when the recipient is carrying on a function related to a Departmental function and the waiver will help accomplish the Department's work;

(7) Records in conformance with generally established business custom (for example, furnishing personal reference data to prospective employers of current or former Department employees); or

(8) One copy of a single record to assist you in obtaining financial benefits to which you may be entitled (for example, veterans or their dependents, employees with Government employee compensation claims).

(b) You cannot appeal the denial of a discretionary fee waiver or reduction.

## Subpart H—Administrative Appeals

**Source:** 77 FR 76906, Dec. 31, 2012, unless otherwise noted.

## § 2.57 When may you file an appeal?

(a) You may file an appeal when:

GSCA_Add_076

(1) The bureau withholds records, or parts of records;

(2) The bureau informs you that your request has not adequately described the records sought;

(3) The bureau informs you that it does not possess or cannot locate responsive records and you have reason to believe this is incorrect or that the search was inadequate;

(4) The bureau did not address all aspects of the request for records;

(5) You believe there is a procedural deficiency (for example, fees are improperly calculated or you have been placed in the wrong fee category);

(6) The bureau denied your request for a fee waiver;

(7) The bureau did not make a decision within the time limits in § 2.16 or, if applicable, § 2.18; or

(8) The bureau denied, or was late in responding to, a request for expedited processing filed under the procedures in § 2.20 of this part.

(b) An appeal under paragraph (a)(8) of this section relates only to the request for expedited processing and does not constitute an appeal of the underlying request for records. Special procedures apply to requests for expedited processing of an appeal (see § 2.63 of this subpart).

(c) Before filing an appeal, you may wish to communicate with the contact person listed in the FOIA response, the bureau's FOIA Officer, and/or the FOIA Public Liaison to see if the issue can be resolved informally. However, appeals must be received by the FOIA Appeals Officer within the time limits in § 2.58 of this subpart or they will not be processed.

*[77 FR 76906, Dec. 31, 2012, as amended at 81 FR 11130, Mar. 3, 2016]*

## § 2.58 How long do you have to file an appeal?

(a) Appeals covered by § 2.57(a)(1) through (5) of this subpart must be received by the FOIA Appeals Officer no later than 90 workdays from the date of the final response.

(b) Appeals covered by § 2.57(a)(6) of this subpart must be received by the FOIA Appeals Officer no later than 90 workdays from the date of the letter denying the fee waiver.

(c) Appeals covered by § 2.57(a)(7) of this subpart may be filed any time after the time limit for responding to the request has passed.

(d) Appeals covered by § 2.57(a)(8) of this subpart should be filed as soon as possible.

(e) Appeals arriving or delivered after 5 p.m. Eastern Time, Monday through Friday, will be deemed received on the next workday.

*[77 FR 76906, Dec. 31, 2012, as amended at 81 FR 92694, Dec. 20, 2016]*

## § 2.59 How do you file an appeal?

(a) You must submit the appeal in writing by mail, fax or email to the FOIA Appeals Officer (using the address available at *http://www.doi.gov/foia/appeals*). Your failure to send an appeal directly to the FOIA Appeals Officer may delay processing.

(b) The appeal must include:

GSCA_Add_077

    (1)   Copies of all correspondence between you and the bureau concerning the FOIA request, including the request and the bureau's response (if there is one); and

    (2)   An explanation of why you believe the bureau's response was in error.

(c)   The appeal should include your name, mailing address, daytime telephone number (or the name and telephone number of an appropriate contact), email address, and fax number (if available) in case the Department needs additional information or clarification.

(d)   An appeal concerning a denial of expedited processing or a fee waiver denial should also demonstrate fully how the criteria in § 2.20 or §§ 2.45 and 2.48 of this part are met.

(e)   All communications concerning an appeal should be clearly marked with the words: "FREEDOM OF INFORMATION APPEAL."

(f)   The Department will reject an appeal that does not attach all correspondence required by paragraph (b)(1) of this section, unless the FOIA Appeals Officer determines, in his or her sole discretion, that good cause exists to accept the defective appeal. The time limits for responding to an appeal will not begin to run until the correspondence is received.

*[77 FR 76906, Dec. 31, 2012, as amended at 81 FR 11130, Mar. 3, 2016]*

## § 2.60 Who makes decisions on appeals?

(a)   The FOIA Appeals Officer is the deciding official for FOIA appeals that do not appeal a decision of the Office of Inspector General.

(b)   The General Counsel is the deciding official for FOIA appeals that appeal a decision of the Office of Inspector General.

(c)   When necessary, the appropriate deciding official for FOIA appeals will consult other appropriate offices, including the Office of the Solicitor or Office of General Counsel for denials of records and fee waivers.

(d)   The deciding official for FOIA appeals normally will not make a decision on an appeal if the request becomes a matter of FOIA litigation.

*[81 FR 11130, Mar. 3, 2016]*

## § 2.61 How are decisions on appeals issued?

(a)   A decision on an appeal must be made in writing.

(b)   A decision that upholds the bureau's determination will notify you of the decision and your statutory right to file a lawsuit.

(c)   A decision that overturns, remands, or modifies the bureau's determination will notify you of the decision. The bureau then must further process the request in accordance with the appeal determination.

## § 2.62 When can you expect a decision on your appeal?

(a)   The basic time limit for responding to an appeal is 20 workdays after receipt of an appeal meeting the requirements of § 2.59 of this subpart.

(b) If the Department is unable to reach a decision on your appeal within the given time limit for response, the appropriate deciding official for FOIA appeals will notify you of your statutory right to seek review in a United States District Court.

*[81 FR 11131, Mar. 3, 2016]*

## § 2.63 Can you receive expedited processing of appeals?

(a) To receive expedited processing of an appeal, you must demonstrate to the Department's satisfaction that the appeal meets one of the criteria under § 2.20 of this part and include a statement that the need for expedited processing is true and correct to the best of your knowledge and belief.

(b) The appropriate deciding official for FOIA appeals will advise you whether the Department will grant expedited processing within 10 calendar days of receiving the appeal.

(c) If the appropriate deciding official for FOIA appeals decides to grant expedited processing, he or she will give the appeal priority over other pending appeals and process it as soon as practicable.

*[77 FR 76906, Dec. 31, 2012, as amended at 81 FR 11131, Mar. 3, 2016]*

## § 2.64 Must you submit an appeal before seeking judicial review?

Before seeking review by a court of the bureau's adverse determination, you generally must first submit a timely administrative appeal.

## Subpart I—General Information

**Source:** 77 FR 76906, Dec. 31, 2012, unless otherwise noted.

## § 2.65 Where are records made available?

Records that are required by the FOIA to be made proactively available for public inspection and copying are accessible on the Department's Web site, *http://www.doi.gov/foia/libraries*. They may also be available at bureau office locations.

*[77 FR 76906, Dec. 31, 2012, as amended at 81 FR 11131, Mar. 3, 2016]*

## § 2.66 What are FOIA Requester Centers and the FOIA Public Liaison?

(a) FOIA Requester Centers typically serve as your first point of contact for questions about how the FOIA works. Before and after you make a request, FOIA Requester Centers can assist you by:

(1) Identifying information that is already posted and available;

(2) Informing you about the types of records maintained by the bureau;

(3) Providing guidance on formulating effective requests;

(4) Describing the Department's various processing tracks and the average processing times for the various tracks;

    (5)  Answering questions about expedited processing standards and the FOIA's fee provisions; and

    (6)  Answering questions about the status of an existing request.

  (b)  The FOIA Public Liaison is responsible for:

    (1)  Assisting in reducing delays;

    (2)  Increasing transparency and understanding of the status of requests; and

    (3)  Assisting in the resolution of disputes between you and the agency.

  (c)  If you need further information or assistance after contacting the applicable FOIA Requester Center and the FOIA Public Liaison, you may wish to seek dispute resolution services from the Office of Government Information Services.

  (d)  Contact information for the FOIA Requester Centers and FOIA Public Liaison is available at *https://www.doi.gov/foia/foiacenters.*

*[84 FR 61829, Nov. 14, 2019]*

## § 2.67 When will the Department make records available without a FOIA request?

  (a)  Each bureau must:

    (1)  Determine which of its records must be made publicly available under the FOIA (for example, certain frequently requested records);

    (2)  Identify additional records of interest to the public that are appropriate for public disclosure; and

    (3)  Post those records in FOIA libraries.

  (b)  Because of these proactive disclosures, you are encouraged to review the Department's FOIA libraries before filing a FOIA request. The material you seek may be immediately available electronically at no cost.

## § 2.68 How will FOIA materials be preserved?

  (a)  Each bureau must preserve all correspondence pertaining to the requests that it receives under subpart B of this part, as well as copies of all requested records, until disposition or destruction is authorized by the General Records Schedule 4.2 of the National Archives and Records Administration (NARA) or another NARA-approved records schedule, such as DAA-0048-2013-0001.

  (b)  Materials that are identified as responsive to a FOIA request will not be disposed of or destroyed while the request or a related appeal or lawsuit is pending. This is true even if they would otherwise be authorized for disposition or destruction under the General Records Schedule 4.2 of NARA or another NARA-approved records schedule, such as DAA-0048-2013-0001.

*[77 FR 76906, Dec. 31, 2012, as amended at 81 FR 11131, Mar. 3, 2016]*

## § 2.69 How will a bureau handle a request for federally-funded research data?

  (a)  If you request research data that were used by the Federal Government in developing certain kinds of agency actions, and the research data relate to published research findings produced under an award, in accordance with OMB Circular A-110:

GSCA_Add_080

    (1)  If the bureau was the awarding agency, it will request the research data from the recipient;

    (2)  The recipient must provide the research data within a reasonable time; and

    (3)  The bureau will review the research data to see if it can be released under the FOIA.

  (b)  If the bureau obtains the research data solely in response to your FOIA request, the bureau may charge you a reasonable fee equaling the full incremental cost of obtaining the research data.

    (1)  This fee should reflect costs incurred by the agency, the recipient, and applicable subrecipients.

    (2)  This fee is in addition to any fees the agency may assess under the FOIA.

  (c)  The bureau will forward a copy of the request to the recipient, who is responsible for searching for and reviewing the requested information in accordance with these FOIA regulations. The recipient will forward a copy of any responsive records that are located, along with any recommendations concerning the releasability of the data, and the total cost incurred in searching for, reviewing, and providing the data.

  (d)  The bureau will review and consider the recommendations of the recipient regarding the releasability of the requested research data. However, the bureau, not the recipient, is responsible for deciding whether the research data will be released or withheld.

## § 2.70 What definitions apply to subparts A through I of this part?

For the purposes of subparts A through I of this part, the following definitions apply:

*Bureau* means any major component of the Department administering its own FOIA program. A list of these components is available at: *http://www.doi.gov/foia/contacts*.

*Commercial interest* means a commercial, trade, or profit interest as these terms are commonly understood. Your status as profitmaking or non-profitmaking is not the deciding factor in determining whether you have a commercial interest.

*Commercial use* means a use that furthers your commercial, trade or profit interests or that of the person on whose behalf the request is made.

*Confidential information* means trade secrets or commercial or financial information (that is privileged or confidential and obtained by the Department from a person) that may be protected from disclosure under Exemption 4 of the FOIA.

*Department* means the Department of the Interior.

*Direct costs* means those resources that the bureau expends in searching for and duplicating (and, in the case of commercial-use requests, reviewing) records to respond to a FOIA request. For example, direct costs include the salary of the employee performing the work (the basic rate of pay for the employee plus 16 percent of that rate to cover benefits) and the cost of operating duplicating machinery, such as photocopiers and scanners. Direct costs do not include overhead expenses such as the costs of space and of heating or lighting a facility.

*Duplication* means reproducing a copy of a record or of the information contained in it necessary to respond to a FOIA request. Copies can take the form of paper, audiovisual materials, or electronic records, among others.

*Educational institution* means any school that operates a program of scholarly research. In order to fall within this category, you must show that the request is authorized by and made under the auspices of, a qualifying institution and that the records are not sought for a commercial use, but rather are sought to further scholarly research. Teachers (if they demonstrate how the requested records will further their teaching, scholarly research, or production of scholarly works) and students (if they demonstrate how the requested records will further their coursework or other school-sponsored activities) may also qualify as an educational institution for the purposes of this definition.

*Exceptional circumstances* means a delay that does not result from a predictable workload of requests (unless the bureau demonstrates reasonable progress in reducing its backlog of pending requests).

*Exempt* means the record in question, or a portion thereof, is not subject to disclosure due to one or more of the FOIA's nine statutory exemptions, found at 5 U.S.C. 552(b)(1)-(9).

*Exemption* means one or more of the FOIA's nine statutory exemptions, found at 5 U.S.C. 552(b)(1)-(9).

*Expedited processing* means giving a FOIA request priority and processing it ahead of other requests pending in the bureau because you have shown a compelling need for the records.

*Fee category* means one of the four categories, discussed in §§ 2.38 and 2.39, that agencies place you in for the purpose of determining whether you will be charged fees for search, review, and duplication.

*FOIA* means the Freedom of Information Act, 5 U.S.C. 552, as amended.

*FOIA libraries* means a physical or electronic compilation of records required to be made available to the public for inspection and copying under 5 U.S.C. 552(a)(2). It also includes a physical or electronic compilation of records that the bureau, at its discretion, makes available to the public for inspection and copying.

*Frequently requested records* means records that have been released to any person in response to a FOIA request and that have been requested, or that the bureau anticipates will be requested, at least two more times under the FOIA.

*Multitrack processing* means placing simple requests, requiring relatively minimal review, in one processing track and more voluminous and complex requests in one or more other tracks. Requests in each track are ordinarily processed on a first-in/first-out basis, but other factors, such as litigation, may affect the sequence and/or timing of processing.

*Noncommercial scientific institution* means an institution that is not operated for commerce, trade or profit, and that is operated solely for the purpose of conducting scientific research the results of which are not intended to promote any particular product or industry. To be in this category, you must show that the request is authorized by and is made under the auspices of a qualifying institution and that the records are not sought for a commercial use but are sought to further scientific research.

*OMB Fee Guidelines* means the Uniform Freedom of Information Fee Schedule and Guidelines published by the Office of Management and Budget at 52 FR 10012 (Mar. 27, 1987).

*Published* means, for the purposes of § 2.69 of this subpart only, when:

(1) Research findings are published in a peer-reviewed scientific or technical journal; or

(2) A Federal agency publicly and officially cites the research findings in support of an agency action that has the force and effect of law.

*Recipient* means, for the purposes of § 2.69 of this subpart only, an organization receiving financial assistance directly from Federal awarding agencies to carry out a project or program. The term includes public and private institutions of higher education, public and private hospitals, and other quasi-public and private non-profit organizations. The term may include commercial organizations, foreign or international organizations (such as agencies of the United Nations) which are recipients, subrecipients, or contractors or subcontractors of recipients or subrecipients at the discretion of the Federal awarding agency. The term does not include government-owned contractor-operated facilities or research centers providing continued support for mission-oriented, large-scale programs that are government-owned or controlled, or are designated as federally-funded research and development centers.

*Record* means an agency record that is either created or obtained by an agency and is under agency possession and control at the time of the FOIA request, or is maintained by an entity under Government contract for the purposes of records management.

*Representative of the news media* means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. The term *news* as used in this definition means information that is about current events or that would be of current interest to the public. Simply distributing copies of released records, electronically or otherwise, does not qualify as using editorial skills to turn the raw materials into a distinct work. Examples of news media entities are newspapers, television, Web sites, or radio stations broadcasting to the public at large, and publishers of periodicals (but only if such entities qualify as disseminators of news) who make their products available for purchase by or subscription by or free distribution to the general public. These examples are not all inclusive. As methods of news delivery evolve, alternative representatives of news media may come into being. A freelance journalist will qualify as a news-media entity if he or she can demonstrate a solid basis for expecting publication through that entity, whether or not the journalist is actually employed by that entity (for example, a publication contract would present a solid basis for such an expectation).

*Research data* means, for the purposes of § 2.69 of this subpart only, the recorded factual material commonly accepted in the scientific community as necessary to validate research findings, but not any of the following: preliminary analyses, drafts of scientific papers, plans for future research, peer reviews, or communications with colleagues. The term *recorded* as used in this definition excludes physical objects (e.g., laboratory samples). Research data also do not include:

(1) Trade secrets, commercial information, materials necessary to be held confidential by a researcher until they are published, or similar information which is protected under law; and

(2) Personnel and medical information and similar information the disclosure of which would constitute a clearly unwarranted invasion of personal privacy, such as information that could be used to identify a particular person in a research study.

*Review* means the examination of a record located in response to a request to determine whether any portion of it is exempt from disclosure. Review time includes processing any record for disclosure, such as doing all that is necessary to prepare the record for disclosure, including the process of redacting the record and marking the appropriate exemptions. Review time also includes time spent both obtaining and considering any formal objection to disclosure made by a confidential information submitter under subpart G of this part, but it excludes time spent resolving general legal or policy issues regarding the application of FOIA exemptions.

*Search* means the process of looking for and retrieving records responsive to a request. Search time includes page-by-page or line-by-line identification of information within records; and the reasonable efforts expended to locate and retrieve electronic records.

*Submitter* means any person or entity outside the Federal Government from whom the Department obtains confidential information, directly or indirectly. The term includes, but is not limited to individuals, corporations, and state, local, tribal, and foreign governments.

*Unusual circumstances* means the need to search for and collect requested records from field facilities or other establishments that are separate from the office processing the request; the need to search for, collect, and examine a voluminous amount of separate and distinct records which are demanded in a single request; or the need for consultation, which shall be conducted with all practicable speed, with another agency, or among two or more components of the Department, having a substantial interest in the determination of the request.

*Workday* means a regular Federal workday. It excludes Saturdays, Sundays, or Federal legal public holidays. Items arriving or delivered after 5 p.m. Eastern Time will be deemed received on the next workday.

*You* means a person requesting records, or filing an appeal, under the FOIA.

[77 FR 76906, Dec. 31, 2012, as amended at 81 FR 11131, Mar. 3, 2016; 84 FR 61829, Nov. 14, 2019]

## Subpart J—Declassification of Classified Documents

**Source:** 40 FR 7305, Feb. 19, 1975, unless otherwise noted. Redesignated at 67 FR 64530, Oct. 21, 2002. Redesignated at 77 FR 76902, Dec. 31, 2012; 78 FR 6216, Jan. 30, 2013.

## § 2.200 Declassification of classified documents.

(a) *Request for classification review.*

(1) Requests for a classification review of a document of the Department of the Interior pursuant to section 5(c) of Executive Order 11652 (37 FR 5209, March 10, 1972) and section III B of the National Security Council Directive Governing Classification, Downgrading, Declassification and Safeguarding of National Security Information (37 FR 10053, May 1972) shall be made in accordance with the procedures established by this section.

(2) Any person desiring a classification review of a document of the Department of the Interior containing information classified as National Security Information by reason of the provisions of Executive Order 12065 (or any predecessor executive order) and which is more than 10 years old, should address such request to the Chief, Division of Enforcement and Security Management, Office of Administrative Services, U.S. Department of the Interior, Washington, DC 20240.

(3) Requests need not be made on any special form, but shall, as specified in the executive order, describe the document with sufficient particularity to enable identification of the document requested with expenditure of no more than a reasonable amount of effort.

(4) Charges for locating and reproducing copies of records will be made when deemed applicable in accordance with appendix A to this part and the requester will be notified.

(b) *Action on requests for classification review.*

This content is from the eCFR and is authoritative but unofficial.

**Title 43 —Public Lands: Interior**

**Subtitle B —Regulations Relating to Public Lands**

**Chapter II —Bureau of Land Management, Department of the Interior**

**Subchapter C —Minerals Management (3000)**

**Part 3600**  Mineral Materials Disposal

  **Subpart 3601**  Mineral Materials Disposal; General Provisions

  Fundamental Provisions

  **§ 3601.1**  Purpose.

  **§ 3601.3**  Authority.

  **§ 3601.5**  Definitions.

  **§ 3601.6**  Policy.

  **§ 3601.8**  Public availability of information.

  **§ 3601.9**  Information collection.

  Limitations on Disposal of Mineral Materials

  **§ 3601.10**  Limitations on BLM's discretion to dispose of mineral materials.

  **§ 3601.11**  When will environmental considerations prevent BLM from disposing of mineral materials?

  **§ 3601.12**  What areas does BLM exclude from disposal of mineral materials?

  **§ 3601.13**  How can I obtain mineral materials from Federal lands that have been withdrawn to aid a function of another Federal agency or of a State or local government agency?

  **§ 3601.14**  When can BLM dispose of mineral materials from unpatented mining claims?

  Rights of Purchasers and Permittees

  **§ 3601.20**  Rights of parties.

  **§ 3601.21**  What rights does a person have under a materials sales contract or use permit?

  **§ 3601.22**  What rights remain with the United States when BLM sells or issues a permit for mineral materials?

  Pre-Application Sampling and Testing

  **§ 3601.30**  Pre-application activities—how and when may I sample and test mineral materials?

  Mining and Reclamation Plans

  **§ 3601.40**  Mining and reclamation plans.

  **§ 3601.41**  What information must I include in my mining plan?

  **§ 3601.42**  What information must I include in my reclamation plan?

  **§ 3601.43**  What is the process for BLM to approve my mining and reclamation plans?

  **§ 3601.44**  How and when may my mining or reclamation plan be modified?

  Contract and Permit Administration

  **§ 3601.50**  Administration of sales contracts and free use permits.

  **§ 3601.51**  How will BLM inspect my operation?

  **§ 3601.52**  After I finish my operations, when must I remove improvements and equipment?

  Contract and Permit Cancellation

  **§ 3601.60**  Cancellation.

  **§ 3601.61**  When may BLM cancel my contract or permit?

GSCA_Add_086

**§ 3601.62** Cancellation procedure.

Unauthorized Use

**§ 3601.70** Unauthorized use.

**§ 3601.71** What constitutes unauthorized use?

**§ 3601.72** What are the consequences of unauthorized use?

Appeals

**§ 3601.80** How do I appeal a final decision by BLM?

**Subpart 3602** Mineral Materials Sales

Applications

**§ 3602.10** Applying for a mineral materials sales contract.

**§ 3602.11** How do I request a sale of mineral materials?

**§ 3602.12** How does the mineral materials sales process affect other users of the same public lands?

**§ 3602.13** How does BLM measure and establish the price of mineral materials?

**§ 3602.14** What kind of financial security does BLM require?

**§ 3602.15** What will happen to my bond if I transferred all of my interests or operations to another bonded party?

Administration of Sales

**§ 3602.20** Administration of mineral materials sales.

**§ 3602.21** What payment terms apply to my mineral materials sales contract?

**§ 3602.22** When will a contract terminate?

**§ 3602.23** When will BLM make refunds or allow credits?

**§ 3602.24** When may I assign my materials sales contract?

**§ 3602.25** What rights and responsibilities does my assignee assume?

**§ 3602.26** If I assign my contract, when do my obligations under the contract end?

**§ 3602.27** When will BLM extend the term of a contract?

**§ 3602.28** What records must I maintain and how long must I keep them?

**§ 3602.29** How will BLM verify my production?

Noncompetitive Sales

**§ 3602.30** Noncompetitive sales.

**§ 3602.31** What volume limitations and fees generally apply to noncompetitive mineral materials sales?

**§ 3602.32** What volume and other limitations pertain to noncompetitive sales associated with public works projects?

**§ 3602.33** How will BLM dispose of mineral materials for use in developing Federal mineral leases?

**§ 3602.34** What is the term of a noncompetitive contract?

Competitive Sales

**§ 3602.40** Competitive sales.

GSCA_Add_087

**§ 3602.41**   When will BLM sell mineral materials on a competitive basis?

**§ 3602.42**   How does BLM publicize competitive mineral materials sales?

**§ 3602.43**   How does BLM conduct competitive mineral materials sales?

**§ 3602.44**   How do I make a bid deposit?

**§ 3602.45**   What final steps will BLM take before issuing me a contract?

**§ 3602.46**   What is the term of a competitive contract?

**§ 3602.47**   When and how may I renew my competitive contract and what is the fee?

**§ 3602.48**   What may BLM require when renewing my contract?

**§ 3602.49**   When will BLM issue a non-renewable contract?

**Subpart 3603**   Community Pits and Common Use Areas

Disposal of Materials—Community Pits and Common Use Areas

**§ 3603.10**   Disposal of mineral materials from community pits and common use areas.

**§ 3603.11**   What rights pertain to users of community pits?

**§ 3603.12**   What rights pertain to users of common use areas?

**§ 3603.13**   What price does BLM charge under materials sales contracts for mineral materials from community pits and common use areas?

**§ 3603.14**   What plans do I need to prepare to mine or remove mineral materials from a community pit or common use area?

Reclamation

**§ 3603.20**   Reclamation.

**§ 3603.21**   What reclamation requirements pertain to community pits and common use areas?

**§ 3603.22**   What fees must I pay to cover the cost of reclamation of community pits and common use areas?

**Subpart 3604**   Free Use of Mineral Materials

Obtaining Free Use Permits

**§ 3604.10**   Permits for free use of mineral materials.

**§ 3604.11**   How do I apply for a free use permit?

**§ 3604.12**   Who may obtain a free use permit?

**§ 3604.13**   When will BLM decline to issue a free use permit to a qualified applicant?

Administration of Free Use

**§ 3604.20**   Administration of free use permits.

**§ 3604.21**   What is the term of a free use permit?

**§ 3604.22**   What conditions and restrictions pertain to my free use permit?

**§ 3604.23**   When and how may I assign my free use permit?

**§ 3604.24**   Who may remove materials on my behalf?

**§ 3604.25**   What bond requirements pertain to free use permits?

**§ 3604.26**   When will BLM cancel my permit?

GSCA_Add_088

§ 3604.27   What rights does a free use permit give me against other users of the land?

# PART 3600—MINERAL MATERIALS DISPOSAL

**Authority:**  30 U.S.C. 601 *et seq.;* 43 U.S.C. 1201, 1701 *et seq.;* Sec. 2, Act of September 28, 1962 (Pub. L. 87-713, 76 Stat. 652).

**Source:**  66 FR 58901, Nov. 23, 2001, unless otherwise noted.

## Subpart 3601—Mineral Materials Disposal; General Provisions

FUNDAMENTAL PROVISIONS

## § 3601.1 Purpose.

The regulations in this part establish procedures for the exploration, development, and disposal of mineral material resources on the public lands, and for the protection of the resources and the environment. The regulations apply to permits for free use and contracts for sale of mineral materials.

## § 3601.3 Authority.

(a)   BLM's authority to dispose of sand, gravel, and other mineral and vegetative materials that are not subject to mineral leasing or location under the mining laws is the Act of July 31, 1947, as amended (30 U.S.C. 601 *et seq.*), commonly referred to as the Materials Act. This authority applies to sale and free use of these materials. BLM's authority to allow removal of limited quantities of petrified wood from public lands without charge is section 2 of the Act of September 28, 1962 (Pub. L. 87-713, 76 Stat. 652).

(b)   Section 302 of the Federal Land Policy and Management Act of 1976 (FLPMA) (43 U.S.C. 1732) provides the general authority for BLM to manage the use, occupancy, and development of the public lands under the principles of multiple use and sustained yield in accordance with the land use plans that BLM develops under FLPMA.

(c)   Section 304 of FLPMA (43 U.S.C. 1734) and the Independent Offices Appropriation Act of 1952 (31 U.S.C. 9701) authorize the U.S. Government to collect fees and to require reimbursement of its costs.

## § 3601.5 Definitions.

As used in this part the term:

*Act*   means the Materials Act of July 31, 1947, as amended (30 U.S.C. 601, *et seq.*).

*BLM*   means the Bureau of Land Management.

*Common use area* means a generally broad geographic area from which BLM can make disposals of mineral materials to many persons, with only negligible surface disturbance. The use is dispersed throughout the area.

GSCA_Add_089

*Community pit* means a relatively small, defined area from which BLM can make disposals of mineral materials to many persons. The surface disturbance is usually extensive in the confined area.

*Mineral materials* means, but is not limited to, petrified wood and common varieties of sand, stone, gravel, pumice, pumicite, cinders, and clay.

*Performance bond* means a bond to ensure compliance with the terms of the contract and reclamation of the site as BLM requires.

*Permittee* means any Federal, State, or territorial agency, unit, or subdivision, including municipalities, or any non-profit organization, to which BLM issued a free use permit for the removal of mineral materials from the public lands.

*Public lands* means any lands and interest in lands owned by the United States and administered by the Secretary of the Interior through BLM without regard to how the United States acquired ownership, except lands held for the benefit of Indians, Aleuts, and Eskimos.

*Purchaser* means any person, including a business or government entity, buying or holding a contract to purchase mineral materials on the public lands.

## § 3601.6 Policy.

It is BLM's policy:

(a) To make mineral materials available unless it is detrimental to the public interest to do so;

(b) To sell mineral material resources at not less than fair market value;

(c) To permit Federal, State, Territorial, and local government entities and non-profit organizations free use of these materials for qualified purposes;

(d) To protect public land resources and the environment and minimize damage to public health and safety during the exploration for and the removal of such minerals;

(e) To prevent unauthorized removal of mineral materials; and

(f) To require purchasers and permittees to account for all removals of mineral materials.

## § 3601.8 Public availability of information.

(a) All data and information concerning Federal and Indian minerals that you submit under this part are subject to part 2 of this title. Part 2 of this title includes the regulations of the Department of the Interior covering the public disclosure of data and information contained in Department of the Interior records. BLM may make available for inspection certain mineral information not protected from disclosure under part 2 of this title without a Freedom of Information Act (FOIA) (5 U.S.C. 552) request.

(b) When you submit data and information under this part that you believe to be exempt from public disclosure, and that you wish BLM to withhold from such disclosure, you must clearly mark each page that you believe includes confidential information. BLM will keep all data and information confidential to the extent allowed by § 2.13(c) of this title.

## § 3601.9 Information collection.

The Office of Management and Budget has approved the information collection requirements in part 3600 under 44 U.S.C. 3501 *et seq.* and assigned clearance number 1004-0103. BLM is collecting the information to allow us to determine if you are qualified to purchase or have free use of mineral materials on the public lands. You must respond to obtain a benefit.

LIMITATIONS ON DISPOSAL OF MINERAL MATERIALS

## § 3601.10 Limitations on BLM's discretion to dispose of mineral materials.

## § 3601.11 When will environmental considerations prevent BLM from disposing of mineral materials?

BLM will not dispose of mineral materials if we determine that the aggregate damage to public lands and resources would exceed the public benefits that BLM expects from the proposed disposition.

## § 3601.12 What areas does BLM exclude from disposal of mineral materials?

(a) BLM will not dispose of mineral materials from wilderness areas or other areas where it is expressly prohibited by law. This includes national parks and monuments.

(b) BLM will not dispose of mineral materials from Indian lands and lands set aside or held for the use or benefit of Indians.

(c) BLM will not dispose of mineral materials from areas identified in land use plans as not appropriate for mineral materials disposal.

## § 3601.13 How can I obtain mineral materials from Federal lands that have been withdrawn to aid a function of another Federal agency or of a State or local government agency?

If you wish to obtain mineral materials from lands withdrawn to aid a function of another Federal agency or of a State or local government agency, you may apply to BLM. BLM will dispose of the mineral materials only with the consent of that agency.

## § 3601.14 When can BLM dispose of mineral materials from unpatented mining claims?

(a) BLM may dispose of mineral materials from unpatented mining claims if disposal does not endanger or materially interfere with prospecting, mining, or processing operations, or uses reasonably incident thereto.

(b) BLM will ask a mining claimant for a waiver before disposing of mineral materials from a claim. If the mining claimant refuses to sign a waiver, BLM will make sure that disposal of the mineral materials will not be detrimental to the public interest. We also will consult with the Solicitor's Office, if necessary, before proceeding with the disposal.

RIGHTS OF PURCHASERS AND PERMITTEES

## § 3601.20 Rights of parties.

## § 3601.21 What rights does a person have under a materials sales contract or use permit?

(a) Unless otherwise provided, if you are a purchaser under a sales contract or a free use permittee, you have the right to:

    (1) Extract, remove, process, and stockpile the material until the contract or permit terminates, regardless of any rights others acquire later under the provisions of the general land laws; and

    (2) Use and occupy the described lands to the extent necessary for fulfillment of the contract or permit.

(b) Users of the lands covered by your materials sales contract or free use permit who acquire their rights later than the date BLM designated the tract for mineral materials disposal will be subject to your existing use authorization, as provided in § 3602.12. This applies to uses due to any later settlement, location, lease, sale, or other appropriation under the general land laws, including the mineral leasing and mining laws.

## § 3601.22 What rights remain with the United States when BLM sells or issues a permit for mineral materials?

Your sale contract or use permit is subject to the continuing right of the United States to issue leases, permits, and licenses for the use and occupancy of the lands, if such use would not endanger or materially interfere with the production or removal of materials under contract or permit.

PRE-APPLICATION SAMPLING AND TESTING

## § 3601.30 Pre-application activities—how and when may I sample and test mineral materials?

(a) BLM may authorize you in writing to sample and test mineral materials. The authorization letter expires after 90 days, but BLM may extend it for an additional 90 days if you show us that an extension is necessary. BLM may authorize these activities before issuing a sales contract or free use permit.

(b) You must submit your sampling and testing findings to BLM. All information you submit under this section is subject to part 2 of this title. That part sets forth the rules of the Department of the Interior relating to public availability of information contained in Departmental records. (*See* § 3601.8.)

(c) A letter from BLM authorizing you to sample and test mineral materials does not give you a preference right to a sales contract or free use permit.

(d) BLM may impose bonding and reclamation requirements on sampling and testing that you conduct under an authorization letter.

MINING AND RECLAMATION PLANS

## § 3601.40 Mining and reclamation plans.

BLM may require you to submit mining and reclamation plans before we begin any environmental review or issue a contract or permit. You may combine these plans in one document.

## § 3601.41 What information must I include in my mining plan?

If BLM requires you to submit a mining plan, it must include:

GSCA_Add_092

(a) A map, sketch, or aerial photograph identifying the area for which you are applying, the area and depth you plan to disturb, existing and proposed access, and the names and locations of major topographic and known cultural features;

(b) A description of your proposed methods of operation and the periods during which you will operate;

(c) A description of measures you will take to prevent hazards to public health and safety and to minimize and mitigate environmental damage; and

(d) Such other information as BLM may require.

## § 3601.42 What information must I include in my reclamation plan?

If BLM requires you to submit a reclamation plan, it must include:

(a) A statement of the proposed manner and time in which you will complete reclamation of the areas disturbed by your operations;

(b) A map or sketch which delineates the area you will reclaim; and

(c) Such other information as BLM may require.

## § 3601.43 What is the process for BLM to approve my mining and reclamation plans?

(a) After reviewing your mining and reclamation plans, BLM will notify you of any deficiencies in the plans and recommend the changes necessary. BLM will notify you in writing when we approve your plan. You must follow BLM-approved mining and reclamation plans, which become part of the contract or permit.

(b) Your operation must not deviate from the plan BLM approves, unless it is modified under § 3601.44.

## § 3601.44 How and when may my mining or reclamation plan be modified?

(a) Either you or BLM may initiate a modification of an approved mining or reclamation plan to adjust for changed conditions or to correct any oversight. BLM will consult with you before requiring a modification.

(b) If BLM notifies you that you must modify your plan, you must prepare the modification, or explain why you need more time, within 30 days. If you fail to modify your plan to BLM's satisfaction, BLM may order you to stop operations under your contract or permit.

(c) When you ask to change an approved mining or reclamation plan for one of the reasons in paragraph (a) of this section, BLM will notify you in writing within 30 days whether we approve the modification, deny it, or require any changes in it.

CONTRACT AND PERMIT ADMINISTRATION

## § 3601.50 Administration of sales contracts and free use permits.

## § 3601.51 How will BLM inspect my operation?

You must allow BLM access at any reasonable time:

(a) To inspect or investigate the mine condition;

(b) To conduct surveys;

(c)   To estimate the volume, types, and composition of commodities that you mine or remove;

(d)   To examine weight tickets, truck logs, and other records that BLM finds necessary to verify production; or

(e)   To determine whether you comply with contract, permit, statutory, or regulatory requirements.

*[66 FR 58901, Nov. 23, 2001; 67 FR 68778, Nov. 13, 2002]*

## § 3601.52 After I finish my operations, when must I remove improvements and equipment?

After your contract or permit period expires, or after cancellation of your permit or contract, BLM will allow you up to 90 days, excluding periods of inclement weather, to remove the equipment, personal property, and any other improvements that you placed on the public lands. You may leave in place improvements such as roads, culverts, and bridges if BLM consents. If you fail to remove equipment, personal property, or any other improvement, it becomes the property of the United States. However, you remain liable for the cost of its removal and for restoration of the site.

CONTRACT AND PERMIT CANCELLATION

## § 3601.60 Cancellation.

## § 3601.61 When may BLM cancel my contract or permit?

BLM may cancel your contract or free use permit if you:

(a)   Fail to comply with the provisions of the Materials Act of 1947, as amended (30 U.S.C. 601 *et seq.*);

(b)   Fail to comply with any applicable regulations; or

(c)   Default in the performance of any material term, covenant, or stipulation in the contract.

## § 3601.62 Cancellation procedure.

(a)   BLM will give you written notice of any defaults, breach, or cause of forfeiture, either in person or by certified mail. You have 30 days after receiving the notice:

(1)   To correct all defaults;

(2)   To request an extension of time in which to correct the defaults; or

(3)   To submit evidence showing to BLM's satisfaction why we should not cancel your contract or free use permit.

(b)   If you fail to respond to the notice under paragraph (a) of this section, or if delivery of the notice is refused, or not completed as described in § 1810.2 of this chapter, BLM may cancel the contract or permit.

UNAUTHORIZED USE

## § 3601.70 Unauthorized use.

## § 3601.71 What constitutes unauthorized use?

(a) Except as provided in paragraph (b) of this section, you must not extract, sever, or remove mineral materials from public lands under the jurisdiction of the Department of the Interior, unless BLM or another Federal agency with jurisdiction authorizes the removal by sale or permit. Violation of this prohibition constitutes unauthorized use.

(b) If you own the surface estate of lands with reserved Federal minerals, you may use mineral materials within the boundaries of your surface estate without a sales contract or permit only in the following circumstances:

(1) You use a minimal amount of mineral materials for your own personal use;

(2) You have statutory authority to use the mineral materials; or

(3) You have other express authority to use the mineral materials.

## § 3601.72 What are the consequences of unauthorized use?

Unauthorized users are liable for damages to the United States, and are subject to prosecution for such unlawful acts (see subpart 9239 of this chapter).

APPEALS

## § 3601.80 How do I appeal a final decision by BLM?

If a BLM decision adversely affects you, you may appeal the decision in accordance with parts 4 and 1840 of this title.

## Subpart 3602—Mineral Materials Sales

APPLICATIONS

## § 3602.10 Applying for a mineral materials sales contract.

## § 3602.11 How do I request a sale of mineral materials?

(a) You may submit a written request for sale of mineral materials to the BLM office with jurisdiction over the site containing the materials. No particular form is required for this request.

(b) BLM also may initiate a sale without a request under paragraph (a) of this section.

(c) You must pay a processing fee as provided in §§ 3602.31(b) and 3602.44(f). If the request is for mineral materials that are from a community pit or common use area this requirement does not apply.

*[66 FR 58901, Nov. 23, 2001, as amended at 70 FR 58878, Oct. 7, 2005; 72 FR 50888, Sept. 5, 2007]*

GSCA_Add_095

## § 3602.12 How does the mineral materials sales process affect other users of the same public lands?

(a)  When BLM designates tracts for competitive or noncompetitive sale of mineral materials, and notes the designation in the public land records, it creates a right to remove the materials superior to any subsequent claim, entry, or other conflicting use of the land, including subsequent mining claim locations.

(b)  The superior right under paragraph (a) of this section is part of all contracts and permits BLM authorizes within 2 years after the date we designate the tract. BLM may extend this 2-year period for one additional year for good cause. The right continues for the entire term of the contract or permit and any renewal term. The superior right under paragraph (a) of this section also applies to any subsequent contracts or permits that BLM authorizes within 2 years after the previous contract or permit expires or terminates.

(c)  This right does not prevent other uses or segregate the land from the operation of the public land laws, including the mining and mineral leasing laws. However, such subsequent uses must not interfere with the extraction of mineral materials.

*[66 FR 58901, Nov. 23, 2001; 67 FR 68778, Nov. 13, 2002]*

## § 3602.13 How does BLM measure and establish the price of mineral materials?

(a)  BLM will not sell mineral materials at less than fair market value. BLM determines fair market value by appraisal.

(b)  BLM may periodically reappraise the value of mineral materials not yet removed, and adjust your contract price accordingly. BLM will not adjust the price during the first 2 years of the contract. BLM also will not adjust the contract price during the 2-year period following any adjustment. However, BLM may adjust the price at the beginning of any contract renewal period.

(c)  BLM measures mineral materials by in-place volume or weight equivalent. When BLM requires you to measure materials, we may either designate the method you must use or allow you to choose either method. We will verify your results.

## § 3602.14 What kind of financial security does BLM require?

(a)  For contracts of $2,000 or more, BLM will require a performance bond of an amount sufficient to meet the reclamation standards provided for in the contract, but at least $500. If you have a sales contract from a community pit or common use area and you pay a reclamation fee, BLM will not require you to post a performance bond.

(b)  BLM may require a performance bond for contracts of less than $2,000. We will not require a bond amount greater than 20 percent of the total contract value.

(c)  A performance bond may be a—

(1)  Bond of a corporate surety shown on the approved list (Circular 570) issued by the U.S. Treasury Department, including surety bonds arranged or paid for by third parties;

(2)  Certificate of deposit that:

(i)  Is issued by a financial institution whose deposits are Federally insured;

(ii)  Does not exceed the maximum insurable amount set by the Federal Deposit Insurance Corporation;

GSCA_Add_096

(iii) Is made payable or assigned to the United States;

(iv) Grants BLM authority to demand immediate payment if you fail to meet the terms and conditions of the contract;

(v) States that no party may redeem it before BLM approves its redemption; and

(vi) Otherwise conforms to BLM's instructions as found in the contract terms;

(3) Cash bond, with a power of attorney to BLM to convert it upon your failure to meet the terms and conditions of the contract;

(4) Irrevocable letter of credit from a bank or financial institution organized or authorized to transact business in the United States, with a power of attorney to BLM to redeem it upon your failure to meet the terms and conditions of the contract; or

(5) Negotiable Treasury bond of the United States of a par value equal to the amount of the required bond, together with a power of attorney to BLM to sell it upon your failure to meet the terms and conditions of the contract.

## § 3602.15 What will happen to my bond if I transferred all of my interests or operations to another bonded party?

BLM will cancel your bond obligations following approval of the transfer of your interests or operations if the transferee provides a bond that assumes all of your existing liabilities as required in § 3602.24. However, under § 3602.26, you remain liable for any reclamation or other obligation that accrued during the time you held your interest.

ADMINISTRATION OF SALES

## § 3602.20 Administration of mineral materials sales.

## § 3602.21 What payment terms apply to my mineral materials sales contract?

(a) Under a sales contract for mineral materials—

(1) For sales of $2,000 or less, you must pay the full amount before BLM will sign the contract.

(2) When the sale exceeds $2,000, you may make installment payments. The first installment payment must be the greater of $500 or 5 percent of the total purchase price. If you elect to make installment payments—

(i) For non-competitive sales, you must pay the first installment at or before the time BLM awards the contract;

(ii) For competitive sales, you must pay the first installment as a deposit at the time you submit the bid; and

(iii) For noncompetitive and competitive sales—

(A) Once you have removed materials, you must make each subsequent installment payment monthly in an amount equal to the value of the minerals you remove each month. You must make the payment by the 15th day following the end of the month for which you are

reporting. However, you must pay the balance of the purchase price not later than 60 days before the expiration date of the contract. BLM will credit your first installment payment to you at the time of your final payment unless we cancel your contract under § 3601.61; or

(B) You may make advance payment for your annual production based on the previous year's production or your projection of the current year's production, so long as you resume paying on a monthly basis as required in paragraph (a)(2)(iii)(A) of this section if your annual payment does not cover your actual production for the current year. You must resume monthly payments no later than the 15th day following the end of the month in which production exceeds the projected production on which payments were based.

(3) You must annually (as provided in your contract) produce an amount sufficient to pay to the United States a sum of money equal to the first installment determined under paragraph (a)(2) of this section. In lieu of such production, you may make an annual payment in the amount of the first installment. If in any contract year you make production payments that are less than the first installment, you must pay the difference between the production payments and the amount of the first installment. These annual payments are due on or before each anniversary date of the contract.

(b) If you fail to comply with the terms and conditions of the contract and BLM cancels your contract under § 3601.61, you will forfeit all moneys that you paid.

## § 3602.22 When will a contract terminate?

(a) Your contract terminates when—

(1) Its term expires;

(2) You have completed production under your contract or permit and any renewal, and completed required reclamation; or

(3) BLM cancels your contract under § 3601.60 *et seq.* of this part.

(b) You and BLM may, by agreement, terminate the sales contract at any time.

## § 3602.23 When will BLM make refunds or allow credits?

(a) BLM may make refunds or allow credits if—

(1) When your contract expires, your total payments exceed the total value of mineral materials included in the contract;

(2) BLM determines that insufficient mineral materials existed in the sales area to fulfill the terms of the contract; or

(3) Materials you paid for are unavailable as a result of terminating your contract by mutual agreement under § 3602.22(b).

(b) If your refund or credit is a result of terminating your contract by mutual agreement under § 3602.22(b), BLM will reduce the amount of the refund or credit by the amount of the administrative cost of processing the disposal action. If these administrative costs exceed your total payments, BLM will not make a refund or allow a credit.

(c)  BLM may credit to future production on the same contract, but not refund, payments that you make in lieu of production under § 3602.21(a)(3). However, if, upon expiration of the contract, the total value of payments you have made exceeds the total value of mineral materials included in your contract, BLM will refund the difference in accordance with paragraphs (a) and (b) of this section.

## § 3602.24 When may I assign my materials sales contract?

(a)  You may not assign the contract or any interest therein unless BLM approves the transfer in writing.

(b)  BLM will not approve your proposed assignment of contract, unless—

   (1)  Your assignee—

      (i)  Furnishes a financial guarantee as required by § 3602.14; or

      (ii)  Obtains a written commitment from the previous surety that it will be bound by the assignment when BLM approves it; and

   (2)  The assignment contains all the terms and conditions in your contract.

## § 3602.25 What rights and responsibilities does my assignee assume?

When BLM approves your assignment, your assignee is entitled to all the rights and is subject to all the obligations under the contract.

## § 3602.26 If I assign my contract, when do my obligations under the contract end?

When BLM approves your assignment, you are released from any further liability under the contract for actions the assignee may take after the effective date of the assignment. You continue to be responsible for obligations that accrued before the approval date, whether or not you knew of them at the time of the transfer.

## § 3602.27 When will BLM extend the term of a contract?

BLM may grant a one-time extension of the contract not to exceed 1 year, if:

(a)

   (1)  For contracts with terms over 90 days, BLM receives your written request between 30 and 90 days before the contract expires; or

   (2)  For contracts with terms of 90 days or less, BLM receives your written request not later than 15 days before the contract expires; and

(b)  You show in writing that the delay in removing the mineral materials was due to causes beyond your control and was not due to your fault or negligence.

## § 3602.28 What records must I maintain and how long must I keep them?

(a)  BLM may require you to maintain and preserve for 6 years records, maps, and surveys relating to production verification and valuation. These include, but are not limited to, detailed records of quantity, types, and value of commodities you moved, processed, sold, delivered, or used.

(b)  You must make such records available to BLM to allow us to determine whether you have complied with statutes, regulations, and the terms of the contract.

## § 3602.29 How will BLM verify my production?

(a) You must submit at least one report per contract year of the amount of mineral materials you have mined or removed under your sales contract so BLM can verify that you have made the required payments. BLM will specify the timing of the reports in your contract or permit.

(b) BLM may require more frequent reporting if we find it necessary.

(c) BLM may require you to conduct pre-operation, annual, and post-operation volumetric surveys of the mine site.

NONCOMPETITIVE SALES

## § 3602.30 Noncompetitive sales.

In addition to the following sections, §§ 3602.31 through 3602.35, the provisions of §§ 3602.11 through 3602.29 also apply to noncompetitive sales.

## § 3602.31 What volume limitations and fees generally apply to noncompetitive mineral materials sales?

(a) BLM may sell, at not less than fair market value, and without advertising or calling for bids, mineral materials not greater than 200,000 cubic yards (or weight equivalent) in any individual sale, when BLM determines it to be:

(1) In the public interest; and

(2) Impracticable to obtain competition.

(b) BLM will charge the purchaser a processing fee on a case-by-case basis as described in § 3000.11 of this chapter.

(c) BLM will not approve multiple noncompetitive sales that exceed a total of 300,000 cubic yards (or weight equivalent) made in any one State for the benefit of any one purchaser, whether an individual, partnership, corporation, or other entity, in any period of 12 consecutive months.

(d) The volume limitations in paragraphs (a) and (c) of this section do not apply to sales in the State of Alaska that BLM determines are needed for construction, operation, maintenance, or termination of the Trans-Alaska Pipeline System or the Alaska Natural Gas Transportation System.

(e) The volume limitations in paragraphs (a) and (b) of this section do not apply if:

(1) BLM determines that circumstances make it impossible to obtain competition; or

(2) There is insufficient time to invite competitive bids, because of an emergency situation affecting public property, health, or safety.

*[66 FR 58901, Nov. 23, 2001, as amended at 70 FR 58878, Oct. 7, 2005; 73 FR 35592, June 24, 2008]*

## § 3602.32 What volume and other limitations pertain to noncompetitive sales associated with public works projects?

BLM may sell mineral materials not exceeding 400,000 cubic yards (or weight equivalent), at not less than fair market value, without advertising or calling for bids if:

   (a)   BLM determines the sale to be in the public interest; and

   (b)   The materials will be used in connection with an urgent public works improvement program on behalf of a Federal, State, or local governmental agency, and time does not permit advertising for a competitive sale.

## § 3602.33 How will BLM dispose of mineral materials for use in developing Federal mineral leases?

   (a)   If you propose to use mineral materials in connection with developing a mineral lease issued by BLM, we may, without calling for competitive bids, sell you at fair market value a volume of mineral materials not exceeding a total of 200,000 cubic yards (or weight equivalent) in one State in any period of 12 consecutive months.

   (b)   If the materials remain within the boundaries of the lease, BLM will not charge for mineral materials that you must move in order to extract minerals under a Federal lease, whether or not you use them for lease development.

## § 3602.34 What is the term of a noncompetitive contract?

BLM will not issue a noncompetitive contract for the sale of mineral materials for a term exceeding 5 years, excluding any contract extension under § 3602.27 and any period that BLM may allow for removal of equipment and improvements under § 3601.52.

COMPETITIVE SALES

## § 3602.40 Competitive sales.

In addition to the following sections, §§ 3602.41 through 3602.49, the provisions of §§ 3602.11 through 3602.29 also apply to competitive sales.

## § 3602.41 When will BLM sell mineral materials on a competitive basis?

Except for sales from community pits and common use areas under subpart 3603 of this part, and noncompetitive sales under § 3602.30 *et seq.,* BLM will make sales only after inviting competitive bids through publication and posting under § 3602.42.

## § 3602.42 How does BLM publicize competitive mineral materials sales?

   (a)   When offering mineral materials for sale by competitive bidding, BLM:

      (1)   Will advertise the sale by publishing a sale notice in a newspaper of general circulation in the area where the material is located, on the same day once a week for 2 consecutive weeks; and

      (2)   Will post a sale notice in a conspicuous place in the office where you will submit bids.

   (b)   In the sale notice, BLM will state:

(1) By legal description, the location of the tract or tracts on which we are offering the materials;

(2) The kind of materials we are offering;

(3) The estimated quantities of materials we are offering;

(4) The unit of measurement;

(5) The appraised prices;

(6) The time and place for receiving and opening of bids;

(7) The minimum deposit we require;

(8) If the sale is by request, the total cost recovery fee paid to BLM by the applicant up to 21 days before the sale;

(9) The site access that will be available to the purchaser;

(10) The method of bidding;

(11) If applicable, that the purchaser must file mining or reclamation plans;

(12) The bonding requirement;

(13) The location for inspection of contract terms and proposed stipulations;

(14) The address and telephone number of the office where you may obtain additional information;

(15) Whether BLM will renew the contract; and

(16) Any additional information that BLM deems necessary.

(c) BLM may, in its discretion, extend the period of time for advertising;

(d) BLM will not hold sales sooner than 1 week after the last advertisement.

*[66 FR 58901, Nov. 23, 2001, as amended at 70 FR 58878, Oct. 7, 2005]*

## § 3602.43 How does BLM conduct competitive mineral materials sales?

(a) The applicant requesting a mineral materials sale must pay a processing fee on a case-by-case basis as described in § 3000.11 of this chapter as modified by the provisions in this section and in § 3602.42(b)(8). The cost recovery process for a competitive mineral materials sale follows:

(1) The applicant requesting the sale must pay the cost recovery fee amount before BLM will publish a sale notice.

(2) Before the contract is issued:

(i) The successful bidder, if someone other than the applicant, must pay to BLM the cost recovery amount specified in the sale notice; and

(ii) The successful bidder must pay all processing costs BLM incurs after the date of the sale notice.

(3) If the successful bidder is someone other than the applicant, BLM will refund to the applicant the amount paid under paragraph (a)(1) of this section.

GSCA_Add_102

(b)  In conducting a competitive sale, BLM may require submission of sealed written bids, oral bids, or a combination of both. The sale notice will state how you must submit your bid. If 2 or more persons make identical high sealed bids, BLM will determine the highest bid by holding an oral auction among the persons making the identical high bids. If no oral bid is made higher than the sealed bids, BLM will pick the successful bidder by lot. After BLM announces the high bid at an oral auction, if you are the high bidder you must confirm that bid in writing at least by the close of business on the date of the sale, or by such time as BLM may specify in the sale notice.

(c)  When BLM determines that it is in the public interest to do so, we may reject any or all bids, or may waive minor deficiencies in the bids that would not ordinarily affect the outcome of the bidding.

*[66 FR 58901, Nov. 23, 2001, as amended at 70 FR 58878, Oct. 7, 2005]*

## § 3602.44 How do I make a bid deposit?

(a)  If you wish to make a bid to purchase mineral materials, you must submit a deposit in advance of the sale.

　(1)  Your sealed bids must contain a deposit.

　(2)  At an oral auction, you must make your deposit before the opening of the bidding.

(b)  Your deposit must be the greater of $500 or 5 percent of the appraised value as we specify in the sale notice.

(c)  Your deposit may be in the form of cash, a money order, a bank draft, or a cashier's or certified check made payable to the Bureau of Land Management.

(d)  If you are not the successful bidder, BLM will return your bid deposit when the bidding concludes.

(e)  If you are the successful bidder, BLM will apply your deposit to the purchase price.

(f)  BLM will charge the successful bidder a processing fee on a case-by-case basis as described in § 3000.11 of this chapter and § 3602.43.

*[66 FR 58901, Nov. 23, 2001, as amended at 70 FR 58878, Oct. 7, 2005]*

## § 3602.45 What final steps will BLM take before issuing me a contract?

(a)  *Ability to perform.* BLM may require you to furnish information we find necessary to determine whether you are able to meet the obligations of the contract.

(b)  *Reasons for denying a contract.* We will deny you the contract, even if you made the highest bid, if—

　(1)  We determine that you are unable to meet the obligations of the contract,

　(2)  You are unwilling to accept the terms of the contract, or

　(3)  BLM rejects all bids.

(c)  *Refund of deposit.* If BLM denies you a contract under paragraph (b)(1) or (b)(3) of this section, we will refund your deposit.

(d)  *Awarding a contract.* BLM will notify you of your contract award by presenting you with or sending you the contract.

(e) *Accepting a contract.* If BLM awards you the contract, you must, within 60 days after receiving it, sign and return the contract, together with a performance bond and mining and reclamation plan when BLM requires them. BLM may extend this period an additional 30 days if you request it in writing within the first 60-day period. If you fail to sign and return the contract within the first 60-day period, or an approved 30-day extension period, you will forfeit the bid deposit.

(f) *Awarding the contract to the second-highest bidder.* If BLM determines that you are unable to meet the obligations of the contract, or if you fail to sign and return the contract within the time period specified, BLM may offer and award the contract for the amount of the high bid to the person making the next highest complete bid. That person must be qualified and willing to accept the contract, and must redeposit the amount required under § 3602.44(b).

(g) *Contract form.* BLM will make all sales on BLM standard contract forms approved by the Director, Bureau of Land Management. We will include as necessary additional provisions and stipulations in the contract to conform to the provisions of the competitive sale notice and to address environmental concerns or other site-specific issues.

## § 3602.46 What is the term of a competitive contract?

The term of the contract will be in the sales notice. BLM will not issue a competitive contract for the sale of mineral materials for a term exceeding 10 years. However, the 10-year period does not include any contract extension under § 3602.27, any contract renewal under § 3602.47, and any periods for removal of equipment and improvements under § 3601.52 of this part.

## § 3602.47 When and how may I renew my competitive contract and what is the fee?

(a) *Applying for competitive contract renewal.* When you have paid the United States the full contract price for the mineral materials you purchased under a competitive contract, you may apply for renewal of the contract without further competitive bidding in order to purchase and extract additional material that may be available at the contract site. You must submit your request for renewal of the contract at least 90 days before it expires. You do not need to use a specific form.

(b) *BLM's response to the application.* BLM will renew your contract if—

   (1) You meet all the requirements of this section;

   (2) Your contract is not limited under § 3602.49; and

   (3) BLM determines that you are able to fulfill the obligations of a new contract.

(c) *Renewal term.* BLM will renew your contract for a maximum term of 10 additional years. The renewal may be for less than 10 years if you do not request that much time, or if BLM finds that the quantity of material involved does not justify a 10-year term.

(d) *Number of times BLM may renew a contract.* There is no maximum number of times BLM may renew a contract.

(e) *Fee.* BLM will charge a processing fee on a case-by-case basis as described in § 3000.11 of this chapter.

*[66 FR 58901, Nov. 23, 2001, as amended at 70 FR 58878, Oct. 7, 2005]*

## § 3602.48 What may BLM require when renewing my contract?

(a) *Reappraisal.* BLM will not grant a renewal without requiring a reappraisal under § 3602.13.

(b) *Bond amount and terms.* Before renewing your contract, BLM may require you to increase, or allow you to decrease, the amount of the performance bond you posted under § 3602.14. BLM may also require other bond modifications to ensure coverage for the renewed contract.

(c) *Environmental protection requirements.* Before renewing your contract, BLM will perform additional environmental analysis as required, and may require you to adopt additional measures to prevent hazards to public health and safety, and to minimize and mitigate environmental damage.

(d) *Other requirements.* BLM may require additions or changes to other terms or conditions of your contract.

## § 3602.49 When will BLM issue a non-renewable contract?

(a) BLM may offer you a contract restricted to a single term or otherwise limited in its duration. We will base this restriction on a finding that—

(1) The land should be used for another, possibly conflicting, purpose after mineral materials are removed;

(2) The deposit of mineral materials may be appropriate for future use by multiple operators or by the local community; or

(3) Other circumstances make renewal inappropriate.

(b) If BLM limits a contract under this section, the sale notice under § 3602.42 will include this information.

(c) If your contract is in existence on December 24, 2001, BLM will decide whether you may request renewal of that contract. You must ask BLM for this decision at least 90 days before the contract expires. If fewer than 120 days remain on your existing contract on December 24, 2001, BLM may approve a renewal request that you submit less than 90 days before the contract expires if we decide the contract qualifies for renewal and we have sufficient time to process your request before your contract is due to expire.

## Subpart 3603—Community Pits and Common Use Areas

DISPOSAL OF MATERIALS—COMMUNITY PITS AND COMMON USE AREAS

## § 3603.10 Disposal of mineral materials from community pits and common use areas.

(a) BLM may make mineral material sales and allow free use under permit from the same deposit within areas that we designate for this purpose. These kinds of disposals must be consistent with other provisions of this part. These designated community pit sites or common use areas may be any size.

(b) This subpart applies to both sales and free use from community pits and common use areas unless otherwise stated. Refer to subpart 3604 of this part for additional regulations applicable to the free use of mineral materials.

## § 3603.11 What rights pertain to users of community pits?

BLM's designation of a community pit site, when noted on the appropriate BLM records or posted on the ground, establishes a right to remove the materials superior to any subsequent claim or entry of the lands.

GSCA_Add_105

## § 3603.12 What rights pertain to users of common use areas?

(a) BLM's designation of a common use area does not establish a right to remove the materials superior to any subsequent claim or entry of the lands.

(b) Once you have a permit or a sales contract to remove mineral materials from a common use area, your rights under that permit or contract are superior to any subsequent claim or entry on the lands.

## § 3603.13 What price does BLM charge under materials sales contracts for mineral materials from community pits and common use areas?

BLM will sell mineral materials from community pits or common use areas under materials sales contracts for not less than fair market value.

## § 3603.14 What plans do I need to prepare to mine or remove mineral materials from a community pit or common use area?

BLM generally will not require a mining or reclamation plan before you mine or remove mineral materials from a community pit or common use area. We may require such a plan if we find that circumstances warrant it. In all cases, you must comply with the terms of the contract or permit to protect health, safety, and the environment.

RECLAMATION

## § 3603.20 Reclamation.

## § 3603.21 What reclamation requirements pertain to community pits and common use areas?

Generally, you do not need to perform reclamation after extracting mineral materials from community pits or common use areas. However, you must pay a reclamation fee as provided in § 3603.22.

## § 3603.22 What fees must I pay to cover the cost of reclamation of community pits and common use areas?

(a) You must pay a reclamation fee based on the amount of mineral materials you extract from the community pit or common use area, unless you make an alternative arrangement under paragraph (b) of this section. The reclamation fee you pay is a proportionate share of the total estimated cost of reclamation, determined by using the ratio of the material that you extract under your permit or contract to the total volume of the material BLM estimates will be extracted from the site.

(b) BLM may, at our discretion, allow purchasers and permittees to perform interim or final reclamation, where needed, in lieu of paying reclamation charges. If BLM allows you to perform reclamation in lieu of paying a fee, we may also require you to post a bond under § 3602.14.

## Subpart 3604—Free Use of Mineral Materials

OBTAINING FREE USE PERMITS

## § 3604.10 Permits for free use of mineral materials.

GSCA_Add_106

## § 3604.11 How do I apply for a free use permit?

If you wish to apply for free use of mineral materials, you may file a letter of request or a BLM standard application form approved by the Office of Management and Budget.

## § 3604.12 Who may obtain a free use permit?

Any Federal, State, or territorial agency, unit, or subdivision, including municipalities, or any non-profit organization, may apply for a free use permit to extract and use mineral materials.

(a) BLM may issue free use permits to a government entity without limitation as to the number of permits or as to the value of the mineral materials to be extracted or removed, provided that the government entity shows that it will not use these materials for commercial or industrial purposes.

(b) BLM may issue free use permits to a non-profit organization for not more than 5,000 cubic yards (or weight equivalent) in any period of 12 consecutive months, provided that the organization shows that it will not use these materials for commercial or industrial purposes.

## § 3604.13 When will BLM decline to issue a free use permit to a qualified applicant?

BLM will not issue a free use permit if we determine that you own or control an adequate supply of suitable mineral materials that:

(a) Are readily available, and

(b) You can mine in a manner that is economically and environmentally acceptable.

ADMINISTRATION OF FREE USE

## § 3604.20 Administration of free use permits.

## § 3604.21 What is the term of a free use permit?

(a) BLM will determine the appropriate length of your free use permit term.

(1) BLM will not grant free use permits to government entities for terms exceeding 10 years.

(2) BLM will not grant free use permits to non-profit organizations for terms exceeding one year.

(b) BLM may extend any free use permit term for a single additional period not to exceed one year.

## § 3604.22 What conditions and restrictions pertain to my free use permit?

(a) You must not barter or sell mineral materials that you obtain under a free use permit.

(b) You must not remove mineral materials before BLM issues you a permit or after your permit expires.

(c) BLM may incorporate other conditions and restrictions into your free use permit.

## § 3604.23 When and how may I assign my free use permit?

You may assign or transfer your free use permit to entities qualified under § 3604.12. You must first obtain BLM's written approval.

## § 3604.24 Who may remove materials on my behalf?

(a) You may allow your agent to extract mineral materials under your free use permit.

(b) Your agent may charge you only for extraction services and must not—

(1) Charge you for the materials extracted, processed, or removed; or

(2) Take mineral materials from the permit area as payment for services rendered to you, or as a donation or gift.

## § 3604.25 What bond requirements pertain to free use permits?

BLM may require a bond or other security as a guarantee of your faithful compliance with the provisions of your permit and applicable regulations, including reclamation. The type of security must be one of those provided for in § 3602.14(c) of this part.

## § 3604.26 When will BLM cancel my permit?

BLM may cancel your permit if you fail, after adequate notice, to follow its terms and conditions.

## § 3604.27 What rights does a free use permit give me against other users of the land?

Permits that BLM issues under this subpart constitute a superior right to remove the materials in accordance with the permit terms and provisions, as against any claim to or entry of the lands made after the date BLM designated the tract for mineral materials disposal. *See* § 3602.12.

This content is from the eCFR and is authoritative but unofficial.

# Title 43 —Public Lands: Interior

# Subtitle B —Regulations Relating to Public Lands

# Chapter II —Bureau of Land Management, Department of the Interior

# Subchapter C —Minerals Management (3000)

# Part 3800 —Mining Claims Under the General Mining Laws

**Authority:** 16 U.S.C. 3101 *et seq.;* 30 U.S.C. 22-42, 181 *et seq.,* 301-306, 351-359, and 601 *et seq.;* 31 U.S.C. 9701; 40 U.S.C. 471 *et seq.;* 42 U.S.C. 6508; 43 U.S.C. 1701 *et seq.;* and Pub. L. No. 97-35, 95 Stat. 357.

**Source:** 45 FR 13974, Mar. 3, 1980, unless otherwise noted.

## Subpart 3809  Surface Management

### General Information

| | |
|---|---|
| **§ 3809.1** | What are the purposes of this subpart? |
| **§ 3809.2** | What is the scope of this subpart? |
| **§ 3809.3** | What rules must I follow if State law conflicts with this subpart? |
| **§ 3809.5** | How does BLM define certain terms used in this subpart? |
| **§ 3809.10** | How does BLM classify operations? |
| **§ 3809.11** | When do I have to submit a plan of operations? |
| **§ 3809.21** | When do I have to submit a notice? |
| **§ 3809.31** | Are there any special situations that affect what submittals I must make before I conduct operations? |
| **§ 3809.100** | What special provisions apply to operations on segregated or withdrawn lands? |
| **§ 3809.101** | What special provisions apply to minerals that may be common variety minerals, such as sand, gravel, and building stone? |
| **§ 3809.111** | Will BLM disclose to the public the information I submit under this subpart? |
| **§ 3809.115** | Can BLM collect information under this subpart? |
| **§ 3809.116** | As a mining claimant or operator, what are my responsibilities under this subpart for my project area? |

### Federal/State Agreements

| | |
|---|---|
| **§ 3809.200** | What kinds of agreements may BLM and a State make under this subpart? |
| **§ 3809.201** | What should these agreements address? |
| **§ 3809.202** | Under what conditions will BLM defer to State regulation of operations? |
| **§ 3809.203** | What are the limitations on BLM deferral to State regulation of operations? |
| **§ 3809.204** | Does this subpart cancel an existing agreement between BLM and a State? |

### Operations Conducted Under Notices

| | |
|---|---|
| **§ 3809.300** | Does this subpart apply to my existing notice-level operations? |
| **§ 3809.301** | Where do I file my notice and what information must I include in it? |
| **§ 3809.311** | What action does BLM take when it receives my notice? |
| **§ 3809.312** | When may I begin operations after filing a complete notice? |

GSCA_Add_109

**§ 3809.313** Under what circumstances may I not begin operations 15 calendar days after filing my notice?

**§ 3809.320** Which performance standards apply to my notice-level operations?

**§ 3809.330** May I modify my notice?

**§ 3809.331** Under what conditions must I modify my notice?

**§ 3809.332** How long does my notice remain in effect?

**§ 3809.333** May I extend my notice, and, if so, how?

**§ 3809.334** What if I temporarily stop conducting operations under a notice?

**§ 3809.335** What happens when my notice expires?

**§ 3809.336** What if I abandon my notice-level operations?

Operations Conducted Under Plans of Operations

**§ 3809.400** Does this subpart apply to my existing or pending plan of operations?

**§ 3809.401** Where do I file my plan of operations and what information must I include with it?

**§ 3809.411** What action will BLM take when it receives my plan of operations?

**§ 3809.412** When may I operate under a plan of operations?

**§ 3809.415** How do I prevent unnecessary or undue degradation while conducting operations on public lands?

**§ 3809.420** What performance standards apply to my notice or plan of operations?

**§ 3809.421** Enforcement of performance standards.

**§ 3809.423** How long does my plan of operations remain in effect?

**§ 3809.424** What are my obligations if I stop conducting operations?

Modifications of Plans of Operations

**§ 3809.430** May I modify my plan of operations?

**§ 3809.431** When must I modify my plan of operations?

**§ 3809.432** What process will BLM follow in reviewing a modification of my plan of operations?

**§ 3809.433** Does this subpart apply to a new modification of my plan of operations?

**§ 3809.434** How does this subpart apply to pending modifications for new or existing facilities?

Financial Guarantee Requirements—General

**§ 3809.500** In general, what are BLM's financial guarantee requirements?

**§ 3809.503** When must I provide a financial guarantee for my notice-level operations?

**§ 3809.505** How do the financial guarantee requirements of this subpart apply to my existing plan of operations?

**§ 3809.551** What are my choices for providing BLM with a financial guarantee?

Individual Financial Guarantee

**§ 3809.552** What must my individual financial guarantee cover?

**§ 3809.553** May I post a financial guarantee for a part of my operations?

**§ 3809.554** How do I estimate the cost to reclaim my operations?

GSCA_Add_110

**§ 3809.555**  What forms of individual financial guarantee are acceptable to BLM?

**§ 3809.556**  What special requirements apply to financial guarantees described in § 3809.555(e)?

Blanket Financial Guarantee

**§ 3809.560**  Under what circumstances may I provide a blanket financial guarantee?

State-Approved Financial Guarantee

**§ 3809.570**  Under what circumstances may I provide a State-approved financial guarantee?

**§ 3809.571**  What forms of State-approved financial guarantee are acceptable to BLM?

**§ 3809.572**  What happens if BLM rejects a financial instrument in my State-approved financial guarantee?

**§ 3809.573**  What happens if the State makes a demand against my financial guarantee?

**§ 3809.574**  What happens if I have an existing corporate guarantee?

Modification or Replacement of a Financial Guarantee

**§ 3809.580**  What happens if I modify my notice or approved plan of operations?

**§ 3809.581**  Will BLM accept a replacement financial instrument?

**§ 3809.582**  How long must I maintain my financial guarantee?

Release of Financial Guarantee

**§ 3809.590**  When will BLM release or reduce the financial guarantee for my notice or plan of operations?

**§ 3809.591**  What are the limitations on the amount by which BLM may reduce my financial guarantee?

**§ 3809.592**  Does release of my financial guarantee relieve me of all responsibility for my project area?

**§ 3809.593**  What happens to my financial guarantee if I transfer my operations?

**§ 3809.594**  What happens to my financial guarantee when my mining claim or millsite is patented?

Forfeiture of Financial Guarantee

**§ 3809.595**  When may BLM initiate forfeiture of my financial guarantee?

**§ 3809.596**  How does BLM initiate forfeiture of my financial guarantee?

**§ 3809.597**  What if I do not comply with BLM's forfeiture decision?

**§ 3809.598**  What if the amount forfeited will not cover the cost of reclamation?

**§ 3809.599**  What if the amount forfeited exceeds the cost of reclamation?

Inspection and Enforcement

**§ 3809.600**  With what frequency will BLM inspect my operations?

**§ 3809.601**  What types of enforcement action may BLM take if I do not meet the requirements of this subpart?

**§ 3809.602**  Can BLM revoke my plan of operations or nullify my notice?

**§ 3809.603**  How does BLM serve me with an enforcement action?

**§ 3809.604**  What happens if I do not comply with a BLM order?

GSCA_Add_111

**§ 3809.605**   What are prohibited acts under this subpart?

Penalties

**§ 3809.700**   What criminal penalties apply to violations of this subpart?

**§ 3809.701**   What happens if I make false statements to BLM?

Appeals

**§ 3809.800**   Who may appeal BLM decisions under this subpart?

**§ 3809.801**   When may I file an appeal of the BLM decision with OHA?

**§ 3809.802**   What must I include in my appeal to OHA?

**§ 3809.803**   Will the BLM decision go into effect during an appeal to OHA?

**§ 3809.804**   When may I ask the BLM State Director to review a BLM decision?

**§ 3809.805**   What must I send BLM to request State Director review?

**§ 3809.806**   Will the State Director review the original BLM decision if I request State Director review?

**§ 3809.807**   What happens once the State Director agrees to my request for a review of a decision?

**§ 3809.808**   How will decisions go into effect when I request State Director review?

**§ 3809.809**   May I appeal a decision made by the State Director?

Public Visits to Mines

**§ 3809.900**   Will BLM allow the public to visit mines on public lands?

## Subpart 3809—Surface Management

**Authority:**  16 U.S.C. 1280; 30 U.S.C. 22; 30 U.S.C. 612; 43 U.S.C. 1201; and 43 U.S.C. 1732, 1733, 1740, 1781, and 1782.

**Source:**  65 FR 70112, Nov. 21, 2000, unless otherwise noted.

GENERAL INFORMATION

## § 3809.1 What are the purposes of this subpart?

The purposes of this subpart are to:

(a)   Prevent unnecessary or undue degradation of public lands by operations authorized by the mining laws. Anyone intending to develop mineral resources on the public lands must prevent unnecessary or undue degradation of the land and reclaim disturbed areas. This subpart establishes procedures and standards to ensure that operators and mining claimants meet this responsibility; and

(b)   Provide for maximum possible coordination with appropriate State agencies to avoid duplication and to ensure that operators prevent unnecessary or undue degradation of public lands.

GSCA_Add_112

## § 3809.2 What is the scope of this subpart?

(a) This subpart applies to all operations authorized by the mining laws on public lands where the mineral interest is reserved to the United States, including Stock Raising Homestead lands as provided in § 3809.31(d) and (e). When public lands are sold or exchanged under 43 U.S.C. 682(b) (Small Tracts Act), 43 U.S.C. 869 (Recreation and Public Purposes Act), 43 U.S.C. 1713 (sales) or 43 U.S.C. 1716 (exchanges), minerals reserved to the United States continue to be removed from the operation of the mining laws unless a subsequent land-use planning decision expressly restores the land to mineral entry, and BLM publishes a notice to inform the public.

(b) This subpart does not apply to lands in the National Park System, National Forest System, and the National Wildlife Refuge System; acquired lands; or lands administered by BLM that are under wilderness review, which are subject to subpart 3802 of this part.

(c) This subpart applies to all patents issued after October 21, 1976 for mining claims in the California Desert Conservation Area, except for any patent for which a right to the patent vested before that date.

(d) This subpart does not apply to private land except as provided in paragraphs (a) and (c) of this section. For purposes of analysis under the National Environmental Policy Act of 1969, BLM may collect information about private land that is near to, or may be affected by, operations authorized under this subpart.

(e) This subpart applies to operations that involve locatable minerals, including metallic minerals; some industrial minerals, such as gypsum; and a number of other non-metallic minerals that have a unique property which gives the deposit a distinct and special value. This subpart does not apply to leasable and salable minerals. Leasable minerals, such as coal, phosphate, sodium, and potassium; and salable minerals, such as common varieties of sand, gravel, stone, and pumice, are not subject to location under the mining laws. Parts 3400, 3500 and 3600 of this title govern mining operations for leasable and salable minerals.

*[65 FR 70112, Nov. 21, 2000, as amended at 66 FR 54860, Oct. 30, 2001]*

## § 3809.3 What rules must I follow if State law conflicts with this subpart?

If State laws or regulations conflict with this subpart regarding operations on public lands, you must follow the requirements of this subpart. However, there is no conflict if the State law or regulation requires a higher standard of protection for public lands than this subpart.

## § 3809.5 How does BLM define certain terms used in this subpart?

As used in this subpart, the term:

*Casual use* means activities ordinarily resulting in no or negligible disturbance of the public lands or resources. For example—

(1) Casual use generally includes the collection of geochemical, rock, soil, or mineral specimens using hand tools; hand panning; or non-motorized sluicing. It may include use of small portable suction dredges. It also generally includes use of metal detectors, gold spears and other battery-operated devices for sensing the presence of minerals, and hand and battery-operated drywashers. Operators

may use motorized vehicles for casual use activities provided the use is consistent with the regulations governing such use (part 8340 of this title), off-road vehicle use designations contained in BLM land-use plans, and the terms of temporary closures ordered by BLM.

(2) Casual use does not include use of mechanized earth-moving equipment, truck-mounted drilling equipment, motorized vehicles in areas when designated as closed to "off-road vehicles" as defined in § 8340.0-5 of this title, chemicals, or explosives. It also does not include "occupancy" as defined in § 3715.0-5 of this title or operations in areas where the cumulative effects of the activities result in more than negligible disturbance.

*Exploration* means creating surface disturbance greater than casual use that includes sampling, drilling, or developing surface or underground workings to evaluate the type, extent, quantity, or quality of mineral values present. Exploration does not include activities where material is extracted for commercial use or sale.

*Minimize* means to reduce the adverse impact of an operation to the lowest practical level. During review of operations, BLM may determine that it is practical to avoid or eliminate particular impacts.

*Mining claim* means any unpatented mining claim, millsite, or tunnel site located under the mining laws. The term also applies to those mining claims and millsites located in the California Desert Conservation Area that were patented after the enactment of the Federal Land Policy and Management Act of October 21, 1976. Mining "claimant" is defined in § 3833.0-5 of this title.

*Mining laws* means the Lode Law of July 26, 1866, as amended (14 Stat. 251); the Placer Law of July 9, 1870, as amended (16 Stat. 217); and the Mining Law of May 10, 1872, as amended (17 Stat. 91); as well as all laws supplementing and amending those laws, including the Building Stone Act of August 4, 1892, as amended (27 Stat. 348); the Saline Placer Act of January 31, 1901 (31 Stat. 745); the Surface Resources Act of 1955 (30 U.S.C. 611-614); and the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 *et seq.*).

*Mitigation,* as defined in 40 CFR 1508.20, may include one or more of the following:

(1) Avoiding the impact altogether by not taking a certain action or parts of an action;

(2) Minimizing impacts by limiting the degree or magnitude of the action and its implementation;

(3) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment;

(4) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action; and

(5) Compensating for the impact by replacing, or providing substitute, resources or environments.

*Operations* means all functions, work, facilities, and activities on public lands in connection with prospecting, exploration, discovery and assessment work, development, extraction, and processing of mineral deposits locatable under the mining laws; reclamation of disturbed areas; and all other reasonably incident uses, whether on a mining claim or not, including the construction of roads, transmission lines, pipelines, and other means of access across public lands for support facilities.

*Operator* means a person conducting or proposing to conduct operations.

*Person* means any individual, firm, corporation, association, partnership, trust, consortium, joint venture, or any other entity conducting operations on public lands.

*Project area* means the area of land upon which the operator conducts operations, including the area required for construction or maintenance of roads, transmission lines, pipelines, or other means of access by the operator.

*Public lands,* as defined in 43 U.S.C. 1702, means any land and interest in land owned by the United States within the several States and administered by the Secretary of the Interior through the BLM, without regard to how the United States acquired ownership, except—

(1) Lands located on the Outer Continental Shelf; and

(2) Lands held for the benefit of Indians, Aleuts, and Eskimos.

*Reclamation* means taking measures required by this subpart following disturbance of public lands caused by operations to meet applicable performance standards and achieve conditions required by BLM at the conclusion of operations. For a definition of "reclamation" applicable to operations conducted under the mining laws on Stock Raising Homestead Act lands, see part 3810, subpart 3814 of this title. Components of reclamation include, where applicable:

(1) Isolation, control, or removal of acid-forming, toxic, or deleterious substances;

(2) Regrading and reshaping to conform with adjacent landforms, facilitate revegetation, control drainage, and minimize erosion;

(3) Rehabilitation of fisheries or wildlife habitat;

(4) Placement of growth medium and establishment of self-sustaining revegetation;

(5) Removal or stabilization of buildings, structures, or other support facilities;

(6) Plugging of drill holes and closure of underground workings; and

(7) Providing for post-mining monitoring, maintenance, or treatment.

*Riparian area* is a form of wetland transition between permanently saturated wetlands and upland areas. These areas exhibit vegetation or physical characteristics reflective of permanent surface or subsurface water influence. Typical riparian areas include lands along, adjacent to, or contiguous with perennially and intermittently flowing rivers and streams, glacial potholes, and the shores of lakes and reservoirs with stable water levels. Excluded are areas such as ephemeral streams or washes that do not exhibit the presence of vegetation dependent upon free water in the soil.

*Tribe* means, and *Tribal* refers to, a Federally recognized Indian tribe.

*Unnecessary or undue degradation* means conditions, activities, or practices that:

(1) Fail to comply with one or more of the following: the performance standards in § 3809.420, the terms and conditions of an approved plan of operations, operations described in a complete notice, and other Federal and state laws related to environmental protection and protection of cultural resources;

(2) Are not "reasonably incident" to prospecting, mining, or processing operations as defined in § 3715.0-5 of this chapter; or

(3) Fail to attain a stated level of protection or reclamation required by specific laws in areas such as the California Desert Conservation Area, Wild and Scenic Rivers, BLM-administered portions of the National Wilderness System, and BLM-administered National Monuments and National Conservation Areas.

*[65 FR 70112, Nov. 21, 2000, as amended at 66 FR 54860, Oct. 30, 2001]*

## § 3809.10 How does BLM classify operations?

BLM classifies operations as—

(a) Casual use, for which an operator need not notify BLM. (You must reclaim any casual-use disturbance that you create. If your operations do not qualify as casual use, you must submit a notice or plan of operations, whichever is applicable. See §§ 3809.11 and 3809.21.);

(b) Notice-level operations, for which an operator must submit a notice (except for certain suction-dredging operations covered by § 3809.31(b)); and

(c) Plan-level operations, for which an operator must submit a plan of operations and obtain BLM's approval.

## § 3809.11 When do I have to submit a plan of operations?

(a) You must submit a plan of operations and obtain BLM's approval before beginning operations greater than casual use, except as described in § 3809.21. Also see §§ 3809.31 and 3809.400 through 3809.434.

(b) You must submit a plan of operations for any bulk sampling in which you will remove 1,000 tons or more of presumed ore for testing.

(c) You must submit a plan of operations for any operations causing surface disturbance greater than casual use in the following special status areas where § 3809.21 does not apply:

   (1) Lands in the California Desert Conservation Area (CDCA) designated by the CDCA plan as "controlled" or "limited" use areas;

   (2) Areas in the National Wild and Scenic Rivers System, and areas designated for potential addition to the system;

   (3) Designated Areas of Critical Environmental Concern;

   (4) Areas designated as part of the National Wilderness Preservation System and administered by BLM;

   (5) Areas designated as "closed" to off-road vehicle use, as defined in § 8340.0-5 of this title;

   (6) Any lands or waters known to contain Federally proposed or listed threatened or endangered species or their proposed or designated critical habitat, unless BLM allows for other action under a formal land-use plan or threatened or endangered species recovery plan; and

   (7) National Monuments and National Conservation Areas administered by BLM.

## § 3809.21 When do I have to submit a notice?

(a) You must submit a complete notice of your operations 15 calendar days before you commence exploration causing surface disturbance of 5 acres or less of public lands on which reclamation has not been completed. See § 3809.301 for information on what you must include in your notice.

(b) You must not segment a project area by filing a series of notices for the purpose of avoiding filing a plan of operations. See §§ 3809.300 through 3809.336 for regulations applicable to notice-level operations.

## § 3809.31 Are there any special situations that affect what submittals I must make before I conduct operations?

(a) Where the cumulative effects of casual use by individuals or groups have resulted in, or are reasonably expected to result in, more than negligible disturbance, the State Director may establish specific areas as he/she deems necessary where any individual or group intending to conduct activities under the mining laws must contact BLM 15 calendar days before beginning activities to determine whether the individual or group must submit a notice or plan of operations. (See § 3809.300 through 3809.336 and § 3809.400 through 3809.434.) BLM will notify the public via publication in the FEDERAL REGISTER of the boundaries of such specific areas, as well as through posting in each local BLM office having jurisdiction over the lands.

(b) *Suction dredges.*

   (1) If your operations involve the use of a suction dredge, the State requires an authorization for its use, and BLM and the State have an agreement under § 3809.200 addressing suction dredging, then you need not submit to BLM a notice or plan of operations, unless otherwise provided in the agreement between BLM and the State.

   (2) For all uses of a suction dredge not covered by paragraph (b)(1) of this section, you must contact BLM before beginning such use to determine whether you need to submit a notice or a plan to BLM, or whether your activities constitute casual use. If your proposed suction dredging is located within any lands or waters known to contain Federally proposed or listed threatened or endangered species or their proposed or designated critical habitat, regardless of the level of disturbance, you must not begin operations until BLM completes consultation the Endangered Species Act requires.

(c) If your operations require you to occupy or use a site for activities "reasonably incident" to mining, as defined in § 3715.0-5 of this title, whether you are operating under a notice or a plan of operations, you must also comply with part 3710, subpart 3715, of this title.

(d) If your operations are located on lands patented under the Stock Raising Homestead Act and you do not have the written consent of the surface owner, then you must submit a plan of operations and obtain BLM's approval. Where you have surface-owner consent, you do not need a notice or a plan of operations under this subpart. See part 3810, subpart 3814, of this title.

(e) For other than Stock Raising Homestead Act lands, if your proposed operations are located on lands conveyed by the United States which contain minerals reserved to the United States, then you must submit a plan of operations under § 3809.11 and obtain BLM's approval or a notice under § 3809.21.

*[65 FR 70112, Nov. 21, 2000, as amended at 66 FR 54860, Oct. 30, 2001]*

## § 3809.100 What special provisions apply to operations on segregated or withdrawn lands?

(a) *Mineral examination report.* After the date on which the lands are withdrawn from appropriation under the mining laws, BLM will not approve a plan of operations or allow notice-level operations to proceed until BLM has prepared a mineral examination report to determine whether the mining claim was valid before the withdrawal, and whether it remains valid. BLM may require preparation of a mineral examination report before approving a plan of operations or allowing notice-level operations to proceed on segregated lands. If the report concludes that the mining claim is invalid, BLM will not approve operations or allow notice-level operations on the mining claim. BLM will also promptly initiate contest proceedings.

(b) *Allowable operations.* If BLM has not completed the mineral examination report under paragraph (a) of this section, if the mineral examination report for proposed operations concludes that a mining claim is invalid, or if there is a pending contest proceeding for the mining claim,

    (1) BLM may—

        (i) Approve a plan of operations for the disputed mining claim proposing operations that are limited to taking samples to confirm or corroborate mineral exposures that are physically disclosed and existing on the mining claim before the segregation or withdrawal date, whichever is earlier; and

        (ii) Approve a plan of operations for the operator to perform the minimum necessary annual assessment work under § 3851.1 of this title; or

    (2) A person may only conduct exploration under a notice that is limited to taking samples to confirm or corroborate mineral exposures that are physically disclosed and existing on the mining claim before the segregation or withdrawal date, whichever is earlier.

(c) *Time limits.* While BLM prepares a mineral examination report under paragraph (a) of this section, it may suspend the time limit for responding to a notice or acting on a plan of operations. See §§ 3809.311 and 3809.411, respectively.

(d) *Final decision.* If a final departmental decision declares a mining claim to be null and void, the operator must cease all operations, except required reclamation.

## § 3809.101 What special provisions apply to minerals that may be common variety minerals, such as sand, gravel, and building stone?

(a) *Mineral examination report.* On mining claims located on or after July 23, 1955, you must not initiate operations for minerals that may be "common variety" minerals, as defined in § 3711.1(b) of this title, until BLM has prepared a mineral examination report, except as provided in paragraph (b) of this section.

(b) *Interim authorization.* Until the mineral examination report described in paragraph (a) of this section is prepared, BLM will allow notice-level operations or approve a plan of operations for the disputed mining claim for—

    (1) Operations limited to taking samples to confirm or corroborate mineral exposures that are physically disclosed and existing on the mining claim;

    (2) Performance of the minimum necessary annual assessment work under § 3851.1 of this title; or

    (3) Operations to remove possible common variety minerals if you establish an escrow account in a form acceptable to BLM. You must make regular payments to the escrow account for the appraised value of possible common variety minerals removed under a payment schedule approved by BLM. The funds in the escrow account must not be disbursed to the operator or to the U.S. Treasury until a final determination of whether the mineral is a common variety and therefore salable under part 3600 of this title.

(c) *Determination of common variety.* If the mineral examination report under paragraph (a) of this section concludes that the minerals are common variety minerals, you may either relinquish your mining claim(s) or BLM will initiate contest proceedings. Upon relinquishment or final departmental determination that the mining claim(s) is null and void, you must promptly close and reclaim your operations unless you are authorized to proceed under parts 3600 and 3610 of this title.

GSCA_Add_118

(d) *Disposal.* BLM may dispose of common variety minerals from unpatented mining claims in accordance with the provisions of § 3601.14 of this chapter.

*[65 FR 70112, Nov. 21, 2000, as amended at 66 FR 58910, Nov. 23, 2001]*

## § 3809.111 Will BLM disclose to the public the information I submit under this subpart?

Part 2 of this title applies to all information and data you submit under this subpart. If you submit information or data under this subpart that you believe is exempt from disclosure, you must mark each page clearly "CONFIDENTIAL INFORMATION." You must also separate it from other materials you submit to BLM. BLM will keep confidential information or data marked in this manner to the extent required by part 2 of this title. If you do not mark the information as confidential, BLM, without notifying you, may disclose the information to the public to the full extent allowed under part 2 of this title.

## § 3809.115 Can BLM collect information under this subpart?

Yes, the Office of Management and Budget has approved the collections of information contained in this subpart under 44 U.S.C. 3501 *et seq.* and assigned clearance number 1004-0194. BLM will use this information to regulate and monitor mining and exploration operations on public lands.

## § 3809.116 As a mining claimant or operator, what are my responsibilities under this subpart for my project area?

(a) Mining claimants and operators (if other than the mining claimant) are liable for obligations under this subpart that accrue while they hold their interests.

(b) Relinquishment, forfeiture, or abandonment of a mining claim does not relieve a mining claimant's or operator's responsibility under this subpart for obligations that accrued or conditions that were created while the mining claimant or operator was responsible for operations conducted on that mining claim or in the project area.

(c) Transfer of a mining claim or operation does not relieve a mining claimant's or operator's responsibility under this subpart for obligations that accrued or conditions that were created while the mining claimant or operator was responsible for operations conducted on that mining claim or in the project area until—

(1) BLM receives documentation that a transferee accepts responsibility for the transferor's previously accrued obligations, and

(2) BLM accepts an adequate replacement financial guarantee adequate to cover such previously accrued obligations and the transferee's new obligations.

*[65 FR 70112, Nov. 21, 2000, as amended at 66 FR 54860, Oct. 30, 2001]*

FEDERAL/STATE AGREEMENTS

## § 3809.200 What kinds of agreements may BLM and a State make under this subpart?

To prevent unnecessary administrative delay and to avoid duplication of administration and enforcement, BLM and a State may make the following kinds of agreements:

(a) An agreement to provide for a joint Federal/State program; and

(b) An agreement under § 3809.202 which provides that, in place of BLM administration, BLM defers to State administration of some or all of the requirements of this subpart subject to the limitations in § 3809.203.

## § 3809.201 What should these agreements address?

(a) The agreements should provide for maximum possible coordination with the State to avoid duplication and to ensure that operators prevent unnecessary or undue degradation of public lands. Agreements should cover any or all sections of this subpart and should consider, at a minimum, common approaches to review of plans of operations, including effective cooperation regarding the National Environmental Policy Act; performance standards; interim management of temporary closure; financial guarantees; inspections; and enforcement actions, including referrals to enforcement authorities. BLM and the State should also include provisions for the regular review or audit of these agreements.

(b) To satisfy the requirements of § 3809.31(b), if BLM and the State elect to address suction dredge activities in the agreement, the agreement must require a State to notify BLM of each application to conduct suction dredge activities within 15 calendar days of receipt of the application by the State. BLM will inform the State whether Federally proposed or listed threatened or endangered species or their proposed or designated critical habitat may be affected by the proposed activities and any necessary mitigating measures. Operations must not begin until BLM completes consultation or conferencing under the Endangered Species Act.

## § 3809.202 Under what conditions will BLM defer to State regulation of operations?

(a) *State request.* A State may request BLM enter into an agreement for State regulation of operations on public lands in place of BLM administration of some or all of the requirements of this subpart. The State must send the request to the BLM State Director with jurisdiction over public lands in the State.

(b) *BLM review.*

(1) When the State Director receives the State's request, he/she will notify the public and provide an opportunity for comment. The State Director will then review the request and determine whether the State's requirements are consistent with the requirements of this subpart, and whether the State has necessary legal authorities, resources, and funding for an agreement. The State requirements may be contained in laws, regulations, guidelines, policy manuals, and demonstrated permitting practices.

(2) For the purposes of this subpart, BLM will determine consistency with the requirements of this subpart by comparing this subpart and State standards on a provision-by-provision basis to determine—

(i) Whether non-numerical State standards are functionally equivalent to BLM counterparts; and

(ii) Whether numerical State standards are the same as corresponding numerical BLM standards, except that State review and approval time frames do not have to be the same as the corresponding Federal time frames.

(3) A State environmental protection standard that exceeds a corresponding Federal standard is consistent with the requirements of this subpart.

(c) *State Director decision.* The BLM State Director will notify the State in writing of his/her decision regarding the State's request. The State Director will address whether the State requirements are consistent with the requirements of this subpart, and whether the State has necessary legal authorities, resources, and

GSCA_Add_120

funding to implement any agreement. If BLM determines that the State's requirements are consistent with the requirements of this subpart and the State has the necessary legal authorities, resources, and funding, BLM must enter into an agreement with the State so that the State will regulate some or all of the operations on public lands, as described in the State request.

(d) Appeal of State Director decision. The BLM State Director's decision will be a final decision of BLM and may be appealed to the Assistant Secretary for Land and Minerals Management, but not to the Department of the Interior Office of Hearings and Appeals. The items you should include in the appeal are the same as the items you must include under § 3809.802.

[65 FR 70112, Nov. 21, 2000, as amended at 68 FR 32656, June 2, 2003]

## § 3809.203 What are the limitations on BLM deferral to State regulation of operations?

Any agreement between BLM and a State in which BLM defers to State regulation of some or all operations on public lands is subject to the following limitations:

(a) *Plans of Operations.* BLM must concur with each State decision approving a plan of operations to assure compliance with this subpart, and BLM retains responsibility for compliance with the National Environmental Policy Act (NEPA). The State and BLM may decide who will be the lead agency in the plan review process, including preparation of NEPA documents.

(b) *Federal land-use planning and other Federal laws.* BLM will continue to be responsible for all land-use planning on public lands and for implementing other Federal laws relating to the public lands for which BLM is responsible.

(c) *Federal enforcement.* BLM may take any authorized action to enforce the requirements of this subpart or any term, condition, or limitation of a notice or an approved plan of operations. BLM may take this action regardless of the nature of its agreement with a State, or actions taken by a State.

(d) *Financial guarantee.* The amount of the financial guarantee must be calculated based on the completion of both Federal and State reclamation requirements, but may be held as one instrument. If the financial guarantee is held as one instrument, it must be redeemable by both the Secretary and the State. BLM must concur in the approval, release, or forfeiture of a financial guarantee for public lands.

(e) *State performance.* If BLM determines that a State is not in compliance with all or part of its Federal/State agreement, BLM will notify the State and provide a reasonable time for the State to comply.

(f) *Termination.*

(1) If a State does not comply after being notified under paragraph (e) of this section, BLM will take appropriate action, which may include termination of all or part of the agreement.

(2) A State may terminate its agreement by notifying BLM 60 calendar days in advance.

## § 3809.204 Does this subpart cancel an existing agreement between BLM and a State?

(a) No, this subpart doesn't cancel a Federal/State agreement or memorandum of understanding in effect on January 20, 2001. A Federal/State agreement or memorandum of understanding will continue while BLM and the State perform a review to determine whether revisions are required under this subpart. BLM and the State must complete the review and make necessary revisions no later than one year from January 20, 2001.

(b) The BLM State Director may extend the review period described in paragraph (a) of this section for one more year upon the written request of the Governor of the State or the delegated representative of the Governor, and if necessary, for a third year upon another written request. The existing agreement or memorandum of understanding terminates no later than one year after January 20, 2001 if this review and any necessary revision does not occur, unless extended under this paragraph.

(c) This subpart applies during the review period described in paragraphs (a) and (b) of this section. Where a portion of a Federal/State agreement or memorandum of understanding existing on January 20, 2001 is inconsistent with this subpart, that portion continues in effect until the agreement or memorandum of understanding is revised under this subpart or terminated.

OPERATIONS CONDUCTED UNDER NOTICES

## § 3809.300 Does this subpart apply to my existing notice-level operations?

If your notice was complete before January 20, 2001, and you are the operator identified in the notice on file with BLM on January 20, 2001, then you may conduct operations under the terms of your existing notice and the regulations in effect immediately before January 20, 2001. You may extend your notice under § 3809.333. BLM may require a modification under § 3809.331(a)(1). See § 3809.503 for financial guarantee requirements applicable to notices.

*[90 FR 46080, Sept. 25, 2025]*

## § 3809.301 Where do I file my notice and what information must I include in it?

(a) If you qualify under § 3809.21, you must file your notice with the local BLM office with jurisdiction over the lands involved. BLM does not require that the notice be on a particular form.

(b) To be complete, your notice must include the following information:

(1) *Operator Information.* The name, mailing address, phone number, taxpayer identification number of the operator(s), and the BLM serial number(s) of any unpatented mining claim(s) where the disturbance would occur. If the operator is a corporation, you must identify one individual as the point of contact;

(2) *Activity Description, Map, and Schedule of Activities.* A description of the proposed activity with a level of detail appropriate to the type, size, and location of the activity. The description must include the following:

(i) The measures that you will take to prevent unnecessary or undue degradation during operations;

(ii) A map showing the location of your project area in sufficient detail for BLM to be able to find it and the location of access routes you intend to use, improve, or construct;

(iii) A description of the type of equipment you intend to use; and

(iv) A schedule of activities, including the date when you expect to begin operations and the date you expect to complete reclamation;

(3) *Reclamation Plan.* A description of how you will complete reclamation to the standards described in § 3809.420; and

(4) *Reclamation cost estimate.* An estimate of the cost to fully reclaim your operations as required by § 3809.552.

(c) BLM may require you to provide additional information, if necessary to ensure that your operations will comply with this subpart.

(d) You must notify BLM in writing within 30 calendar days of any change of operator or corporate point of contact, or of the mailing address of the operator or corporate point of contact.

## § 3809.311 What action does BLM take when it receives my notice?

(a) Upon receipt of your notice, BLM will review it within 15 calendar days to see if it is complete under § 3809.301.

(b) If your notice is incomplete, BLM will inform you in writing of the additional information you must submit. BLM may also take the actions described in § 3809.313.

(c) BLM will review your additional information within 15 calendar days to ensure it is complete. BLM will repeat this process until your notice is complete, or until we determine that you may not conduct operations because of your inability to prevent unnecessary or undue degradation.

## § 3809.312 When may I begin operations after filing a complete notice?

(a) If BLM does not take any of the actions described in § 3908.313, you may begin operations no sooner than 15 calendar days after the appropriate BLM office receives your complete notice. BLM may send you an acknowledgement that indicates the date we received your notice. If you don't receive an acknowledgement or have any doubt about the date we received your notice, contact the office to which you sent the notice. This subpart does not require BLM to approve your notice or inform you that your notice is complete.

(b) If BLM completes our review sooner than 15 calendar days after receiving your complete notice, we may notify you that you may begin operations.

(c) You must provide to BLM a financial guarantee that meets the requirements of this subpart before beginning operations.

(d) Your operations may be subject to BLM approval under part 3710, subpart 3715, of this title relating to use or occupancy of unpatented mining claims.

## § 3809.313 Under what circumstances may I not begin operations 15 calendar days after filing my notice?

To see when you may not begin operations 15 calendar days after filing your notice, follow this table:

| If BLM reviews your notice and, within 15 calendar days— | Then— |
| --- | --- |
| (a) Notifies you that BLM needs additional time, not to exceed 15 calendar | You must not begin operations until the additional review time period ends. |

| If BLM reviews your notice and, within 15 calendar days— | Then— |
|---|---|
| days, to complete its review | |
| (b) Notifies you that you must modify your notice to prevent unnecessary or undue degradation | You must not begin operations until you modify your notice to ensure that your operations prevent unnecessary or undue degradation. |
| (c) Requires you to consult with BLM about the location of existing or proposed access routes | You must not begin operations until you consult with BLM and satisfy BLM's concerns about access. |
| (d) Determines that an on-site visit is necessary | You must not begin operations until BLM visits the site, and you satisfy any concerns arising from the visit. BLM will notify you if we will not conduct the site visit within 15 calendar days of determining that a visit is necessary, including the reason(s) for the delay. |
| (e) BLM determines you don't qualify under § 3809.11 as a notice-level operation | You must file a plan of operations before beginning operations. See §§ 3809.400 through 3809.420. |

## § 3809.320 Which performance standards apply to my notice-level operations?

Your notice-level operations must meet all applicable performance standards of § 3809.420.

## § 3809.330 May I modify my notice?

(a)  Yes, you may submit a notice modification at any time during operations under a notice.

(b)  BLM will review your notice modification the same way it reviewed your initial notice under §§ 3809.311 and 3809.313.

## § 3809.331 Under what conditions must I modify my notice?

(a)  You must modify your notice—

   (1)  If BLM requires you to do so to prevent unnecessary or undue degradation; or

   (2)  If you plan to make material changes to your operations. Material changes are changes that disturb areas not described in the existing notice; change your reclamation plan; or result in impacts of a different kind, degree, or extent than those described in the existing notice.

(b)  You must submit your notice modification 15 calendar days before making any material changes. If BLM determines your notice modification is complete before the 15-day period has elapsed, BLM may notify you to proceed. When BLM requires you to modify your notice, we may also notify you to proceed before the 15-day period has elapsed to prevent unnecessary or undue degradation.

GSCA_Add_124

## § 3809.332 How long does my notice remain in effect?

If you filed your complete notice on or after January 20, 2001, it remains in effect for 2 years, unless extended under § 3809.333, or unless you notify BLM beforehand that operations have ceased and reclamation is complete. BLM will conduct an inspection to verify whether you have met your obligations, will notify you promptly in writing, and terminate your notice, if appropriate.

## § 3809.333 May I extend my notice, and, if so, how?

Yes, if you wish to conduct operations for 2 additional years after the expiration date of your notice, you must notify BLM in writing on or before the expiration date and meet the financial guarantee requirements of § 3809.503. You may extend your notice more than once.

## § 3809.334 What if I temporarily stop conducting operations under a notice?

(a) If you stop conducting operations for any period of time, you must—

    (1) Maintain public lands within the project area, including structures, in a safe and clean condition;

    (2) Take all steps necessary to prevent unnecessary or undue degradation; and

    (3) Maintain an adequate financial guarantee.

(b) If the period of non-operation is likely to cause unnecessary or undue degradation, BLM, in writing, will—

    (1) Require you to take all steps necessary to prevent unnecessary or undue degradation; and

    (2) Require you, after an extended period of non-operation for other than seasonal operations, to remove all structures, equipment, and other facilities and reclaim the project area.

## § 3809.335 What happens when my notice expires?

(a) When your notice expires, you must—

    (1) Cease operations, except reclamation; and

    (2) Complete reclamation promptly according to your notice.

(b) Your reclamation obligations continue beyond the expiration or any termination of your notice until you satisfy them.

## § 3809.336 What if I abandon my notice-level operations?

(a) BLM may consider your operations to be abandoned if, for example, you leave inoperable or non-mining related equipment in the project area, remove equipment and facilities from the project area other than for purposes of completing reclamation according to your reclamation plan, do not maintain the project area, discharge local workers, or there is no sign of activity in the project area over time.

(b) If BLM determines that you abandoned your operations without completing reclamation, BLM may initiate forfeiture under § 3809.595. If the amount of the financial guarantee is inadequate to cover the cost of reclamation, BLM may complete the reclamation, and the operator and all other responsible persons are liable for the cost of reclamation.

OPERATIONS CONDUCTED UNDER PLANS OF OPERATIONS

## § 3809.400 Does this subpart apply to my existing or pending plan of operations?

You may continue to operate under the terms and conditions of a plan of operations that BLM approved before January 20, 2001. All provisions of this subpart except plan content (§ 3809.401) and performance standards (§§ 3809.415 and 3809.420) apply to such plan of operations. See § 3809.505 for the applicability of financial guarantee requirements.

*[90 FR 33318, July 17, 2025]*

## § 3809.401 Where do I file my plan of operations and what information must I include with it?

(a)  If you are required to file a plan of operations under § 3809.11, you must file it with the local BLM field office with jurisdiction over the lands involved. BLM does not require that the plan be on a particular form. Your plan of operations must demonstrate that the proposed operations would not result in unnecessary or undue degradation of public lands.

(b)  Your plan of operations must contain the following information and describe the proposed operations at a level of detail sufficient for BLM to determine that the plan of operations prevents unnecessary or undue degradation:

(1)  *Operator Information.* The name, mailing address, phone number, taxpayer identification number of the operator(s), and the BLM serial number(s) of any unpatented mining claim(s) where disturbance would occur. If the operator is a corporation, you must identify one individual as the point of contact. You must notify BLM in writing within 30 calendar days of any change of operator or corporate point of contact or in the mailing address of the operator or corporate point of contact;

(2)  *Description of Operations.* A description of the equipment, devices, or practices you propose to use during operations including, where applicable—

(i)  Maps of the project area at an appropriate scale showing the location of exploration activities, drill sites, mining activities, processing facilities, waste rock and tailing disposal areas, support facilities, structures, buildings, and access routes;

(ii)  Preliminary or conceptual designs, cross sections, and operating plans for mining areas, processing facilities, and waste rock and tailing disposal facilities;

(iii)  Water management plans;

(iv)  Rock characterization and handling plans;

(v)  Quality assurance plans;

(vi)  Spill contingency plans;

(vii)  A general schedule of operations from start through closure; and

(viii)  Plans for all access roads, water supply pipelines, and power or utility services;

(3)  *Reclamation Plan.* A plan for reclamation to meet the standards in § 3809.420, with a description of the equipment, devices, or practices you propose to use including, where applicable, plans for—

(i)  Drill-hole plugging;

(ii)  Regrading and reshaping;

GSCA_Add_126

    (iii) Mine reclamation, including information on the feasibility of pit backfilling that details economic, environmental, and safety factors;

    (iv) Riparian mitigation;

    (v) Wildlife habitat rehabilitation;

    (vi) Topsoil handling;

    (vii) Revegetation;

    (viii) Isolation and control of acid-forming, toxic, or deleterious materials;

    (ix) Removal or stabilization of buildings, structures and support facilities; and

    (x) Post-closure management;

(4) *Monitoring Plan.* A proposed plan for monitoring the effect of your operations. You must design monitoring plans to meet the following objectives: To demonstrate compliance with the approved plan of operations and other Federal or State environmental laws and regulations, to provide early detection of potential problems, and to supply information that will assist in directing corrective actions should they become necessary. Where applicable, you must include in monitoring plans details on type and location of monitoring devices, sampling parameters and frequency, analytical methods, reporting procedures, and procedures to respond to adverse monitoring results. Monitoring plans may incorporate existing State or other Federal monitoring requirements to avoid duplication. Examples of monitoring programs which may be necessary include surface- and ground-water quality and quantity, air quality, revegetation, stability, noise levels, and wildlife mortality; and

(5) *Interim management plan.* A plan to manage the project area during periods of temporary closure (including periods of seasonal closure) to prevent unnecessary or undue degradation. The interim management plan must include, where applicable, the following:

    (i) Measures to stabilize excavations and workings;

    (ii) Measures to isolate or control toxic or deleterious materials (See also the requirements in § 3809.420(c)(12)(vii).);

    (iii) Provisions for the storage or removal of equipment, supplies and structures;

    (iv) Measures to maintain the project area in a safe and clean condition;

    (v) Plans for monitoring site conditions during periods of non-operation; and

    (vi) A schedule of anticipated periods of temporary closure during which you would implement the interim management plan, including provisions for notifying BLM of unplanned or extended temporary closures.

(c) In addition to the requirements of paragraph (b) of this section, BLM may require you to supply—

(1) Operational and baseline environmental information for BLM to analyze potential environmental impacts as required by the National Environmental Policy Act and to determine if your plan of operations will prevent unnecessary or undue degradation. This could include information on public and non-public lands needed to characterize the geology, paleontological resources, cave resources, hydrology, soils, vegetation, wildlife, air quality, cultural resources, and socioeconomic conditions in and around the project area, as well as information that may require you to conduct static and kinetic

GSCA_Add_127

testing to characterize the potential for your operations to produce acid drainage or other leachate. BLM is available to advise you on the exact type of information and level of detail needed to meet these requirements; and

(2) Other information, if necessary to ensure that your operations will comply with this subpart.

(d) *Reclamation cost estimate.* At a time specified by BLM, you must submit an estimate of the cost to fully reclaim your operations as required by § 3809.552. BLM will review your reclamation cost estimate and notify you of any deficiencies or additional information that must be submitted in order to determine a final reclamation cost. BLM will notify you when we have determined the final amount for which you must provide financial assurance.

[65 FR 70112, Nov. 21, 2000, as amended at 66 FR 54860, Oct. 30, 2001]

## § 3809.411 What action will BLM take when it receives my plan of operations?

(a) BLM will review your plan of operations within 30 calendar days and will notify you that—

(1) Your plan of operations is complete, that is, it meets the content requirements of § 3809.401(b);

(2) Your plan does not contain a complete description of the proposed operations under § 3809.401(b). BLM will identify deficiencies that you must address before BLM can continue processing your plan of operations. If necessary, BLM may repeat this process until your plan of operations is complete; or

(3) The description of the proposed operations is complete, but BLM cannot approve the plan until certain additional steps are completed, including one or more of the following:

(i) You collect adequate baseline data;

(ii) BLM completes the environmental review required under the National Environmental Policy Act;

(iii) BLM completes any consultation required under the National Historic Preservation Act, the Endangered Species Act, or the Magnuson-Stevens Fishery Conservation and Management Act;

(iv) BLM or the Department of the Interior completes other Federal responsibilities, such as Native American consultation;

(v) BLM conducts an on-site visit;

(vi) BLM completes review of public comments on the plan of operations;

(vii) For public lands where BLM does not have responsibility for managing the surface, BLM consults with the surface-managing agency;

(viii) In cases where the surface is owned by a non-Federal entity, BLM consults with the surface owner; and

(ix) BLM completes consultation with the State to ensure your operations will be consistent with State water quality requirements.

(b) Pending final approval of your plan of operations, BLM may approve any operations that may be necessary for timely compliance with requirements of Federal and State laws, subject to any terms and conditions that may be needed to prevent unnecessary or undue degradation.

(c) Following receipt of your complete plan of operations and before BLM acts on it, we will publish a notice of the availability of the plan in either a local newspaper of general circulation or a NEPA document and will accept public comment for at least 30 calendar days on your plan of operations.

(d) Upon completion of the review of your plan of operations, including analysis under NEPA and public comment, BLM will notify you that—

(1) BLM approves your plan of operations as submitted (See part 3810, subpart 3814 of this title for specific plan-related requirements applicable to operations on Stock Raising Homestead Act lands.);

(2) BLM approves your plan of operations subject to changes or conditions that are necessary to meet the performance standards of § 3809.420 and to prevent unnecessary or undue degradation. BLM may require you to incorporate into your plan of operations other agency permits, final approved engineering designs and plans, or other conditions of approval from the review of the plan of operations filed under § 3809.401(b); or

(3) BLM disapproves, or is withholding approval of your plan of operations because the plan:

(i) Does not meet the applicable content requirements of § 3809.401;

(ii) Proposes operations that are in an area segregated or withdrawn from the operation of the mining laws, unless the requirements of § 3809.100 are met; or

(iii) Proposes operations that would result in unnecessary or undue degradation of public lands.

*[65 FR 70112, Nov. 21, 2000, as amended at 66 FR 54860, Oct. 30, 2001]*

## § 3809.412 When may I operate under a plan of operations?

You must not begin operations until BLM approves your plan of operations and you provide the financial guarantee required under § 3809.551.

## § 3809.415 How do I prevent unnecessary or undue degradation while conducting operations on public lands?

You prevent unnecessary or undue degradation while conducting operations on public lands by—

(a) Complying with § 3809.420, as applicable; the terms and conditions of your notice or approved plan of operations; and other Federal and State laws related to environmental protection and protection of cultural resources;

(b) Assuring that your operations are "reasonably incident" to prospecting, mining, or processing operations and uses as defined in § 3715.0-5 of this title; and

(c) Attaining the stated level of protection or reclamation required by specific laws in areas such as the California Desert Conservation Area, Wild and Scenic Rivers, BLM-administered portions of the National Wilderness System, and BLM-administered National Monuments and National Conservation Areas.

*[65 FR 70112, Nov. 21, 2000, as amended at 66 FR 54861, Oct. 30, 2001]*

## § 3809.420 What performance standards apply to my notice or plan of operations?

The following performance standards apply to your notice or plan of operations:

(a) *General performance standards —*

(1) *Technology and practices.* You must use equipment, devices, and practices that will meet the performance standards of this subpart.

(2) *Sequence of operations.* You must avoid unnecessary impacts and facilitate reclamation by following a reasonable and customary mineral exploration, development, mining and reclamation sequence.

(3) *Land-use plans.* Consistent with the mining laws, your operations and post-mining land use must comply with the applicable BLM land-use plans and activity plans, and with coastal zone management plans under 16 U.S.C. 1451, as appropriate.

(4) *Mitigation.* You must take mitigation measures specified by BLM to protect public lands.

(5) *Concurrent reclamation.* You must initiate and complete reclamation at the earliest economically and technically feasible time on those portions of the disturbed area that you will not disturb further.

(6) *Compliance with other laws.* You must conduct all operations in a manner that complies with all pertinent Federal and state laws.

(b) *Specific standards —*

(1) *Access routes.* Access routes shall be planned for only the minimum width needed for operations and shall follow natural contours, where practicable to minimize cut and fill. When the construction of access routes involves slopes that require cuts on the inside edge in excess of 3 feet, the operator may be required to consult with the authorized officer concerning the most appropriate location of the access route prior to commencing operations. An operator is entitled to access to his operations consistent with provisions of the mining laws. Where a notice or a plan of operations is required, it shall specify the location of access routes for operations and other conditions necessary to prevent unnecessary or undue degradation. The authorized officer may require the operator to use existing roads to minimize the number of access routes, and, if practicable, to construct access roads within a designated transportation or utility corridor. When commercial hauling is involved and the use of an existing road is required, the authorized officer may require the operator to make appropriate arrangements for use and maintenance.

(2) *Mining wastes.* All tailings, dumps, deleterious materials or substances, and other waste produced by the operations shall be disposed of so as to prevent unnecessary or undue degradation and in accordance with applicable Federal and state Laws.

(3) *Reclamation.*

(i) At the earliest feasible time, the operator shall reclaim the area disturbed, except to the extent necessary to preserve evidence of mineralization, by taking reasonable measures to prevent or control on-site and off-site damage of the Federal lands.

(ii) Reclamation shall include, but shall not be limited to:

(A) Saving of topsoil for final application after reshaping of disturbed areas have been completed;

(B) Measures to control erosion, landslides, and water runoff;

(C) Measures to isolate, remove, or control toxic materials;

GSCA_Add_130

      (D)   Reshaping the area disturbed, application of the topsoil, and revegetation of disturbed areas, where reasonably practicable; and

      (E)   Rehabilitation of fisheries and wildlife habitat.

    (iii)   When reclamation of the disturbed area has been completed, except to the extent necessary to preserve evidence of mineralization, the authorized officer shall be notified so that an inspection of the area can be made.

  (4)  *Air quality.* All operators shall comply with applicable Federal and state air quality standards, including the Clean Air Act (42 U.S.C. 1857 *et seq.*).

  (5)  *Water quality.* All operators shall comply with applicable Federal and state water quality standards, including the Federal Water Pollution Control Act, as amended (30 U.S.C. 1151 *et seq.*).

  (6)  *Solid wastes.* All operators shall comply with applicable Federal and state standards for the disposal and treatment of solid wastes, including regulations issued pursuant to the Solid Waste Disposal Act as amended by the Resource Conservation and Recovery Act (42 U.S.C. 6901 *et seq.*). All garbage, refuse or waste shall either be removed from the affected lands or disposed of or treated to minimize, so far as is practicable, its impact on the lands.

  (7)  *Fisheries, wildlife and plant habitat.* The operator shall take such action as may be needed to prevent adverse impacts to threatened or endangered species, and their habitat which may be affected by operations.

  (8)  *Cultural and paleontological resources.*

    (i)   Operators shall not knowingly disturb, alter, injure, or destroy any scientifically important paleontological remains or any historical or archaeological site, structure, building or object on Federal lands.

    (ii)   Operators shall immediately bring to the attention of the authorized officer any cultural and/or paleontological resources that might be altered or destroyed on Federal lands by his/her operations, and shall leave such discovery intact until told to proceed by the authorized officer. The authorized officer shall evaluate the discoveries brought to his/her attention, take action to protect or remove the resource, and allow operations to proceed within 10 working days after notification to the authorized officer of such discovery.

    (iii)   The Federal Government shall have the responsibility and bear the cost of investigations and salvage of cultural and paleontology values discovered after a plan of operations has been approved, or where a plan is not involved.

  (9)  *Protection of survey monuments.* To the extent practicable, all operators shall protect all survey monuments, witness corners, reference monuments, bearing trees and line trees against unnecessary or undue destruction, obliteration or damage. If, in the course of operations, any monuments, corners, or accessories are destroyed, obliterated, or damaged by such operations, the operator shall immediately report the matter to the authorized officer. The authorized officer shall prescribe, in writing, the requirements for the restoration or reestablishment of monuments, corners, bearing and line trees.

  (10)  *Fire.* The operator shall comply with all applicable Federal and state fire laws and regulations, and shall take all reasonable measures to prevent and suppress fires in the area of operations.

(11) *Acid-forming, toxic, or other deleterious materials.* You must incorporate identification, handling, and placement of potentially acid-forming, toxic or other deleterious materials into your operations, facility design, reclamation, and environmental monitoring programs to minimize the formation and impacts of acidic, alkaline, metal-bearing, or other deleterious leachate, including the following:

   (i) You must handle, place, or treat potentially acid-forming, toxic, or other deleterious materials in a manner that minimizes the likelihood of acid formation and toxic and other deleterious leachate generation (source control);

   (ii) If you cannot prevent the formation of acid, toxic, or other deleterious drainage, you must minimize uncontrolled migration of leachate; and

   (iii) You must capture and treat acid drainage, or other undesirable effluent, to the applicable standard if source controls and migration controls do not prove effective. You are responsible for any costs associated with water treatment or facility maintenance after project closure. Long-term, or post-mining, effluent capture and treatment are not acceptable substitutes for source and migration control, and you may rely on them only after all reasonable source and migration control methods have been employed.

(12) *Leaching operations and impoundments.*

   (i) You must design, construct, and operate all leach pads, tailings impoundments, ponds, and solution-holding facilities according to standard engineering practices to achieve and maintain stability and facilitate reclamation.

   (ii) You must construct a low-permeability liner or containment system that will minimize the release of leaching solutions to the environment. You must monitor to detect potential releases of contaminants from heaps, process ponds, tailings impoundments, and other structures and remediate environmental impacts if leakage occurs.

   (iii) You must design, construct, and operate cyanide or other leaching facilities and impoundments to contain precipitation from the local 100-year, 24-hour storm event in addition to the maximum process solution inventory. Your design must also include allowances for snowmelt events and draindown from heaps during power outages in the design.

   (iv) You must construct a secondary containment system around vats, tanks, or recovery circuits adequate to prevent the release of toxic solutions to the environment in the event of primary containment failure.

   (v) You must exclude access by the public, wildlife, or livestock to solution containment and transfer structures that contain lethal levels of cyanide or other solutions.

   (vi) During closure and at final reclamation, you must detoxify leaching solutions and heaps and manage tailings or other process waste to minimize impacts to the environment from contact with toxic materials or leachate. Acceptable practices to detoxify solutions and materials include natural degradation, rinsing, chemical treatment, or equally successful alternative methods. Upon completion of reclamation, all materials and discharges must meet applicable standards.

   (vii) In cases of temporary or seasonal closure, you must provide adequate maintenance, monitoring, security, and financial guarantee, and BLM may require you to detoxify process solutions.

(13) *Maintenance and public safety.* During all operations, the operator shall maintain his or her structures, equipment, and other facilities in a safe and orderly manner. Hazardous sites or conditions resulting from operations shall be marked by signs, fenced, or otherwise identified to alert the public in accordance with applicable Federal and state laws and regulations.

*[66 FR 54861, Oct. 30, 2001]*

## § 3809.421 Enforcement of performance standards.

Failure of the operator to prevent unnecessary or undue degradation or to complete reclamation to the standards described in this subpart may cause the operator to be subject to enforcement as described in §§ 3809.600 through 3809. 605 of this subpart.

*[66 FR 54862, Oct. 30, 2001]*

## § 3809.423 How long does my plan of operations remain in effect?

Your plan of operations remains in effect as long as you are conducting operations, unless BLM suspends or revokes your plan of operations for failure to comply with this subpart.

## § 3809.424 What are my obligations if I stop conducting operations?

(a) To see what you must do if you stop conducting operations, follow this table:

| If— | Then— |
| --- | --- |
| (1) You stop conducting operations for any period of time | (1) You must follow your approved interim management plan submitted under § 3809.401(b)(5); (ii) You must submit a modification to your interim management plan to BLM within 30 calendar days if it does not cover the circumstances of your temporary closure per § 3809.431(a); (iii) You must take all necessary actions to assure that unnecessary or undue degradation does not occur; and (iv) You must maintain an adequate financial guarantee. |
| (2) The period of non-operation is likely to cause unnecessary or undue degradation | The BLM will require you to take all necessary actions to assure that unnecessary or undue degradation does not occur, including requiring you, after an extended period of non-operation for other than seasonal operations, to remove all structures, equipment, and other facilities and reclaim the project area. |
| (3) Your operations are inactive for 5 consecutive years | BLM will review your operations and determine whether BLM should terminate your plan of operations and direct final reclamation and closure. |
| (4) BLM | BLM may initiate forfeiture under § 3809.595. If the amount of the financial |

| If— | Then— |
|---|---|
| determines that you abandoned your operations | guarantee is inadequate to cover the costs of reclamation, BLM may complete the reclamation, and the operator and all other responsible persons are liable for the costs of such reclamation. See § 3809.336(a) for indicators of abandonment. |

(b) Your reclamation and closure obligations continue until satisfied.

MODIFICATIONS OF PLANS OF OPERATIONS

## § 3809.430 May I modify my plan of operations?

Yes, you may request a modification of the plan at any time during operations under an approved plan of operations.

## § 3809.431 When must I modify my plan of operations?

You must modify your plan of operations when any of the following apply:

(a) Before making any changes to the operations described in your approved plan of operations;

(b) When BLM requires you to do so to prevent unnecessary or undue degradation; and

(c) Before final closure, to address impacts from unanticipated events or conditions or newly discovered circumstances or information, including the following:

(1) Development of acid or toxic drainage;

(2) Loss of surface springs or water supplies;

(3) The need for long-term water treatment and site maintenance;

(4) Repair of reclamation failures;

(5) Plans for assuring the adequacy of containment structures and the integrity of closed waste units;

(6) Providing for post-closure management; and

(7) Eliminating hazards to public safety.

## § 3809.432 What process will BLM follow in reviewing a modification of my plan of operations?

(a) BLM will review and approve a modification of your plan of operations in the same manner as it reviewed and approved your initial plan under §§ 3809.401 through 3809.420; or

(b) BLM will accept a minor modification without formal approval if it is consistent with the approved plan of operations and does not constitute a substantive change that requires additional analysis under the National Environmental Policy Act.

## § 3809.433 Does this subpart apply to a new modification of my plan of operations?

To see how this subpart applies to a modification of your plan of operations that you submit to BLM after January 20, 2001, refer to the following table.

| If you have an approved plan of operations on January 20, 2001 | Then— |
|---|---|
| (a) *New facility.* You subsequently propose to modify your plan of operations by constructing a new facility, such as waste rock repository, leach pad, impoundment, drill site, or road | The plan contents requirements (§ 3809.401) and performance standards (§ 3809.420) of this subpart apply to the new facility. Those facilities and areas not included in the modification may continue to operate under the terms of your existing plan of operations. |
| (b) *Existing facility.* You subsequently propose to modify your plan of operations by modifying an existing facility, such as expansion of a waste rock repository, leach pad, or impoundment; layback of a mine pit; or widening of a road | The plan contents requirements (§ 3809.401) and performance standards (§ 3809.420) of this subpart apply to the modified portion of the facility, unless you demonstrate to BLM's satisfaction it is not practical to apply them for economic environmental, safety, or technical reasons. If you make the demonstration, the plan content requirements (43 CFR 3809.1-5) and performance standards (43 CFR 3809.1-3(d) and 3809.2-2) that were in effect immediately before January 20, 2001 apply to your modified facility. (See 43 CFR parts 1000-end, revised as of Oct. 1, 2000.) |

## § 3809.434 How does this subpart apply to pending modifications for new or existing facilities?

(a) This subpart applies to modifications pending before BLM on January 20, 2001 to construct a new facility, such as a waste rock repository, leach pad, drill site, or access road; or to modify an existing mine facility such as expansion of a waste rock repository or leach pad.

(b) All provisions of this subpart, except plan content (§ 3809.401) and performance standards (§§ 3809.415 and 3809.420) apply to any modification of a plan of operations that was pending on January 20, 2001. See § 3809.505 for applicability of financial guarantee requirements.

(c) If your unapproved modification of a plan of operations is pending on January 20, 2001, then the plan content requirements (§ 3809.1-5) and the performance standards (§§ 3809.1-3(d) and 3809.2-2) that were in effect immediately before January 20, 2001 apply to your modification of a plan of operations. (See 43 CFR parts 1000-end, revised as of Oct. 1, 2000).

(d) If you want this subpart to apply to your pending modification of a plan of operations, where not otherwise required, you may choose to have this subpart apply.

FINANCIAL GUARANTEE REQUIREMENTS—GENERAL

## § 3809.500 In general, what are BLM's financial guarantee requirements?

To see generally what BLM's financial guarantee requirements are, follow this table:

| If— | Then— |
|---|---|
| (a) Your operations constitute casual use, | You do not have to provide any financial guarantee. |
| (b) You conduct operations under a notice or a plan of operations | You must provide BLM or the State a financial guarantee that meets the requirements of this subpart before starting operations operations. For more information, see §§ 3809.551 through under a 3809.573. |

## § 3809.503 When must I provide a financial guarantee for my notice-level operations?

To see how this subpart applies to your notice, follow this table:

| If— | Then— |
|---|---|
| (a) Your notice was on file with BLM on January 20, 2001 | You do not need to provide a financial guarantee unless you modify the notice or extend the notice under § 3809.333. |
| (b) Your notice was on file with BLM before January 20, 2001 and you choose to modify your notice as required by this subpart on or after that date | You must provide a financial guarantee before you can begin operations under the modified notice. If you modify your notice, you must post a finacial guarantee for the entire notice. |
| (c) You file a new notice on or after January 20, 2001 | You must provide a financial guarantee before you can begin operations under the notice. |

## § 3809.505 How do the financial guarantee requirements of this subpart apply to my existing plan of operations?

For each plan of operations approved before January 20, 2001, for which you or your predecessor in interest posted a financial guarantee under the regulations in force before that date, you must post a financial guarantee according to the requirements of this subpart no later than November 20, 2001, at the local BLM office with jurisdiction over the lands involved. You do not need to post a new financial guarantee if your existing financial guarantee satisfies this subpart. If you are conducting operations under a plan of operations approved before January 20, 2001, but you have not provided a financial guarantee, you must post a financial guarantee under § 3809.551 by September 13, 2001.

*[66 FR 32575, June 15, 2001]*

## § 3809.551 What are my choices for providing BLM with a financial guarantee?

You must provide BLM with a financial guarantee using any of the 3 options in the following table:

| If— | Then— |
|---|---|
| (a) You have only one notice or plan of operations, or wish to provide a financial guarantee for a single notice or plan of operations | You may provide an individual financial guarantee that covers only the cost of reclaiming areas disturbed under the single notice or plan of operations. See §§ 3809.552 through 3809.556 for more information. |
| (b) You are currently operating under more than one notice or plan of operations | You may provide a blanket financial guarantee covering statewide or nationwide operations. See § 3809.560 for more information. |
| (c) You do not choose one of the options in paragraphs (a) and (b) of this section | You may provide evidence of an existing financial guarantee under State law or regulations. See §§ 3809.570 through 3809.573 for more information. |

INDIVIDUAL FINANCIAL GUARANTEE

## § 3809.552 What must my individual financial guarantee cover?

(a) If you conduct operations under a notice or a plan of operations and you provide an individual financial guarantee, it must cover the estimated cost as if BLM were to contract with a third party to reclaim your operations according to the reclamation plan, including construction and maintenance costs for any treatment facilities necessary to meet Federal and State environmental standards. The financial guarantee must also cover any interim stabilization and infrastructure maintenance costs needed to maintain the area of operations in compliance with applicable environmental requirements while third-party contracts are developed and executed.

(b) BLM will periodically review the estimated cost of reclamation and the adequacy of any funding mechanism established under paragraph (c) of this section and require increased coverage, if necessary.

(c) When BLM identifies a need for it, you must establish a trust fund or other funding mechanism available to BLM to ensure the continuation of long-term treatment to achieve water quality standards and for other long term, post-mining maintenance requirements. The funding must be adequate to provide for construction, long-term operation, maintenance, or replacement of any treatment facilities and infrastructure, for as long as the treatment and facilities are needed after mine closure. BLM may identify the need for a trust fund or other funding mechanism during plan review or later.

## § 3809.553 May I post a financial guarantee for a part of my operations?

(a) Yes, BLM may authorize you to provide a financial guarantee covering a part of your operations if—

(1) Your operations do not go beyond what is specifically covered by the partial financial guarantee; and

(2) The partial financial guarantee covers all reclamation costs within the incremental area of operations.

(b)  BLM will review the amount and terms of the financial guarantee for each increment of your operations at least annually.

## § 3809.554 How do I estimate the cost to reclaim my operations?

(a)  You must estimate the cost to reclaim your operations as if BLM were hiring a third-party contractor to perform reclamation of your operations after you have vacated the project area. Your estimate must include BLM's cost to administer the reclamation contract. Contact BLM to obtain this administrative cost information.

(b)  Your estimate of the cost to reclaim your operations must be acceptable to BLM.

## § 3809.555 What forms of individual financial guarantee are acceptable to BLM?

You may use any of the following instruments for an individual financial guarantee, provided that the BLM State Director has determined that it is an acceptable financial instrument within the State where the operations are proposed:

(a)  Surety bonds that meet the requirements of Treasury Department Circular 570, including surety bonds arranged or paid for by third parties;

(b)  Cash in an amount equal to the required dollar amount of the financial guarantee, to be deposited and maintained in a Federal depository account of the United States Treasury by BLM;

(c)  Irrevocable letters of credit from a bank or financial institution organized or authorized to transact business in the United States;

(d)  Certificates of deposit or savings accounts not in excess of the maximum insurable amount as set by the Federal Deposit Insurance Corporation; and

(e)  Either of the following instruments having a market value of not less than the required dollar amount of the financial guarantee and maintained in a Securities Investors Protection Corporation insured trust account by a licensed securities brokerage firm for the benefit of the Secretary of the Interior, acting by and through BLM:

   (1)  Negotiable United States Government, State and Municipal securities or bonds; or

   (2)  Investment-grade rated securities having a Standard and Poor's rating of AAA or AA or an equivalent rating from a nationally recognized securities rating service.

(f)  Insurance, if its form and function is such that the funding or enforceable pledges of funding are used to guarantee performance of regulatory obligations in the event of default on such obligations by the operator. Insurance must have an A.M. Best rating of "superior" or an equivalent rating from a nationally recognized insurance rating service.

## § 3809.556 What special requirements apply to financial guarantees described in § 3809.555(e)?

(a)  If you choose to use the instruments permitted under § 3809.555(e) in satisfaction of financial guarantee requirements, you must provide BLM, before you begin operations and by the end of each calendar year thereafter, a certified statement describing the nature and market value of the instruments maintained in that account, and including any current statements or reports furnished by the brokerage firm to the operator or mining claimant concerning the asset value of the account.

(b) You must review the market value of the account instruments by December 31 of each year to ensure that their market value continues to be not less than the required dollar amount of the financial guarantee. When the market value of the account instruments has declined by more than 10 percent of the required dollar amount of the financial guarantee, you must, within 10 calendar days after its annual review or at any time upon the written request of BLM, provide additional instruments, as defined in § 3809.555(e), to the trust account so that the total market value of all account instruments is not less than the required dollar amount of the financial guarantee. You must send a certified statement to BLM within 45 calendar days thereafter describing your actions to raise the market value of its account instruments to the required dollar amount of the financial guarantee. You must include copies of any statements or reports furnished by the brokerage firm to you documenting such an increase.

(c) If your review under paragraph (b) of this section demonstrates that the total market value of trust account instruments exceeds 110 percent of the required dollar amount of the financial guarantee, you may ask BLM to authorize a written release of that portion of the account that exceeds 110 percent of the required financial guarantee. BLM will approve your request only if you are in compliance with the terms and conditions of your notice or approved plan of operations.

BLANKET FINANCIAL GUARANTEE

## § 3809.560 Under what circumstances may I provide a blanket financial guarantee?

(a) If you have more than one notice- or plan-level operation underway, you may provide a blanket financial guarantee covering statewide or nationwide operations instead of individual financial guarantees for each operation.

(b) BLM will accept a blanket financial guarantee if we determine that its terms and conditions are sufficient to comply with the regulations of this subpart.

STATE-APPROVED FINANCIAL GUARANTEE

## § 3809.570 Under what circumstances may I provide a State-approved financial guarantee?

When you provide evidence of an existing financial guarantee under State law or regulations that covers your operations, you are not required to provide a separate financial guarantee under this subpart if—

(a) The existing financial guarantee is redeemable by the Secretary, acting by and through BLM;

(b) It is held or approved by a State agency for the same operations covered by your notice(s) or plan(s) of operations; and

(c) It provides at least the same amount of financial guarantee as required by this subpart.

## § 3809.571 What forms of State-approved financial guarantee are acceptable to BLM?

You may provide a State-approved financial guarantee in any of the following forms, subject to the conditions in §§ 3809.570 and 3809.574:

(a) The kinds of individual financial guarantees specified under § 3809.555;

(b) Participation in a State bond pool, if—

(1) The State agrees that, upon BLM's request, the State will use part of the pool to meet reclamation obligations on public lands; and

(2) The BLM State Director determines that the State bond pool provides the equivalent level of protection as that required by this subpart; or

(c) A corporate guarantee that existed on January 20, 2001, subject to the restrictions on corporate guarantees in § 3809.574.

## § 3809.572 What happens if BLM rejects a financial instrument in my State-approved financial guarantee?

If BLM rejects a submitted financial instrument in an existing State-approved financial guarantee, BLM will notify you and the State in writing, with a complete explanation of the reasons for the rejection within 30 calendar days of BLM's receipt of the evidence of State-approved financial guarantee. You must provide BLM with a financial guarantee acceptable under this subpart at least equal to the amount of the rejected financial instrument.

## § 3809.573 What happens if the State makes a demand against my financial guarantee?

When the State makes a demand against your financial guarantee, thereby reducing the available balance, you must do both of the following:

(a) Notify BLM within 15 calendar days; and

(b) Replace or augment the financial guarantee within 30 calendar days if the available balance is insufficient to cover the remaining reclamation cost.

## § 3809.574 What happens if I have an existing corporate guarantee?

(a) If you have an existing corporate guarantee on January 20, 2001 that applies to public lands under an approved BLM and State agreement, your corporate guarantee will continue in effect. BLM will not accept any new corporate guarantees or increases to existing corporate guarantees. You may not transfer your existing corporate guarantee to another operator.

(b) If the State revises existing corporate guarantee criteria or requirements that apply to a corporate guarantee existing on January 20, 2001, the BLM State Director will review the revisions to ensure that adequate financial coverage continues. If the BLM State Director determines it is in the public interest to do so, the State Director may terminate a revised corporate guarantee and require an acceptable replacement financial guarantee after due notice and a reasonable time to obtain a replacement.

MODIFICATION OR REPLACEMENT OF A FINANCIAL GUARANTEE

## § 3809.580 What happens if I modify my notice or approved plan of operations?

(a) If you modify a notice or an approved plan of operations under § 3809.331 or § 3809.431 respectively, and your estimated reclamation cost increases, you must increase the amount of the financial guarantee to cover any estimated additional cost of reclamation and long-term treatment in compliance with § 3809.552.

(b) If you modify a notice or an approved plan of operations under § 3809.331 or § 3809.431 respectively, and your estimated reclamation cost decreases, you may request BLM decrease the amount of the financial guarantee for your operations.

## § 3809.581 Will BLM accept a replacement financial instrument?

(a) Yes, if you or a new operator have an approved financial guarantee, you may request BLM to accept a replacement financial instrument at any time after the approval of an initial instrument. BLM will review the offered instrument for adequacy and may reject any offered instrument, but will do so by a decision in writing, with a complete explanation of the reasons for the rejection, within 30 calendar days of the offering.

(b) A surety is not released from an obligation that accrued while the surety bond was in effect unless the replacement financial guarantee covers such obligations to BLM's satisfaction.

## § 3809.582 How long must I maintain my financial guarantee?

You must maintain your financial guarantee until you or a new operator replace it with another adequate financial guarantee, subject to BLM's written concurrence, or until BLM releases the requirement to maintain your financial guarantee after you have completed reclamation of your operation according to the requirements of § 3809.320 (for notices), including any measures identified as the result of consultation with BLM under § 3809.313, or § 3809.420 (for plans of operations).

RELEASE OF FINANCIAL GUARANTEE

## § 3809.590 When will BLM release or reduce the financial guarantee for my notice or plan of operations?

(a) When you (the mining claimant or operator) have completed all or any portion of the reclamation of your operations in accordance with your notice or approved plan of operations, you may notify BLM that the reclamation has occurred and request a reduction in the financial guarantee or BLM approval of the adequacy of the reclamation, or both.

(b) BLM will then promptly inspect the reclaimed area. We encourage you to accompany the BLM inspector.

(c) For your plan of operations, BLM will either post in the local BLM office or publish notice of final financial guarantee release in a local newspaper of general circulation and accept comments for 30 calendar days. Subsequently, BLM will notify you, in writing, whether you may reduce the financial guarantee under § 3809.591, or the reclamation is acceptable, or both.

## § 3809.591 What are the limitations on the amount by which BLM may reduce my financial guarantee?

(a) This section applies to your financial guarantee, but not to any funding mechanism established under § 3809.552(c) to pay for long-term treatment of effluent or site maintenance. Calculation of bond percentages in paragraphs (b) and (c) of this section does not include any funds held in that kind of funding mechanism.

(b) BLM may release up to 60 percent of your financial guarantee for a portion of your project area when BLM determines that you have successfully completed backfilling; regrading; establishment of drainage control; and stabilization and detoxification of leaching solutions, heaps, tailings, and similar facilities on that portion of the project area.

(c) BLM may release the remainder of your financial guarantee for the same portion of the project area when—

GSCA_Add_141

(1) BLM determines that you have successfully completed reclamation, including revegetating the area disturbed by operations; and

(2) Any effluent discharged from the area has met applicable effluent limitations and water quality standards for one year without needing additional treatment, or you have established a funding mechanism under § 3809.552(c) to pay for long-term treatment, and any effluent discharged from the area has met applicable effluent limitations and water quality standards water for one year with or without treatment.

## § 3809.592 Does release of my financial guarantee relieve me of all responsibility for my project area?

(a) Release of your financial guarantee under this subpart does not release you (the mining claimant or operator) from responsibility for reclamation of your operations should reclamation fail to meet the standards of this subpart.

(b) Any release of your financial guarantee under this subpart does not release or waive any claim BLM or other persons may have against any person under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. 9601 *et seq.,* or under any other applicable statutes or regulations.

## § 3809.593 What happens to my financial guarantee if I transfer my operations?

You remain responsible for obligations or conditions created while you conducted operations unless a transferee accepts responsibility under § 3809.116, and BLM accepts an adequate replacement financial guarantee. Therefore, your financial guarantee must remain in effect until BLM determines that you are no longer responsible for all or part of the operation. BLM can release your financial guarantee on an incremental basis. The new operator must provide a financial guarantee before BLM will allow the new operator to conduct operations.

## § 3809.594 What happens to my financial guarantee when my mining claim or millsite is patented?

(a) When your mining claim or millsite is patented, BLM will release the portion of the financial guarantee that applies to operations within the boundaries of the patented land. This paragraph does not apply to patents issued on mining claims within the boundaries of the California Desert Conservation Area.

(b) BLM will release the remainder of the financial guarantee, including the portion covering approved access outside the boundaries of the mining claim, when you have completed reclamation to the standards of this subpart.

FORFEITURE OF FINANCIAL GUARANTEE

## § 3809.595 When may BLM initiate forfeiture of my financial guarantee?

BLM may initiate forfeiture of all or part of your financial guarantee for any project area or portion of a project area if—

(a) You (the operator or mining claimant) refuse or are unable to conduct reclamation as provided in the reclamation measures incorporated into your notice or approved plan of operations or the regulations in this subpart;

(b)　You fail to meet the terms of your notice or your approved plan of operations; or

(c)　You default on any of the conditions under which you obtained the financial guarantee.

## § 3809.596 How does BLM initiate forfeiture of my financial guarantee?

When BLM decides to require the forfeiture of all or part of your financial guarantee, BLM will notify you (the operator or mining claimant) by certified mail, return receipt requested; the surety on the financial guarantee, if any; and the State agency holding the financial guarantee, if any, informing you and them of the following:

(a)　BLM's decision to require the forfeiture of all or part of the financial guarantee;

(b)　The reasons for the forfeiture;

(c)　The amount that you will forfeit based on the estimated total cost of achieving the reclamation plan requirements for the project area or portion of the project area affected, including BLM's administrative costs; and

(d)　How you may avoid forfeiture, including—

　(1)　Providing a written agreement under which you or another person will perform reclamation operations in accordance with a compliance schedule which meets the conditions of your notice or your approved plan of operations and the reclamation plan, and a demonstration that such other person has the ability to satisfy the conditions; and

　(2)　Obtaining written permission from BLM for a surety to complete the reclamation, or the portion of the reclamation applicable to the bonded phase or increment, if the surety can demonstrate an ability to complete the reclamation in accordance with the reclamation measures incorporated in your notice or approved plan of operations.

## § 3809.597 What if I do not comply with BLM's forfeiture decision?

If you fail to meet the requirements of BLM's forfeiture decision provided under § 3809.596, and you fail to appeal the forfeiture decision under §§ 3809.800 to 3809.807, or the Interior Board of Land Appeals does not grant a stay under 43 CFR 4.321, or the decision appealed is affirmed, BLM will—

(a)　Immediately collect the forfeited amount as provided by applicable laws for the collection of defaulted financial guarantees, other debts, or State bond pools; and

(b)　Use funds collected from financial guarantee forfeiture to implement the reclamation plan, or portion thereof, on the area or portion of the area to which financial guarantee coverage applies.

## § 3809.598 What if the amount forfeited will not cover the cost of reclamation?

If the amount forfeited is insufficient to pay for the full cost of reclamation, the operators and mining claimants are liable for the remaining costs as set forth in § 3809.116. BLM may complete or authorize completion of reclamation of the area covered by the financial guarantee and may recover from responsible persons all costs of reclamation in excess of the amount forfeited.

*[66 FR 54862, Oct. 30, 2001]*

## § 3809.599 What if the amount forfeited exceeds the cost of reclamation?

If the amount of financial guarantee forfeited is more than the amount necessary to complete reclamation, BLM will return the unused funds within a reasonable amount of time to the party from whom they were collected.

INSPECTION AND ENFORCEMENT

## § 3809.600 With what frequency will BLM inspect my operations?

(a) At any time, BLM may inspect your operations, including all structures, equipment, workings, and uses located on the public lands. The inspection may include verification that your operations comply with this subpart. See § 3715.7 of this title for special provisions governing inspection of the inside of structures used solely for residential purposes.

(b) At least 4 times each year, BLM will inspect your operations if you use cyanide or other leachate or where there is significant potential for acid drainage.

## § 3809.601 What types of enforcement action may BLM take if I do not meet the requirements of this subpart?

BLM may issue various types of enforcement orders, including the following:

(a) *Noncompliance order.* If your operations do not comply with any provision of your notice, plan of operations, or requirement of this subpart, BLM may issue you a noncompliance order; and

(b) *Suspension orders.*

(1) BLM may order a suspension of all or any part of your operations after—

(i) You fail to timely comply with a noncompliance order for a significant violation issued under paragraph (a) of this section. A significant violation is one that causes or may result in environmental or other harm or danger or that substantially deviates from the complete notice or approved plan of operations;

(ii) BLM notifies you of its intent to issue a suspension order; and

(iii) BLM provides you an opportunity for an informal hearing before the BLM State Director to object to a suspension.

(2) BLM may order an immediate, temporary suspension of all or any part of your operations without issuing a noncompliance order, notifying you in advance, or providing you an opportunity for an informal hearing if—

(i) You do not comply with any provision of your notice, plan of operations, or this subpart; and

(ii) An immediate, temporary suspension is necessary to protect health, safety, or the environment from imminent danger or harm. BLM may presume that an immediate suspension is necessary if you conduct plan-level operations without an approved plan of operations or conduct notice-level operations without submitting a complete notice.

(3) BLM will terminate a suspension order under paragraph (b)(1) or (b)(2) of this section when BLM determines you have corrected the violation.

(c) *Contents of enforcement orders.* Enforcement orders will specify—

GSCA_Add_144

(1) How you are failing or have failed to comply with the requirements of this subpart;

(2) The portions of your operations, if any, that you must cease or suspend;

(3) The actions you must take to correct the noncompliance and the time, not to exceed 30 calendar days, within which you must start corrective action; and

(4) The time within which you must complete corrective action.

## § 3809.602 Can BLM revoke my plan of operations or nullify my notice?

(a) BLM may revoke your plan of operations or nullify your notice upon finding that—

(1) A violation exists of any provision of your notice, plan of operation, or this subpart, and you have failed to correct the violation within the time specified in the enforcement order issued under § 3809.601; or

(2) a pattern of violations exists at your operations.

(b) The finding is not effective until BLM notifies you of its intent to revoke your plan or nullify your notice, and BLM provides you an opportunity for an informal hearing before the BLM State Director.

(c) If BLM nullifies your notice or revokes your plan of operations, you must not conduct operations on the public lands in the project area, except for reclamation and other measures specified by BLM.

## § 3809.603 How does BLM serve me with an enforcement action?

(a) BLM will serve a noncompliance order, a notification of intent to issue a suspension order, a suspension order, or other enforcement order on the person to whom it is directed or his or her designated agent, either by—

(1) Sending a copy of the notification or order by certified mail or by hand to the operator or his or her designated agent, or by any means consistent with the rules governing service of a summons and complaint under rule 4 of the Federal Rules of Civil Procedure. Service is complete upon offer of the notification or order or of the certified mail and is not incomplete because of refusal to accept; or

(2) Offering a copy at the project area to the designated agent or to the individual who, based upon reasonable inquiry, appears to be in charge. If no such individual can be located at the project area, BLM may offer a copy to any individual at the project area who appears to be an employee or agent of the person to whom the notification or order is issued. Service is complete when the notice or order is offered and is not incomplete because of refusal to accept. Following service at the project area, BLM will send an information copy by certified mail to the operator or the operator's designated agent.

(b) BLM may serve a mining claimant in the same manner an operator is served under paragraph (a)(1) of this section.

(c) The mining claimant or operator may designate an agent for service of notifications and orders. You must provide the designation in writing to the local BLM field office having jurisdiction over the lands involved.

## § 3809.604 What happens if I do not comply with a BLM order?

(a) If you do not comply with a BLM order issued under §§ 3809.601 or 3809.602, the Department of the Interior may request the United States Attorney to institute a civil action in United States District Court for an injunction or order to enforce its order, prevent you from conducting operations on the public lands in violation of this subpart, and collect damages resulting from unlawful acts. This relief may be in addition to the enforcement actions described in §§ 3809.601 and 3809.602 and the penalties described in § 3809.700.

(b) If you fail to timely comply with a noncompliance order issued under § 3809.601(a), and remain in noncompliance, BLM may order you to submit plans of operations under § 3809.401 for current and future notice-level operations.

[65 FR 70112, Nov. 21, 2000, as amended at 66 FR 54862, Oct. 30, 2001]

## § 3809.605 What are prohibited acts under this subpart?

Prohibited acts include, but are not limited to, the following:

(a) Causing any unnecessary or undue degradation;

(b) Beginning any operations, other than casual use, before you file a notice as required by § 3809.21 or receive an approved plan of operations as required by § 3809.412;

(c) Conducting any operations outside the scope of your notice or approved plan of operations;

(d) Beginning operations prior to providing a financial guarantee that meets the requirements of this subpart;

(e) Failing to meet the requirements of this subpart when you stop conducting operations under a notice (§ 3809.334), when your notice expires (§ 3809.335), or when you stop conducting operations under an approved plan of operations (§ 3809.424);

(f) Failing to comply with any applicable performance standards in § 3809.420;

(g) Failing to comply with any enforcement actions provided for in § 3809.601; or

(h) Abandoning any operation prior to complying with any reclamation required by this subpart or any order provided for in § 3809.601.

PENALTIES

## § 3809.700 What criminal penalties apply to violations of this subpart?

The criminal penalties established by statute for individuals and organizations are as follows:

(a) *Individuals.* If you knowingly and willfully violate the requirements of this subpart, you may be subject to arrest and trial under section 303(a) of FLPMA (43 U.S.C. 1733(a)). If you are convicted, you will be subject to a fine of not more than $100,000 or the alternative fine provided for in the applicable provisions of 18 U.S.C. 3571, or imprisonment not to exceed 12 months, or both, for each offense; and

(b) *Organizations.* If an organization or corporation knowingly and willfully violates the requirements of this subpart, it is subject to trial and, if convicted, will be subject to a fine of not more than $200,000, or the alternative fine provided for in the applicable provisions of 18 U.S.C. 3571.

## § 3809.701 What happens if I make false statements to BLM?

Under Federal statute (18 U.S.C. 1001), you are subject to arrest and trial before a United States District Court if, in any matter under this subpart, you knowingly and willfully falsify, conceal, or cover up by any trick, scheme, or device a material fact, or make any false, fictitious, or fraudulent statements or representations, or make or use any false writings or document knowing the same to contain any false, fictitious, or fraudulent statement or entry. If you are convicted, you will be subject to a fine of not more than $250,000 or the alternative fine provided for in the applicable provisions of 18 U.S.C. 3571 or imprisonment for not more than 5 years, or both.

APPEALS

## § 3809.800 Who may appeal BLM decisions under this subpart?

(a) A party adversely affected by a decision under this subpart may ask the State Director of the appropriate BLM State Office to review the decision.

(b) An adversely affected party may bypass State Director review and directly appeal a BLM decision under this subpart to the Office of Hearings and Appeals (OHA) under part 4 of this title. See § 3809.801.

## § 3809.801 When may I file an appeal of the BLM decision with OHA?

(a) If you intend to appeal a BLM decision under this subpart, use the following table to see when you must file a notice of appeal with OHA:

| If— | And— | Then if you intend to appeal, you must file a notice of appeal with OHA— |
| --- | --- | --- |
| (1) You do not request State Director review | | Within 30 calendar days after the date you receive the original decision. |
| (2) You request State Director review | The State Director does not accept your request for review | On the original decision within 30 calendar days of the date you receive the State Director's decision not to review. |
| (3) You request State Director review | The State Director has accepted your request for review, but has not made a decision on the merits of the appeal | On the original decision before the State Director issues a decision. |
| (4) You request State Director review | The State Director makes a decision on the merits of the appeal | On the State Director's decision within 30 calendar days of the date you receive, or are notified of, the State Director's decision. |

(b) In order for OHA to consider your appeal of a decision, you must file a notice of appeal in writing with the BLM office where the decision was made.

## § 3809.802 What must I include in my appeal to OHA?

(a) Your written appeal must contain:

    (1) Your name and address; and

    (2) The BLM serial number of the notice or plan of operations that is the subject of the appeal.

(b) You must submit a statement of your reasons for the appeal and any arguments you wish to present that would justify reversal or modification of the decision within the time frame specified in part 4 of this chapter (usually within 30 calendar days after filing your appeal).

## § 3809.803 Will the BLM decision go into effect during an appeal to OHA?

All decisions under this subpart go into effect immediately and remain in effect while appeals are pending before OHA unless OHA grants a stay under § 4.21(b) of this title.

## § 3809.804 When may I ask the BLM State Director to review a BLM decision?

The State Director must receive your request for State Director review no later than 30 calendar days after you receive or are notified of the BLM decision you seek to have reviewed.

## § 3809.805 What must I send BLM to request State Director review?

(a) Your request for State Director review must be a single package that includes a brief written statement explaining why BLM should change its decision and any documents that support your written statement. Mark your envelope "State Director Review." You must also provide a telephone or fax number for the State Director to contact you.

(b) When you submit your request for State Director review, you may also request a meeting with the State Director. The State Director will notify you as soon as possible if he or she can accommodate your meeting request.

## § 3809.806 Will the State Director review the original BLM decision if I request State Director review?

(a) The State Director may accept your request and review a decision made under this subpart. The State director will decide within 21 days of a timely filed request whether to accept your request and review the original BLM decision. If the State Director does not make a decision within 21 days on whether to accept your request for review, you should consider your request for State Director review declined, and you may appeal the original BLM decision to OHA.

(b) The State Director will not begin a review and will end an ongoing review if you or another affected party files an appeal of the original BLM decision with OHA under section § 3809.801 before the State Director issues a decision under this subpart, unless OHA agrees to defer consideration of the appeal pending a State Director decision.

(c) If you file an appeal with OHA after requesting State Director review, you must notify the State Director who, after receiving your notice, may request OHA to defer considering the appeal.

(d) If you fail to notify the State Director of your appeal to OHA, any decision issued by the State Director may be voided by a subsequent OHA decision.

## § 3809.807 What happens once the State Director agrees to my request for a review of a decision?

(a) The State Director will promptly send you a written decision, which may be based on any of the following:

(1) The information you submit;

(2) The original BLM decision and any information BLM relied on for that decision;

(3) Any additional information, including information obtained from your meeting, if any, with the State Director.

(b) Any decision issued by the State Director under this subpart may affirm the original BLM decision, reverse it completely, or modify it in part. The State Director's decision may incorporate any part of the original BLM decision.

(c) If the original BLM decision was published in the FEDERAL REGISTER, the State Director will also publish his or her decision in the FEDERAL REGISTER.

## § 3809.808 How will decisions go into effect when I request State Director review?

(a) The original BLM decision remains in effect while State Director review is pending, except that the State Director may stay the decision during the pendency of his or her review.

(b) The State Director's decision will be effective immediately and remain in effect, unless a stay is granted by OHA under § 4.21 of this title.

## § 3809.809 May I appeal a decision made by the State Director?

(a) An adversely affected party may appeal the State Director's decision to OHA under part 4 of this title, except that you may not appeal a denial of your request for State Director review or a denial of your request for a meeting with the State Director.

(b) Once the State Director issues a decision under this subpart, it replaces the original BLM decision, which is no longer in effect, and you may appeal only the State Director's decision.

PUBLIC VISITS TO MINES

## § 3809.900 Will BLM allow the public to visit mines on public lands?

Link to an amendment published at 90 FR 46080, Sept. 25, 2025.

(a) If requested by any member of the public, BLM may sponsor and schedule a public visit to a mine on public land once each year. The purpose of the visit is to give the public an opportunity to view the mine site and associated facilities. Visits will include surface areas and surface facilities ordinarily made available to visitors on public tours. BLM will schedule visits during normal BLM business hours at the convenience of the operator to avoid disruption of operations.

(b) Operators must allow the visit and must not exclude persons whose participation BLM authorizes. BLM may limit the size of a group for safety reasons. An operator's representative must accompany the group on the visit. Operators must make available any necessary safety training that they provide to other visitors. BLM will provide the necessary safety equipment if the operator is unable to do so.

(c)  Members of the public must provide their own transportation to the mine site, unless provided by BLM. Operators don't have to provide transportation within the project area, but if they don't, they must provide access for BLM-sponsored transportation.

GSCA_Add_150